## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C.  20001,

        Plaintiff,

    v.

DONALD J. TRUMP,
President of the United States
1600 Pennsylvania Avenue N.W.
Washington, D.C. 20500,

CHARLES EZELL,
Acting Director
Office of Personnel Management
1900 E Street N.W.
Washington, D.C. 20415,

PAMELA J. BONDI,
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530,

ROBERT F. KENNEDY, JR.,
Secretary
U.S. Department of Health and Human Services
200 Independence Avenue S.W.
Washington, D.C. 20201,

LEE M. ZELDIN,
Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue N.W.
Washington, D.C. 20460,

Case No. 1:25cv935

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

1

CHRISTOPHER A. WRIGHT,
Secretary
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington, D.C. 20585,

BRENDAN T. CARR,
Chairman
Federal Communications Commission
45 L Street N.E.
Washington, D.C. 20554,

SCOTT BESSENT,
Secretary
U.S. Department of Treasury
1500 Pennsylvania Avenue N.W.
Washington, D.C. 20220,

MELANIE KRAUSE,
Acting Commissioner
Internal Revenue Service
U.S. Department of Treasury
1111 Constitution Avenue N.W.
Washington, D.C. 20224,

MARGIE ROLLINSON,
Chief Counsel
Office of Chief Counsel
Internal Revenue Service
U.S. Department of Treasury
1111 Constitution Avenue N.W.
Washington, D.C. 20224,

TIMOTHY E. GRIBBEN,
Commissioner
Bureau of the Fiscal Service
U.S. Department of Treasury
3201 Pennsy Drive, Building E
Landover, MD 20785,

MARY G. RYAN,
Administrator
Alcohol and Tobacco Tax and Trade Bureau
U.S. Department of Treasury
1310 G Street N.W., Box 12
Washington, D.C. 20005,

RODNEY E. HOOD,
Acting Comptroller of the Currency
Office of the Comptroller of the Currency
U.S. Department of Treasury
400 7th Street S.W.
Washington, D.C. 20219, and

JOHN RABY,
Acting Director
Bureau of Land Management
1849 C Street N.W.
Washington, D.C. 20240,

                              Defendants.
_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

Plaintiff National Treasury Employees Union (NTEU) is a labor union that represents federal government employees in thirty-seven agencies and departments. NTEU negotiates collective bargaining agreements with agency employers, pushes for legislation that improves federal employees' working lives, and litigates disputes involving federal employees' rights.

On March 27, 2025, Defendant Donald J. Trump issued an executive order that guts Congress's federal sector collective bargaining regime. The Executive Order strips the collective bargaining rights of hundreds of thousands of federal

employees across a number of agencies. That includes nearly a dozen agencies or departments for which NTEU represents bargaining unit employees.

The heads of those agencies, who are defendants in this action along with the President and Acting Director of the Office of Personnel Management (OPM), must comply with the Executive Order. They will refuse to recognize NTEU as the duly elected exclusive representative of their bargaining unit employees. They will also cease the payroll deductions that their employees have requested for their dues payments, cutting off more than half of NTEU's revenue stream.

Congress granted federal employees collective bargaining rights. Congress gave the President narrow authority to exclude some agencies from the collective bargaining statute. But the President may use that authority only if the agency primarily does intelligence, counterintelligence, investigative, or national security work, *and* only if the statute cannot be applied "in a manner consistent with national security requirements and considerations."

The President's sweeping Executive Order is inconsistent with this narrow authority. The Administration's own issuances show that the President's exclusions are not based on national security concerns, but instead a policy objective of making federal employees easier to fire and political animus against federal sector unions. The Executive Order is therefore unlawful and must be enjoined.

## **JURISDICTION**

1.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

2.      Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e). NTEU is located in Washington, D.C. The Defendants also reside here, and a substantial part of the events or omissions giving rise to the claim occurred in Washington, D.C. because the Executive Order was issued here.

## PARTIES

3.      Plaintiff NTEU is an unincorporated association with its principal place of business at 800 K Street N.W., Suite 1000, Washington, D.C. 20001. NTEU is, pursuant to Title VII of the Civil Service Reform Act, Public Law No. 95-454, 92 Stat. 1111, the exclusive bargaining representative of nearly 160,000 federal employees in thirty-seven departments and agencies. NTEU represents the interests of these employees by enforcing employees' collective and individual rights through grievances and federal court litigation; negotiating collective bargaining agreements; filing unfair labor practice charges; and advocating in Congress for favorable working conditions, pay, and benefits. NTEU brings this action on behalf of itself because the Executive Order will harm it directly.

4.      Defendant Donald J. Trump is the President of the United States of America. On March 27, 2025, he issued an executive order terminating federal employees' collective bargaining rights in numerous offices, departments, and agencies, including the termination of, as relevant here, twelve existing collective bargaining agreements that NTEU has negotiated. Executive Order, *Exclusions*

5

*from Federal Labor-Management Relations Programs* (Mar. 27, 2025) (the Executive Order).

5.     Defendant Charles Ezell, in his official capacity as the Acting Director of OPM, will implement and guide federal agencies' compliance and implementation of the Executive Order, including the termination of collective bargaining agreements of employees represented by NTEU.

6.     Defendant Pamela J. Bondi, in her official capacity as the Attorney General of the United States Department of Justice (DOJ), will comply with the Executive Order and will take steps to implement it as described in this complaint by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of DOJ employees in two of the agency's divisions: the Environment and Natural Resources Division and the Civil Rights Division.

7.     Defendant Robert F. Kennedy, Jr., in his official capacity as the Secretary of the United States Department of Health and Human Services (HHS), will comply with the Executive Order and will take steps to implement it as described in this complaint by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of HHS employees in five of the agency's subdivisions: the Office of the Secretary, the Food and Drug Administration, the Administration for Strategic Preparedness and Response, the

Centers for Disease Control and Prevention, and the Office of Refugee Resettlement in the Administration for Children and Families.

8.    Defendant Lee M. Zeldin, in his official capacity as the Administrator of the Environmental Protection Agency (EPA), will comply with the Executive Order and will take steps to implement it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of EPA employees.

9.    Defendant Christopher A. Wright, in his official capacity as the Secretary of the United States Department of Energy (DOE), will comply with the Executive Order and will take steps to implement it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of DOE employees.

10.    Defendant Brendan T. Carr, in his official capacity as the Chairman of the Federal Communications Commission (FCC), will comply with the Executive Order and will take steps to implement it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of FCC employees.

11.    Defendant Scott Bessent, in his official capacity as the Secretary of the United States Department of Treasury (Treasury), will comply with the Executive Order and will take steps to implement it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of Treasury employees within the Internal Revenue

Service (IRS), the IRS Office of Chief Counsel (IRS-OCC), the Bureau of Fiscal

Service (BFS), the Alcohol and Tobacco Tax and Trade Bureau (TTB), the Office of

the Comptroller of the Currency (OCC), and Treasury Departmental Offices (TDO).

12.     Defendant Melanie Krause, in her official capacity as the Acting

Commissioner of the IRS, will comply with the Executive Order and will take steps

to implement it as described in this complaint, including by, for example, refusing to

recognize and interact with NTEU as the duly authorized representative of IRS

employees.

13.     Defendant Margie Rollinson, in her official capacity as the Chief

Counsel of the IRS-OCC, will comply with the Executive Order and will take steps

to implement it as described in this complaint, including by, for example, refusing to

recognize and interact with NTEU as the duly authorized representative of IRS-

OCC employees.

14.     Defendant Timothy E. Gribben, in his official capacity as the

Commissioner of the BFS, will comply with the Executive Order and will take steps

to implement it as described in this complaint, including by, for example, refusing to

recognize and interact with NTEU as the duly authorized representative of BFS

employees.

15.      Defendant Mary G. Ryan, in her official capacity as the Administrator

of the TTB, will comply with the Executive Order and will take steps to implement

it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of TTB employees.

16.     Defendant Rodney E. Hood, in his official capacity as the Acting Comptroller of the OCC, will comply with the Executive Order and will take steps to implement it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of OCC employees.

17.     Defendant John Raby, in his official capacity as the Acting Director of the Bureau of Land Management (BLM), will comply with the Executive Order and will take steps to implement it as described in this complaint, including by, for example, refusing to recognize and interact with NTEU as the duly authorized representative of BLM employees.

## STATEMENT OF CLAIMS

### I.     Congress Broadly Granted Collective Bargaining Rights to Federal Employees.

18.     Prior to 1978, an "outdated patchwork of statutes and rules built up over almost a century" governed federal employment. *United States v. Fausto*, 484 U.S. 439, 444 (1988). Congress reacted to this state of disarray through its enactment of the Civil Service Reform Act of 1978 (the Act), which "overhauled the civil service system." *Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 773 (1985).

19.     "In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had

been under the [prior] regime." *Bureau of Alcohol, Tobacco, & Firearms v. Fed. Labor Rel. Auth.*, 464 U.S. 89, 107 (1983). Thus, as a central piece of its federal civil service reform and as Title VII of the Act, Congress enacted the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101 *et seq.* (the Statute).

20.    The Statute rests on Congress's explicit finding that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest." 5 U.S.C. § 7101(a)(1).

21.    Through the Statute, Congress assigned federal sector labor organizations the job of "act[ing] for" and "negotiat[ing] collective bargaining agreements covering" not only their members, but all employees in the bargaining units that they were elected to represent. 5 U.S.C. § 7114(a).

22.    Congress gave federal sector labor unions this responsibility based upon its conclusion that the work of labor organizations "contributes to the effective conduct of public business" and "facilitates and encourages the amicable settlement of disputes between employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a)(1).

23.    The Statute generally requires bargaining over matters affecting conditions of employment. *See* 5 U.S.C. § 7103(a)(14).

24.    Congress specifically excluded some agencies or offices within agencies from the Statute, such as the Federal Bureau of Investigation. 5 U.S.C. § 7103(a)(3).

25.    The Statute gives the President narrow grounds to exclude additional agencies if he determines that an agency or subdivision has a "primary function of intelligence, counterintelligence, investigative, or national security work," *and* the Statute cannot be applied "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1) (emphasis added).

26.    The Statute requires agencies to honor dues allotment forms signed by employees who wish to voluntarily join a federal sector union and to have dues deducted from their paychecks. 5 U.S.C. § 7115.

27.    Under the Statute, NTEU must represent the interests of all employees in its bargaining units, not just the employees who choose to pay dues and become members. 5 U.S.C. § 7114(a)(1).

## II.    Presidents Have Used Their Authority Narrowly to Exclude Certain Security and Intelligence Agencies from the Statute.

28.    Presidents have issued orders exempting certain offices from the Statute, but no President has ever exempted an entire Cabinet-level agency–let alone multiple Cabinet-level agencies.

29.    Presidents have previously exempted discrete offices within agencies that clearly perform primarily security or intelligence work. In 1979, for example, President Carter exempted the Office of Intelligence Support from the Department of Treasury. Exec. Order No. 12171, 44 Fed. Reg. 66565 (Nov. 19, 1979). In 1986, President Reagan exempted the Office of Intelligence within the Drug Enforcement Administration of DOJ. Exec. Order No. 12559, 51 Fed. Reg. 18761 (May 20, 1986).

11

### III.    The President's Order Excluding Hundreds of Thousands of Federal Employees from the Statute is Baseless and Unlawful.

30.    President Trump's Executive Order strips collecting bargaining rights from three-quarters of the federal employees who are currently represented by federal sector unions. *See* Hassan Ali Kanu, Trump Moves to Strip Unionization Rights from Most Federal Workers, Politico.com (Mar. 28, 2025), www.politico.com/news/ 2025/03/28/union-rights-federal-workers-donald-trump-00257010. The Executive Order singly eliminates collective bargaining for some two-thirds of the federal workforce. *Id.*

31.    The Executive Order states that the President has determined that each of the agencies or agency components listed in the Order has "as a primary function intelligence, counterintelligence, investigative, or national security work." It further states "that chapter 71 of title 5, United States Code, cannot be applied to those agencies or agency components in a manner consistent with national security requirements and considerations."

32.    According to OPM, the agencies excluded from the Statute through the Executive Order "are no longer subject to the collective bargaining requirements of chapter 71," and the unions representing bargaining unit employees at those agencies have "los[t] their status" as the exclusive representatives for those employees. *See* OPM, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs* (Mar. 27, 2025) at 3, www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf (OPM Guidance). Thus, the OPM Guidance discusses

12

the "terminat[ion] of [] CBAs" at these agencies in the context of ending participation in negotiated grievance procedures and ending compliance with negotiated reduction-in-force articles. *Id.* at 5.

33.     NTEU represents nearly a dozen federal departments or agencies that the Executive Order excludes from the Statute's coverage. The Executive Order and OPM Guidance will lead to the termination of, as relevant here, twelve collective bargaining agreements that NTEU bargained with those departments and agencies.

a.     The Executive Order and OPM Guidance direct the IRS to disregard its current collective bargaining agreement with NTEU. The IRS and NTEU agreed that the agreement would last until September 2027.

b.     The Executive Order and OPM Guidance direct the IRS Office of Chief Counsel to disregard its current collective bargaining agreement with NTEU. The IRS Chief Counsel and NTEU agreed that the agreement would last until January 2029.

c.     The Executive Order and OPM Guidance direct HHS to disregard its current collective bargaining agreement with NTEU as to the HHS components that the Executive Order excludes from the Statute. HHS and NTEU agreed that the agreement would last until July 2028 and then further extended its duration to July 2029.

d.     The Executive Order and OPM Guidance direct DOE to disregard its current collective bargaining agreement with NTEU. DOE and NTEU agreed that the agreement would last until January 2026.

13

e. The Executive Order and OPM Guidance direct EPA to disregard its current collective bargaining agreement with NTEU. EPA and NTEU agreed that the agreement would last until December 2028.

f. The Executive Order and OPM Guidance direct FCC to disregard its current collective bargaining agreement with NTEU. FCC and NTEU agreed that the agreement would last until March 2030.

g. The Executive Order and OPM Guidance direct OCC to disregard its current collective bargaining agreement with NTEU. OCC and NTEU agreed that the agreement would last until February 2028.

h. The Executive Order and OPM Guidance direct Treasury to disregard its current collective bargaining agreement covering its departmental offices with NTEU. Treasury and NTEU agreed that the agreement would last until June 2025.

i. The Executive Order and OPM Guidance direct TTB to disregard its current collective bargaining agreement with NTEU. TTB and NTEU agreed that the agreement would last until January 2027.

j. The Executive Order and OPM Guidance direct BLM to disregard its current collective bargaining agreements with NTEU. That direction eliminates three collective bargaining agreements. For one part of BLM, NTEU and BLM agreed that an interim collective bargaining agreement would last until a comprehensive collective bargaining agreement became effective. For a second part of BLM, the parties agreed that the collective bargaining agreement would last

until January 2028. For a third part of BLM, the parties agreed that the collective

bargaining agreement would last until February 2030.

k. The Executive Order and OPM Guidance direct BFS to

disregard its current collective bargaining agreement with NTEU. BFS and NTEU

agreed that the agreement would last until August 2025.

### A. None of the NTEU-Represented Agencies Excluded from the Statute Has a Primary Function of Intelligence, Counterintelligence, Investigative, or National Security Work.

34. The IRS does not primarily perform security, investigative, or

intelligence work. The IRS is the revenue service for the federal government,

responsible for collecting federal taxes and administering the Internal Revenue

Code. NTEU-represented employees at IRS do not primarily perform security,

investigative, or intelligence work. They provide tax assistance to taxpayers,

conduct taxpayer audits, and collect overdue tax revenue.

35. The IRS Office of Chief Counsel does not primarily perform security,

investigative, or intelligence work. NTEU-represented employees at the Office of

Chief Counsel do not primarily perform security, investigative, or intelligence work.

They provide legal guidance and interpretive advice to the IRS, to Treasury, and to

taxpayers; and coordinate the IRS's position in litigation.

36. The HHS components that the Executive Order excludes from the

Statute and that NTEU represents—the Office of the Secretary, the Food and Drug

Administration, the Administration for Strategic Preparedness and Response, the

Centers for Disease Control and Prevention, and the Office of Refugee Resettlement

in the Administration for Children and Families—do not primarily perform security, investigative, or intelligence work. Those components administer social service programs, civil rights and healthcare programs, and programs that assure food and drug safety and efficacy. NTEU-represented employees at those components of HHS do not primarily perform security, investigative, or intelligence work. They provide guidance and assistance on HHS's priorities; oversee state administration of HHS's programs; and inspect food and drugs.

37.    BFS does not primarily perform security, investigative, or intelligence work. BFS functions primarily to manage the government's accounting and federal centralized payment systems, and to reduce public debt. NTEU-represented employees at BFS do not primarily perform security, investigative, or intelligence work. They ensure that Americans receive their federal government payments on time.

38.    BLM does not primarily perform security, investigative, or intelligence work. BLM's primary function is to sustain the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations. NTEU-represented employees at BLM do not primarily perform security, investigative, or intelligence work. They manage public lands for various purposes, including energy development, livestock grazing, recreation, and resource conservation; and maintain natural, cultural, and historic resources.

39.    EPA does not primarily perform security, investigative, or intelligence work. EPA ensures compliance with and the fair administration of environmental

16

laws; conserving national resources; and repairing and reversing harmful environmental trends, where possible. NTEU-represented employees at EPA conduct studies and research on environmental issues; develop and enforce environmental regulations; and provide technical assistance.

40.     FCC does not primarily perform security, investigative, or intelligence work. FCC regulates interstate and international communications by radio, television, wire, satellite, and cable across the nation. NTEU-represented employees at FCC do not primarily perform security, investigative, or intelligence work. They review and act on license applications for radio, enforce FCC rules regarding construction and operation of communications systems, and respond to consumer inquiries.

41.     Treasury's departmental offices do not primarily perform security, investigative, or intelligence work. These offices guide Treasury's policies. NTEU-represented employees at Treasury's departmental offices do not primarily perform security, investigative, or intelligence work. They are non-professional employees who provide logistical and mission support, such as assuring adequate supplies, equipment, and mail services; distributing mail; and performing building repairs.

42.     OCC does not primarily perform security, investigative, or intelligence work. OCC ensures that national banks and federal savings associations operate in a safe and sound manner and provide fair access to financial services. NTEU-represented employees at OCC do not primarily perform security, investigative, or

intelligence work. They examine banks to ensure they are complying with banking rules and regulations that protect consumers.

43.     TTB does not primarily perform security, investigative, or intelligence work. TTB collects taxes on alcohol, tobacco, firearms, and ammunition; ensures the integrity of alcohol products; ensures that only qualified businesses enter the alcohol and tobacco industries; and prevents unfair and unlawful market activity for alcohol and tobacco products. NTEU-represented employees at TTB do not primarily perform security, investigative, or intelligence work. They are responsible for reviewing applications for permits for beer, wine, and spirits producers and manufacturers; and investigating those entities for product integrity, tax collection, and compliance.

44.     DOE does not primarily perform security, investigative, or intelligence work. DOE is responsible for ensuring that the United States has access to reliable, affordable, and cleaner sources of energy. Its work includes advancing energy technologies, managing the nation's energy resources, and addressing environmental impacts from past energy-related activities. NTEU-represented employees at DOE do not primarily perform security, investigative, or intelligence work. They evaluate the effectiveness and efficiency of DOE programs and provide information and advice to DOE management on the agency's programs and operations.

45.     The DOJ components that the Executive Order excludes from the Statute and that NTEU represents—the Environment and Natural Resources

Division and the Civil Rights Division—do not primarily perform security, investigative, or intelligence work. The Environment and Natural Resources Division is responsible for bringing cases against those who violate the nation's environmental laws as well as defending the federal government in litigation arising under a broad range of environmental statutes. Those in the Civil Rights Division work to uphold the civil and constitutional rights of all persons in the United States and enforce federal statutes prohibiting discrimination. NTEU-represented employees in these two DOJ divisions do not primarily perform security, investigative, or intelligence work. They are attorneys who enforce the laws that their division is charged with upholding.

**B.      The Statute Can Be—and Has Been—Applied to the Excluded Agencies that NTEU Represents in a Manner Consistent with National Security Requirements and Considerations.**

46.     NTEU has represented bargaining unit workers at the IRS since before the Statute was enacted. The IRS has approximately 76,892 bargaining unit employees who NTEU represents. It is NTEU's largest bargaining unit and has more dues-paying members than any other NTEU-represented agency or department. For the nearly half-century that the Statute has been in place, the IRS has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

47.     NTEU has represented bargaining unit workers at the IRS Office of Chief Counsel since March 1987. During that period, the IRS Office of Chief

Counsel has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

48.     NTEU has represented bargaining unit workers at HHS since November 1978. During that period, HHS has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

49.     NTEU has represented bargaining unit workers at the FCC since July 1978. During that period, the FCC has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

50.     NTEU has represented bargaining unit workers at DOE since January 1979. During that period, DOE has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

51.     NTEU has represented bargaining unit workers at BFS since April 1985. During that period, BFS has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

52.     NTEU has represented bargaining unit workers at the EPA since April 1998. During that period, the EPA has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

53.     NTEU has represented bargaining unit workers at Treasury's departmental offices since May 2002. During that period, Treasury's departmental offices have fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

54.     NTEU has represented bargaining unit workers at OCC since November 2002. During that period, OCC has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

55.     NTEU has represented bargaining unit workers at TTB since October 2003. During that period, TTB has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests.

56.     NTEU has represented bargaining unit workers at BLM since February 2021. During that period, BLM has fallen within the Statute's coverage and had a collective bargaining agreement with NTEU without any adverse effect on national security interests. BLM has three different collective bargaining agreements with NTEU, each covering a different portion of the agency.

57.     NTEU has represented bargaining unit workers at DOJ since January 2025.  During that period, DOJ has fallen within the Statute's coverage without any adverse effect on national security interests.

**C.     The Actual Motivations for the President's Mass Exclusion of Agencies from the Statute Have Nothing to do with National Security.**

58.     The OPM Guidance on the Executive Order shows that the President's primary motivation for the mass exclusion of agencies from the Statute's coverage is to make their employees easier to fire.

59.     The first section of the OPM Guidance falls under the heading "Performance Accountability," which is aimed at "facilitat[ing] the separation of underperforming employees." OPM Guidance at 3. That section states, "[a]gency CBAs often create procedural impediments to separating poor performers beyond those required by statute or regulation." *Id.* OPM thus presents the reason for the President's mass exclusion of agencies from the Statute's coverage: nullifying those agencies' collective bargaining agreements (CBAs), so that they will no longer impede firing employees.

60.     Indeed, the OPM Guidance on the Executive Order references the larger context:  the President's direction to agencies "to prepare large-scale reductions in force (RIFs)." OPM Guidance at 5. Now, with the Executive Order's issuance, OPM advises that agencies can "conduct RIFs . . . without regard to provisions in terminated CBAs that go beyond [statutory and regulatory] requirements." *Id.*

61.     The White House's Fact Sheet on the Executive Order further demonstrates that the objective of the Executive Order is to facilitate the firing of federal employees. The Fact Sheet indicates that the Civil Service Reform Act, of

22

which the Statute is one part, "enables hostile Federal unions to obstruct agency management," citing, among other examples, union litigation leading to the reinstatement of employees who had been fired. *See* Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/.

62.    The same White House Fact Sheet reveals the secondary motivation for the Executive Order: political retribution. In justifying the Executive Order, the Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda." It continues, "[t]he largest Federal union describes itself as 'fighting back' against Trump. It is widely filing grievances to block Trump policies." It then adds that this union has "filed 70 national and local grievances over President Trump's policies since the inauguration—an average of over one a day."

63.    NTEU is one of the federal unions that has fought back against President's Trump's agenda. It has filed lawsuits in federal district court against Executive Order No. 14171, Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce (Jan. 20, 2025) (*NTEU v. Trump*, No. 25-cv-170 (D.D.C.)); the Administration's attempt to dismantle the Consumer Financial Protection Bureau (CFPB) (*NTEU v. Vought*, No. 25-cv-381 (D.D.C.)); the Department of Government Efficiency's access of Privacy Act-protected

information at the CFPB (*NTEU v. Vought*, No. 25-cv-380 (D.D.C.)); and the Administration's attempt to hobble the federal civil workforce overall through mass firings of probationary employees, reductions-in-force, and a pressure campaign to get federal workers to resign their positions (*NTEU v. Trump*, 25-cv-420 (D.D.C.)). NTEU has also filed dozens of grievances in response to the Trump Administration's actions against federal workers.

64.    The Executive Order targets about a dozen different collective bargaining relationships that NTEU has with federal agencies and departments.

65.    Indeed, the morning after the Executive Order issued, the Administration sued an NTEU chapter in a federal district court seeking a judgment that the Department of Treasury may rely on the Executive Order to terminate the IRS's collective bargaining agreement with NTEU. This preemptive lawsuit filed in the U.S. District Court for the Eastern District of Kentucky shows the aggressiveness with which the Executive Branch is targeting NTEU. *See Dep't of Treasury v. NTEU Chapter 73*, No. 25-cv-49 (E.D. Ky.).

66.    Neither facilitating employee firings nor political retribution is an appropriate basis for invoking Section 7103(b)(1)'s national security exemption. These are nonetheless the President's declared bases for excluding about two-thirds of the federal workforce from the Statute through this narrow exemption.

67.    Underscoring the Executive Order's improper application of Section 7103(b)(1)'s national security exemption is the Executive Branch's inconsistency on whether the NTEU-represented employees excluded from the Statute through the

Executive Order do national security work. In January 2025, NTEU-represented employees in each of the agencies or agency components at issue here received an offer to participate in this Administration's "deferred resignation program." And NTEU-represented employees in each of the agencies or agency components at issue here accepted that offer and had their applications processed. But the Administration's deferred resignation program was not available to employees in "positions related to . . . national security." *See* OPM, *Guidance Regarding Deferred Resignation Program* (Jan. 28, 2025) at 3, www.opm.gov/media/3oaf3vs0/opm-guidance-memo-re-deferred-resignation-program-01-28-25-final.pdf. Thus, the Administration's view is that these NTEU-represented employees do not have a nexus to national security for purposes of the deferred resignation program—but must nonetheless be excluded from the Statute through Section 7103(b)(1)'s national security exemption.

## IV. The Executive Order Will Cause NTEU Severe and Immediate Harm.

68. The Executive Order will immediately and drastically reduce the number of employees that NTEU represents and prevent NTEU from collecting dues from those members via payroll deduction. This will threaten NTEU's very existence and will severely diminish NTEU's influence at the bargaining table.

### A. Financial Harm

69. In fiscal year 2024, member dues accounted for approximately 84.5% of NTEU's total revenue. NTEU gets 94% of its dues revenue through its members'

payroll deductions. Member dues paid through payroll deductions thus amount to 79.9% of NTEU's total annual revenue.

70.    The Executive Order will exclude about 60,000 dues-paying members from the Statute's coverage. Those members' dues payments reflect approximately 60% of NTEU's total dues revenue.

71.    The OPM Guidance directs agencies that are excluded from the Statute through the Executive Order to stop using payroll deductions for dues payments to unions. This will stop the flow of nearly all (approximately 94%) of the dues revenue from roughly 60,000 NTEU members. NTEU will also lose the interest it would otherwise earn on that revenue in its accounts. The Department of Interior, which encompasses BLM, has notified NTEU that it will stop processing dues deductions via payroll effective immediately.

72.    Even if collective bargaining rights were restored to employees at a later point, there is no mechanism under which NTEU can require employees whose automatic dues withholding stopped to pay back dues for a period in which those employees lacked collective bargaining rights.

73.    The loss of these dues will adversely affect NTEU's ability to carry out its mission. Even for NTEU-represented agencies that remain within the Statute's coverage, NTEU will have less money available for staff to assist employees with grievances; to file litigation on employees' behalf; to advocate for employees on Capitol Hill; and to negotiate collective bargaining agreements.

**B.**    **Loss of Bargaining Power**

74.    At the end of December 2024, NTEU represented about 158,000 employees in bargaining units across thirty-seven federal agencies and departments.

75.    The Executive Order will reduce the number of employees in NTEU's bargaining units represented by over 100,000 employees. The Executive Order thus decreases the number of employees who NTEU represents by roughly two-thirds.

76.    The strength and influence of any union correlate directly with the size of its membership. NTEU, for example, is the nation's largest independent federal sector union and the second largest federal sector union overall. NTEU regularly tells its employees, agencies, Congress, courts, and the public that it represents over 150,000 employees in thirty-seven agencies across the government.

77.    Because the Executive Order will substantially reduce the number of employees that NTEU represents, the union's influence in negotiating agreements with other agencies or lobbying Congress for benefits that help federal employees will be diminished.

## CAUSES OF ACTION

**Count 1:    The President's Executive Order, Section 2 is unlawful and *ultra vires* because it conflicts with 5 U.S.C. § 7103(b)(1).**

78.    NTEU reasserts the allegations contained in paragraphs 1 through 77 of this complaint as though contained herein.

79.    Courts have jurisdiction to grant relief when the President acts beyond the scope of his authority and violates the law, to the injury of an individual or organization.

80.    A President can exclude an agency from the Statute *only* if the agency has "as a primary function intelligence, counterintelligence, investigative, or national security work" *and* if the Statute cannot be applied "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

81.    None of the federal agencies or agency components described above meet the requirements of 5 U.S.C. § 7103(b)(1). They therefore cannot be excluded from the Statute using this narrow exception.

82.    The President's own Fact Sheet regarding his Executive Order underscores that the Order's exclusions from the Statute were not based on Section 7103(b)(1)'s criteria. They were instead based on a policy goal of making federal employees easier to fire and political animus against federal sector unions who have opposed the Trump Administration's initiatives. These considerations are an improper basis for exclusions under Section 7103(b)(1).

**<u>Count 2</u>:   The President's Executive Order, Section 2 is unlawful and *ultra vires* because it conflicts with 5 U.S.C. Chapter 71.**

83.    NTEU reasserts the allegations contained in paragraphs 1 through 82 of this complaint as though contained herein.

84.     Courts have jurisdiction to grant relief when the President acts beyond the scope of his authority and violates the law, to the injury of an individual or organization.

85.     Before the Executive Order at issue here, no President had ever used the Statute's narrow national security exemption in Section 7103(b)(1) to exempt an entire Cabinet-level agency from the Statute. But this Executive Order exempts *six*, nearly one-half of all Cabinet-level agencies. It excludes some two-thirds of the federal workforce and three-fourths of workers who are currently represented by unions from the Statute.

86.     The Executive Order's attempt to largely nullify the Statute through the Statute's national security exemption conflicts with Congress's intent in enacting the Statute: to facilitate and strengthen collective bargaining—and to do so statutorily to guard against a President altering it materially.

87.     Congress enacted the Statute to facilitate and to strengthen collective bargaining in the federal sector (*Bureau of Alcohol, Tobacco, & Firearms*, 464 U.S. at 107), codifying its finding that collective bargaining is in the public interest in the Statute's initial section (5 U.S.C. § 7101(a)).

88.     Congress's explicit aim with the Statute was to create a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. Clay).

89.    The President cannot use the Statute's narrow national security exemption to undo the bulk of the Statute's coverage. His sweeping Executive Order thus conflicts with the Statute itself.

**Count 3:   The President's Executive Order, Section 2 is unlawful because it reflects retaliation in violation of NTEU's First Amendment rights.**

90.    Plaintiff reasserts the allegations contained in paragraphs 1 through 89 of this complaint as though contained herein.

91.    "[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018).

92.    NTEU's litigation against the Trump Administration's actions is protected speech and petitioning activity. *See, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-49 (2000) ("advocacy by [an] attorney to the courts" is "speech and expression" that enjoys First Amendment protection); *McDonald v. Smith*, 472 U.S. 479, 484 (1985) (holding that "filing a complaint in court is a form of petitioning activity" that the First Amendment protects).

93.    The Executive Order retaliates against NTEU for that protected First Amendment activity. Indeed, the White House's Fact Sheet on the Executive Order proclaims the Order's retaliatory motive. To justify the Executive Order, the Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda." Prior to this lawsuit, NTEU filed four other federal district court lawsuits challenging the Trump's Administration's execution of high priority policy objectives. That included legal challenges to the Trump Administration's attempts

to reduce the federal workforce through mass firings and resignations and to the Administration's attempt to dismantle the CFPB.

94.    The Executive Order plainly punishes NTEU for its legal challenges to this Administration's actions, cancelling, as relevant here, twelve of NTEU's collective bargaining relationships, including NTEU's largest and longest one at the IRS. The Order eliminates NTEU's ability to serve as the exclusive bargaining representative for more than half of its membership.

95.    The Executive Order thus "constitutes a sufficiently adverse action" against NTEU "to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The Order, in other words, "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Connelly v. Cnty. of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023).

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff NTEU requests judgment against the defendants:

A.      Declaring that Section 2 of the Executive Order is unlawful as applied to the Defendants who are heads of NTEU-represented agencies.

B.      Declaring that the OPM Guidance on the Executive Order is unlawful as applied to the Defendants who are heads of NTEU-represented agencies.

C.      Enjoining all Defendants other than President Trump from implementing Section 2 of the Executive Order.

D.      Enjoining all Defendants other than President Trump from implementing the OPM Guidance on the Executive Order.

E.      Awarding Plaintiffs reasonable attorney fees and costs incurred.

F.      Ordering such further relief as the Court may deem just and appropriate.

Respectfully submitted,

*/s/ Julie M. Wilson*
JULIE M. WILSON
General Counsel
D.C. Bar 482946

*/s/ Paras N. Shah*
PARAS N. SHAH
Deputy General Counsel
D.C. Bar 983881

*/s/ Allison C. Giles*
ALLISON C. GILES
Assistant Counsel
D.C. Bar 439705

*/s/ Lindsay Dunn*
LINDSAY DUNN (pro hac vice application
forthcoming)
Assistant Counsel
N.Y. Bar 4574224

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C.  20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
lindsay.dunn@nteu.org

March 31, 2025          Attorneys for Plaintiff NTEU