# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C. 20001,

                Plaintiff,

    v.

DONALD J. TRUMP,
President of the United States
1600 Pennsylvania Avenue N.W.
Washington, D.C. 20500, *et al.*,

                Defendants.

Case No. 1:25-cv-00935 (PLF)

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFF NTEU'S
## <u>MOTION FOR A PRELIMINARY INJUNCTION</u>

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES .......................................................................................iii

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 2

   I.   Congress's Broad Grant of Collective Bargaining Rights to Federal Workers. 2

   II.   The President's Sweeping Executive Order Cancelling Most of the Federal
       Workforce's Statutory Collective Bargaining Rights Through the Narrow
       National Security Exemption ................................................................................. 4

   III.   The Administration's Admitted Motivations Behind the Executive Order:
        Making Federal Employees Easier To Fire and Effecting Political Retribution
        Against Unions Speaking Out Against the President's Agenda ...................... 6

ARGUMENT ................................................................................................................ 9

   I.   NTEU's Claims Will Likely Succeed. ................................................................ 9

      A.   The Executive Order's Exclusion of the NTEU-Represented Agencies at
          Issue Is Ultra Vires Because Those Agencies Do Not Plausibly Fit Within
          the Statute's Narrow National Security Exemption and the
          Administration's Issuances Show Improper Motives for Exclusion. .......... 10

         1.   The President's Exclusions of the NTEU-Represented Agencies at Issue
            Are Baseless. ..................................................................................... 10

           a.   IRS. .................................................................................... 11

           b.   IRS Office of Chief Counsel............................................... 12

           c.   Health and Human Services. ............................................. 13

           d.   Federal Communications Commission. ............................. 14

           e.   Department of Energy........................................................ 15

           f.   Bureau of Fiscal Services. .................................................. 16

           g.   Environmental Protection Agency..................................... 16

           h.   Treasury's Departmental Offices....................................... 17

　　　　i.　　Office of the Comptroller of the Currency. ........................................ 18

　　　　j.　　Alcohol and Tobacco Tax and Trade Bureau. .................................... 19

　　　　k.　　Bureau of Land Management. ............................................................. 20

　　　　l.　　Department of Justice. ...................................................................... 20

　　2.　　The President Relied on Improper Bases for His Exclusions. ............... 21

B.　　The Executive Order Is Ultra Vires Because It Attempts to Nullify the Statute. .................................................................................................. 24

C.　　The Executive Order Is First Amendment Retaliation, as the White House's Own Fact Sheet Effectively Concedes. ......................................... 26

II.　　NTEU Will Suffer Irreparable Harm Absent Prompt Preliminary Injunctive Relief. ........................................................................................................ 30

A.　　The Executive Order Is Causing NTEU Severe Financial Harm. ............... 30

B.　　The Executive Order Irreparably Harms NTEU's Bargaining Power. ....... 32

C.　　The Executive Order's Violation of NTEU's First Amendment Rights Is Irreparable Harm. .................................................................................... 33

III.　　The Balance of Equities Tips in NTEU's Favor, and the Public Interest Will Be Served by Prompt Preliminary Injunctive Relief. ..................................... 35

CONCLUSION. .............................................................................................. 36

## TABLE OF AUTHORITIES

*AFGE v. Reagan*, 870 F.2d 723 (D.C. Cir. 1989) ......................................................... 24

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) ........................................................ 26-27

*Bailey v. Fed. Bureau of Prisons*, No. 24-1219, 2024 U.S. Dist. LEXIS 114113
    (D.D.C. June 28, 2024) ................................................................................. 34

*Bureau of Alcohol, Tobacco, & Firearms v. Fed. Labor Rel. Auth.*,
    464 U.S. 89 (1983) .................................................................................. 3, 25

*Cigar Ass'n of Am. v. U.S. FDA*, 317 F. Supp. 3d 555 (D.D.C. 2018) ....................... 34

*Connelly v. Cnty. of Rockland*, 61 F.4th 322 (2d Cir. 2023) ................................. 27-28

*Dep't of Treasury v. NTEU Ch. 73*, No. 25-cv-49 (E.D. Ky.) ........................... 9, 29, 30

*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009) ......................................................... 28

*Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022) ............................................. 27

*In re American Fed'n of Gov't Emps.*, 790 F.2d 116 (D.C. Cir. 1986) ....................... 33

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) ....................................................... 25

*Int'l Union of Elec., Radio & Machine Workers v. NLRB*,
    426 F.2d 1243 (D.C. Cir. 1970) ...................................................................... 33

*Kohli v. Gonzales*, 473 F.3d 1061 (9th Cir. 2007) ..................................................... 10

*Latif v. Obama*, 666 F.3d 746 (D.C. Cir. 2011) ......................................................... 10

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) ............................................. 27

*Lindahl v. OPM*, 470 U.S. 768 (1985) ........................................................................ 3

*Local Union No. 5741, United Mine Workers v. NLRB*,
    865 F.2d 733 (6th Cir. 1989) .......................................................................... 30

*Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018) ............................................... 26

*Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174 (D.D.C. 2021) ........... 31-32

*McDonald v. Smith*, 472 U.S. 479 (1985) ................................................................. 27

*New Mexico ex rel. v. Richardson*, 39 F. Supp. 2d 48 (D.D.C. 1999) ......................... 9

*Nieves v. Bartlett*, 587 U.S. 391 (2019) .......................................................... 28

*NTEU v. Trump*, No. 25-cv-170 (D.D.C.) .................................................. 8, 29

*NTEU v. Trump*, No. 25-cv-420 (D.D.C.) .................................................. 8, 29

*NTEU v. Vought*, No. 25-cv-380 (D.D.C.) ................................................. 8, 29

*NTEU v. Vought*, No. 25-cv-381 (D.D.C.) ................................................. 8, 29

*OPM v. FLRA*, 864 F.2d 165 (D.C. Cir. 1988) ............................................. 25

*Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9 (D.D.C. 2013) ........ 9, 30

*Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022) ............................................. 35

*United States v. Fausto*, 484 U.S. 439 (1988) ..........................................2-3

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
    No. 25-917, 2025 U.S. Dist. LEXIS 61536 (D.D.C. Mar. 28, 2025) ........... 31, 33, 36

*Wisconsin Gas Co. v. Fed. Eng. Reg. Comm.*, 758 F.2d 669 (D.C. Cir. 1985) ............ 31

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977) ..................................................................... 9

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................................ 25

**Statutes**

5 U.S.C. § 7101 *et seq.*....................................................................................... 3

5 U.S.C. § 7101(a) ................................................................... 3, 24, 34, 35

5 U.S.C. § 7103(a)(3) ...................................................................................... 4

5 U.S.C. § 7103(a)(12) ................................................................................... 3

5 U.S.C. § 7103(b)(1) .............................................................................*passim*

5 U.S.C. § 7114(a) .......................................................................................... 4

**Executive Orders**

Executive Order, *Exclusions from Federal Labor-Management Relations Programs*
    (Mar. 27, 2025)...................................................................................*passim*

Executive Order No. 12,171, *Exclusions from the Federal Labor-Management Relations Program*, 44 Fed. Reg. 66565 (Nov. 19, 1979)........................................ 4

Executive Order No. 12,559, *Exclusions From the Federal Labor-Management Relations Program*, 51 Fed. Reg. 18761 (May 20, 1986)........................................ 4

Executive Order No. 14,171, *Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*, 90 Fed. Reg. 8625 (Jan. 20, 2025)......................... 8

Executive Order No. 14,210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, 90 Fed. Reg. 9669 (Feb. 11, 2025) ...................................................................................... 22

## Other Authorities

124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) .................................................. 25, 26

*About ASPR*, Admin. for Strategic Preparedness & Response, https://aspr.hhs.gov/AboutASPR/ProgramOffices/Pages/ProgramOffice.aspx (last visited Apr. 1, 2025) ........................................................................................ 13

*About CDC*, U.S. Ctrs. for Disease Control & Prevention, https://www.cdc.gov/about/cdc/index.html (last updated Feb. 12, 2024) ............. 13

*About the Office of Energy Efficiency and Renewable Energy*, U.S. Dep't of Energy, https://www.energy.gov/eere/about-office-energy-efficiency-and-renewable-energy (last visited Apr. 2, 2025) ...................................................................................... 15

*About TTB*, Alcohol & Tobacco Tax & Trade Bureau, https://www.ttb.gov/about-ttb (last updated Feb. 3, 2021)...................................................................................... 19

*About Us*, Bureau of the Fiscal Serv., https://fiscal.treasury.gov/about.html (last modified Jan. 23, 2025) ........................................................................................ 16

*Environment and National Resources Division*, Env't & Natural Res. Div., U.S. Dep't of Justice, https://www.justice.gov/enrd (last visited Apr. 1, 2025)............ 21

Charles Ezell, *Guidance Regarding Deferred Resignation Program*, OPM (Jan. 28, 2025)........................................................................................................................ 11

Charles Ezell, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs*, OPM (Mar. 27, 2025)..............................................*passim*

Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025) ........................................................................................................................*passim*

Hassan Ali Kanu, *Trump Moves to Strip Unionization Rights from Most Federal Workers*, Politico.com (Mar. 28, 2025), www.politico.com/news/ 2025/03/28/union-rights-federal-workers-donald-trump-00257010 ............................................... 5, 24

*Immediate Office of the Secretary (IOS)*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/about/agencies/staff-divisions/immediate-office-secretary/index.html (last updated Mar. 12, 2024) ............................................... 13

*Internal Revenue Manual* 1.1.6.1 (June 18, 2015) ...................................................... 12

*IRS, The agency, its mission and statutory authority*, IRS, https://www.irs.gov/about-irs/the-agency-its-mission-and-statutory-authority (last updated Mar. 25, 2025). .................................................................................. 12

*Mission*, U.S. Dep't of Energy, https://www.energy.gov/mission (last visited Apr. 2, 2025) ........................................................................................................................ 15

*Organization and Functions*, U.S. Dep't of the Treasury, https://home.treasury.gov/about/history/history-overview/organization-and-functions (last visited Apr. 2, 2025) ........................................................... 17

*Our Mission and What We Do*, U.S. Env't Prot. Agency, https://www.epa.gov/aboutepa/our-mission-and-what-we-do (last updated Feb. 28, 2025) .................................................................................................. 17

*Our Mission*, U.S. Dep't of the Interior, Bureau of Land Mgmt., https://www.blm.gov/about/our-mission (last visited Apr. 1, 2025) .................... 20

*Our Work*, Civil Rights Div., U.S. Dep't of Justice, https://www.justice.gov/crt/our-work (last updated Mar. 12, 2025) ........................................................................ 21

Russel Vought, *Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative*, OPM (Feb. 26, 2025) ...................................... 22

*What We Do*, Fed. Commc'ns Comm'n, https://www.fcc.gov/about-fcc/what-we-do (last visited Apr. 2, 2025) ............................................................................... 14

*What We Do*, Office of Refugee Resettlement, An Office of the Admin. for Children & Families, https://acf.gov/orr/about (last updated Nov. 21, 2024) ........................ 13

*What We Do*, Office of the Comptroller of the Currency, https://www.occ.gov/about/what-we-do/index-what-we-do.html (last visited Apr. 2, 2025) .................................................................................................... 18

*Who We Are*, Office of the Comptroller of the Currency,
   https://www.occ.gov/about/who-we-are/index-who-we-are.html (last visited
   Apr. 2, 2025). ..................................................................................................... 18

*What We Do*, U.S. Food & Drug Admin., https://www.fda.gov/about-fda/what-we-do
   (last updated Nov. 21, 2023) ............................................................................... 13

## **INTRODUCTION**

Plaintiff National Treasury Employees Union (NTEU) is a labor union that represents nearly 160,000 federal government employees in thirty-seven agencies and departments.

On the evening of March 27, 2025, Defendant Donald J. Trump issued an unprecedented executive order that guts Congress's federal sector collective bargaining regime. The executive order, titled *Exclusions from Labor-Management Relations Program* (the Executive Order), strips the collective bargaining rights of hundreds of thousands of federal employees across a number of agencies. That includes nearly a dozen agencies or departments for which NTEU represents bargaining unit employees.

The heads of those agencies, who are defendants in this action along with the President and Acting Director of the Office of Personnel Management (OPM), will comply with the Executive Order. They will refuse to recognize NTEU as the duly elected exclusive representative of their bargaining unit employees—as some are already doing. They will also cease the payroll deductions that their employees have requested for their union dues payments—as some have already started to do. NTEU will imminently lose two-thirds of the employees that it represents and more than half its revenue stream.

Congress granted federal employees collective bargaining rights. Congress gave the President narrow authority to exclude some agencies from the collective bargaining statute. But the President may use that authority only if the agency

primarily does intelligence, counterintelligence, investigative, or national security work, *and* only if the statute cannot be applied "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

The President's sweeping Executive Order is inconsistent with the narrow exception that Congress provided. None of the NTEU-represented agencies that the Order targets—including the Internal Revenue Service, Health and Human Services, and the Environmental Protection Agency—do national security or intelligence work. Indeed, the Administration's own issuances show that the President's exclusions are not based on national security concerns, but instead a desire to make federal employees easier to fire and to weaken federal sector unions. The Executive Order is therefore unlawful.

NTEU seeks preliminary relief to protect the workers it represents from the President's unprecedented and sweeping attempt to de-unionize two-thirds of the federal workforce. Absent preliminary relief, NTEU's very existence will be threatened, and its bargaining power and influence at agencies where it still represents workers will be diminished in a way that cannot be undone. NTEU thus asks this Court to preliminarily enjoin Section 2 of the Executive Order and OPM's guidance on the Order's implementation.

## **BACKGROUND**

### I.    **Congress's Broad Grant of Collective Bargaining Rights to Federal Workers**

Prior to 1978, an "outdated patchwork of statutes and rules built up over almost a century" governed federal employment. *United States v. Fausto*, 484 U.S.

439, 444 (1988). Congress reacted to this state of disarray through its enactment of the Civil Service Reform Act of 1978 (the Act), which "overhauled the civil service system." *Lindahl v. OPM*, 470 U.S. 768, 773 (1985).

"In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had been under the [prior] regime." *Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Rels. Auth.*, 464 U.S. 89, 107 (1983) (*BATF*). Thus, as a central piece of its federal civil service reform and as Title VII of the Act, Congress enacted the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101 *et seq.* (the Statute).

The Statute rests on Congress's explicit finding that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest." 5 U.S.C. § 7101(a). Congress codified its conclusion that the work of labor organizations "contributes to the effective conduct of public business" and "facilitates and encourages the amicable settlement of disputes between employees and their employers involving conditions of employment." *Id.*

The Statute generally requires federal agencies to bargain with labor organizations over matters affecting conditions of employment. *See* 5 U.S.C. § 7103(a)(12). Through the Statute, Congress assigned federal sector labor organizations the job of "act[ing] for" and "negotiat[ing] collective bargaining agreements covering" not only their members, but all employees in the bargaining

units that they were elected to represent. 5 U.S.C. § 7114(a).

Congress specifically excluded some agencies or offices within agencies from the Statute, such as the Federal Bureau of Investigation. 5 U.S.C. § 7103(a)(3). The Statute gives the President narrow grounds to exclude additional agencies if he determines that an agency or subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work," *and* the Statute cannot be applied "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

Presidents have used this narrow authority to exempt discrete offices within agencies that clearly perform primarily national security or intelligence work. In 1979, for example, President Carter exempted the Office of Intelligence Support from the Department of Treasury. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 19, 1979). In 1986, President Reagan exempted the Office of Intelligence within the Drug Enforcement Administration of the Department of Justice. Exec. Order No. 12,559, 51 Fed. Reg. 18,761 (May 20, 1986).

## II.    The President's Sweeping Executive Order Cancelling Most of the Federal Workforce's Statutory Collective Bargaining Rights Through the Narrow National Security Exemption

Before last week, no president had ever attempted to use Section 7103(b)(1)'s narrow national security exemption to exclude an entire Cabinet-level agency from the Statute—let alone multiple Cabinet-level agencies. President Trump's Executive Order, though, strips collecting bargaining rights from three-quarters of

the federal employees who are currently represented by federal sector unions.[1] The Executive Order singly eliminates collective bargaining for some two-thirds of the federal workforce. *Id.*

The Executive Order states that the President has determined that each of the agencies or agency components listed in the Order has "as a primary function intelligence, counterintelligence, investigative, or national security work."[2] It further states "that Chapter 71 of title 5, United States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." *Id.*

According to OPM, the agencies excluded from the Statute through the Executive Order "are no longer subject to the collective bargaining requirements of chapter 71," and the unions representing bargaining unit employees at those agencies have "los[t] their status" as the exclusive representatives for those employees.[3] Thus, the OPM Guidance discusses the "terminat[ion of] CBAs" at these agencies in the context of ending participation in negotiated grievance

---

[1] *See* Hassan Ali Kanu, *Trump Moves to Strip Unionization Rights from Most Federal Workers*, Politico (Mar. 28, 2025, 11:04 AM), www.politico.com/news/2025/03/28/union-rights-federal-workers-donald-trump-00257010.

[2] Executive Order, *Exclusions from Labor-Management Relations Program*, sec. 1 (Mar. 27, 2025), www.whitehouse.gov/presidential-actions/2025/03/exclusions-from-federal-labor-management-relations-programs/.

[3] *See* Charles Ezell, *Guidance on Executive Order* Exclusions from Federal Labor-Management Programs, OPM, Mar. 27, 2025, at 3, www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf (OPM Guidance).

procedures and ending compliance with negotiated reduction-in-force articles. *Id.* at 5.

NTEU represents nearly a dozen federal departments or agencies that the Executive Order excludes from the Statute's coverage. Ex. 1, Declaration of Daniel Kaspar (Kaspar Decl.) ¶ 6 (Apr. 2, 2025). The Executive Order and OPM Guidance will lead to the termination of, as relevant here, twelve collective bargaining agreements that NTEU bargained with those departments and agencies. *Id.* ¶ 59. The Executive Order will cause NTEU to lose approximately two-thirds of the bargaining unit employees that it represents. Ex. 2, Declaration of Mark Gray (Gray Decl.) ¶ 6 (Apr. 2, 2025). NTEU has represented several of the bargaining units that the Executive Order excludes from the Statute's coverage for decades and some since the Statute's inception. Kaspar Decl. ¶¶ 46-57.

### III.    The Administration's Admitted Motivations Behind the Executive Order: Making Federal Employees Easier To Fire and Effecting Political Retribution Against Unions Speaking Out Against the President's Agenda

The Administration issued a Fact Sheet and OPM Guidance on the Executive Order on the same night that the Executive Order issued.[4] The Administration's own words plainly discuss the impetus behind the Executive Order: facilitating mass firings of federal employees and exacting political vengeance.

___

[4] *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Fact Sheet) (Mar. 27, 2025), www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ (Fact Sheet).

6

**A.**     The OPM Guidance on the Executive Order shows that a significant motivation for the President's mass exclusion of agencies from the Statute's coverage is to make their employees easier to fire.

The first section of the OPM Guidance is titled "Performance Accountability" and states that the Executive Order is aimed at "facilitat[ing] the separation of underperforming employees." OPM Guidance at 3. According to OPM, "[a]gency CBAs often create procedural impediments to separating poor performers beyond those required by statute or regulation." *Id.*

The OPM Guidance acknowledges the larger context: the President's direction to agencies "to prepare large-scale reductions in force (RIFs)." *Id.* at 5. Now, with the Executive Order's issuance, OPM advises that agencies can "conduct RIFs . . . without regard to provisions in terminated CBAs that go beyond [statutory and regulatory] requirements." *Id.*

The White House's Fact Sheet on the Executive Order further demonstrates that the objective of the Executive Order is to facilitate the firing of federal employees. The Fact Sheet indicates that the Civil Service Reform Act, of which the Statute is one part, "enables hostile Federal unions to obstruct agency management," citing, among other examples, union litigation leading to the reinstatement of employees who had been fired. *Id.*

**B.**     The White House Fact Sheet reveals an additional motivation for the Executive Order: political retribution. In justifying the Executive Order, the Fact Sheet states that "[c]ertain Federal unions have declared war on President

Trump's agenda." *Id.* It continues, taking aim at the American Federation of Government Employees (AFGE), stating that "[t]he largest Federal union describes itself as 'fighting back' against Trump. It is widely filing grievances to block Trump policies." *Id.*

NTEU is, along with AFGE, one of the "Federal unions" that has fought back against President's Trump's agenda. NTEU has filed lawsuits in federal district court against Executive Order No. 14,171, *Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce* (*NTEU v. Trump*, No. 25-cv-170 (D.D.C.)); the Administration's attempt to dismantle the Consumer Financial Protection Bureau (CFPB) (*NTEU v. Vought*, No. 25-cv-381 (D.D.C.)); the Department of Government Efficiency's access of Privacy Act-protected information at the CFPB (*NTEU v. Vought*, No. 25-cv-380 (D.D.C.)); and the Administration's attempt to hobble the federal civil workforce overall through mass firings of probationary employees, reductions-in-force, and a pressure campaign to get federal workers to resign their positions (*NTEU v. Trump*, 25-cv-420 (D.D.C.)). NTEU has also filed multiple grievances in response to the Trump Administration's actions against federal workers. Kaspar Decl. ¶ 34.

The Executive Order targets about a dozen different collective bargaining relationships that NTEU has with federal agencies and departments. *Id.* ¶ 59. That includes the largest and oldest bargaining unit that NTEU represents: the IRS. Gray Decl. ¶ 9. And the morning after the Executive Order issued, the Administration preemptively sued an NTEU chapter in a federal district court

8

seeking a declaratory judgment that the Department of Treasury may rely on the
Executive Order to terminate the IRS's collective bargaining agreement with
NTEU. *See Dep't of Treasury v. NTEU Ch. 73*, No. 25-cv-49 (E.D. Ky.).

## ARGUMENT

NTEU must establish that (1) it is likely to succeed on the merits, (2) it is
likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance
of equities tips in its favor, and (4) an injunction is in the public interest. *Sierra
Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 24 (D.D.C. 2013) (cleaned up).
"[A] district court must balance the strengths of the requesting party's arguments in
each of the four required areas. If the showing in one area is particularly strong, an
injunction may issue even if the showings in other areas are rather weak." *Id.*
(cleaned up).

### I.    NTEU's Claims Will Likely Succeed.

To establish a likelihood of success on the merits, NTEU must show that a
"serious legal question" is at issue. *Washington Metro. Area Transit Comm'n v.
Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977). "The court is not required to
find that ultimate success by the movant is a mathematical probability, and indeed,
the court may grant an injunction even though its own approach may be contrary to
movants' view of the merits." *New Mexico ex rel. v. Richardson*, 39 F. Supp. 2d 48,
50 (D.D.C. 1999) (alterations omitted).

### A.    The Executive Order's Exclusion of the NTEU-Represented Agencies at Issue Is Ultra Vires Because Those Agencies Do Not Plausibly Fit Within the Statute's Narrow National Security Exemption and the Administration's Issuances Show Improper Motives for Exclusion.

The Administration's own words show that policy objectives and political animus motivated the President's sweeping Executive Order instead of an application of Section 7103(b)(1)'s narrow criteria. Any presumption of regularity that might be owed a President's national security determinations can be overcome by "clear evidence." *Latif v. Obama,* 666 F.3d 746, 748 (D.C. Cir. 2011); *see Kohli v. Gonzales*, 473 F.3d 1061, 1068 (9th Cir. 2007). Such clear evidence exists here. The Administration's statements show that its motivations for the Executive Order go far beyond Section 7103(b)(1)'s criteria. This Court should not rubber stamp the baseless exclusions from the Statute at issue here, which plainly exceed the President's authority under Section 7103(b)(1).

### 1.    The President's Exclusions of the NTEU-Represented Agencies at Issue Are Baseless.

A President can exclude an agency from the Statute *only* if the agency has "as a primary function intelligence, counterintelligence, investigative, or national security work" *and* if the Statute cannot be applied "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1). None of the NTEU-represented federal agencies or agency components at issue meet either requirement of 5 U.S.C. § 7103(b)(1), as detailed below. They therefore cannot be excluded from the Statute using this narrow exception.

The Administration has effectively conceded that the NTEU-represented employees at issue here do not do national security work. Less than three months ago, NTEU-represented employees in each of the agencies or agency components relevant here received and accepted offers to participate in this Administration's "deferred resignation program." Kaspar Decl. ¶ 31. But that program was not available to employees in "positions related to . . . national security."[5] Thus, the Administration's untenable position is that these employees do not have a nexus to national security for purposes of the deferred resignation program—but must nonetheless be entirely excluded from the Statute through Section 7103(b)(1)'s national security exemption.

**a.   <u>IRS.</u>**  The IRS has approximately 76,892 bargaining unit employees who NTEU represents. Gray Decl. ¶ 9. It is NTEU's largest and oldest bargaining unit. *Id.* NTEU has represented IRS since 1977. Kaspar Decl. ¶ 46. The Executive Order and OPM Guidance direct the IRS to terminate its current collective bargaining agreement with NTEU. Exec. Order, sec. 2(b); OPM Guidance at 1.

The IRS does not have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 34. The IRS is the revenue service for the federal government, responsible for collecting federal taxes and administering the Internal Revenue

---

[5] *See* Charles Ezell, *Guidance Regarding Deferred Resignation Program*, OPM, Jan. 28, 2025, at 3, www.opm.gov/media/3oaf3vs0/opm-guidance-memo-re-deferred-resignation-program-01-28-25-final.pdf.

Code.[6] NTEU-represented employees at IRS provide tax assistance to taxpayers, conduct taxpayer audits, and collect overdue tax revenue. Kaspar Decl. ¶ 34.

NTEU has represented bargaining unit workers at the IRS since before the Statute was enacted, showing that the Statute can be applied to it "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 46.

**b.**    **IRS Office of Chief Counsel.** The Executive Order and OPM Guidance direct the IRS Office of Chief Counsel to terminate its collective bargaining agreement with NTEU. Exec. Order, sec. 2(b); OPM Guidance at 1.

The IRS Office of Chief Counsel does not have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 35. NTEU-represented employees at the Office of Chief Counsel, consistent with the Office's mission, provide legal guidance and interpretive advice to the IRS, to Treasury, and to taxpayers; and coordinate the IRS's position in litigation.[7]

NTEU has represented bargaining unit workers at the IRS Office of Chief Counsel since March 1987, showing that the Statute can be applied to it "in a

---

[6] *See The agency, its mission and statutory authority*, IRS, https://www.irs.gov/about-irs/the-agency-its-mission-and-statutory-authority (last updated Mar. 25, 2025); *see also* Kaspar Decl. ¶ 34.

[7] *See Internal Revenue Manual* 1.1.6.1 (June 18, 2015), https://www.irs.gov/irm/part1/irm_01-001-006*; see also* Kaspar Decl. ¶ 35.

manner consistent with national security requirements and considerations." 5

U.S.C. § 7103(b)(1); s*ee* Kaspar Decl. ¶ 47.

     **c.**     **<u>Health and Human Services.</u>**  The Executive Order and OPM

Guidance direct HHS to disregard its current collective bargaining agreement with

NTEU as to the HHS components that the Executive Order excludes from the

Statute: the Office of the Secretary, the Food and Drug Administration, the

Administration for Strategic Preparedness and Response, the Centers for Disease

Control and Prevention, and the Office of Refugee Resettlement in the

Administration for Children and Families. Exec. Order, sec. 2(b); OPM Guidance at

2.

     The HHS components that the Executive Order excludes from the Statute

and that NTEU represents do not have "as a primary function intelligence,

counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1);

*see* Kaspar Decl. ¶ 36. Those components administer social service programs, civil

rights and healthcare programs, and programs that assure food and drug safety and

efficacy.[8] NTEU-represented employees at those components of HHS provide

---

[8] *See Immediate Office of the Secretary (IOS)*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/about/agencies/staff-divisions/immediate-office-secretary/index.html (last reviewed Mar. 12, 2024); *What We Do*, U.S. Food & Drug Admin., https://www.fda.gov/about-fda/what-we-do (last updated Nov. 21, 2023); *About ASPR*, Admin. for Strategic Preparedness & Response, https://aspr.hhs.gov/AboutASPR/ProgramOffices/Pages/ProgramOffice.aspx (last visited Apr. 2, 2025); *About CDC*, U.S. Ctrs. for Disease Control & Prevention, https://www.cdc.gov/about/cdc/index.html (last updated Feb. 12, 2024); *What We Do*, Office of Refugee Resettlement, An Office of the Admin. for Children & Families, https://acf.gov/orr/about/what-we-do (last updated Nov. 21, 2024). *See also* Kaspar Decl. ¶ 36.

guidance and assistance on HHS's priorities; oversee state administration of HHS's programs; and inspect food and drugs. Kaspar Decl. ¶ 36.

NTEU has represented bargaining unit workers at HHS since November 1978, showing that the Statute can be applied to it "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 48.

 **d.** **Federal Communications Commission.** The Executive Order and OPM Guidance direct FCC to terminate its current collective bargaining agreement with NTEU. Exec. Order, sec. 2(b); OPM Guidance at 2.

FCC does not have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 40. FCC regulates interstate and international communications by radio, television, wire, satellite, and cable across the nation.[9] NTEU-represented employees at FCC review and act on license applications for radio, enforce FCC rules regarding construction and operation of communications systems, and respond to consumer inquiries. *See* Kaspar Decl. ¶ 40.

NTEU has represented bargaining unit workers at the FCC since July 1978, showing that the Statute can be applied to it "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 49.

---

[9] *See What We Do*, Fed. Commc'ns Comm'n, https://www.fcc.gov/about-fcc/what-we-do (last visited Apr. 2, 2025); *see also* Kaspar Decl. ¶ 40.

**e.**    **Department of Energy.** The Executive Order and OPM Guidance direct DOE to terminate its current collective bargaining agreement with NTEU. Exec. Order, sec. 2(b); OPM Guidance at 2.

DOE does not have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 44. DOE is responsible for ensuring that the United States has access to reliable, affordable, and cleaner sources of energy.[10] Its work includes advancing energy technologies, managing the nation's energy resources, and addressing environmental impacts from past energy-related activities.[11] NTEU-represented employees at DOE evaluate the effectiveness and efficiency of DOE programs and provide information and advice to DOE management on the its programs and operations. Kaspar Decl. ¶ 44.

NTEU has represented bargaining unit workers at DOE since January 1979, showing that the Statute can be applied to it "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 50.

---

[10] *See, e.g.*, *About the Office of Energy Efficiency and Renewable Energy*, U.S. Dep't of Energy, https://www.energy.gov/eere/about-office-energy-efficiency-and-renewable-energy (last visited Apr. 2, 2025).

[11] *See Mission*, U.S. Dep't of Energy, https://www.energy.gov/mission (last visited Apr. 2, 2025); *see also* Kaspar Decl. ¶ 44.

f.   **Bureau of Fiscal Services.** The Executive Order and OPM Guidance direct BFS to terminate its current collective bargaining agreement with NTEU. Exec. Order, sec. 2(b); OPM Guidance at 1.

BFS does not have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 37. BFS functions primarily to manage the government's accounting and federal centralized payment systems, and to reduce public debt.[12] NTEU-represented employees at BFS work to ensure that Americans receive their federal government payments on time. *See* Kaspar Decl. ¶ 37.

NTEU has represented bargaining unit workers at BFS since April 1985, showing that the Statute can be applied to it "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1); s*ee* Kaspar Decl. ¶ 51.

g.   **Environmental Protection Agency.** The Executive Order and OPM Guidance direct EPA to terminate its current collective bargaining agreement with NTEU. Exec. Order, sec. 2(b); OPM Guidance at 2.

EPA does not have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1); s*ee* Kaspar Decl. ¶ 39. EPA ensures compliance with and the fair administration of environmental

---

[12] *See About Us*, Bureau of the Fiscal Serv., https://fiscal.treasury.gov/about.html (last modified Jan. 23, 2025); *see also* Kaspar Decl. ¶ 37.

laws and acts to conserve natural resources.[13] NTEU-represented employees at EPA conduct studies and research on environmental issues; develop and enforce environmental regulations; and provide technical assistance. *See* Kaspar Decl. ¶ 39.

NTEU has represented bargaining unit workers at EPA since April 1998, showing that the Statute can be applied to it "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 52.

h.   **Treasury's Departmental Offices.** The Executive Order and OPM Guidance direct Treasury to terminate its current collective bargaining agreement with NTEU covering its Departmental Offices. Exec. Order, sec 2(b); OPM Guidance at 1.

Treasury's Departmental Offices do not have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1); s*ee* Kaspar Decl. ¶ 41. These offices guide Treasury's policies.[14] NTEU-represented employees at Treasury's Departmental Offices are non-professional employees who provide logistical and mission support, such as assuring adequate supplies, equipment, and mail services; distributing mail; and performing building repairs. *See* Kaspar Decl. ¶ 41.

---

[13] *See Our Mission and What We Do*, U.S. Env't Prot. Agency, https://www.epa.gov/aboutepa/our-mission-and-what-we-do (last updated Feb. 28, 2025); *see also* Kaspar Decl. ¶ 39.

[14] *See Organization and Functions*, U.S. Dep't of the Treasury, https://home.treasury.gov/about/history/history-overview/organization-and-functions (last visited Apr. 2, 2025); *see also* Kaspar Decl. ¶ 41.

NTEU has represented bargaining unit workers at Treasury's Departmental Offices since May 2002, showing that the Statute can be applied to those offices "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1); s*ee* Kaspar Decl. ¶ 53.

     **i.**     **Office of the Comptroller of the Currency.** The Executive Order and OPM Guidance direct OCC, an independent bureau within Treasury,[15] to terminate its current collective bargaining agreement with NTEU. Exec. Order, sec. 2(b); OPM Guidance at 1.

OCC does not have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1); s*ee* Kaspar Decl. ¶ 42. OCC ensures that national banks and federal savings associations operate in a safe and sound manner and provide fair access to financial services.[16] NTEU-represented employees at OCC examine banks to ensure they are complying with banking rules and regulations that protect consumers. *See* Kaspar Decl. ¶ 42.

NTEU has represented bargaining unit workers at OCC since November 2002, showing that the Statute can be applied to it "in a manner consistent with

---

[15] *See Who We Are*, Office of the Comptroller of the Currency, https://www.occ.gov/about/who-we-are/index-who-we-are.html (last visited Apr. 2, 2025).

[16] *See What We Do*, Office of the Comptroller of the Currency, https://www.occ.gov/about/what-we-do/index-what-we-do.html (last visited Apr. 2, 2025); *see also* Kaspar Decl. ¶ 42.

national security requirements and considerations." 5 U.S.C. § 7103(b)(1); *see*
Kaspar Decl. ¶ 54.

      **j.**    **Alcohol and Tobacco Tax and Trade Bureau.** The Executive Order
and OPM Guidance direct TTB, a bureau under Treasury,[17] to terminate its current
collective bargaining agreement with NTEU. Exec. Order, sec. 2(b); OPM Guidance
at 1.

      TTB does not have "as a primary function intelligence, counterintelligence,
investigative, or national security work." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl.
¶ 43. TTB collects taxes on alcohol, tobacco, firearms, and ammunition; ensures the
integrity of alcohol products; ensures that only qualified businesses enter the
alcohol and tobacco industries; and prevents unfair and unlawful market activity
for alcohol and tobacco products.[18] NTEU-represented employees at TTB review
applications for permits for beer, wine, and spirits producers and manufacturers;
and investigate those entities for product integrity, tax collection, and compliance.
*See* Kaspar Decl. ¶ 43.

      NTEU has represented bargaining unit workers at TTB since October 2003,
showing that the Statute can be applied to it "in a manner consistent with national
security requirements and considerations." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl.
¶ 55.

---

[17] *See About TTB*, Alcohol & Tobacco Tax & Trade Bureau,
https://www.ttb.gov/about-ttb (last updated Feb. 3, 2021); *see also* Kaspar Decl.
¶ 43.

[18] *See About TTB*, *supra* note 17; *see also* Kaspar Decl. ¶ 43.

**k.** **Bureau of Land Management.** The Executive Order and OPM Guidance direct BLM to terminate its three collective bargaining agreements with NTEU covering various parts of the agency. Exec. Order sec. 2(b); OPM Guidance at 2.

BLM does not have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 38. BLM sustains the health, diversity, and productivity of public lands for the use and enjoyment of the public.[19] NTEU-represented employees at BLM manage public lands for various purposes, including energy development, livestock grazing, recreation, and resource conservation; and maintain natural, cultural, and historic resources. *See* Kaspar Decl. ¶ 38.

NTEU has represented bargaining unit workers at BLM since February 2021, showing that the Statute can be applied to it "in a manner consistent with national security requirements and considerations." *See id.* ¶ 56.

**l.** **Department of Justice.** The Executive Order and OPM Guidance direct DOJ to end its collective bargaining relationship with NTEU, which extends to two DOJ divisions: the Environment and Natural Resources Division and the Civil Rights Division. Exec. Order, sec. 2(b); OPM Guidance at 1; Kaspar Decl. ¶ 45.

---

[19] *See Our Mission*, U.S. Dep't of the Interior, Bureau of Land Mgmt., https://www.blm.gov/about/our-mission (last visited Apr. 2, 2025); *see also* Kaspar Decl. ¶ 38.

These DOJ divisions do not have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 45. The Environment and Natural Resources Division is responsible for bringing cases against those who violate the nation's environmental laws and defending the federal government in litigation arising under a broad range of environmental statutes.[20] Those in the Civil Rights Division work to uphold the civil and constitutional rights of all persons in the United States and enforce federal statutes prohibiting discrimination.[21] NTEU-represented employees in these DOJ divisions are attorneys who enforce the laws that their division is charged with upholding. *See* Kaspar Decl. ¶ 45.

NTEU has represented bargaining unit workers at DOJ since January 2025, showing that the Statute can be applied to it "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1); *see* Kaspar Decl. ¶ 57.

### 2. The President Relied on Improper Bases for His Exclusions.

Both the OPM Guidance and the White House Fact Sheet underscore that the Order's exclusions were not based on Section 7103(b)(1)'s criteria. Fact Sheet, *supra*

---

[20] *See Environment and National Resources Division*, Env't & Natural Res. Div., U.S. Dep't of Justice, https://www.justice.gov/enrd (last visited Apr. 2, 2025); *see also* Kaspar Decl. ¶ 45.

[21] *See Our Work*, Civil Rights Div., U.S. Dep't of Justice, https://www.justice.gov/crt/our-work (last updated Mar. 12, 2025); *see also* Kaspar Decl. ¶ 45.

note 4. The Executive Order's exclusions were instead based on a policy goal of making federal employees easier to fire and political animus against federal sector unions who have opposed the Administration's initiatives. These considerations are improper bases for exclusions under Section 7103(b)(1).

**First**, the Administration's contemporaneous explanations of the Executive Order show that the exclusions are aimed at facilitating the mass—and swift—firing of federal employees. That is a policy objective of this Administration and the focus of a February 2025 Executive Order.[22]

The first section of the OPM Guidance falls under the heading "Performance Accountability" and indicates that the Order is aimed at "facilitat[ing] the separation of underperforming employees." OPM Guidance at 3. According to the OPM Guidance, "[a]gency CBAs often create procedural impediments to separating poor performers beyond those required by statute or regulation." *Id.* OPM thus presents the true reason for the President's mass exclusion of agencies from the Statute's coverage: nullifying those agencies' collective bargaining agreements, so that they will no longer impede firing employees.

---

[22] *See* Exec. Order No. 14,210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, 90 Fed. Reg. 9669 (Feb. 11, 2025); OPM, *Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 26, 2025), opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf.

The OPM Guidance acknowledges the larger objective, which the Executive Order aids: the President's direction to agencies "to prepare large-scale reductions in force (RIFs)." OPM Guidance at 5. Now, with the Executive Order's issuance, OPM advises that agencies can "conduct RIFs . . . without regard to provisions in terminated CBAs that go beyond [statutory and regulatory] requirements." *Id.*

The White House Fact Sheet further demonstrates that the objective of the Executive Order is to facilitate the firing of federal employees. The Fact Sheet states that the Civil Service Reform Act, of which the Statute is one part, "enables hostile Federal unions to obstruct agency management." The Fact Sheet cites, among other examples, union litigation leading to the reinstatement of employees who had been fired. Fact Sheet, *supra* note 4.

**Second**, the same Fact Sheet reveals another motivation for the Executive Order: political retribution. In explaining the Executive Order, the Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda." *Id.* It continues, "[t]he largest Federal union describes itself as 'fighting back' against Trump. It is widely filing grievances to block Trump policies." *Id.*

NTEU is one of the "Federal unions" that has fought back against President's Trump's agenda. It has filed four lawsuits in federal district court against high-profile objectives of this Administration, and it has also filed dozens of grievances against the Administration's policies. *See supra* at 8. The Executive Order targets about a dozen different collective bargaining relationships that NTEU has with federal agencies and departments. Kaspar Decl. ¶ 59.

Neither facilitating employee firings nor political retribution is an appropriate basis for invoking Section 7103(b)(1)'s national security exemption. These are nonetheless the President's declared bases for excluding about two-thirds of the federal workforce from the Statute through this narrow exemption. These improper motivations—which the Administration's own statements establish—distinguish this situation from those where Presidents have based their limited exclusions on the narrow criteria set forth in Section 7103(b)(1). *See, e.g.*, *AFGE v. Reagan*, 870 F.2d 723, 725 (D.C. Cir. 1989) (denying challenge to executive order excluding parts of the U.S. Marshals Service from the Statute based on presumption of regularity). Here, the President's improper bases for his exclusions show that the exclusion of the NTEU-represented agencies is unlawful and must be enjoined.

## B.    The Executive Order Is Ultra Vires Because It Attempts to Nullify the Statute.

The Executive Order's attempt to largely nullify the Statute through its narrow national security exemption conflicts with Congress's intent in enacting the Statute. Congress intended to facilitate and strengthen collective bargaining and to guard against a President altering collective bargaining materially. The Executive Order's sweeping exclusions of agencies and agency components from the Statute's coverage, collectively, exceed the President's authority and are ultra vires.

The Executive Order's far-reaching use of the Statute's narrow national security exemption is unprecedented. Before this Executive Order, no president had ever used Section 7103(b)(1) to exempt an entire Cabinet-level agency from the

24

Statute. But this Executive Order exempts *six*—nearly one-half of all Cabinet-level agencies. It excludes from the Statute some *two-thirds* of the federal workforce and *three-fourths* of workers who are currently represented by unions.[23]

Congress enacted the Statute to facilitate and to strengthen collective bargaining in the federal sector (*BATF*, 464 U.S. at 107), codifying its finding that collective bargaining "safeguards the public interest" in the Statute's initial section (5 U.S.C. § 7101(a)). Congress's explicit aim with the Statute was to create a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. Clay).[24]

The President's use of the Statute's narrow national security exemption to undo the bulk of the Statute's coverage is plainly at odds with Congress's expressed intent. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . ." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

As then-Judge Kavanaugh explained, the President "may not decline to follow a statutory mandate . . . simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). Here, the President's policy view that

---

[23] *See* Hassan Ali Kanu, *Trump Moves to Strip Unionization Rights from Most Federal Workers*, Politico (Mar. 28, 2025, 11:04 AM), www.politico.com/news/2025/03/28/union-rights-federal-workers-donald-trump-00257010. *See also* Kaspar Decl. ¶ 35.

[24] The D.C. Circuit has relied on the statements of "major players in the legislation, such as Representative Clay." *OPM v. FLRA*, 864 F.2d 165, 169 (D.C. Cir. 1988).

"hostile Federal unions . . . obstruct agency management" cannot excuse his Administration's compliance with the Statute. Fact Sheet, *supra* note 4. Neither can it justify an Executive Order that blows a hole through the Statute by undoing two-thirds of its coverage—with potentially more to come, as the Order foreshadows. *See* Exec. Order, sec. 7 (requiring agency head reports on additional exclusions from the Statute). That is the opposite of what Congress intended when it sought to stabilize federal sector collective bargaining through federal statute. *See* 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. Clay).

### C.   The Executive Order Is First Amendment Retaliation, as the White House's Own Fact Sheet Effectively Concedes.

The Executive Order is textbook First Amendment retaliation against NTEU and other federal sector unions that have stood up to the President. While the White House Fact Sheet proclaims that "President Trump supports constructive partnerships with unions who work with him," the Executive Order shows that unions that challenge this Administration's actions should look out. Fact Sheet, *supra* note 4. NTEU's protected activity triggered an Executive Order that imperils its existence.

"[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018) (citing *Crawford-El v. Britton*, 524 U.S. 574, 592 (1998)). For its First Amendment retaliation claim, NTEU must show that (1) it "engaged in conduct protected under the First Amendment"; (2) the government "took some retaliatory action sufficient to deter a person of ordinary firmness in

[NTEU's] position from speaking again"; and (3) "a causal link between the exercise of a constitutional right and the adverse action taken." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)). NTEU makes that showing here.

     1.     As a threshold matter, NTEU's litigation against the Trump Administration's actions, described in more detail below, is protected speech and petitioning activity. *See, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-49 (2001) (providing that "advocacy by [an] attorney to the courts" is "speech and expression" that enjoys First Amendment protection); *McDonald v. Smith*, 472 U.S. 479, 484 (1985) (holding that "filing a complaint in court is a form of petitioning activity" that the First Amendment protects).

     2.     The Executive Order "constitutes a sufficiently adverse action" against NTEU "to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The Executive Order plainly punishes NTEU for its legal challenges to this Administration's actions, cancelling, as relevant here, twelve of NTEU's collective bargaining relationships, including NTEU's largest and longest one at the IRS. Kaspar Decl. ¶¶ 46, 59; Gray Decl. ¶ 9. The Order eliminates NTEU's ability to serve as the exclusive bargaining representative for about two-thirds of its membership, and it cuts off more than half of NTEU's dues revenue. Kaspar Decl. ¶¶ 16, 17; Gray Decl. ¶11.

     Particularly given the President's mandate to agency heads to recommend even broader exclusions from the Statute within thirty days (*see* Exec. Order, sec.

7), the Executive Order "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Connelly v. Cnty. of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023) (quoting *Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007)). NTEU will continue to speak out, however, against the Administration's overreach, including in the courts. Kaspar Decl. ¶ 34. And it is reasonable to believe that protected activity might lead to more of NTEU's agencies being excluded from the Statute in the near future. *Id.*

**3.**    The "adverse action" here—the exclusion of the NTEU-represented agencies from the Statute through a national security exemption that could not conceivably apply to them—"would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019). The IRS, for example, does not plausibly have a "primary function" of national security or intelligence work (*see* 5 U.S.C. § 7103(b)(1)); but the IRS is NTEU's largest bargaining unit, so the Executive Order excludes it from the Statute.

The Executive Order retaliates against NTEU for its litigation against this Administration, which "strikes at the heart of the First Amendment." *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009) (addressing "state action designed to retaliate against and chill an attorney's advocacy for his or her client" (brackets omitted)). Indeed, the White House Fact Sheet on the Executive Order proclaims the Order's retaliatory motive. To justify the Executive Order, the Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda." Fact Sheet, *supra* note 4.

28

Before this lawsuit, NTEU filed four other federal district court lawsuits challenging the Trump's Administration's execution of high priority policy objectives. That included legal challenges to the Executive Order reviving the Schedule F Executive Order from the President's first term, the Administration's attacks on the CFPB, and the Administration's efforts to get rid of a substantial portion of the federal workforce. *NTEU v. Trump*, No. 25-cv-170 (D.D.C.); *NTEU v. Vought*, No. 25-cv-380 (D.D.C.); *NTEU v. Vought*, No. 25-cv-381 (D.D.C.); *NTEU v. Trump*, 25-cv-420 (D.D.C.). NTEU has also filed dozens of grievances in response to the Trump Administration's actions against federal workers.

NTEU's protected activity spurred the Executive Order's exclusions of its agencies from the Statute. And a preemptive lawsuit filed by the Department of Justice in the U.S. District Court for the Eastern District of Kentucky shows the aggressiveness with which the Executive Branch is targeting NTEU. The morning after the Executive Order issued, the Administration sued an NTEU chapter in a federal district court seeking a judgment that the Department of Treasury may rely on the Executive Order to terminate the IRS's collective bargaining agreement with NTEU. *See Dep't of Treasury v. NTEU Ch. 73*, No. 25-cv-49 (E.D. Ky.).

This type of lawsuit against NTEU, coupled with the Administration's forum shopping, shows a government on the attack. The Administration's lawsuit seeks to solidify NTEU's loss of its largest bargaining unit as promptly as possible. And the retaliatory animus abounds in the Administration's complaint. It references "hostile unions"—presumably one of which is NTEU, as the defendant in its action—that

29

use collective bargaining agreements to "prevent changes to agency operations that they oppose" and "interfere with the President's ability to oversee the Executive Branch." Compl. ¶ 30, *Dep't of Treasury v. NTEU Ch. 73*, No. 25-cv-49 (E.D. Ky.). And the Administration specifically calls out NTEU's National President. In the complaint the government provides a web link to a letter that NTEU's National President wrote to the IRS, which the government characterizes as "confirm[ing] the union 'vehemently opposes' any reductions in force and plans to use [a] contract provision to resist this administration policy." *Id.* ¶ 54.

The Administration's lawsuit against NTEU shows the government's targeting of NTEU in connection with its Executive Order. And it shows that the Administration's retaliatory attack will continue, including in the courts.

## II.    NTEU Will Suffer Irreparable Harm Absent Preliminary Injunctive Relief.

A party seeking preliminary injunctive relief must show that, without it, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Sierra Club*, 990 F. Supp. 2d at 38 (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 2013)). That prerequisite is satisfied here.

### A.    The Executive Order Is Causing NTEU Severe Financial Harm.

"Dues payments of union members are the economic lifeblood of a labor organization and normally its primary source of income." *Local Union No. 5741, United Mine Workers v. NLRB*, 865 F.2d 733, 738 (6th Cir. 1989) (cleaned up). The Executive Order eliminates 58,692 of NTEU's dues-paying members. Gray Decl.

¶ 11; Kaspar Decl. ¶ 16. The vast majority of NTEU members—approximately 94%—pay their dues through payroll deductions. Gray Decl. ¶ 8. Several of the agencies relevant here have already stopped processing dues deductions to NTEU. Kaspar Decl. ¶¶ 19-21. When all the NTEU-represented agencies and agency components that the Executive Order excludes from the Statute stop processing dues deductions, NTEU will lose about $25 million in dues revenue over the next year. Gray Decl. ¶ 12; Kaspar Decl. ¶ 17. That is over half of NTEU's annual revenue. Kaspar Decl. ¶ 17.

There are two scenarios in which economic losses are irreparable for purposes of preliminary relief. *First*, even "[r]ecoverable monetary loss may constitute irreparable harm . . . where the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). *Second*, where damages are unrecoverable, "significant" economic loss may constitute irreparable harm. *See Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021) (issuing injunction). Both scenarios exist here.

***First***, the dues revenue that is being lost now is an existential threat to NTEU. The dues that will be lost due to the Executive Order reflect more than half of NTEU's revenue stream. A judge on this Court recently found irreparable harm where an Executive Order threatened almost one-third of the plaintiff's revenue, which would be a "devastating blow to plaintiff—threatening plaintiff's very existence." *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. 25-cv-917, 2025 U.S. Dist. LEXIS 61536, at *5 (D.D.C. Mar. 28, 2025) (Leon, J.).

31

*See also Luokung Tech. Corp.*, 538 F. Supp. 3d at 193-94 (finding that "the very serious unrecoverable financial harm [plaintiff] has already begun to experience, along with the reputational damage" warrant preliminary injunctive relief). Here, NTEU stands to lose more than half its annual dues revenue, threatening its very survival.

**Second**, even if NTEU were to eventually prevail, the dues revenue that is cut off is forever lost. There is no mechanism for NTEU to recover lost dues revenue from former members for a period during which they had no union representation. *See* Kaspar Decl. ¶ 17.

## B.    The Executive Order Irreparably Harms NTEU's Bargaining Power.

In addition to the devastating financial impact, NTEU will suffer an irremediable loss of bargaining power and influence in agency workplaces. That is because the Executive Order substantially reduces the number of employees that NTEU represents. At the end of 2024, NTEU represented approximately 158,144 employees in its various agencies. Gray Decl. ¶ 5; Kaspar Decl. ¶ 9. The Executive Order will take away about 104,278 of those employees. Gray Decl. ¶ 6; Kaspar Decl. ¶ 9. The Executive Order will thus cut the number of NTEU-represented employees by over 65%. Gray Decl. ¶ 6; Kaspar Decl. ¶ 9.[25]

---

[25] Federal sector unions are required to represent all employees in their bargaining units, not just the employees who voluntarily choose to join a union and pay dues. Accordingly, NTEU represents almost 160,000 employees of whom about 91,000 are dues-paying members. The Executive Order slashes both.

NTEU's clout and influence—with agency management and with its own employees—is directly related to the number of employees that it represents. *See* Kaspar Decl. ¶ 10. The Executive Order diminishes NTEU's stature through its drastic reduction of the employees that NTEU now represents. *See id.* ¶ 11. NTEU will now have less influence at the bargaining table with agencies where it still represents employees. *See id.* ¶ 12. So too when NTEU is advocating for its employees before Congress. *See id.* ¶ 14. And NTEU's remaining members will question whether they should remain members in light of NTEU's diminished stature; that diminished stature will likewise make it more difficult for NTEU to persuade non-members at its agencies to become members. *See id.* ¶ 13.

In sum, the Executive Order will make NTEU a less effective, less influential organization in ways that cannot be undone. "Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining." *See Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970). Thus, "relief, if it is to be effective, must come quickly." *See In re AFGE*, 790 F.2d 116, 117–18 (D.C. Cir. 1986) (R. Ginsburg, J.). *See also Wilmer Cutler Pickering Hale & Dorr LLP*, No. 25-cv-917, 2025 U.S. Dist. LEXIS 61536, at *6 (finding irreparable harm where Executive Order "thoroughly hamstrung" a law firm from representing clients).

## C.    The Executive Order's Violation of NTEU's First Amendment Rights Is Irreparable Harm.

The Administration's violation of NTEU's First Amendment rights also qualifies as irreparable harm.

Before this lawsuit, NTEU filed four other lawsuits challenging the Trump Administration's execution of high priority policy objectives. *See supra* at 8. NTEU also filed numerous grievances regarding the Administration's unlawful violation of lawfully executed collective bargaining agreements. *Id.* The White House Fact Sheet explicitly links this type of union activity—protected speech—to the Executive Order. According to the Fact Sheet, this activity reflects that "[c]ertain Federal unions have declared war on President Trump's agenda." Fact Sheet, *supra* note 4. And as a result of NTEU's protected activity, the Administration has gutted federal sector collective bargaining through its Executive Order.

This direct retaliation in violation of NTEU's First Amendment rights is irreparable harm that warrants a preliminary injunction. "The loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury." *Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 562 (D.D.C. 2018) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (cleaned up) (granting injunction). That showing may be based on "First Amendment freedoms [that] are actually lost," or that "imminently will be." *Bailey v. Fed. Bureau of Prisons*, No. 24-1219, 2024 U.S. Dist. LEXIS 114113, at *28 (D.D.C. June 28, 2024) (granting injunction).

And there is a good chance that if left undeterred, the Administration will replicate its First Amendment retaliation against NTEU. NTEU will continue to speak out, including in the courts, against this Administration's overreach. Kaspar Decl. ¶ 34. That might very well lead to more of NTEU's agencies being excluded from the Statute, absent injunctive relief. *Id.* Indeed, the Executive Order, at

Section 7, mandates that the head of each agency still within the Statute's coverage submit a report to the President "identify[ing] any agency subdivisions" that should be excluded from the Statute through Section 7103(b)(1). Exec. Order, sec. 7.

### III. The Balance of Equities Tips in NTEU's Favor, and the Public Interest Will Be Served by Prompt Preliminary Injunctive Relief.

The last two preliminary injunction requirements "merge when, as here, the Government is the opposing party." *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting *Karem v. Trump,* 960 F.3d 656, 668 (D.C. Cir. 2020)). The balance of equities and the public interest support a grant of preliminary injunctive relief.

Preliminary injunctive relief would preserve the status quo: maintaining collective bargaining rights of over a hundred thousand NTEU-represented federal workers until this Court has the opportunity to resolve the constitutional and statutory claims at issue. Injunctive relief would keep NTEU from facing drastic and irremediable harm to its bargaining power, influence, and revenue stream, as described above. In the absence of preliminary injunctive relief, NTEU may no longer be able to exist in a manner that is meaningful to the federal workers for whom it fights.

There is, moreover, a clear public interest in maintaining the status quo of honoring the collective bargaining rights that afforded federal workers. *See* 5 U.S.C. § 7101(a). The Executive Order unlawfully eliminates collective bargaining for some two-thirds of the federal workforce. Yet,"[e]xperience in both private and public employment indicates that the statutory protection of the right of employees to

organize, bargain collectively, and participate through labor organizations" both "safeguards the public interest" and "contributes to the effective conduct of public business." 5 U.S.C. § 7101(a). As Congress made clear on the face of the Statute, "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a).

In the absence of prompt, preliminary injunctive relief, collective bargaining in the federal civil service faces a potential end. "The public interest demands protecting against harms of this magnitude." *Wilmer Cutler Pickering Hale & Dorr LLP*, No. 25-cv-917, 2025 U.S. Dist. LEXIS 61536, at *6.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that this Court grant the preliminary injunctive relief set out in its proposed order.

Respectfully submitted,

*/s/ Julie M. Wilson*
JULIE M. WILSON
General Counsel
D.C. Bar 482946

*/s/ Paras N. Shah*
PARAS N. SHAH
Deputy General Counsel
D.C. Bar 983881

*/s/ Allison C. Giles*
ALLISON C. GILES
Assistant Counsel
D.C. Bar 439705

*/s/ Lindsay Dunn*
LINDSAY DUNN (pro hac vice)
Assistant Counsel
N.Y. Bar 4574224

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C.  20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
lindsay.dunn@nteu.org

April 4, 2025              Attorneys for Plaintiff NTEU

37