**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, | ) ) ) | |
| *Plaintiff*; | ) ) | Case No. 1:25-cv-935-PLF |
| v. | ) ) | Judge Paul L. Friedman |
| DONALD J. TRUMP, *et al.*, | ) ) | |
| *Defendants*. | ) ) | |

**DEFENDANTS' OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.   The President's Authority to Control the Conduct of Federal Employees............................ 3

II.  The FSLMRS Framework and Related Executive Orders ...................................................... 4

III. Office of Personnel Management Guidance and Agency Implementation of
     Executive Order 14,251 ......................................................................................................... 5

IV.  The Statutory Channeling Requirement ................................................................................. 7

V.   Procedural History ................................................................................................................. 8

LEGAL STANDARD .......................................................................................................... 8

ARGUMENT ....................................................................................................................... 9

I.   Plaintiff Cannot Show Irreparable Harm Absent a Preliminary Injunction ........................... 9

II.  Plaintiff Cannot Show Likelihood of Success on the Merits of its Claims ............................ 12

     A.   The FSLMRS precludes district court jurisdiction over Plaintiff's claims.................... 12

     B.   Plaintiff is unlikely to succeed on its *ultra vires* claims. ............................................... 16

     C.   Executive Order 14,251 is valid..................................................................................... 17

     D.   Plaintiff is unlikely to succeed on its First Amendment retaliation claim. .................... 29

III. The Balance of The Equities and The Public Interest Favor the Government ....................... 33

CONCLUSION.................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AFGE v. Reagan,*
  870 F.2d 723 (D.C. Cir. 1989) ......................................................................... 18, 19

*Air Line Emps. Ass'n Int'l. v. Nat'l Mediation Bd.,*
  1981 WL 2391 (D.D.C. May 18, 1981) .................................................................. 18

*Am. Fed'n of Gov't Emps., ALF-CIO v. Loy,*
  281 F. Supp. 2d 59 (D.D.C. 2003),
  *aff'd on other grounds,* 367 F.3d 932 (D.C. Cir. 2004) ......................................... 11

*American Federation of Government Employees, AFL-CIO v. Trump,*
  929 F.3d 748 (D.C. Cir. 2019) .............................................. 12, 13, 14, 16

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
  897 F.3d 314 (D.C. Cir. 2018) ............................................................................ 8

*Aref v. Lynch,*
  833 F.3d 242 (D.C. Cir. 2016) ........................................................................... 31

*Arlington Heights v. Metropolitan Housing Development Corp.,*
  429 U.S. 252 (1977) ......................................................................................... 30

*Army Corps of Eng'rs,*
  53 FLRA 79 (1997) ......................................................................................... 27

*Axon Enterprises v. Fed. Trade Comm'n,*
  598 U.S. 175 (2023) ................................................................................ 14, 15

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ......................................................................................... 11

*Baltimore Sun Co. v. Ehrlich,*
  437 F.3d 410 (4th Cir. 2006) ............................................................................ 32

*Bauer v. DeVos,*
  325 F. Supp. 3d 74 (D.D.C. 2018) ..................................................................... 19

*Bd. of Governors of Fed. Reserve Sys. v. MCorp,*
  502 U.S. 32 (1991) ........................................................................................... 16

*Black Lives Matter D.C. v. Trump,*
  544 F. Supp. 3d 15 (D.D.C. 2021) ..................................................................... 31

*Building & Construction Trades Department, AFL-CIO v. Allbaugh,*
  295 F.3d 28 (D.C. Cir. 2002) .............................................................................. 3

*Bureau of Alcohol, Tobacco and Firearms v. FLRA*,
   464 U.S. 89 (1983) ............................................................................... 3, 4, 15

*Chaplaincy of Full Gospel Churches v. England*,
   454 F. 3d 290 (D.C. Cir. 2006) ................................................................ 9, 10

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948) ...................................................................................... 26

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ...................................................................................... 30

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ...................................................................................... 11

*Constantine v. Rectors & Visitors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005) ......................................................................... 33

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ..................................................................... 34

*DCH Reg. Med. Ctr. v. Azar*,
   925 F.3d 503 (D.C. Cir. 2019) ....................................................................... 16

*Def. Logistics Agency*,
   5 FLRA 126 (1981) ................................................................................ 10, 13

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ...................................................................................... 30

*Dep't of Def. v. FLRA*,
   685 F.2d 641 (D.C. Cir. 1982) ....................................................................... 18

*Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181*,
   4 FLRA 644 (1980) ................................................................................ 20, 22

*Dep't of the Navy v. Egan*,
   484 U.S. 518 (1988) ............................................................................... 20, 28

*Elgin v. Dep't of Treasury*,
   567 U.S. 1 (2012) .......................................................................................... 14

*Fed. Express Corp. v. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ....................................................................... 16

*Fed. Law Enf't Officers Ass'n v. Ahuja*,
   62 F.4th 551 (D.C. Cir. 2023) ....................................................................... 14

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
No. 23-1038, 2025 WL 978101 (Apr. 2, 2025) ..................................................... 30

*Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.*,
391 F. Supp. 2d 1 (D.D.C. 2005) ...................................................................... 11

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) .......................................................................................... 31

*Gilligan v. Morgan*,
413 U.S. 1 (1973) .............................................................................................. 28

*Heckler v. Ringer*,
466 U.S. 602 (1984) .......................................................................................... 14

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .................................................................................... 19, 34

*Holy Land Found. For Relief & Dev. v. Ashcroft*,
219 F. Supp. 2d 57 (D.D.C. 2002) ................................................................... 34

*Kensington Vol. Fire Dep't., Inc. v. Montgomery Cnty.*,
684 F.3d 462 (4th Cir. 2012) ........................................................................... 33

*Kim v. FINRA*,
698 F. Supp. 3d 147 (D.D.C. 2023),
*appeal dismissed*, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025) ...................... 34

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) .......................................................................................... 31

*Local 1498, AFGE v. AFGE, AFL/CIO*,
522 F.2d 486 (3d Cir. 1975) ............................................................................... 3

*Manhattan-Bronx Postal Union v. Gronouski*,
350 F.2d 451 (D.C. Cir. 1965) ............................................................................ 3

*Media Matters for Am. v. Bailey*,
2024 WL 3924573 (D.D.C. Aug. 23, 2024) ..................................................... 33

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) .......................................................................................... 32

*Myers v. United States*,
272 U.S. 52 (1926) .............................................................................................. 3

*N. Am. Butterfly Ass'n v. Wolf*,
977 F.3d 1244 (D.C. Cir. 2020) ....................................................................... 16

*Nat'l Mining Ass'n v. Jackson*,
   768 F. Supp. 2d 34 (D.D.C. 2011) ........................................................................ 9

*Nat'l Treasury Emps. Union v. Reagan*,
   509 F. Supp. 1337 (D.D.C. 1981) ........................................................................ 12

*Nat'l Treasury Emps. Union v. Reagan*,
   1981 WL 150530 (D.D.C. Sept. 3, 1981) ............................................................ 18

*Nat'l Treasury Emps. Union v. United States*,
   927 F.2d 1253 (D.C. Cir. 1991) ........................................................................... 11

*Nieves v. Barlett*,
   587 U.S. 391 (2019) .............................................................................................. 32

*Nken v. Holder*,
   556 U.S. 418 (2009) .............................................................................................. 33

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ............................................................................. 16

*Smith v. Ark. State Highway Emps., Local,*
   *1315*, 441 U.S. 463 (1979) .................................................................................. 11

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) .............................................................................................. 14

*TikTok Inc. v. Trump*,
   490 F. Supp. 3d 73 (D.D.C. 2020) ...................................................................... 34

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ........................................................... 19, 24, 28, 31

*Trump v. Thompson*,
   20 F.4th 10 (D.C. Cir. 2021) .................................................................................. 8

*U.S. Dep't of Def., Ohio Nat'l Guard*,
   71 FLRA 829 (2020) ............................................................................................ 10

*U.S. Dep't of Lab., Wash., D.C.*,
   37 FLRA 25 (1990) .............................................................................................. 10

*U.S. Dep't of the Treasury, U.S. Mint*,
   35 FLRA 1095 (1990) .......................................................................................... 10

*United States EPA*,
   70 FLRA 279 (2017) ............................................................................................ 24

*United States v. Chemical Found.*,
    272 U.S. 1 (1926) .................................................................................. 30

*Webster v. Doe*,
    486 U.S. 592 (1988) .............................................................................. 19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................. 8, 11

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
    758 F.2d 669 (D.C. Cir. 1985) ............................................................... 9

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .............................................................................. 17

**Statutes**

5 U.S.C. § 7101 ........................................................................................ 4

5 U.S.C. § 7103 ............................................................................... *passim*

5 U.S.C. § 7104 ........................................................................................ 7

5 U.S.C. § 7105 ........................................................................................ 7

5 U.S.C. § 7107 ........................................................................................ 2

5 U.S.C. § 7116 ................................................................................... 7, 15

5 U.S.C. § 7118 ........................................................................................ 7

5 U.S.C. § 7121 ................................................................................... 8, 15

5 U.S.C. § 7123 ................................................................................... 8, 14

5 U.S.C. § 7301 ........................................................................................ 3

28 U.S.C. § 509A(b) ............................................................................... 24

42 U.S.C. § 247d(a) ................................................................................ 22

42 U.S.C. § 247d-4 ................................................................................. 22

42 U.S.C § 300hh-10 .............................................................................. 23

42 U.S.C. § 7111 ................................................................................ 21, 25

47 U.S.C. § 151 ....................................................................................... 25

Pub. L. No. 95-454, 92 Stat. 111 (1978) .................................................. 4

Pub. L. No. 111-353, 124 Stat. 3885 (2011) ................................................................ 23

**The Constitution**

U.S. Const., art. II, § 1, cl. 1 ....................................................................................... 3

**Rules**

Fed. R. Civ. P. 4(i)(1) ................................................................................................... 8

**Regulations and Executive Orders**

5 C.F.R. § 2423.30 ........................................................................................................ 7

5 C.F.R. § 2423.40 ........................................................................................................ 7

5 C.F.R. § 2423.41 ........................................................................................................ 7

Exec. Order No. 10,988, 3 C.F.R. § 521 (1959-1963) ................................................ 3

Exec. Order No. 11,491, 3 C.F.R. § 861 (1966-1970) ................................................ 3

Exec. Order No. 11,616, 3 C.F.R. § 605 (1971-1975) ................................................ 3

Exec. Order No. 11,838, 3 C.F.R. § 957 (1971-1975) ................................................ 3

Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979) .................................. 4

Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997) .................................. 4

Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 7, 2002) ....................................... 4

Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008) .................................... 4

Exec. Order No. 13,760, 73 Fed. Reg. 73,991 (Jan. 17, 2017) ................................... 4

*Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024) ................................................ 25

*New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units*, 89 Fed. Reg. 39,798 (May 9, 2024) ................................................................................................................. 25

Exec. Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 20, 2025) ..................................... 22

Exec. Order No. 14,251, 90 Fed. Reg. 14,553 (Mar. 27, 2025) ............................... 4, 5

## <u>INDEX OF EXHIBITS</u>

Ex. 1       Declaration of Allen R. Brooks, Acting Deputy Associate Director for Accountability and Workforce Relations, Office of Personnel Management (April 11, 2025)

      Ex. 1-A:    Memorandum from Charles Ezell, Acting Director, U.S. Office of Personnel Management to Heads and Acting Heads of Departments and Agencies, regarding Guidance on Executive Order *Exclusions from Federal Labor-Management Programs* (March 27, 2025).

      Ex. 1-B:    Frequently Asked Questions: Executive Order 14251:"Exclusions from Federal Labor-Management Relations Programs" (April 7, 2025)

Ex. 2       Declaration of Erica Balkum, Chief, Office of Case Intake and Publication, Federal Labor Relations Authority (April 11, 2025)

      Ex. 2-A:    Sample Order to Show Cause

## INTRODUCTION

Plaintiff, a national labor union that represents certain federal employees, has filed the present lawsuit seeking to second guess a lawful exercise of the President's authority. The federal statute that governs bargaining with public-sector labor unions authorizes the President to exempt from its coverage "*any* agency or subdivision thereof" if the President makes the determination that "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and that the provisions of the statute "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1). Since 1979, when President Carter exempted more than forty-five agencies or subdivisions pursuant to that authority, Presidents have issued executive orders exempting additional agencies and subdivisions from the statute's coverage as they have assessed the Nation's changing needs.

On March 27, 2025, President Trump issued such an order. In Executive Order 14,251, *Exclusions from Federal Labor Management Relations Program*, the President made the determinations specified in the governing statute, thereby excluding  the identified agencies and agency subdivisions from its coverage. Plaintiff seeks to enjoin Defendants—the President, the Director of the Office of Personnel Management (OPM), and eleven federal agencies or subdivisions—from implementing Executive Order 14,251. Plaintiff alleges that the Executive Order will "[threaten] its very survival" and reduce its "clout and influence." Mem. of P.&A. in Supp. of Pl. NTEU's Mot. for a Prelim. Inj. 32-33, ECF No. 9-1 ("Mot."). In addition, Plaintiff asserts that the Executive Order constitutes retaliation for the multiple lawsuits the Union has previously filed against the Administration. Based on such speculative and unsubstantiated allegations, Plaintiff seeks the extraordinary remedy of a preliminary injunction enjoining the Defendants from implementing the Executive Order.

Plaintiff's request for a preliminary injunction should be denied for multiple reasons. To start, Plaintiff fails to establish irreparable harm absent the immediate relief it seeks. The harms alleged in Plaintiff's motion are all either remediable on a favorable ruling later in this case, or insufficiently certain and imminent to justify the extraordinary relief of a preliminary injunction.

Nor can Plaintiff establish a likelihood of success on the merits of its claims, which broadly allege that the President impermissibly exceeded lawful authority delegated to him by Congress and that the President, in exercising this authority, retaliated against Plaintiff. First, this Court lacks jurisdiction to hear Plaintiff's claims. Congress intended claims under Chapter 71 of the Federal Service Labor-Management Relations Statute (FSLMRS or Statute), 5 U.S.C. §§ 7107–7135, to be covered by the comprehensive remedial scheme set forth in that statute. Plaintiff's claims, which turn on its unfair labor practices assertion that the Defendant agencies remain covered by Chapter 71 and are violating their obligations under the FSLMRS, do not fall within the narrow exception to such preclusion articulated in *Thunder Basin* and its progeny. Second, FSLMRS precludes *ultra vires* review and Plaintiff has not identified a clear and mandatory prohibition that the President is alleged to have violated. Third, the Court lacks authority to review the President's national security determination, as Congress expressly recognized. And in any event, the President's exercise of discretion here is readily supported by the facts and the law. Finally, the President's decision is entitled to a presumption of regularity as a facially valid executive action that Plaintiff has not, and cannot, overcome by way of its unsupportable First Amendment retaliation claim.

Likewise, the balance of the equities and the public interest favor Defendants, as Plaintiff's requested preliminary injunction would interfere with the President's lawfully delegated authority to ensure the relevant segments of the federal workforce are able to meet a primary purpose of theirs: protecting the national security of the United States.

Accordingly, because Plaintiff cannot establish any element required for the extraordinary relief requested, its motion should be denied.

## BACKGROUND

### I.    The President's Authority to Control the Conduct of Federal Employees

Article II of the Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const., art. II, § 1, cl. 1. This power "necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government," *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)), and includes the authority to make "improvement[s] in the efficiency of federal employment." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965). Congress has further recognized this aspect of Executive power by enacting, *inter alia*, 5 U.S.C. § 7301, which provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch."

Before Congress enacted the FSLMRS, the President routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees[]" by Executive Order. *See, e.g., Local 1498, AFGE v. AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975). "This was a project of the Executive, and not of the Congress." *Manhattan-Bronx Postal Union*, 350 F.2d at 452. Indeed, President Kennedy took the first formal measure to regulate federal-sector labor relations when he issued Executive Order No. 10,988, in 1962. Exec. Order No. 10,988, 3 C.F.R. § 521 (1959-1963); *see Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 91-92 (1983) ("*BATF*"). Multiple Presidents subsequently have amended that Order. *See* Exec. Order No. 11,491, 3 C.F.R. § 861 (1966-1970), as amended by Exec. Orders Nos. 11,616, 11,636, 3 C.F.R. § 605, § 634 (1971-1975) and Exec. Order No. 11,838, and 3 C.F.R.

§ 957 (1971-1975).

## II.    The FSLMRS Framework and Related Executive Orders

Against this backdrop, Congress in 1978 passed the FSLMRS, 5 U.S.C. § 7101 *et seq*. The statute, enacted as Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 111, provides a "comprehensive . . . scheme governing labor relations between federal agencies and their employees." *BATF*, 464 U.S. at 91. FSLMRS establishes the right of certain federal employees to form or join a labor union, among other protections. However, the Statute exempts certain agencies and matters from its coverage. 5 U.S.C. § 7103(a)(3) (excluding from coverage the Federal Bureau of Investigation, the Central Intelligence Agency, and the National Security Agency, among others). FSLMRS also empowers the President to exempt additional agencies from its requirements: It provides that "[t]he President may issue an order excluding *any* agency or subdivision thereof from coverage under [the statute] if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the statute] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." *Id.* § 7103(b)(1) (emphasis added).

Pursuant to this authority, President Carter issued an executive order in 1979 excluding from FSLMRS coverage more than forty-five agencies or agency subdivisions, precluding those agencies' and subdivisions' employees from collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979). Every President since then, with the sole exception of President Biden, has issued similar executive orders adding to that list in response to changing circumstances and the evolving investigative and national security responsibilities of federal agencies.  *See, e.g.*, Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997); Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 7, 2002); Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec.

Order No. 13,760, 73 Fed. Reg. 73,991 (Jan. 17, 2017).

Like these other Presidents, on March 27, 2025, President Trump issued another such Executive Order. *See* Exec. Order No. 14,251, 90 Fed. Reg. 14,553 (Mar. 27, 2025).  In Section 2 of the Executive Order, the President determined that certain agencies and subdivisions have as a primary function intelligence, counterintelligence, investigative, or national security work, and that the FSLMRS cannot be applied to those agencies and subdivisions in a manner consistent with national security requirements and considerations.[1]

## III. Office of Personnel Management Guidance and Agency Implementation of Executive Order 14,251

On March 27, 2025, the Office of Personnel Management ("OPM") issued guidance to federal agencies regarding Executive Order 14,251. *See*. Decl. of Allen R. Brooks ¶ 4 ("Brooks Decl."), attached as Exhibit 1; Mem. from Charles Ezell, Acting Director, OPM to Heads and Acting Heads of Departments and Agencies (Mar. 27, 2025), attached as Exhibit 1-A. In that guidance, OPM opined that the covered agencies "are no longer required to collectively bargain with Federal unions" and that "the statutory authority underlying the agency's original recognition of the relevant unions no longer applies," so those unions are no longer exclusive representatives of the agency employees. OPM directed covered agencies to "consult with their General Counsels as to how to implement the President's directive" in the Executive Order, and to consider and implement changes that are "consistent with the President's national security determination." *Id.* at 3.

---

[1] Those agencies and subdivisions include, as relevant here: the Department of Justice; the Department of the Treasury, except the Bureau of Engraving and Printing; certain agencies and subdivisions of the Department of Health and Human Services; certain agencies and subdivisions of the Department of the Interior, including but not limited to the Bureau of Land Management; the Department of Energy, except for the Federal Energy Regulatory Commission; the Environmental Protection Agency; the Federal Communications Commission; and certain subdivisions of the Office of Personnel Management. Exec. Order 14,554, § 2.

Defendant agencies and/or their components are some of the agencies and subdivisions covered by Executive Order 14,251. They have previously executed one or more collective bargaining agreements (CBAs) (including local agreements and memoranda of understanding) that remain currently in effect and cover employees in the relevant components. The CBAs impose demanding burdens on Defendant agencies, and per the President's directive, undermine his authority to supervise and direct agencies with a primary function of advancing the country's national security, intelligence, counterintelligence and investigative work.

However, Defendant agencies have not yet repudiated or repealed their CBAs. Following issuance of the OPM Guidance, the Administration filed two affirmative suits requesting a declaratory judgment that Executive Order 14,251 preempts the full force and scope of agency CBAs that fall within its scope.

On April 8, 2025, the Chief Human Capital Officers Council (CHCOC), an interagency forum led by the OPM Director, shared with agencies, including the Defendant agencies, a Frequently Asked Questions (FAQs) document that addresses agency questions concerning the implementation of Executive Order 14,251. *See* Brooks Decl. ¶ 4. Within the CHCOC FAQs document were the following key points of advice to federal agencies:

> ➢ Agencies should not terminate any collective bargaining agreements ("CBAs") until the conclusion of litigation or further guidance from OPM directing such termination.

> ➢ Agencies should not file any decertification petitions until litigation regarding the Executive Order has been resolved.

> ➢ Agencies should ask the Federal Labor Relations Authority to hold cases where an arbitrator ordered relief for a bargaining unit covered under the Executive Order in abeyance pending the outcome of litigation, where practicable.

*Id.* ¶ 6; *see also* Frequently Asked Questions: Executive Order 14251:"Exclusions from Federal Labor-Management Relations Programs" (April 7, 2025), attached as Ex. 1-B.

## IV.    The Statutory Channeling Requirement

In the FSLMRS, Congress established a dedicated mechanism for resolving disputes regarding alleged unfair labor practices (ULP) for failing to bargain in good faith or comply with the provisions of the FSLMRS.[2] An employee or a union alleging that an agency has "refuse[d] to consult or negotiate in good faith with a labor organization as required by [the FSLMRS]," or that an agency has "otherwise fail[ed] or refuse[d] to comply with any provision of [the FSLMRS]," 5 U.S.C. § 7116(a)(5) and (a)(8), may file a charge of an ULP with the Federal Labor Relations Authority (FLRA). *See* 5 U.S.C. § 7118(a)(1). The FLRA's General Counsel "shall investigate the charge and may issue and cause to be served upon the agency . . . a complaint."[3] *Id.*; *see also id.* § 7104(f). An Administrative Law Judge (ALJ) employed by the FLRA shall conduct a hearing on the complaint, and determine whether an ULP exists. *See id.* §§ 7105(e)(2), 7118(a)(6); 5 C.F.R. § 2423.30. Any exceptions to the ALJ's decision must be filed with the Authority.[4] 5 C.F.R. § 2423.40; *see also* 5 U.S.C. § 7105(f). The Authority issues the final agency decision on the unfair labor practices complaint and can order appropriate relief.[5] *See* 5 C.F.R. § 2423.41; 5 U.S.C. §§ 7105(f)–(g), 7118. The statute also provides exclusive mechanisms for an employee or union to file a grievance in accordance with a negotiated grievance procedure outlined in a collective

---

[2] The statute also provides exclusive mechanisms for an employee or union to file a grievance in accordance with a negotiated grievance procedure outlined in a CBA. *See* 5 U.S.C. §§ 7103(a)(9), 7121.

[3] "In any case in which the General Counsel does not issue a complaint because the charge fails to state an unfair labor practice, the General Counsel shall provide the person making the charge a written statement of the reasons for not issuing a complaint." 5 U.S.C. § 7118.

[4] The Authority is a quasi-judicial body comprised of three full-time members who the President appoints for fixed five-year terms. The Authority adjudicates ULP disputes, among other statutory duties. *See* 5 U.S.C. § 7104; U.S. FLRA, *The Authority: About Us*, https://www.flra.gov/components-offices/components/authority.

[5] If no exceptions to the ALJ's decision are timely filed, then that decision becomes the final decision and order of the Authority. 5 C.F.R. § 2423.41(a).

bargaining agreement. 5 U.S.C. § 7121.

The Authority's final orders, including orders resolving negotiability disputes and ULP charges, are, with few exceptions not relevant here, subject to specified judicial review "in the United States court of appeals in the circuit in which the [aggrieved] person resides or transacts business or in the United States Court of Appeals for the District of Columbia." 5 U.S.C. § 7123(a).

## V.    Procedural History

Plaintiff the National Treasury Employees Union filed this lawsuit on March 31, 2025, ECF No. 1. As of the date of filing, counsel is still confirming whether all Defendants have been properly served with the summons and the Complaint pursuant to Fed. R. Civ. P. 4(i)(1)–(2). On April 4, Plaintiff filed a motion for preliminary injunction, ECF No. 9. On April 7, the Court ordered Defendants to file a response to that motion on or before April 11. Minute Order (Apr. 7, 2025). Defendants hereby oppose the motion.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Accordingly, the moving party must "make a 'clear showing that four factors, taken together, warrant [such] relief'": (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) a balance of the equities in its favor; and (4) accord with the public interest. *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018) (citation omitted). "The likelihood of success and irreparability of harm 'are the most critical' factors." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (citation omitted). And the third and fourth factors "merge when the government is the opposing party." *Id.*

**ARGUMENT**

## I.    Plaintiff Cannot Show Irreparable Harm Absent a Preliminary Injunction

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F. 3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief in order to prevent irreparable harm." *Id.* (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). To qualify as irreparable, the injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297-98. Plaintiff's alleged harms fail to meet this high standard.

Plaintiff claims it will lose substantial revenue from the Defendants' refusal to withhold union dues from employees' paychecks. As an initial matter, it is black letter law in this Circuit that "economic loss does not, in and of itself, constitute irreparable harm." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (citing *Wis. Gas Co.*, 758 F.2d at 674).  And even if economic loss were irreparable, Plaintiff can only speculate as to any economic loss it may suffer from Defendants' failure to withhold dues from employees' paychecks. That is because the termination of automatic withholding is merely a procedural move. Union members remain free to pay their dues directly to the union, rather than through payroll deductions. Plaintiff cannot demonstrate that its members—whose union membership is entirely voluntary—will cease paying union dues in the wake of Executive Order 14,251 or agency decisions not to withhold dues payments.

And in any event, contrary to Plaintiff's assertion, arbitrators and ALJs have broad latitude to fashion appropriate remedies to make a union whole, including by requiring the relevant agency to compensate for revenues lost due to improperly failing to withhold dues. Indeed, when an ULP

causes employees or unions to suffer monetary losses, the Authority requires the offending party to pay backpay, restore leave, or otherwise reimburse them. *U.S. Dep't of Lab., Wash., D.C.*, 37 FLRA 25, 39-41 (1990). And when agencies have violated the dues deduction requirements of § 7115, the Authority routinely orders agencies to reinstate the dues allotments of individuals in the unit whose allotments were unlawfully terminated, and to reimburse the union in an amount equal to the amount of dues it would have received but for the agency's unlawful conduct. *See, e.g., U.S. Dep't of the Treasury, U.S. Mint*, 35 FLRA 1095, 1100 (1990); *Def. Logistics Agency*, 5 FLRA 126, 131-33 (1981); *see U.S. Dep't of Def., Ohio Nat'l Guard,* 71 FLRA 829, 873, 875 (2020) (upholding ALJ decision finding that requiring agencies to reimburse unions when the agency's unlawful conduct prevented dues withholding is "routine[]" and ordering such reimbursement). For these reasons, Plaintiff's asserted economic loss fails to establish the substantial, certain, and unrecoverable injury necessary to justify a preliminary injunction.

Plaintiff next argues that it will suffer an irremediable loss of bargaining power absent immediate relief, both because it will lose members and because losing members will harm its clout, which would in turn result in less power at the bargaining table and fewer non-members choosing to join the union. This speculative chain of possibilities fails to establish irreparable harm. First, no defendant agency has yet taken action to terminate a CBA or to remove individuals covered by Executive Order 14,251 from bargaining units. Indeed, guidance from OPM and CHCOC instructs agencies not to take those actions—so any loss of members is not "certain" or "imminen[t]." *England*, 454 F.3d at 297. Even if agencies did remove NTEU members from bargaining units, those employees could remain members of NTEU—the union would simply no longer be the *exclusive* bargaining representative. Further, even if Plaintiff somehow could establish certain, imminent loss of members, Plaintiff offers no reason why losing current NTEU members while this litigation is pending could not be remedied by a favorable ruling in this case

restoring its scope of representation. Second, any loss of clout or related loss bargaining power is too speculative a basis for granting relief at this stage. Plaintiff provides no support for the proposition that potential members who otherwise would have joined the union will decide not to join because of Executive Order 14,251. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410-11 (2013) (explaining that a "theory of standing[] which relies on a highly attenuated chain of possibilities[] does not satisfy the requirement that a threatened injury must be certainly impending"). Moreover, Plaintiff's asserted loss of "power at the bargaining table"—when it is engaged in bargaining for members who are not subject to the Executive Order, and thus still covered by the FSLMRS—is based only on conjecture. Nothing in the FSLMRS ties an exclusive representative's ability to negotiate a contract with the number of employees it represents inside the bargaining unit. Mere speculation about a loss of bargaining power falls short of the required "clear" showing of irreparable harm. *Winter*, 555 U.S. at 22.

Plaintiff's First Amendment argument also fails to highlight any harm, let alone an irreparable one. In the First Amendment context, "[a] preliminary injunction is not appropriate . . . unless the party seeking it can demonstrate that First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought." *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (citation omitted) (alteration in original).  Plaintiff has shown neither.  Indeed, the Supreme Court has explained that "the First Amendment does not impose any affirmative obligation on the government . . . to recognize [a public employee union] and bargain with it." *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 313 (1979). As a result, "[t]here is . . . no constitutionally protected right to bargain collectively." *Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.*, 391 F. Supp. 2d 1, 8-9 (D.D.C. 2005); *see also Am. Fed'n of Gov't Emps., ALF-CIO v. Loy*, 281 F. Supp. 2d 59, 65 (D.D.C. 2003), *aff'd on other*

11

*grounds,* 367 F.3d 932 (D.C. Cir. 2004). This is precisely why courts have uniformly rejected First Amendment challenges to Presidents' executive orders issued under 5 U.S.C. § 7103(b)(1) denying segments of the Federal Government collective bargaining rights. *See, e.g.*, *Nat'l Treasury Emps. Union v. Reagan*, 509 F. Supp. 1337 (D.D.C. 1981) (rejecting such a challenge and noting an identical holding in *Police Ass'n of the District of Columbia v. Dep't of the Treasury*, No. 78-0236 (D.D.C. May 19, 1980)). To the extent Plaintiff argues that it will suffer irreparable harm due to loss of dues revenue, those arguments fail for the same reasons articulated above. Further, Plaintiff is steadfast that it "will continue to speak out[.]" Mot. at 28. Thus, it has disclaimed any actual chilling effect. In the absence of demonstrated injury to Plaintiff's purported First Amendment rights, Plaintiff fails to show that it will suffer irreparable harm, and on that basis alone, its motion should be denied.

## II.    Plaintiff Cannot Show Likelihood of Success on the Merits of its Claims

Plaintiff cannot establish likelihood of success on the merits for at least two reasons: its claims are statutorily channeled away from district court review, and it would not prevail on the merits in any event.

### A. The FSLMRS precludes district court jurisdiction over Plaintiff's claims.

Plaintiff cannot show that its claims may be heard in district court. By Plaintiff's account, Executive Order 14,251 is invalid, meaning the agencies and subdivisions identified in the Executive Order remain subject to the FSLMRS, and the CBAs with Defendant agencies are therefore valid and binding. Under that theory, Plaintiff's claims must be channeled to the administrative process provided in the FSLMRS, and the D.C. Circuit's decision in *American Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*"), compels dismissal of this case on jurisdictional grounds.

In *AFGE v. Trump*, numerous federal unions, including Plaintiff, asserted broad

constitutional and statutory challenges to a set of three Executive Orders issued by President Trump during his first term. The orders would have enacted substantial changes to the way federal unions operated. The D.C. Circuit reversed a district court decision in favor of the unions on jurisdictional grounds, holding that the comprehensive administrative-judicial review scheme set forth by the FSLMRS channeled jurisdiction from federal district courts. *AFGE v. Trump*, 929 F. 3d at 753, 762. The D.C. Circuit emphasized that most federal labor disputes must be heard through the FLRA review scheme, with any judicial review occurring in the relevant federal court of appeals. *Id.* at 754-61.

This case requires the same jurisdictional outcome. Similar to those plaintiffs' broad challenge to three labor EOs at issue in *AFGE v. Trump*, Plaintiff here alleges that Executive Order 14,251 and OPM guidance will result in financial harm and loss of bargaining power. Specifically, Plaintiff claims that Defendants repudiated the relevant CBAs, refused to recognize and bargain with the relevant unions, and ceased withholding dues. These claims turn on Plaintiff's argument that its members are covered by the FSLMRS's statutory requirements. They therefore fall within the statute's exclusive review scheme and may not be heard in federal district court. *Id.* at 756. Notably, Plaintiff's motion does not address these jurisdictional issues.

The Supreme Court's decision in *Axon Enterprises* does not change the calculus. *See Axon Enterprises v. Fed. Trade Comm'n*, 598. U.S. 175 (2023). As the Court explained in *Axon Enterprises*, "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.* at 185. The D.C. Circuit in *AFGE v. Trump* held that the FSLMRS is such a scheme. And Plaintiff's claims are not like the "wholly collateral" challenge the *Axon* plaintiff brought to the Federal Trade Commission's structure. Rather, the crux of Plaintiff's claim is that Defendant agencies are violating the FSLMRS by implementing the President's Executive Order—precisely the sort of claims that the D.C. Circuit

found precluded in *AFGE v. Trump*.

The *Thunder Basin* factors that the Court applied in *Axon*—the existence of meaningful relief without district court review, whether a claim is "wholly collateral," and the relevance of agency expertise—establish that the FSLMRS precludes district court jurisdiction over Plaintiff's claims. *See Axon*, 598 U.S. at 186 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994)). First, a finding of preclusion in this case does not foreclose meaningful judicial review of Plaintiff's claims. Plaintiff can bring its claims before the FLRA, and any arguments that the FLRA cannot resolve will be addressed by the circuit courts on appeal through the administrative-judicial review process Congress crafted in the FSLMRS. *See* 5 U.S.C. § 7123(a); *AFGE v. Trump*, 929 F.3d at 759. For that reason, Plaintiff's invocation of constitutional claims does not excuse it from the requirement that it first seek relief before the FLRA. *Id.* The Supreme Court has previously held that whether a claim is precluded under the Civil Service Reform Act does not "turn on its constitutional nature . . . but rather on the type of the employee and the challenged employment action." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012). So too here, Plaintiff cannot escape the FSLMRS's preclusive review scheme by framing its breach of contract arguments in constitutional terms. In short, Plaintiff can still receive meaningful judicial review of its claims by bringing them before the FLRA in the first instance followed by an appeal in the circuit courts.

Second, Plaintiff's claims are within the statutory scheme and not collateral to it. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 615 (1984)). As the Supreme Court recently explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated

14

to the "auditing practices" and "business merger" that constituted the subject matter of the agency

actions. *See id.* Nor were they related to the "procedural or evidentiary matters an agency often

resolves on its way to a merits decision." *Id.* No such separation exists here.  Plaintiff challenges

Defendant agencies' refusal to abide by provisions of their CBAs, including a provision requiring

them to deduct union dues from paychecks. These issues fall well within the FSLMRS's broad

definition of "grievance," which CBAs provide the exclusive procedures for resolving.[6] 5 U.S.C.

§ 7103(a)(9); 5 U.S.C. § 7121(a)(1). The Plaintiff also broadly complains that by following the

Executive Order Defendant agencies will not comply with FSLMRS requirements. This is an ULP,

complaints of which the FLRA General Counsel prosecutes. 5 U.S.C. §§ 7116(a)(8), 7118. These

are the kinds of issues central to the FLRA's work and are in no way collateral to the statutory

review provisions.

For similar reasons, Plaintiff's claims are clearly within the expertise of the FLRA.  The

FLRA is the federal authority on matters of federal employment and labor relations. *E.g.*, *Bureau*

*of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 (1983). In concluding that the unions

had to first bring their constitutional claims before the FLRA and MSPB in *AFGE v. Trump*, the

D.C. Circuit noted that those agencies, despite having less expertise on constitutional issues, may

be able to "offer an interpretation of the [statutes] in the course of the proceeding that might

alleviate or shed light on the constitutional concerns." *AFGE*, 929 F.3d at 761.  So too here, the

---

[6] The FSLMRS defines a "grievance" as "any complaint (A) by any employee concerning any matter relating to the employment of the employee; (B) by any labor organization concerning any matter relating to the employment of any employee; or (C) by any employee, labor organization, or agency concerning (i) the effect or interpretation, or a claim of breach, of a collective bargaining agreement; or (ii) any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." 5 U.S.C. § 7103(a)(9). Pursuant to 5 U.S.C. § 7121(a)(1), "any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability," and except for narrow circumstances provided for in the statute, "[these] procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage."

FLRA may well offer an interpretation of the statute or Executive Order 14,251 that obviates the need for addressing some of Plaintiff's broader constitutional arguments. For the foregoing reasons, Plaintiff's claims must be channeled to the FLRA.

> **B.      Plaintiff is unlikely to succeed on its *ultra vires* claims.**

Plaintiff may not escape FSLMRS's channeled jurisdiction by characterizing its claims as *ultra vires*. The mere characterization of Plaintiff's claims as an attack on the President and Defendant agencies' authority is insufficient to overcome the statutory bar. When, as here, "the statute provides us with clear and convincing evidence that Congress intended to deny" judicial review, the characterization of a claim as *ultra vires* is insufficient to confer subject matter jurisdiction. *Bd. of Governors of Fed. Reserve Sys. v. MCorp*, 502 U.S. 32, 44 (1991); *accord DCH Reg. Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) ("Following *MCorp*, there is not much room to contend that courts may disregard statutory bars on judicial review just because the underlying merits seem obvious.").

In any event, "[*u*]*ltra vires* review is . . . only available in extraordinary circumstances." *See DCH Reg. Med. Ctr.*, 925 F.3d at 509 (noting "extremely limited scope" and "extraordinarily narrow" nature of *ultra vires* claims). Indeed, the bar for asserting an *ultra vires* claim is high: Plaintiff must meet a heightened standard "confined to 'extreme'" errors. *See Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 763-64 (D.C. Cir. 2022). Accordingly, an *ultra vires* cause of action requires a violation of a "specific prohibition in the statute that is clear and mandatory," a violation that was "obviously beyond the terms of the statute," or action that was "far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citations omitted). As a result, *ultra vires* claims "rarely succeed." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). As explained below, Executive Order 14,251 was a lawful exercise of the President's statutory authority. Because the President's

decision does not contravene any clear and specific statutory mandate, Plaintiff fails to demonstrate a likelihood of success on the merits of an *ultra vires* claim.

### C.    Executive Order 14,251 is valid.

Plaintiff also is unlikely to succeed on the merits in its challenge to the validity of Executive Order 14,251. The Court lacks authority to review the President's national security-related determinations under § 7103(b). But in any event, the President's determinations are supported.

### 1.    *The President's § 7103(b)(1) determinations are not subject to judicial review.*

Executive Order 14,251 represents the President's exercise of his authority under 5 U.S.C. § 7103(b)(1) to exclude certain agencies or subdivisions from the provisions of Chapter 71. The statute provides:

> The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—
>
> > (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
> >
> > (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1).

As Executive Order 14,251 makes plain, the President determined that each covered agency or subdivision has a relevant primary function, and he determined that Chapter 71's provisions could not be applied to that agency or subdivision in a manner consistent with national security requirements and considerations. And as the statute makes plain, Congress vested the President—and the President alone—with the authority to exclude agencies or subdivisions from Chapter 71's coverage. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization

of Congress, his authority is at its maximum."). This Court lacks authority to second guess the President's determinations as Plaintiff requests.

Courts have repeatedly recognized that § 7103(b)(1) entrusts the relevant determinations to the President alone, without interference from courts or other actors. This Court held decades ago that a § 7103(b)(1) exclusion by President Carter was "not reviewable" because "Congress intended the chief executive to act 'in his or her sole discretion'" when making § 7103(b)(1) determinations. *Nat'l Treasury Emps. Union v. Reagan*, 1981 WL 150530, at *2 (D.D.C. Sept. 3, 1981) (quoting 124 Cong. Rec. H.9633 (daily ed. Sept. 13, 1978)). There, the Court concluded that "Congress granted the President complete discretion in determining the agencies to be excluded from the labor relations provisions," *id.*, leaving judicial review of the President's determinations available only in "instances of constitutional dimension or gross violation of the statute." *Id.* at *2-3.[7]

The D.C. Circuit has echoed that conclusion, observing that "Section 7103(b)(1) makes clear that the President may exclude an agency from the Act's coverage whenever he 'determines' that the conditions statutorily specified exist." *AFGE v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989). And the D.C. Circuit has cautioned that others must not "arrogate … the President's power in this regard"; instead, § 7103(b)(1) "is for the President alone to invoke." *Dep't of Def. v. FLRA*, 685 F.2d 641, 650 (D.C. Cir. 1982).

Indeed, the President need not even "insert written findings in an exempting order[]" under

---

[7] *Reagan* suggested that this exception *may* exist, but did not apply it. But in other contexts, courts have suggested that when judicial review is available only for "gross violations," that "narrow" exception applies only where the action is "plainly beyond the bounds" of the governing statute. *Air Line Emps. Ass'n Int'l. v. Nat'l Mediation Bd.*, 1981 WL 2391 at *1-3 (D.D.C. May 18, 1981). And the President's exercise of authority here plainly falls within the scope of the statute.

§ 7103(b)(1). *AFGE*, 870 F.2d at 727. If the President's order can be sustained without *any* findings, the statute surely does not permit second-guessing or flyspecking of findings actually made. Any other conclusion would be flatly inconsistent with the deference regularly due to the President's national security-related determinations. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (dismissing as "inconsistent with the broad statutory text and the deference traditionally accorded the President in th[e national security] sphere" an argument "for a searching inquiry into … the President's justifications" for a finding about national interests); *Webster v. Doe*, 486 U.S. 592, 600 (1988) (concluding that a statute authorizing the CIA Director to terminate an employee when the Director "shall deem such termination necessary or advisable in the interests of the United States" forecloses "any meaningful judicial standard of review"); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 103 (D.D.C. 2018) (*Webster* retains vitality in "the context of national security"). In sum, "[w]hen it comes to collecting evidence and drawing factual inferences" on questions of national security, "the lack of competence on the part of the courts is marked," and judicial review of those determinations is thus sharply constrained. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (citation omitted).

The President's determination under the statute's second prong—whether the provisions of Chapter 71 "cannot be applied … in a manner consistent with national security requirements and considerations," 5 U.S.C. § 7103(b)(1)(B)—is especially ill-suited to judicial second-guessing. When the President adopts "a preventive measure … in the context of … national security," he is "not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions." *Holder*, 561 U.S. at 35. Determining the "national security requirements and considerations" of the Nation is not a task for which this Court or any other is well-equipped. *See id.* at 34 ("the lack of competence on the part of the courts is marked" (citation omitted)); *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) (refusing to review denial

of security clearance because "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgement … [n]or can such a body determine what constitutes an acceptable margin of error in assessing the potential risk"). Rather, the President is entitled to reach a national security-based finding before the national security is jeopardized. As with the exemption's first prong, this Court is ill situated to second-guess that determination.

### 2. *The identified agencies meet the FSLMRS statutory criteria.*

**A.** In any event, the President's determinations withstand scrutiny. As detailed below, each Defendant agency or subdivision "has as a primary function intelligence, counterintelligence, investigative, or national security work[.]" 5 U.S.C. § 7103(b)(1)(A).

The statute's first three categories of primary functions require no further explanation. As for "national security work," that term has long and consistently been interpreted in the federal labor relations context to refer to work "directly related to protection and preservation of the military, economic, and productive strength of the United States[.]" *Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181*, 4 FLRA 644, 655-56 (1980).

**Department of the Treasury (Treasury).** NTEU's principal complaint is with the exclusion of Treasury, but its national security role is clear, primary, and longstanding. Treasury's "mission is to maintain a strong economy and create economic and job opportunities by promoting the conditions that enable economic growth and stability at home and abroad, strengthen national security by combating threats and protecting the integrity of the financial system, and manage the U.S. Government's finances and resources effectively." U.S. Dep't of the Treasury, *Role of the Treasury*, https://home.treasury.gov/about/general-information/role-of-the-treasury. Put simply, Treasury exists to promote the economic and productive strength of the United States—a core national security mission.

NTEU particularly complains about the exclusion of its largest bargaining unit, the Internal

Revenue Service (IRS). But the IRS falls within the exemption of Treasury, which straightforwardly meets the requirements for exclusion. Regardless, the IRS is tasked with collecting almost all Federal revenues. America's military, economic, and productive capacity directly depend on revenue the IRS collects, and IRS tax collections fund almost everything the Federal Government does. *See* IRS, *The agency, its mission and statutory authority*, https://www.irs.gov/about-irs/the-agency-its-mission-and-statutory-authority. History underscores that military readiness through revenue collection is a primary function of the IRS. After all, it was created in 1862 to collect taxes needed to fund the Civil War. *See* IRS, *Historical Highlights of the IRS*, https://www.irs.gov/newsroom/historical-highlights-of-the-irs. And as NTEU admits, the IRS has a primary investigative function, as a principal duty is auditing tax filings. *See* Mot. at 12 ("NTEU-represented employees at IRS … conduct taxpayer audits[.]").

**Department of Energy.** The Department's primary role is setting national energy policy, with obvious national security objectives and implications. The same Congress that enacted the FSLMRS acknowledged the Department's national security objectives, closely tied to its role in regulating domestic energy production, when it created the Department. *See* 42 U.S.C. § 7111(2) ("[O]ur increasing dependence on foreign energy supplies present a serious threat to the national security of the United States and to the health, safety and welfare of its citizens."). The Department "ensure[s] the security of the U.S. nuclear weapons stockpile," "manages the Strategic Petroleum Reserve, invests in protection against cyber and physical attacks on U.S. energy infrastructure," and "provides training tools and procedures for emergency response and preparedness." U.S. Dep't of Energy, *Energy Security*, https://www.energy.gov/topics/energy-security. On his first day in office, President Trump recognized that "[e]nergy security is an increasingly crucial theater of global competition"; "hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause

dramatic swings within international commodity markets"; and "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." Exec. Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 20, 2025).

**Bureau of Land Management.** Domestic energy production is a critical national security priority, and the Bureau of Land Management oversees energy production on America's hundreds of millions of acres of public lands as one of its principal responsibilities. The Bureau thus directly manages the Nation's "economic[] and productive strength." *Oak Ridge*, 4 FLRA at 655-56. The Bureau's public lands management also plays a substantial role in funding the Federal Government's operations through mineral development, the Nation's second-largest revenue source after tax revenue. *See* Bureau of Land Management, *About the BLM Oil and Gas Program*, https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/about.

**Department of Health and Human Services (HHS) Subdivisions.** The relevant HHS subdivisions play major roles in, and have as primary functions, the "protection and preservation of the military, economic, and productive strength of the United States," *Oak Ridge*, 4 FLRA at 655-56, given their critical roles in pandemic and bioterrorism preparedness and response. The Office of the Secretary plays key roles in achieving that objective, including by holding the power to declare an emergency in the event of a pandemic or bioterrorist attack, and broad powers stemming from such a declaration, 42 U.S.C. § 247d(a). The Centers for Disease Control and Prevention (CDC) likewise "has an essential role in defending against and combatting public health threats domestically and abroad," including the threat of "bioterrorism." 42 U.S.C. § 247d-4(a)(1). And the Administration for Strategic Preparedness and Response similarly "leads the nation's medical and public health preparedness for, response to, and recovery from disasters and public health emergencies." ASPR, *ASPR: Administration for Strategic Preparedness and Response*, https://aspr.hhs.gov/Pages/Home.aspx; *see* 42 U.S.C § 300hh-10(f)(1) ("[T]he Assistant

Secretary for Preparedness and Response shall implement strategic initiatives or activities to address threats, including pandemic influenza and which may include a chemical, biological, radiological, or nuclear agent … that pose a significant level of risk to public health and national security.").

The Food and Drug Administration (FDA) is best known for investigating the efficacy of drugs and medical treatments like vaccines. These investigative functions also directly affect America's economic and productive strength—for example, the FDA's rapid approval of the COVID-19 vaccine facilitated the reopening of the American economy. Likewise, a secure food supply is critical to national security, as Congress recognized in 2011 by passing the Food Safety Modernization Act to enhance the FDA's authority to prevent and respond to foodborne threats, including terrorist threats. *See* Pub. L. No. 111-353, 124 Stat. 3885. Likewise, preparedness for chemical, biological, radiological, and nuclear threats is a key part of FDA's mission, as it collaborates with other agencies to approve and stockpile treatments for national security threats such as anthrax, smallpox, and the like. *See* Press Release, *HHS Strengthens Country's Preparedness for Health Emergencies, Announces Administration for Strategic Preparedness and Response (ASPR)* (July 22, 2022), https://www.hhs.gov/about/news/2022/07/22/hhs-strengthens-countrys-preparedness-health-emergencies-announces-administration-for-strategic-preparedness-response.html. And the FDA's authority to issue Emergency Use Authorization for critical treatments, such as the COVID-19 vaccine, represents an important part of its mission and a crucial tool for maintaining the country's military, economic, and productive strength.

Finally, the Office of Refugee Resettlement has as its mission aid to refugees and other immigrants. Immigration and the government's policy toward foreign nationals within the country are core national security issues and emphatically within the President's national security prerogatives. *See, e.g.*, *Hawaii*, 585 U.S. at 704.

**Department of Justice (DOJ).** DOJ performs investigative, intelligence, and national security work as primary functions. DOJ's investigative work is carried out, for example, by prosecutors in U.S. Attorney's Offices, the Drug Enforcement Administration, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, and Firearm as well as its other litigating components. *See* U.S. Dept. of Just., *Organization, Mission and Functions Manual*, https://www.justice.gov/doj/organization-mission-and-functions-manual. The Bureau of Prisons conducts internal investigations into inmate activities, including identifying and monitoring terrorist inmates' communications. *See* U.S. Dept. of Just. Off. of the Inspector General, *DOJ OIG Releases Report on the BOP's Monitoring of Inmate Communications to Prevent Radicalization* (Mar. 25, 2020), https://oig.justice.gov/news/doj-oig-releases-report-bops-monitoring-inmate-communications-prevent-radicalization. DOJ's national security and intelligence missions are carried out by its National Security Division, which "consist[s] of the elements of the Department of Justice … engaged primarily in support of the intelligence and intelligence-related activities of the United States Government." 28 U.S.C. § 509A(b). Similarly, DOJ litigating divisions prosecute terrorist and other foreign threats against U.S. citizens, while other DOJ arms investigate and prevent hostile actions. This is why DOJ components like the National Security Division, U.S. Attorney's Offices, and the Criminal Division have long been exempted under 5 U.S.C. § 7103(b)(1).

**Environmental Protection Agency (EPA).** As the FLRA has recognized, EPA's mission of environmental regulation, investigation, and enforcement is a national security mission. "Any sabotage or interference with the availability of safe drinking water or breathing air may impact the economic and productive strength of the country as well as the general health and safety of U.S. citizens." *United States EPA*, 70 FLRA 279, 283 (2017). EPA also has taken on a role in energy policy through its regulation of greenhouse gas emissions under the Clean Air Act. *See,*

*e.g.*, *New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units*, 89 Fed. Reg. 39,798 (May 9, 2024). EPA policies like its mandate to produce electric vehicles have serious national security implications, including by making America dependent on its adversaries for critical minerals necessary to produce electric vehicle batteries. *See Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024). Congress has long recognized that policies that reduce our reliance on foreign nations for critical resources implicate national security. *See* 42 U.S.C. § 7111.

**Federal Communications Commission (FCC).** Congress created the FCC "for the purpose of the national defense[.]" 47 U.S.C. § 151. The FCC secures the Nation by regulating and protecting its communications networks—crucial infrastructure for national defense and America's economic productivity. The acknowledged primacy of national security in the agency's mission and operations is reflected, for example, in its Council on National Security, which "leverage[s] the full range of the Commission's regulatory, investigatory, and enforcement authorities to protect America and counter foreign adversaries, particularly the threats posed by the People's Republic of China (PRC) and Chinese Communist Party (CCP)." FCC, *FCC Council on National Security*, https://www.fcc.gov/fcc-council-national-security.

**Office of Personnel Management (OPM).** OPM's Office of the Chief Information Officer has as a primary function national security. Its role is to operate, maintain, and protect OPM's information technology infrastructure, including protecting agency systems from cyberattacks by hostile nation-states. *See* OPM, *Information Technology Strategic Plan*, Fiscal Years 2023-2026, at 5-6, https://www.opm.gov/about-us/reports-publications/2023-2026-information-technology-strategic-plan.pdf; *see, e.g.*, Chris Jaikaran, Cong. Rsrch. Serv., IF 12798, Salt Typhoon *Hacks of Telecommunications Companies and Federal Response Implications* (Jan. 23, 2025) (detailing

ongoing cyberattacks by People's Republic of China state-sponsored hackers), https://www.congress.gov/crs-product/IF12798. The scale of the cybersecurity incidents OPM has experienced, resulting in exposure of personal information of tens of millions of Federal Government employees, demonstrates the critical national security implications of OPM's cybersecurity functions. *See* OPM, Cybersecurity Resource Center, FAQs, https://www.opm.gov/cybersecurity-resource-center/faqs/ ("In 2015, OPM announced malicious cyber activity on its network and identified two separate but related cybersecurity incidents which had impacted the data of approximately 22.1 million Federal government employees, contractors, and others."). The United States undoubtedly has a national security interest in the integrity of its federal workforce and workforce information.

In sum, each Defendant agency "has as a primary function intelligence, counterintelligence, investigative, or national security work[.]" 5 U.S.C. § 7103(b)(1)(A).

**B.** The President also properly determined that the provisions of Chapter 71 cannot be applied to any of the exempted agencies or subdivisions "consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). As detailed already, each Defendant agency or subdivision has a significant, critical national security mission. When it comes to national security, the needs of the mission dictate working conditions. By nature, national security work may and does, at any time, require changes in working conditions or employee status to be accomplished without hesitation, advanced notice, or opportunity to bargain with labor organizations. The President's "executive decisions" in the national-security realm require "delicate, complex" assessments and rapid responses from agencies and employees. *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948)

But CBAs negotiated under the FSLMRS, including those of Defendant agencies, are by nature designed to reduce the control of the agency or subdivision over its personnel and

operations. For example, under the FSLMRS, agencies must postpone operational changes that substantively affect working conditions until they have offered the relevant union or unions an opportunity to bargain and finished any subsequent negotiations, including impasse proceedings when needed. The FLRA routinely pauses agency attempts to implement changes before this midterm bargaining process has concluded. *See, e.g.*, *Army Corps of Eng'rs,* 53 FLRA 79, 81 (1997). This process often imposes delays of months or years before operational changes can take effect; for example, the Department of Energy spent over 14 months negotiating the comparatively minor issue of office-sharing for employees on partial telework. *See NTEU Ch. 213 & 228 and U.S. Dep't of Energy*, 2023 FSIP 041 (2023). The President has permissibly concluded that requiring lengthy delays before agencies with important national security roles can ordinarily adjust their operations is incompatible with national security considerations.

Employee performance is also critical in agencies with important national security roles. Many provisions in the Defendant agencies' CBAs make it more difficult to remove employees who perform poorly. For example, CBAs often require "performance improvement periods" (PIPs) of at least 60 days before agencies can propose removing an employee for poor performance. *See, e.g.*, IRS & NTEU, *2022 National Agreement* 142, https://www.jobs.irs.gov/sites/default/files/nho_documents/2022-National-Agreement.pdf. ("never less than sixty (60) days"). Even after that process, CBAs allow unions to grieve dismissals of poor performers to binding arbitration, with arbitrators overturning approximately three-fifths of removals they hear. *See* James Sherk, America First Policy Inst., *Union Arbitrators Overturn Most Federal Employee Dismissals* 5 (2022). The result: OPM recently found that a plurality of federal employees reported that poor performers in their work units typically "remain in the work unit and continue to underperform," including at most of the Defendant agencies. *See* OPM, *2023 Office of Personnel Management Federal Employees Viewpoint Survey: Report by Agency* 49-60,

https://www.opm.gov/fevs/reports/data-reports/data-reports/report-by-agency/2023/2023-agency-report.pdf. The President permissibly concluded that CBAs operating under the provisions of Chapter 71 that impede or prevent Defendant agencies from separating underperforming employees are inconsistent with national security considerations.

Plaintiff protests that the Defendant agencies have thus far been able to operate subject to CBAs without imperiling national security. That assertion ignores NTEU's newly stated goal of interfering with the President's control over the agencies and subdivisions in which it represents employees. *See, e.g.*, Compl. ¶ 63 (describing NTEU as "f[igh]t[ing] back against President Trump's agenda" and identifying steps it has taken in pursuit of that goal, such as filing dozens of grievances against Administration policies). That assertion also ignores that national-security determinations inevitably involve the exercise of "[p]redictive judgment" about risks to national security. *Egan*, 484 U.S. at 529; *see Hawaii*, 585 U.S. at 708 (national-security judgments "involve large elements of prophecy"). They also involve policy determinations about what level of risk is tolerable in any given set of circumstances. The Court should not second-guess the President's determinations about the relevant "national security requirements and considerations" at all, 5 U.S.C. § 7103(b)(1)(B), because—to reiterate—"it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see supra* Section II(C)(1). But the Court certainly must not second-guess those determinations in a retrospective manner, based on the agencies, threats, and union behavior of yesteryear.

**C.** Plaintiff's contrary arguments are unavailing. While Plaintiff points to other functions of Defendant agencies, they do not belie the President's determination that those agencies have "as a primary function intelligence, counterintelligence, investigative, or national security work." 5 U.S.C. § 7103(b)(1). Plaintiff likewise attempts to shift the focus to the specific work performed

by its represented employees, but the statute focuses on the functions of the "agency or subdivision thereof" as a whole, not the work responsibilities of any specific employee. *Id.* For the same reason, Plaintiff's focus on subdivisions of Treasury is irrelevant. *See* Mot. at 17-19 (discussing the Office of the Comptroller of the Currency and the Alcohol and Tobacco Tax and Trade Bureau). The President exempted all of Treasury, with the exception of the Bureau of Engraving and Printing. That means that the relevant question is whether the exempted agency, as a whole, has a relevant primary objective, not whether a different, hypothetical executive order could have exempted various subdivisions of the agency.

Plaintiff's argument that some of its represented employees "received and accepted offers to participate in this Administration's 'deferred resignation program,'" which "was not available to employees in 'positions related to … national security,'" fails for a similar reason. The deferred resignation program looks to an individual employee's role and responsibilities, while § 7103(b)(1) looks to the primary functions of the exempted agency or subdivision. There is no inconsistency in concluding that an agency has a primary national security function while a particular employee within that agency may not occupy a national security-related position.

Plaintiff likewise accuses the President of improper and retaliatory motives in promulgating Executive Order 14,251. Mot. at 21-24. But § 7103(b)(1) does not suggest or authorize a searching inquiry into the President's motives, and neither it nor any other source of law Plaintiff identifies requires the President to ignore larger policy objectives in deciding whether to exercise his authority to exclude agencies or subdivisions as § 7103(b)(1) allows. And Plaintiff's baseless and speculative suggestions of retaliation sound in a retaliation claim, not an improper determination under the statute, and fail for the reasons explained below.

### D.    Plaintiff is unlikely to succeed on its First Amendment retaliation claim.

Perhaps recognizing that its challenge to the Executive Order's validity under the FSLMRS

would not succeed, Plaintiff launches a second offensive: Plaintiff asserts that Executive Order 14,251 was issued in retaliation for Plaintiff's numerous lawsuits challenging President Trump's actions. Mot. at 26. This claim is unlikely to succeed for two reasons: (1) courts cannot look behind a facially legitimate presidential action to search for allegedly illicit motives; and (2) Plaintiff cannot meet the high bar to establish that retaliation occurred.

Executive actions that are facially valid—that is, within the lawful authority of the executive—are entitled to a presumption of regularity. That courts traditionally defer to the Executive Branch in areas committed to its discretion, especially in matters of national security, is well-established. "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Found.*, 272 U.S. 1, 14 (1926). Indeed, "judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268, n.18 (1977)); *see also id.* at 787 (Thomas, J., concurring in part) ("[W]e have often stated that courts reviewing agency action owe the Executive a 'presumption of regularity.'") (citation omitted). That presumption imposes a bar to review that is difficult to surmount. Overcoming it requires a "strong showing of bad faith or improper behavior." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, No. 23-1038, 2025 WL 978101, at *18 (Apr. 2, 2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). Plaintiff cannot clear that bar.

As courts have held time and again, the Court's review of a presidential decision is limited to "whether the Executive gave a 'facially legitimate and bona fide' reason for its action. *Hawaii*, 585 U.S. at 703 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972)). The President wields

significant authority over both matters of national security and federal labor-management relations—authority assigned to him both by the constitutional structure and by numerous federal statutes. *See e.g.,* 5 U.S.C. § 7103. Given that authority, "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against a plaintiff's asserted constitutional interests. *Mandel*, 408 U.S. at 770.

As explained above, the President has acted within the bounds of his clear authority over Executive Branch employees. *See, e.g.*, *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 496-97 (2010) ("Article II makes a single President responsible for the actions of the Executive Branch." (internal quotation marks and citation omitted)). The President provided legitimate reasons for exempting the covered agencies and subdivisions from coverage under the FSLMRS, grounded in his statutory and constitutional responsibility to direct the actions of the Executive Branch. The Court's inquiry should stop here.

And even if the Court could properly look behind the President's stated justification, Plaintiff's claim fails on the merits. To state a claim for First Amendment retaliation, a plaintiff must allege that: "(1) [it] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link exists between the exercise of a constitutional right and the adverse action taken against [it]." *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 46 (D.D.C. 2021) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)). Plaintiff has not established that it is likely to succeed on such a claim here.

Most fundamentally, Plaintiff fails to show that the President's allegedly retaliatory motive was the cause of its alleged injury. *See Nieves v. Barlett*, 587 U.S. 391, 398-99 (2019). Plaintiff's primary contention is that Executive Order 14,251 must be retaliatory because the exemptions are

broader than the FSLMRS permits. Mot. at 28. But that argument is both circular and incorrect—as explained in detail above, the President's exemption decision was plainly consistent with his statutory authority to exempt agencies with a primary national security purpose under 5 U.S.C. § 7103(b)(1), and it was adopted for facially legitimate national security reasons. But on Plaintiff's theory, its retaliation claim must fail if its substantive objections to the exemptions fail.

Plaintiff further suggests that the White House "Fact Sheet" regarding the Executive Order and a separate lawsuit filed in the Eastern District of Kentucky—both of which note that certain federal-sector unions have taken actions hostile to the President's policy objectives—offer evidence of retaliatory motive. But neither passes muster. As both the Fact Sheet and the Government's Kentucky Complaint explain at length, the President signed Executive Order 14,251 in service of two of his top policy priorities: protecting Americans from threats to our national security and improving the efficiency and efficacy of the federal workforce. When the Federal Government can show that it would have taken the challenged action absent the asserted First Amendment activity, a retaliation claim must fail. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). That is precisely the case here, where the President acted consistent with his longstanding policy priorities and with the motive of ensuring he can efficiently supervise agencies that have a primary purpose implicating national security and investigative functions.

Finally, Plaintiff has also failed to establish any chilling effect. "Not every government restriction … is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory," *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006) (citation omitted). Plaintiff suggests that because Section 7 of Executive Order 14,251 directs agency heads to determine whether other agency subdivisions should be exempt under the FSLMRS, the Executive Order "would deter a similarly situated individual of ordinary firmness

from exercising his or her constitutional rights" to avoid prompting further exemptions. Mot. at 27-28 (citation omitted). But the President's instruction that agencies provide input as to whether the President should exercise his statutory authority is not an action directed at Plaintiff at all, let alone an action that could plausibly operate to deter expressive activity. *See e.g., Kensington Vol. Fire Dep't., Inc. v. Montgomery Cnty.*, 684 F.3d 462, 468 (4th Cir. 2012) (rejecting Plaintiffs' First Amendment retaliation claim where "the budget eliminated some of Plaintiffs' funding, [but] its effect was not felt by Plaintiffs alone"). Further, while a court must consider the alleged retaliatory action against a person of ordinary firmness, "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005); *see also Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *11 (D.D.C. Aug. 23, 2024) (considering plaintiffs' "actual response" to alleged retaliatory conduct to determine whether chilling effect occurred). And indeed, Executive Order 14,251 apparently has not had any actual chilling effect on Plaintiff, which firmly asserts that it "will continue to speak out … against the Administration's overreach, including in the courts." Mot. at 28.

Plaintiff has not established that it is likely to succeed on the merits of its retaliation claim. So that claim likewise cannot support a preliminary injunction here.

## III.    The Balance of The Equities and The Public Interest Favor the Government

A preliminary injunction also is not appropriate because the balance of the equities and the public interest weigh in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). As an initial matter, given that Plaintiff cannot establish the first two factors necessary to obtain a preliminary injunction, "it is clear [it] cannot make the corresponding strong showings [on the second two factors] required to tip the balance in its favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d

1288, 1295 (D.C. Cir. 2009).

The remaining factors, however, also weigh in Defendants' favor. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025). It is vital that agencies with a primary purpose of national security are responsive and accountable to the American people. The clear congressional purpose of § 7103(b)(1) is to allow the President to guarantee the effective operation of agencies relevant to national security without the constraints of collective bargaining. Moreover, the public has an interest in ensuring that agencies with a primary intelligence, counterintelligence, investigative, or national security function operate effectively and without delay to protect the American people. A preliminary injunction would displace and frustrate the President's decision about how to best address issues of national security, matters on which the courts typically defer to the President's judgment. Indeed, courts must "give deference to the Executive Branch's 'evaluation of the facts' and the 'sensitive and weighty interests of national security[,]' including 'the timing of those . . . decisions.'" *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (quoting *Humanitarian Law Project*, 561 US. at 33-34, then *Holy Land Found. For Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002)).

Plaintiff contends that there is a public interest in "honoring the collective bargaining rights that [are] afforded federal workers." Mot. at 35. The balance of equities and the public interest point in the opposite direction, however: the President has long been charged with directing the Executive Branch workforce, and he has determined that agencies with a primary national security focus are being hamstrung by restrictive terms of CBAs that frustrate the ability of the President to safeguard the interests of the American people. The democratically-elected President's determination regarding the public interest in that sphere is entitled to deference.

34

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion for a preliminary injunction.


Dated: April 11, 2025

YAAKOV M. ROTH
Acting Assistant Attorney General
EMILY M. HALL
SARAH E. WELCH
Counsel to the Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

ALEXANDER K. HAAS
Director
Civil Division, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Branch Director
Civil Division, Federal Programs Branch

   */s/ Lydia J. Jines*
LYDIA JINES (MD Bar No. 2205230001)
JEREMY MAURITZEN
Trial Attorneys
LISA ZEIDNER MARCUS
Senior Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L St., NW, Twelfth Floor
Washington, DC 20530
Tel: (202) 353-5652
Fax: (202) 616-8470
Email: Lydia.Jines@usdoj.gov

*Counsel for Defendants*