**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION<br>800 K Street N.W., Suite 1000<br>Washington, D.C. 20001,<br>　　　　　　　　　　　*Plaintiff,*<br>v.<br>DONALD J. TRUMP,<br>President of the United States<br>1600 Pennsylvania Avenue N.W.<br>Washington, D.C. 20500, *et al.,*<br>　　　　　　　　　　　*Defendants.* | Case No. 1:25-cv-00935<br>(PLF)<br><br>**HEARING SCHEDULED<br>FOR APRIL 23** |

**PLAINTIFF NTEU'S REPLY IN SUPPORT OF ITS
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

Table of Contents.................................................................................................i

Table of Authorities...........................................................................................ii

Introduction.........................................................................................................1

Argument.............................................................................................................2

    I.      **NTEU's Ultra Vires Claims Will Likely Succeed.** ...................................2

          A.    NTEU's Statutory Claims Are Reviewable and No Presumption of Regularity Applies. ........................................................................... 3

          B.    The Government Does Not Contest that the Executive Order's Exclusions Were Based on Considerations Outside of the Statutory Criteria. ........................................................................................ 5

          C.    The Government's Limitless National Security Argument Conflicts with Supreme Court Precedent, Would Defeat the Statute as a Whole, and Is Flawed in Other Critical Respects. ................................. 7

    II.     **NTEU's First Amendment Retaliation Claim Is Likely to Succeed.**...............................................................................13

    III.    **Defendants' Jurisdictional Argument Fails and Reflects the Government's Inconsistent Positions in the Federal Courts.** .........17

    IV.    **The Defendants Do Not Meaningfully Contest Irreparable Harm.** ............................................................................20

    V.     **Defendants' Equities Arguments Ignore Congress's Role in Our System of Government and Its Findings on the Public Interest.** ......................................................................................23

Conclusion ........................................................................................................24

## TABLE OF AUTHORITIES

# Cases

*AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019)..........................................................19, 20

*AFGE, AFL-CIO Local 1738*, 73 F.L.R.A. 339 (2022)..........................................................6

*AFGE, AFL-CIO Local 446 v. Nicholson*, 475 F.3d 341 (D.C. Cir. 2007)....................19

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) ........................................................13, 14

*Asseo v. Centro Medico Del Turabo, Inc.*, 900 F.2d 445 (1st Cir. 1990).......................22

*Chamber of Com. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)...............................................3

*Cole v. Young*, 351 U.S. 536 (1956) .........................................................................9, 10

*Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803 (9th Cir. 2017) ..............................4

*Dep't of Energy, Oak Ridge Ops.*, 4 F.L.R.A. 644 (1980) .................................................9

*DHS, ICE*, 70 F.L.R.A. 628 (2018) ..................................................................................6

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) ..........................23

*Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015)..................................................................20

*Latif v. Obama*, 666 F.3d 746 (D.C. Cir. 2011) ..............................................................5

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)............................................9, 13

*Nat'l Fed'n of Fed. Emps. v. McDonald*, 128 F. Supp. 3d 159 (D.D.C. 2015) ..............10

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ...................................................15

*NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559 (7th Cir. 1996)............................................22

*NTEU v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006) .........................................................22

*OPM v. FLRA*, 864 F.2d 165 (D.C. Cir. 1988) .............................................................10

*Perkins Coie LLP v. DOJ*, No. 1:25-cv-716 (Mar. 12, 2025) ..........................................14

*Small v. Avanti Health Sys., LLC*, 661 F.3d 1180 (9th Cir. 2011) ................................22

*TikTok Inc. v. Trump*, 490 F. Supp. 3d 73 (D.D.C. 2020) ........................................23, 24

*U.S. Atty's Off, S. Dist. of Tex., Hous., Tex.*, 57 F.L.R.A. 750 (2002)............................18

*U.S. Dep't of Treasury v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky.) .................13, 15, 16

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir. 1977)........................................................................................................................3

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. 1:25-cv-917, 2025 U.S. Dist. LEXIS 61536 (D.D.C. Mar. 28, 2025) ...........14, 21

*Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) .......................................20

## Statutes

5 U.S.C. § 7101(a) ........................................................................................ 7, 23

5 U.S.C. § 7103(b)(1) ......................................................................................passim

5 U.S.C. § 7106 .................................................................................................. 6

5 U.S.C. § 7115 ........................................................................................... 1, 21

## Executive Orders

Exec. Order No. 14,215, 90 Fed. Reg. 10,447 (Feb. 24, 2025) ..........................19

Executive Order No. 14,251, *Exclusions from Labor-Management Relations Program* (Mar. 27, 2025) ................................................................. 1, 7, 11, 15

## Other Authorities

*About Us*, American Federation of Government Employees, www.afge.org/about-us/agencies/bureau-of-prisons-bop/ (last visited Apr. 12, 2025) ...................7

Charles Ezell, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs*, OPM (Mar. 27, 2025).............................................5, 6

Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (March 27, 2025)..............................................................................passim

## INTRODUCTION

Plaintiff National Treasury Employees Union (NTEU) respectfully submits this reply in support of its motion for a preliminary injunction with respect to Executive Order No. 14,251, *Exclusions from Labor-Management Relations Program* (the Executive Order). The Executive Order strips collective bargaining rights from about two-thirds of the nearly 160,000 federal workers represented by NTEU.

Defendants' opposition to NTEU's motion shows that their path to success requires two things from this Court. The first is a rubber stamp of the President's unprecedented and sweeping exemption of nearly a dozen NTEU-represented agencies from the federal sector labor statute, none of which has a "primary function" of national security and most of which have fallen within the statute's coverage for decades. The second is a blind eye towards the Administration's effective admissions that the exemptions are based not on national security concerns but on the Administration's desires to facilitate mass firings of federal workers and to hurt unions that stand up to the President's agenda.

Defendants' path to avoiding preliminary relief also requires that this Court accept a blatant factual misstatement: that the agencies or agency components that the President excluded from the federal sector labor statute are honoring their collective bargaining agreements with NTEU. They are not. Agency defendants have, in fact, stopped processing dues payments to NTEU through the payroll deduction system that Congress created in 5 U.S.C. § 7115. These agencies have also stopped bargaining with NTEU on changes to conditions of employment;

1

stopped participating in the collectively bargained grievance-arbitration process; and are issuing reduction-in-force notices that, consistent with the Office of Personnel Management's guidance, state that the reduction-in-force procedures in collective bargaining agreements will not be honored.[1] *See* Supplemental Declaration of Daniel Kaspar ("Kaspar Supp. Decl.") (Apr. 16, 2025) ¶¶ 9–24.

NTEU's collective bargaining agreements, in the eyes of the federal agencies sued here, are a dead letter. NTEU might be dead soon, too, absent preliminary relief. Its losses from dues revenue that the agency defendants have refused to transmit via payroll deduction, as their collective bargaining agreements require, already exceed $2 million. NTEU is losing more than half of its revenue—losses from which it will soon be unable to recover. The balance of equities and public interest favor preserving the existence of NTEU and federal sector collective bargaining—and not allowing an unchecked Executive to destroy Congress's regime.

## ARGUMENT

### I.    NTEU's Ultra Vires Claims Will Likely Succeed.

NTEU has shown, with its claims that the Executive Order conflicts with the Federal Service Labor-Management Relations Statute (the Statute), that a "serious

---

[1] Those agencies, as relevant here, include the Internal Revenue Service (IRS), IRS Office of Chief Counsel, Federal Communications Commission (FCC), Department of Energy (DOE), Bureau of Fiscal Service (BFS), Environmental Protection Agency (EPA), Treasury's Departmental Offices, Office of the Comptroller of the Currency (OCC), Alcohol and Tobacco Tax and Trade Bureau (TTB), Bureau of Land Management (BLM), and the Department of Justice (DOJ). Health and Human Services (HHS) remains within the statute's coverage in part and its collective bargaining agreement with NTEU thus remains in effect as to that portion of the agency.

legal question" is at issue. *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977). Defendants concede that such claims are reviewable. And no "presumption of regularity" is owed to the President's national security exemptions where the Administration's own words show that policy objectives and political animus motivated the sweeping Executive Order instead of an application of Section 7103(b)(1)'s narrow criteria. Finally, the government's expansive—and limitless—argument regarding its ability to exempt federal agencies from the Statute on national security grounds conflicts with Supreme Court precedent and thus fails.

### A. NTEU's Statutory Claims Are Reviewable and No Presumption of Regularity Applies.

NTEU has argued that the President exceeded his narrow statutory authority in 5 U.S.C. § 7103(b)(1) through his sweeping and improperly motivated exclusions, individually and collectively. *See* NTEU's Memorandum in Support of its Motion for a Preliminary Injunction (NTEU Mem.) at 10–26. "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

1.    The government argues that NTEU's ultra vires claims are not judicially reviewable, citing the very limited number of cases involving presidential carve-outs under Section 7103(b)(1). *See* Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction (Opp.) at 17–20. Those cases, however, involved

very narrow exemptions of agency divisions or suboffices based solely on the statutory criteria.

But even those distinguishable cases show, as the government ultimately concedes, that this Court may review national security exemptions that are "plainly beyond the bounds" of the Statute; reflect a "gross violation of the [S]tatute"; or present a "constitutional" question. *See* Opp. at 18 & n.7. Those are the types of arguments that NTEU presents here. So these otherwise uninstructive decisions defeat the government's threshold argument.

**2.**    Ultimately, "[w]hen confronting a statutory question touching on . . . national security . . . a court does not adequately discharge its duty by pointing to the broad authority of the President and Congress and vacating the field without considered analysis." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 827 (9th Cir. 2017). *Contra* Opp. at 20 (arguing that this Court is "ill situated" to apply one of Section 7103(b)(1) criteria).

This unprecedented situation urgently calls for the Court to engage in judicial review instead of allowing the President to proceed unchecked. Never before has a president issued an executive order that exempts agencies or agency components from the Statute based avowedly on policy considerations outside of Section 7103(b)(1)'s narrow criteria. Typical arguments against judicial review—a concern with probing presidential motivations or second-guessing national security decisions (*see* Opp. at 29–30)—are inapplicable where the White House explicitly states the President's improper motivations for his national security decisions:

here, a desire to make federal employees easier to fire and to exact political revenge on "[c]ertain Federal sector unions."[2]

Defendants' effective concessions as to their improper motivations, moreover, present the "clear evidence" needed to overcome any presumption of regularity that might be owed the President's national security exemptions. *See Latif v. Obama*, 666 F.3d 746, 748 (D.C. Cir. 2011). In other words, the Administration's contemporaneous statements about the Executive Order should deprive it of the rubber stamp for which it argues.

### B.    The Government Does Not Contest that the Executive Order's Exclusions Were Based on Considerations Outside of the Statutory Criteria.

Far from contesting that the President failed to stay within the bounds of Section 7103(b)(1)'s criteria for national security exemptions, the government doubles down on the President's policy objections to the existence of federal sector unions in its brief. *See* Opp. at 26–28. Those generalized and incorrect policy arguments against Congress's decision to codify collective bargaining in the federal sector cannot justify the President's national security exemptions of the agencies at issue here. Instead, they show that the President has exceeded his narrow statutory

---

[2] *See* NTEU Mem. at 6–9 (discussing Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ ("Fact Sheet"), and Charles Ezell, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs*, OPM (Mar. 27, 2025), https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf ("OPM Guidance")).

authority to exclude agencies or agency components based on the criteria that Congress established in Section 7103(b)(1).

1.    Defendants do not resist the notion that the President's national security exemptions were based on "larger policy objectives" (Opp. at 29)—those that are discussed in the White House Fact Sheet and the OPM Guidance on the Executive Order. Indeed, under the guise of national security, Defendants mimic the President's policy concerns about federal sector unions generally, parroting his view that unions make it harder to fire federal employees (Opp. at 27) and characterizing protected activity like filing legal actions as "interfering with the President's control over [his] agencies" (Opp. at 28).

This is not an appropriate Section 7103(b)(1) analysis. It strays beyond the bounds of Congress's narrow statutory criteria. And Defendants are wrong, in any event, that unions "reduce the control" of agencies over their employees or "routinely pause[] agency attempts to implement changes" before bargaining with a union. Opp. at 26–27. The Statute grants agencies wide latitude to act without delay in exigent situations, and it frequently allows bargaining to occur after an agency implements a change to working conditions.[3] Also, Congress itself provided

---

[3] *See* 5 U.S.C. § 7106 (granting agencies the right "to take whatever actions may be necessary to carry out the agency mission during emergencies"); *AFGE, AFL-CIO Local 1738*, 73 F.L.R.A. 339, 340 (2022) (agency may unilaterally change work schedules contrary to parties' contract under a declared national emergency); *DHS, ICE*, 70 F.L.R.A. 628, 630 (2018) (agency may bargain after implementing changes to condition of employment if made pursuant to a law or government-wide regulation).

the rejoinder to Defendants' policy objections with its finding that unions "contribute[] to the effective conduct of public business." 5 U.S.C. § 7101(a)(1)(B).

**2.** Critically, the Executive Order and the accompanying White House Fact Sheet show that hurting unions was not just a bonus of the President's national security determinations: It was a driving factor in the analysis of which agencies or agency components to exclude from the Statute. The White House Fact Sheet distinguishes between "[c]ertain Federal unions [that] have declared war on President Trump's agenda" and "unions who work with him." *See* Fact Sheet.

Those in the first category, like NTEU, were hurt badly through the Executive Order's exclusions. But unions with "constructive partnerships" with the President were protected. *See* Fact Sheet. The Executive Order, at Section 2, provides that "agency police officers, security guards, and firefighters" will not be exempted from the Statute—that is, unless they work for the Bureau of Prisons (*see id.*), which is represented by a large federal sector union that the President has likewise targeted.[4] No "searching inquiry into the President's motives" is needed here. *See* Opp. at 29.

### C. The Government's Limitless National Security Argument Conflicts with Supreme Court Precedent, Would Defeat the Statute as a Whole, and Is Flawed in Other Critical Respects.

NTEU showed in its motion that, even putting aside the President's extra-statutory considerations, none of the agencies relevant here plausibly satisfy

---

[4] *See About Us*, American Federation of Government Employees, www.afge.org/about-us/agencies/bureau-of-prisons-bop/ (last visited Apr. 12, 2025).

Section 7103(b)(1)'s narrow criteria. *See* NTEU Mem. at 11–21. Under Section 7103(b)(1), a President may exclude an agency or agency component from the Statute only if the agency has "as a primary function intelligence, counterintelligence, investigative, or national security work" and if the Statute cannot be applied "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

Defendants' response centers on an expansive definition of "national security" that is inconsistent with Supreme Court precedent and that would allow any federal agency to fall within the national security exemption. *See* Opp. at 20–26. The government also relies on a mistaken premise for its analysis of the components of the Department of Treasury that the Executive Order exempts from the Statute.[5] And Defendants have no explanation for the government's abrupt shift in position on the nearly one-dozen agencies at issue, most of which have been within the Statute's coverage for decades, including during President Trump's initial term.

1.    The government's elastic view that "national security work" is anything that affects our economy, for example, is entirely at odds with Supreme Court precedent—and, as the Executive Order shows, could be used to defeat the entire purpose of the Statute. *See* Opp. at 20–23, 25 (relying on a link between the agency and the economy to justify the national security exemption for nearly all the

---

[5] Defendants also appear to mistakenly believe that OPM coverage under the labor statute is at issue. *See* Opp. at 25–26. NTEU does not represent employees at OPM. NTEU has sued OPM because of its implementation of the Executive Order.

agencies and agency components at issue, including the Department of Treasury's components, IRS, BLM, HHS, and FCC).

As a threshold matter, the Federal Labor Relations Authority's interpretation of Section 7103(b)(1)'s "national security work" language is owed no deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). *Contra* Opp. at 20, 22 (relying on the Authority's definition of "national security work," *i.e.*, work "directly related to the protection and preservation of the military, economic, and productive strength" of the nation). And while the Executive Order references that Authority interpretation in Section 7, which directs agencies to consider additional components that should be excluded from the Statute, this Court is free to perform its own statutory interpretation.[6]

The Supreme Court's definition of "national security" in *Cole v. Young*, 351 U.S. 536, 544 (1956), should govern here. In that case, the Court evaluated a statute that allowed agencies to summarily suspend and terminate employees "whenever [they] shall determine such termination necessary or advisable in the interest of the national security of the United States." *Id.* at 541. The Court held that the statutory context—federal worker protections—called for a "narrow meaning" of "national security" that included "only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the

_____

[6] Even the Authority decision on which Defendants rely cautions that "national security" must be read narrowly because Congress determined "collective bargaining in the civil service . . . to be 'in the public interest.'" *See Dep't of Energy, Oak Ridge Ops.*, 4 F.L.R.A. 644, 655–56 (1980) (quoting 5 U.S.C. § 7101(a)).

strength of the Nation only through their impact on the general welfare." *Id.* at 544. Adopting the government's "indefinite and virtually unlimited meaning" for national security, the Court cautioned, would result in the underlying statute— which was "in form but an exception to the general personnel laws"—being "utilized effectively to supersede those laws." *Id.* at 547.

That is the situation here too. If this Court accepts Defendants' view of "national security work," then *every federal agency* is at risk for being exempted from the Statute (especially if, as the government urges, courts conclude that these exemptions are unreviewable). That would "allow[] the exception to swallow the rule, thereby undermining the purpose of the statute itself." *See Nat'l Fed'n of Fed. Emps. v. McDonald*, 128 F. Supp. 3d 159, 172 (D.D.C. 2015) ("If any proposal touching on how nurses do their job would be excluded from collective bargaining, then what would be left for unions and the VA to bargain over?").

The sweeping Executive Order under review would be just the start, if the Court "impute[s] to Congress a purpose to paralyze with one hand what it sought to promote with the other." *OPM v. FLRA*, 864 F.2d 165, 168 (D.C. Cir. 1988) (quoting *Clark v. Uebersee Finanz-Korporation*, 332 U.S. 480, 488 (1947)). And the federal sector collective bargaining regime that Congress intended to promote and to insulate from presidential interference (*see* NTEU Mem. at 24–26) would collapse.

**2.**    Defendants' statutory analysis is flawed in other important respects.

***First***, Defendants interpret "a primary function . . . [of] national security work" in Section 7103(b)(1) in a way that reads "primary" entirely out of the text, as they

reference *any* function that an agency at issue performs—or ever performed—to justify its exclusion. For IRS, that it collected taxes for the Civil War is thus enough for Defendants to argue that it has a primary function of national security work. Opp. at 21. For DOJ, that the portfolios of a few of its components that "have long been exempted under 5 U.S.C. § 7103(b)(1)" is enough to justify the President's exclusion of the entire agency. *Id.* at 24. And for BLM, which serves primarily to sustain and conserve public lands (NTEU Mem. at 20), Defendants seize upon its oversight of mineral development and energy production on these lands, which they tie to national security. Opp. at 22. Defendants struggle to find any nexus to national security at all for EPA, straining with references to electric car production and the nations' interest in clean water and air. *Id.* at 24–25.

**_Second_**, Defendants fail to address any of the Department of Treasury's components that the Executive Order excludes from the Statute (except for IRS) based on a mistaken premise. In the government's view, the President excluded "all of Treasury" and therefore only Treasury "as a whole" should be subject to Section 7103(b)(1)'s analysis, including its primary function criterion. *See* Opp. at 29. That is incorrect. The Executive Order, at Section 2, exempted components of Treasury— all of them except for the Bureau of Engraving and Printing—and not the entirety of Treasury. So the government failed to address each of the Treasury components at issue—like the IRS Office of Chief Counsel, BFS, OCC, TTB, and Treasury's departmental offices—none of which have any nexus to national security.

***Third***, Defendants fail to provide any real analysis of Section 7103(b)(1)'s second criterion: that the Statute cannot be applied to the agency "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). Defendants' response to the fact that the agencies and agency components that the Executive Order targets have fallen within the Statute's coverage, in many cases, for decades (see NTEU Mem. at 11–20) is twofold. Defendants complain about the existence of collective bargaining in the federal sector (while simultaneously mischaracterizing it). Opp. at 26–28. And then, in conclusory form, Defendants warn that this Court "must not second-guess" the government's unexplained determinations that the agencies at issue cannot fall within the Statute's coverage "in a manner consistent with national security requirements and considerations." *Id.* at 28.

That Defendants will not deign to engage in Congress's carefully crafted statutory criteria tells the tale. Those words, like the collective bargaining agreements that Defendants are disregarding, mean nothing to them. It does not matter to them that presidents did not pull these agencies—or any entire Cabinet-level agency—out of the Statute's coverage during any military conflict since the Statute was enacted, not even after the September 11, 2001 attacks that fundamentally altered our country's national security regime. The "behavior of yesteryear," Defendants chide, is meaningless. Opp. at 28. That ignores, though, that "the longstanding 'practice of the government . . . can inform a court's

determination of what the law is." *Loper Bright Enters.*, 603 U.S. at 386 (cleaned up).

## II.    NTEU's First Amendment Retaliation Claim Is Likely to Succeed.

NTEU has shown that the Executive Order's exclusion of nearly a dozen NTEU-represented agencies and agency components from the Statute is retaliation for NTEU's litigation against the Administration's top priorities. *See* NTEU Mem. at 26–30. The Administration's own statements regarding its motivations for the Executive Order and its actions show a government targeting NTEU for its protected activity. *See id.* Added to this is the government's preemptive lawsuit against NTEU in the Eastern District of Kentucky seeking a declaratory judgment that NTEU's collective bargaining agreement with the IRS is void.[7]

For its First Amendment retaliation claim, NTEU must show that (1) it "engaged in conduct protected under the First Amendment"; (2) the government "took some retaliatory action sufficient to deter a person of ordinary firmness in [NTEU's] position from speaking again"; and (3) "a causal link between the exercise of a constitutional right and the adverse action taken." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)).

Defendants do not contest that NTEU has engaged in protected activity or that the Executive Order punished the union. Instead, Defendants argue that: (1) the Executive Order is lawful and thus cannot be retaliatory (Opp. at 30–31); (2) NTEU has not been deterred from speaking out against the Administration (Opp. at

---

[7] *See U.S. Dep't of Treasury v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky.).

32–33); and (3) the Executive Order was based on the President's "longstanding policy priorities" and not a retaliatory motive (Opp. at 31–32). Each argument fails.

*First*, the Executive Order is unlawful, as discussed in the preceding section. And no presumption of regularity is owed to the President's national security determinations here, given the Administration's explicit statements about its improper reasons for the Executive Order's exclusions. *See supra* sec. I.

*Second*, Defendants are wrong that, because NTEU has stated that it will continue to engage in protected activity, no actionable First Amendment retaliation occurred when the Executive Order cut off over half of NTEU's revenue and over two-thirds of the workers that it represents. *See* Opp. at 32–33. NTEU does not need to be conclusively bullied into stopping its First Amendment activity to show that the government "took some retaliatory action sufficient to deter a person of ordinary firmness in [NTEU's] position from speaking again." *Aref*, 833 F.3d at 258.

Imposing that type of requirement would deter First Amendment activity. And it would be incompatible with the preliminary relief that this Court has ordered in the First Amendment retaliation cases brought by law firms targeted in Executive Orders. *See, e.g.*, *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. 1:25-cv-917, 2025 U.S. Dist. LEXIS 61536, at *6 (D.D.C. Mar. 28, 2025); *Perkins Coie LLP v. DOJ*, No. 1:25-cv-716, 2025 U.S. Dist. LEXIS 46423, at *2–3 (D.D.C. Mar. 12, 2025). Those lawsuits reflected continued protected speech against the Administration. *See* NTEU Mem. at 27.

14

Here, the deterrent effect of the President's retaliatory action is plain given the "power that [he] wields," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024); the Executive Order's targeting of NTEU-represented agencies; and the Executive Order's directive to agency heads, at Section 7, to suggest additional exclusions from the Statute by April 26, 2025.

**Third**, Defendants cannot credibly argue that the heavily gerrymandered Executive Order is not based on the retaliatory motive that the Administration's own issuances describe—and that the administration's lawsuit against NTEU mimics—and is instead based on general policy views regarding national security and "the efficiency and efficacy of the federal workforce." Opp. at 32.

The White House Fact Sheet itself acknowledges that the Executive Order is the result of "[c]ertain Federal unions [] declar[ing] war on President Trump's agenda." Fact Sheet. NTEU has filed lawsuits challenging several of this Administration's high-profile policy objectives, from its mass firings of employees to its attempt to dismantle the Consumer Financial Protection Bureau. *See* NTEU Mem. at 29.

Coupled with that statement in the White House Fact Sheet, the government's targeting of NTEU through an aggressive and unusual lawsuit further shows the causal connection. The Department of Justice, on behalf of the Treasury Department, sued a local NTEU chapter in Kentucky seeking a declaratory judgment that NTEU's collective bargaining agreement with the IRS is void. *See U.S. Dep't of Treasury v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky.).

15

That lawsuit was preemptive and filed in an atypical forum given the national-level collective bargaining agreement at issue between two parties headquartered in Washington, D.C. Moreover, it shows the government targeting NTEU and dispels Defendants' argument that the Executive Order was based on generalized policy views. *See* Opp. at 31–32. Filed only hours after the Executive Order issued, that complaint mimics the Fact Sheet's language, referring to NTEU as a "hostile union." Compl. ¶ 30, *U.S. Dep't of Treasury v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky. Mar. 28, 2025). And the complaint takes aim at NTEU's National President specifically, providing a link to a letter that she wrote to the IRS and alleging that she "vehemently opposes" and intends to "resist" the Administration's planned reductions-in-force. *Id.* ¶ 54.

The Kentucky lawsuit's narrow scope underscores that the Executive Order was intended to punish NTEU. The government sued to have a court affirm its voiding of NTEU's collective bargaining agreement with IRS. The government did not sue on behalf of any other agency listed in the Executive Order, even though there are *eleven* other NTEU collective bargaining agreements that the Order affects. *See* NTEU Mem. at 6. Instead, the Administration picked the collective bargaining agreement with the agency with NTEU's largest membership and sued in the forum of its choice to ensure that the NTEU–IRS agreement would be voided, even though the IRS has perhaps the most tenuous connection to national security of the agencies at issue here. *See supra* sec. I.C.

16

The Kentucky lawsuit thus confirms that the Executive Order seeks to punish NTEU. And its filing is consistent with the White House Fact Sheet on the Executive Order, which makes clear that unions like NTEU that are "hostile" to the President will be hurt, while those unions "who work with him" will not. *See* Fact Sheet. The Executive Order further demonstrates this with the Administration's affirmative statement that it will not exempt "agency police officers, security guards, or firefighters" from the Statute—unless they work for the Bureau of Prisons, which is represented by another federal sector union that the President has likewise targeted. *See supra* sec. I.C.

In sum, the Executive Order's gerrymandering, the White House Fact Sheet's statements, and the Administration's litigation against NTEU in Kentucky are sufficient to show, at this stage, that NTEU would not have been targeted in the Executive Order if it had not engaged in protected activity against the Administration.

## III. Defendants' Jurisdictional Argument Fails and Reflects the Government's Inconsistent Positions in the Federal Courts.

Defendants argue that this Court lacks subject matter jurisdiction over NTEU's claims because the Statute precludes them—in other words that NTEU's claims must be brought through the Statute's administrative channels instead of in federal district court. *See* Opp. at 12–16. That argument—which reflects inconsistent positions in this Court and in the Eastern District of Kentucky—fails for several reasons. The most obvious is that the Executive Order has taken away the administrative channels that Defendants argue must be used.

***First***, this Court should reject the government's argument that a federal district court has jurisdiction to declare that the Executive Order is *lawful*, as it asks the Eastern District of Kentucky to do, but that a federal district court lacks jurisdiction to determine that the Executive Order is *unlawful*, as it argues to this Court. Those positions are irreconcilable. The Statute's administrative processes—including the mechanisms for adjudicating unfair labor practices—are available to agencies and to unions under the Statute's coverage. Defendants cannot argue that unions are required to use those processes to vindicate their rights, while agencies can proceed to federal district court to vindicate theirs.

***Second***, the Executive Order eliminates the opportunity for NTEU to use the Statute's administrative processes to vindicate its claims. The agency and agency components sued here no longer fall within the Statute, and NTEU is no longer the exclusive representative for their bargaining units. The Federal Labor Relations Authority has issued orders asking why NTEU's cases before it that involve the agencies and agency components targeted in the Executive Order should not be dismissed for lack of jurisdiction. *See, e.g.*, Kaspar Supp. Decl., Ex. 17 (FLRA Show Cause Order).

Indeed, these show cause orders cite Authority precedent regarding the dismissal of cases involving agency components excluded from coverage under the Statute. *See id.* at 1 n.2 (citing *U.S. Att'y's Off., S. Dist. of Tex., Hous., Tex.*, 57 F.L.R.A. 750 (2002), which concluded that "since [an] Executive Order exempt[ed] United States Attorneys' Offices from coverage of the Statute, the

Authority lack[ed] jurisdiction to decide the cases and should dismiss the complaints"). And the President's Executive Order No. 14,215, which reins in independent agencies and provides that they cannot "advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law," eliminates any doubt that the Authority will follow its longstanding precedent, recognize the President's exclusions, and dismiss the pending actions. Exec. Order No. 14,215, 90 Fed. Reg. 10,447 (Feb. 24, 2025).[8]

This Circuit's precedent, in turn, shows that federal district court jurisdiction exists for claims over which the Authority lacks jurisdiction. *See AFGE, AFL-CIO Local 446 v. Nicholson*, 475 F.3d 341, 347–48 (D.C. Cir. 2007) (unanimously concluding that the federal district court had jurisdiction because the challenged action was "expressly outside the FLRA's purview" and the union was "presumptively entitled to judicial review of its claim).

**Third**, this case is nothing like *AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019). That case did not involve any exclusions from the Statute, leaving the Statute's administrative processes available to the parties in that litigation. *See id*. at 757 (observing that unions had "several administrative options" available to pursue their claims) (cleaned up). The Authority would decide the disputes put before it and then court of appeals review would be available for those rulings. *See*

---

[8] Arbitrators, too, are refusing to hear grievances brought under the parties' collective bargaining agreements, including those raising statutory unfair labor practice claims, for agencies excluded from the Statute through the Executive Order. Kaspar Supp. Decl. ¶ 25.

*id.* at 758 (citing 5 U.S.C. § 7123(a), (c)). That is not the situation here because the Executive Order cuts off access to the Authority's administrative processes through its exclusions from the Statute.

**Fourth**, this Circuit's precedent instructs that where a party would suffer "independent harm caused by the delay" associated with channeling, "full relief" cannot not be obtained through the administrative scheme and district court jurisdiction is thus merited. *Jarkesy v. SEC*, 803 F.3d 9, 27–28 (D.C. Cir. 2015). That would certainly be the case here, given the urgent threat to NTEU's existence.

## IV.    The Defendants Do Not Meaningfully Contest Irreparable Harm.

While Defendants call NTEU's harm "speculative" and not sufficiently "imminen[t]" (Opp. at 10), they cannot credibly dispute the irreparable harm showing that NTEU has made—harm that *is already occurring*. The Executive Order has taken away over half of NTEU's revenue stream and about two-thirds of the workers that it represents.

**First**, Defendants fail to acknowledge this Circuit's precedent explaining that even if financial losses are eventually recoverable, a plaintiff can show irreparable harm where the loss threatens the plaintiff's very existence. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). NTEU has shown that the loss of the dues revenue that it is no longer receiving through payroll reductions will lead to NTEU losing over half of its annual revenue. NTEU Mem. at 31. And NTEU has already lost over $2 million in dues revenue to date. *See* Kaspar Supp. Decl. ¶¶ 13–14; *see also Wilmer Cutler Pickering Hale & Dorr LLP*, 2025 U.S. Dist. LEXIS

61536, at *4–6 (finding that the loss of a third of plaintiff's revenue was sufficient to establish irreparable injury).

Defendants suggest NTEU can make up for dues that are lost through agencies' termination of payroll deductions by asking members to make voluntary contributions. Opp. at 9. But Defendants have taken away the very apparatus—one that Congress created in 5 U.S.C. § 7115—on which NTEU relies for virtually all its dues payments. *See* NTEU Mem. at 31. And Defendants have also taken away the basic reason that NTEU members pay dues: to support their exclusive bargaining representative, which is entitled to collectively bargain on its behalf.

**Second**, as to the irreparable harm to NTEU's bargaining power from the loss of two-thirds of the workers that it represents, Defendants raise the false premise that agencies are honoring their collective bargaining agreements with NTEU. *See* Opp. at 10. Defendants' representation to this Court is based on the fig leaf of OPM's "Frequently Asked Questions," which asserts that "[a]gencies should not terminate any collective bargaining agreements[.]" *See* Opp. at 6, 10.

The April 8, 2025 FAQs were hurriedly issued in a transparent attempt to aid the government in litigation *after* NTEU filed suit and filed its motion for preliminary relief. But it does not matter: Despite the magic words of the FAQs, agencies have, in fact, utterly rejected their collective bargaining obligations with NTEU. Before and after April 8, agencies have refused to meet with NTEU, to bargain with NTEU, or to honor contractual obligations (for example, the withholding of dues payments via payroll deduction for members). *See* Kaspar

Supp. Decl. ¶¶ 12–24. So, Defendants' bald statement that NTEU's collective bargaining agreements remain intact is meaningless.

**Third**, Defendants claim that any weakening of NTEU's bargaining power is not sufficient harm. *See* Opp. at 11. But courts have recognized that government action that "fundamentally diminishe[s]" union bargaining power is an Article III injury and that an employer's refusal to bargain with a union is likely to cause irreparable harm. *See NTEU v. Chertoff*, 452 F.3d 839, 853 (D.C. Cir. 2006) (finding Article III injury where federal union's bargaining power was "fundamentally diminished"); *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011) (finding that absent injunctive relief employer's "refusal to bargain in good faith" would likely cause irreparable harm); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996) (recognizing that with the passage of time, "[a] union's position . . . may deteriorate to the point that effective organization and representation is no longer possible"); *Asseo v. Centro Medico Del Turabo, Inc.*, 900 F.2d 445, 455 (1st Cir. 1990) (concluding there was a "very real danger that if [the employer] continued to withhold recognition from the Union, employee support would erode" and any final remedy "would be ineffective").

**Fourth**, Defendants argue that NTEU is not suffering any harm stemming from the asserted First Amendment violation. But the retaliatory Executive Order, which was issued to punish NTEU for its advocacy, has led to a multitude of documented harms—loss of dues, weakened bargaining power, and harm to NTEU's

central mission. *See* Pl. Mem., Exh. 1 (Declaration of Daniel Kaspar ¶¶ 10–12 (Apr. 2, 2025)); Kaspar Supp. Decl. ¶¶ 14–15.

## V.    Defendants' Equities Arguments Ignore Congress's Role in Our System of Government and Its Findings on the Public Interest.

Defendants' arguments concerning equities and the public interest entirely ignore the deference owed to Congress in its passing of the Statute. Neither the equities nor public interest favor allowing the Defendants to proceed with terminating the collective bargaining rights of over one hundred thousand NTEU-represented federal workers.

As Congress, duly elected by the people to legislate, made clear on the face of the Statute, "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). "The public has an interest in ensuring that the laws enacted by their representatives are not imperiled by executive fiat." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (cleaned up).

Deference to the Executive Branch is not, as Defendants suggest, absolute. And Defendants' reliance upon *TikTok Inc.* v. *Trump*, 490 F. Supp. 3d 73 (D.D.C. 2020), is misplaced. *See* Opp. at 34. In *TikTok*, this Court made clear that appropriate deference to the Executive Branch, even in matters concerning national security, does not translate into a lack of deference to Congress and the laws that it passes. *See Tiktok Inc.*, 490 F. Supp. 3d at 85 (observing that there is "no public interest in the perpetuation of an unlawful [government] action" and granting preliminary relief enjoining the actions of the Executive Branch) (cleaned up).

Here, the balance of equities and the public interest support a grant of preliminary injunctive relief until this Court has the opportunity to resolve the constitutional and statutory claims at issue.

## CONCLUSION

For the foregoing reasons and those stated in its motion and memorandum in support, Plaintiff requests that this Court grant the preliminary injunctive relief set out in its proposed order.

Respectfully submitted,

*/s/  Julie M. Wilson*
JULIE M. WILSON
General Counsel
D.C. Bar 482946

*/s/  Paras N. Shah*
PARAS N. SHAH
Deputy General Counsel
D.C. Bar 983881

*/s/  Allison C. Giles*
ALLISON C. GILES
Assistant Counsel
D.C. Bar 439705

*/s/  Lindsay Dunn*
LINDSAY DUNN (pro hac vice)
Assistant Counsel
N.Y. Bar 4574224

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C.  20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
lindsay.dunn@nteu.org

April 16, 2025              Attorneys for Plaintiff NTEU