**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C. 20001,

|                                   |                              |
|-----------------------------------|------------------------------|
| Plaintiff,                        | Case No. 1:25-cv-00935 (PLF) |
| v.                                |                              |
| DONALD J. TRUMP,                  |                              |
| President of the United States   |                              |
| 1600 Pennsylvania Avenue N.W.     |                              |
| Washington, D.C. 20500, *et al.*, |                              |
| Defendants.                       |                              |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF NTEU'S
MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ............................................................................................................ 2

I.   Congress's Broad Grant of Collective-Bargaining Rights to Federal Workers  2

II.  The President's Sweeping Executive Order Cancelling Statutory Collective-
     Bargaining Rights ................................................................................................ 3

III. The Administration's Admitted Motivations Behind the Executive Order ...... 4

IV.  Procedural History ............................................................................................... 5

LEGAL STANDARD .................................................................................................... 7

ARGUMENT ................................................................................................................. 7

I.   The Executive Order's Sweeping and Politically Motivated Exemptions,
     Individually and Collectively, Are Ultra Vires (Counts 1 and 2) .................... 7

     A.   Judicial Review and the Presumption of Regularity ............................... 8

     B.   The Merits of NTEU's Ultra Vires Claims ............................................... 9

II.  The Executive Order Is First Amendment Retaliation, as the White House
     Fact Sheet Effectively Concedes (Count 3). .................................................... 18

III. NTEU Will Continue to Suffer Harm Absent Injunctive Relief. ................... 23

     A.   The Executive Order Is Harming NTEU's Bargaining Power ............... 23

     B.   The Executive Order Is Causing NTEU Ongoing Financial Harm. ....... 26

     C.   The Executive Order Is Exacting First Amendment Retaliation. .......... 27

CONCLUSION ............................................................................................................ 27

## TABLE OF AUTHORITIES

**Cases**

*Am. Forest Res. Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023)...................9

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) .............................................. 18

*Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89 (1983). ................ 2, 17

*Chamber of Com. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ..........................................9

*City of Ketchikan v. Cape Fox Corp.*, 85 F.3d 1381 (9th Cir. 1996) .......................... 11

*Cole v. Young*, 351 U.S. 536 (1956) .................................................... 11–12

*Connelly v. Cty. of Rockland*, 61 F.4th 322 (2d Cir. 2023) ...................................... 19

*Delligatti v. United States*, 145 S. Ct. 797 (2025)........................................... 11

*Dep't of Treasury v. NTEU Ch. 73*, No. 25-cv-49, 2025 U.S. Dist. LEXIS 95533 (E.D. Ky. May 20, 2025).............................................................................. 21, 22

*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009). ........................................... 20

*Feliciano v. DOT*, 145 S. Ct. 1284 (2025)................................................... 17

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006)........................................... 7

*Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022)............................... 19

*In re Aiken Cty.*, 725 F.3d 255 (D.C. Cir. 2013) ........................................... 17

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) ................................ 19

*Local Union No. 5741, United Mine Workers v. NLRB*, 865 F.2d 733 (6th Cir. 1989) ....................................................................................................... 26

*McDonald v. Smith*, 472 U.S. 479 (1985)................................................... 19

*Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960 (D.C. Cir. 2022) ............... 10

*Nieves v. Bartlett*, 587 U.S. 391 (2019). .................................................... 20

*NTEU v. Trump*, No. 25-0935, 2025 U.S. Dist. LEXIS 80268 (D.D.C. Apr. 28, 2025) ............................................................................................................... passim

*NTEU v. Trump*, No. 25-5157, 2025 U.S. App. LEXIS 11952 (D.C. Cir. May 16, 2025)................................................................................................ 3, 6, 7

*OPM v. FLRA*, 864 F.2d 165 (D.C. Cir. 1988)......................................... 3, 12

*Perkins Coie LLP v. U.S. Dep't of Justice*, No. 25-716, 2025 U.S. Dist. LEXIS 84475 (D.D.C. May 2, 2025) ...................................................... 27

*Wilmer Cutler Picking Hale & Dorr v. Exec. Off. of the President*, No. 25-917, 2025 U.S. Dist. LEXIS 100078 (D.D.C. May 27, 2025) ........................... 22

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................. 17

**Statutes**

5 U.S.C. § 7101, *et seq.*............................................................................... 2

5 U.S.C. § 7101(a) ......................................................... 2, 3, 8, 10, 17

5 U.S.C. § 7103(a)(3) .................................................................... 3

5 U.S.C. § 7103(b)(1) .......................................................... passim

5 U.S.C. § 7114(a). ...................................................................... 3, 23

5 U.S.C. § 7115(a) ............................................................... 25, 26

**Other Authorities**

124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. Clay). ...... 2–3, 17

Executive Order No. 14,251, *Exclusions from Federal Labor-Management Relations Programs,* 90 Fed. Reg. 14553 (Mar. 27, 2025).............................. passim

*Primary*, Merriam Webster, https://www.merriam-webster.com/dictionary/primary (last visited June 6, 2025)......................................................... 11

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................... 7

## INTRODUCTION

Less than two months ago, this Court preliminarily enjoined Section 2 of Executive Order No. 14,251, *Exclusions from Federal Labor-Management Relations Programs,* 90 Fed. Reg. 14,553 (Mar. 27, 2025) (the Executive Order), as it applies to twelve agencies where Plaintiff National Treasury Employees Union (NTEU) represents federal workers. NTEU now moves for summary judgment that the Executive Order is unlawful.

The Executive Order strips collective-bargaining rights from federal workers in over thirty agencies or subdivisions. *NTEU v. Trump*, No. 25-0935, 2025 U.S. Dist. LEXIS 80268, at *2 (D.D.C. Apr. 28, 2025). In all, it takes about two-thirds of federal workers outside the coverage of the Federal Service Labor-Management Relations Statute of 1978 (the Statute). *Id.* For NTEU, that means "65.9% of all NTEU-represented employees, or approximately 104,278 employees." *Id.* at *46. The one dozen NTEU-represented agencies that the Executive Order exempts from the Statute are refusing to bargain with or to engage with NTEU—all while federal workers are under unprecedented attack and facing large-scale reductions-in-force. *Id.* at *32, *48–49.

This Court correctly concluded that there is "clear evidence" that the Executive Order's sweeping use of a narrow national-security exemption to undo the bulk of the Statute's coverage was driven by extra-statutory motivations unrelated to national security. *Id.* at *23. Those motivations, the White House Fact Sheet on the Executive Order makes clear, included exacting political retribution against

1

"hostile" federal-sector unions that have challenged the President's agenda and making federal workers easier to fire. *Id.* at *8, *25.

Congress passed the Statute to codify federal labor relations and to safeguard it from the whims of any President; to promote collective bargaining; and to strengthen federal labor unions. *See* 5 U.S.C. § 7101(a); *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 107 (1983). It cannot follow that Congress also provided for unchecked Executive discretion to dismantle that same statutory system, including as a way to punish union dissent.

This Court should confirm what it indicated two months ago and rule that the Executive Order's exclusions are ultra vires. It should likewise hold that those exclusions violate the First Amendment.

## BACKGROUND

### I.    Congress's Broad Grant of Collective-Bargaining Rights to Federal Workers

"In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had been under the Executive Order regime." *Bureau of Alcohol, Tobacco & Firearms*, 464 U.S. at 107.

As Title VII of the Act, Congress enacted the Statute, 5 U.S.C. § 7101, *et seq*. Congress intended the Statute to replace the existing Executive Order regime governing collective bargaining with a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec.

2

H9637 (daily ed. Sept. 13, 1978) (statement of Rep. Clay).[1]

The Statute rests on Congress's finding that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest." 5 U.S.C. § 7101(a). The Statute assigns federal-sector unions the job of "act[ing] for" and "negotiat[ing] collective-bargaining agreements covering" all employees in the bargaining units that they are elected to represent. *Id*. § 7114(a).

Congress excluded some agencies from the Statute, like the Federal Bureau of Investigation. *Id*. § 7103(a)(3). The Statute gives the President narrow grounds to exclude additional agencies if he determines that an agency or subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work," and the Statute cannot be applied "in a manner consistent with national security requirements and considerations." *Id*. § 7103(b)(1).

## II.  The President's Sweeping Executive Order Cancelling Statutory Collective-Bargaining Rights

Before the Executive Order at issue, no President had used Section 7103(b)(1)'s narrow national-security exemption to exclude an entire Cabinet-level agency from the Statute—let alone multiple Cabinet-level agencies. *NTEU v. Trump*, No. 25-5157, 2025 U.S. App. LEXIS 11952, at *8 (D.C. Cir. May 16, 2025) (Childs, J., dissenting). This Executive Order, though, strips collective-bargaining

---

[1] This Court has relied on statements from "major players in the legislation, such as Representative Clay." *OPM v. FLRA*, 864 F.2d 165, 169 (D.C. Cir. 1988).

rights from about two-thirds of federal workers, including 65.9% of the workers that NTEU represents. *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *2, *46.

The Office of Personnel Management (OPM) issued guidance explaining that excluded agencies "are no longer subject to the collective-bargaining requirements of [chapter 71]" and that the unions representing bargaining-unit employees at those agencies have "los[t] their status" as the exclusive representative for those employees. Plaintiff's Statement of Material Facts Not in Dispute (Facts) ¶¶ 8–9.

NTEU represents eleven federal agencies that the Executive Order excludes from the Statute's coverage entirely and another agency that the Order excludes in part. *Id.* ¶ 30. NTEU has represented several of the bargaining units that the Executive Order excludes from the Statute's coverage for decades and some since the Statute's inception in 1978. *Id.* ¶¶ 32, 34, 48, 53.

### III.  The Administration's Admitted Motivations Behind the Executive Order

The Administration issued a Fact Sheet and OPM Guidance on the same night as the Executive Order. Each discusses the Executive Order's impetus: facilitating mass firings of federal employees and exacting political vengeance.

**A.** The OPM Guidance acknowledges the larger context: the President's direction to agencies "to prepare large-scale reductions in force." Facts ¶ 12. Now, with the Executive Order's issuance, OPM advises agencies to "[d]isregard [c]ontractual [reduction-in-force] [a]rticles" and "prepare large-scale reductions in force" as the "President has directed." *Id.* According to OPM, "Agency [collective-

bargaining agreements] often create procedural impediments" to removing underperforming employees. *Id.* ¶ 10.

**B.**    The White House Fact Sheet reveals an additional motivation for the Executive Order: political retribution against "hostile Federal unions." *Id.* ¶ 14. The Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda." *Id.* ¶ 15. NTEU is one of the "Federal unions" that has fought back against President Trump's agenda. NTEU has initiated litigation against several Administration initiatives that it believes are unlawful. *Id.* ¶¶ 103–106.

The Executive Order targets a dozen different collective-bargaining relationships that NTEU has with federal agencies and departments. *Id.* ¶¶ 30, 115. That includes NTEU's largest bargaining unit: the IRS. *Id.* ¶ 34.

## IV.    Procedural History

On March 31, NTEU filed a lawsuit alleging that the Executive Order's exemptions of its bargaining units from the Statute, individually and collectively, were ultra vires because they exceeded the President's authority under the Statute; and that the exemptions reflected First Amendment retaliation for NTEU's litigation against the Administration. *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *10. NTEU then moved for a preliminary injunction against the Executive Order, Section 2, and OPM's implementing guidance. *Id.* at *11.

In a decision issued on April 28, this Court held that the White House's own words and actions defeated the presumption of regularity and allowed for judicial review of NTEU's ultra vires claims. *Id.* at *22–33. The Court found "clear evidence"

5

that the President's sweeping use of the national-security exemption was "retaliatory" and aimed to "punish unions for the 'war' they have 'declared [] on President Trump's agenda'"; served to facilitate "unrelated policy objectives" like "mak[ing] federal employees easier to fire"; and "b[ore] no relation to the [statutory] criteria" for the national-security exemption. *Id.* at *27–33, *35. The evidence likewise showed that the President's exemptions were based on a "disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly, rather than a determination that such rights cannot be applied in a 'manner consistent with national security requirements and considerations.'" *Id.* at *26 (quoting 5 U.S.C. § 7103(b)(1)(B)).

This Court concluded that NTEU would likely succeed in proving its ultra vires claims (*id.* at *33–45 (abstaining from evaluating First Amendment claim)); that it had shown irreparable harm given the damage to its bargaining power and the financial losses that threatened its very existence (*id.* at *45–55); and that the equities favored preliminary relief (*id.* at *55–58). The Court thus preliminarily enjoined Section 2 of the Executive Order as it applies to eleven NTEU-represented agencies that the Order exempts from the Statute entirely and another NTEU-represented agency that the Order exempts in part. *Id.* at *6–7.

On April 30, the government appealed this Court's ruling. It then asked the D.C. Circuit for an immediate administrative stay of the ruling and a stay pending appeal. *NTEU*, 2025 U.S. App. LEXIS 11952, at *8. The D.C. Circuit did not grant

an administrative stay, but on May 16 granted a stay pending appeal in a divided

decision that was based solely on the equitable factors. *Id.* at *2 n.1.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). "'The mere existence of *some* alleged factual

dispute between the parties' will not defeat summary judgment; 'the requirement is

that there be no *genuine* issue of *material* fact.'" *Holcomb v. Powell*, 433 F.3d 889,

895 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48

(1986)). "A fact is 'material' if a dispute over it might affect the outcome of a suit

under governing law . . .  An issue is 'genuine' if 'the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting

*Anderson*, 477 F.3d at 248).

## ARGUMENT

### I.   The Executive Order's Sweeping and Politically Motivated Exemptions, Individually and Collectively, Are Ultra Vires (Counts 1 and 2).

This Court found "clear evidence" in the government's own statements and

actions showing that political vengeance and policy objectives unrelated to national

security prompted the Executive Order's unprecedented use of the Statute's narrow

national-security exemption. *See NTEU*, 2025 U.S. Dist. LEXIS 80268, at *23. This

evidence shows that the President's use of the narrow-security exemption is ultra

vires. *See id.* at *34. A contrary conclusion would mean that there is no national-

security exemption that the President could make—no matter how outlandish or pretextual—that would exceed his authority under the Statute.

### A.    Judicial Review and the Presumption of Regularity

Typical arguments against judicial review—a concern with probing presidential motivations or second-guessing national-security decisions—are inapplicable where the White House explicitly states the President's improper motivations for his national-security decisions. Consistent with D.C. Circuit precedent, this Court previously held that, in this unique circumstance, the White House's own words and actions defeated the presumption of regularity and allowed for judicial review of NTEU's ultra vires claims. *See NTEU*, 2025 U.S. Dist. LEXIS 80268, at *18–33.

This Court previously found "clear evidence that 'the President was indifferent to the purposes and requirements of the [Statute], or acted deliberately in contravention of them.'" *Id.* at *23  (quoting *AFGE v. Reagan*, 870 F.2d 723, 728 (D.C. Cir. 1989)). Specifically, the Court made the following findings, among others:

- "The scope of the Executive Order – covering two-thirds of the federal workforce – and the Fact Sheet's characterization of unions and collective bargaining rights . . . as 'dangerous' stand in stark contrast to" Congress's findings in Section 7101(a)(1) of the Statute. *Id.* at *24.

- The White House Fact Sheet's justifications for the Executive Order are "better understood as a disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly, rather than a determination that such rights cannot be applied in a 'manner consistent with national security requirements and considerations.'" *Id.* at *26 (quoting 5 U.S.C. § 7103(b)(1)(B)).

- The White House Fact Sheet's statements regarding "hostile Federal unions . . . bear no relation to the criteria established by Congress in Section 7103(b)(1)." *Id.* at *28. They instead "reflect President Trump's

frustration with the unions' representational activity and exercise of their First Amendment rights . . . and the impact those activities have had on his policy directives." *Id.*

- "[T]hese statements in the Fact Sheet appear to be in direct response to the number of lawsuits and grievances NTEU has filed against the Trump Administration in the last several months." *Id.*

- "[C]ertain inclusions and exclusions from the Executive Order reflect a preference for unions that have a 'constructive relationship' with the President. For example, the President's decision to allow 'police officers, security guards, [and] firefighters' to retain their collective bargaining rights, but to remove such rights from employees of the Federal Bureau of Prisons – whose employees are represented by a union that has been critical of the President and his Administration – suggests that the President's relationship with particular unions was a factor in determining which agencies and subdivisions were included in the Executive Order." *Id.* at *29–30.

- "The language used in the Fact Sheet coupled with the focus on 'constructive partnership[s] as opposed to 'mass obstruction' undercuts the presumption that the President considered and abided by the statutory language in Section 7103(b)(1)." *Id.* at *30. "Furthermore, it suggests a retaliatory motive to punish unions for the 'war' they have 'declared [] on President Trump's agenda." *Id.*

- There "is strong evidence that the President's invocation of Section 7103(b)(1) was to remove the barriers created by the [Statute] to his unrelated policy objectives," *i.e.*, "mak[ing] federal employees easier to fire." *Id.* at *31–33.

## B.    The Merits of NTEU's Ultra Vires Claims

"The Congress can and often does cabin the discretion it grants the President, and it remains the responsibility of the judiciary to ensure that the President acts within those limits." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023). Thus, "[w]hen an executive acts ultra vires, courts are normally available to reestablish the limits on his authority." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

Congress's findings in Section 7101(a) of the Statute that "labor organizations and collective bargaining in the civil service are in the public interest," and the criteria in Section 7103(b)(1) on which the President must base his statutory exclusions, place the kinds of "clear limits" on the President's statutory authority that form the basis of ultra vires review. *See Nat'l Ass'n of Postal Supervisors v. USPS,* 26 F.4th 960, 970–71 (D.C. Cir. 2022) (holding that Congress's explicit "policy" in the Postal Act "place[d] clear limits" on agency's discretion and formed the basis for an ultra vires claim).

And indeed, as this Court's factual findings show, the President exceeded these limits. The sheer scope of the exemptions (three-quarters of unionized workers); the President's heavy reliance on extra-statutory criteria (a desire for political retribution and an easier path to firing employees); and the lack of any credible arguments regarding the statutory criteria show that NTEU should prevail on its ultra vires claims.

    **1.**    Under Section 7103(b)(1), a President may exclude "any agency or subdivision" from the Statute's coverage if "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" *and* if the Statute "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."[2]

---

[2] As relevant to the several NTEU-represented Treasury subdivisions that the Executive Order exempts—the Internal Revenue Service, the IRS Office of Chief Counsel, the Bureau of Fiscal Service, the Office of the Comptroller of the Currency, the Alcohol and Tobacco Tax and Trade Bureau, and Treasury's Departmental Offices—the plain text of Section 7103(b)(1) requires that the statutory criteria be

As a threshold matter, the Statute does not define "a primary function," as that phrase is used in "a primary function . . . [of] national security work." 5 U.S.C. § 7103(b)(1). In the absence of that definition, the dictionary definition of "primary" should govern. *See Delligatti v. United States*, 145 S. Ct. 797, 810 (2025) (explaining that "when the meaning of" a statutory term "is not clear, the ordinary meaning of the term . . . is one of the most important factors we can consider"); *Primary*, Merriam Webster, https://www.merriam-webster.com/dictionary/primary (last visited June 6, 2025) (defining primary as "first in order of time" or "of first rank, importance, or value").

Consistent with this approach, the Ninth Circuit has construed "a primary place of business" in a way that is instructive here. *See City of Ketchikan v. Cape Fox Corp.*, 85 F.3d 1381, 1383–84 (9th Cir. 1996). "Despite the use of 'a,' the word 'primary' connotes a single leading location"—or, here, function. *Id.* at 1384 (citing dictionary definitions of "primary" as "[f]irst; principal; chief; leading," and "first in importance; chief; principal; main"). As the Ninth Circuit explained, "[t]o read the statute otherwise would change the meaning of 'primary' to merely 'significant.'" *Id.* The same would be true here.

As another preliminary matter, the Statute does not define "national security work." Given that absence, the Supreme Court's definition of "national security" in

---

applied to each "subdivision" as opposed to Treasury as a whole. The Executive Order does not exempt the entirety of Treasury because it leaves the Bureau of Engraving and Printing within the Statute's coverage. Exec. Order No. 14,251 § 2. Because the Executive Order exempts various subdivisions of Treasury, those subdivisions must likewise be the focus of the statutory analysis.

*Cole v. Young*, 351 U.S. 536, 544 (1956), should govern here. In that case, the Court evaluated a statute that allowed agencies to summarily suspend and terminate employees "whenever [they] shall determine such termination necessary or advisable in the interest of the national security of the United States." *Id.* at 541.

The Court held that the statutory context—federal worker protections—called for a "narrow meaning" of "national security" that included "only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare." *Id.* at 544. Adopting the government's "indefinite and virtually unlimited meaning" for national security, the Court cautioned, would result in the underlying statute—which was "an exception to the general personnel laws"—being "utilized effectively to supersede those laws." *Id.* at 547.

That is the situation here too. If this Court accepts Defendants' view of "national security work," then *every federal agency* is at risk for being exempted from the Statute. That would "impute to Congress a purpose to paralyze with one hand what it sought to promote with the other." *OPM*, 864 F.2d at 168.

**2.** None of the agencies or subdivisions at issue plausibly meet either requirement of 5 U.S.C. § 7103(b)(1). As this Court previously concluded, "the President applied an overly broad interpretation of the term 'primary function' or wrote the term out of the statute entirely" and likewise "applied an overly broad interpretation of 'national security' when invoking Section 7103(b)(1), thereby

12

making the President's Executive Order ultra vires." *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *39, *45.

The government's own publications provide the "primary function" for the relevant agencies and subdivisions, none of which pertain to "national security work." 5 U.S.C. § 7103(b)(1). And continuing these agencies and subdivisions' coverage under the Statute—which in many cases goes back for decades—is consistent with "national security considerations." *Id*.[3]

- The IRS is the revenue service for the federal government, responsible for collecting federal taxes and administering the Internal Revenue Code. Facts ¶ 36. NTEU has represented bargaining-unit workers at the IRS since before Congress enacted the Statute. *See id.* ¶¶ 31, 34.

- The IRS Office of Chief Counsel provides legal guidance and interpretive advice to the IRS, to Treasury, and to taxpayers; and coordinates the IRS's position in litigation. *Id.* ¶ 38. NTEU has represented bargaining-unit workers at the IRS Office of Chief Counsel since March 1987. *Id.* ¶ 39.

- The relevant Health and Human Services (HHS) components that the Executive Order excludes from the Statute are: the Office of the Secretary,

---

[3] NTEU-represented employees in each of these agencies or agency components received and accepted offers to participate in this Administration's "deferred resignation program." Facts ¶ 204. But that program was not available to employees in "positions related to . . . national security." *Id.* ¶ 205. Thus, the government's untenable position is that these employees do not have a nexus to national security for purposes of the deferred resignation program—but must nonetheless be entirely excluded from the Statute through Section 7103(b)(1)'s national security exemption.

the Food and Drug Administration, the Administration for Strategic
Preparedness and Response, the Centers for Disease Control and Prevention,
and the Office of Refugee Resettlement in the Administration for Children
and Families. *Id.* ¶ 42. These components administer social service programs,
civil rights and healthcare programs, and programs that assure food and
drug safety and efficacy. *Id.* ¶¶ 43–47. NTEU has represented bargaining-
unit workers at HHS since November 1978. *Id.* ¶ 48.

- The Federal Communications Commission (FCC) regulates interstate and
  international communications by radio, television, wire, satellite, and cable
  across the nation. *Id.* ¶ 51. NTEU has represented bargaining-unit workers
  at the FCC since July 1978. *Id.* ¶ 53.

- The Department of Energy (DOE) is responsible for ensuring that the United
  States has access to reliable, affordable, and cleaner sources of energy. *Id.*
  ¶ 56. Its work includes advancing energy technologies, managing the nation's
  energy resources, and addressing environmental impacts from past energy-
  related activities. *Id.* NTEU has represented bargaining-unit workers at DOE
  since January 1979. *Id.* ¶ 58.

- The Bureau of the Fiscal Service (BFS) functions primarily to manage the
  government's accounting and federal centralized payment systems, and to
  reduce public debt. *Id.* ¶ 61. NTEU has represented bargaining-unit workers
  at BFS since April 1985. *Id.* ¶ 63.

14

- The Environmental Protection Agency (EPA) ensures compliance with and the fair administration of environmental laws and acts to conserve natural resources. *Id.* ¶ 66. NTEU has represented bargaining-unit workers at EPA since April 1998. *Id.* ¶ 68.

- Treasury's Departmental Offices guide Treasury's policies. *Id.* ¶ 71. NTEU represents employees who provide logistical support, such as assuring adequate supplies, equipment, and mail services; distribute mail; and perform building repairs. *Id.* ¶ 72. NTEU has represented bargaining-unit workers at Treasury's Departmental Offices since May 2002. *Id.*

- The Office of the Comptroller of the Currency (OCC) ensures that national banks and federal savings associations operate in a safe and sound manner and provide fair access to financial services. *Id.* ¶ 75. NTEU has represented bargaining-unit workers at OCC since November 2002. *Id.* ¶ 77.

- The Alcohol and Tobacco Tax and Trade Bureau (TTB) collects taxes on alcohol, tobacco, firearms, and ammunition; ensures the integrity of alcohol products; ensures that only qualified businesses enter the alcohol and tobacco industries; and prevents unfair and unlawful market activity for alcohol and tobacco products. *Id.* ¶ 80. NTEU has represented bargaining-unit workers at TTB since October 2003. *Id.* ¶ 82.

- The Bureau of Land Management (BLM) sustains the health, diversity, and productivity of public lands for the use and enjoyment of the public. *Id.* ¶ 85.

NTEU has represented bargaining-unit workers at BLM since February 2021. *Id.* ¶ 87.

- The Department of Justice's (DOJ) Environment and Natural Resources Division is responsible for bringing cases against those who violate the nation's environmental laws and defending the federal government in litigation arising under a broad range of environmental statutes. *Id.* ¶ 92. Those in DOJ's Civil Rights Division work to uphold the civil and constitutional rights of all persons in the United States and enforce federal statutes prohibiting discrimination. *Id.* ¶ 93. NTEU has represented bargaining-unit workers at DOJ since January 2025. *Id.* ¶ 95.

**3.**     The Executive Order's exemptions of the agencies and subdivisions listed above are ultra vires not only individually but also collectively. The Executive Order's attempt to largely nullify the Statute through its narrow national-security exemption conflicts with Congress's intent in enacting the Statute. Congress intended to facilitate and strengthen collective bargaining and to guard against a President materially altering collective bargaining. The Executive Order's sweeping exclusions of agencies and agency components from the Statute's coverage, collectively, exceed the President's authority and are ultra vires.

The Executive Order's far-reaching use of the Statute's narrow national-security exemption is unprecedented. Before this Executive Order, no President had ever used Section 7103(b)(1) to exempt an entire Cabinet-level agency from the Statute. But this Executive Order exempts *six*—nearly one-half of all Cabinet-level

agencies. *See* Exec. Order No. 14,251 § 2. It excludes from the Statute some two-thirds of the federal workforce and three-fourths of workers who are currently represented by unions. Facts ¶ 4.

Congress enacted the Statute to facilitate and to strengthen collective bargaining in the federal sector (*Bureau of Alcohol, Tobacco & Firearms*, 464 U.S. at 107), codifying its finding that collective bargaining "safeguards the public interest" in the Statute's initial section (5 U.S.C. § 7101(a)). Congress's explicit aim with the Statute was to create a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. Clay). This "[c]ontext plays a vital role when interpreting [the Statute]." *Feliciano v. DOT*, 145 S. Ct. 1284, 1293 (2025).

The President's use of the Statute's narrow national-security exemption to undo the bulk of the Statute's coverage is plainly at odds with Congress's expressed intent. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . " *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

The President "may not decline to follow a statutory mandate . . . simply because of policy objections." *In re Aiken Cty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). Yet, here, the Executive Order's national-security exemptions collectively reflect "disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly," instead of an analysis of Section 7103(b)(1)'s criteria. *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *26.

17

The President's policy view that "hostile Federal unions . . . obstruct agency management" cannot excuse his Administration's compliance with the Statute. Facts ¶ 14. Nor can it justify an Executive Order that blows a hole through the Statute by undoing two-thirds of its coverage—with potentially more to come, as the Order foreshadows. *See* Exec. Order No. 14,251 § 7 (requiring agency-head reports on additional exclusions from the Statute). That is the opposite of what Congress intended when it sought to stabilize federal-sector collective bargaining through federal statute.

## II.    The Executive Order Is First Amendment Retaliation, as the White House Fact Sheet Effectively Concedes (Count 3).

The Executive Order is textbook First Amendment retaliation against NTEU and other unions that have stood up to the President. While the White House Fact Sheet proclaims that "President Trump supports constructive partnerships with unions who work with him," the Executive Order shows that unions that challenge this Administration's actions will be hurt. Facts ¶ 15. NTEU's protected activity triggered an Executive Order that threatens its existence. *Id.* ¶¶ 103–107, 126.

For its First Amendment retaliation claim, NTEU must show that (1) it "engaged in conduct protected under the First Amendment"; (2) the government "took some retaliatory action sufficient to deter a person of ordinary firmness in [NTEU's] position from speaking again"; and (3) "a causal link between the exercise of a constitutional right and the adverse action taken." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)). NTEU makes that showing here.

18

1.      NTEU's litigation against the Trump Administration's actions, described in more detail below, is protected speech and petitioning activity. *See, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542–49 (2001) (providing that "advocacy by [an] attorney to the courts" is "speech and expression" that enjoys First Amendment protection); *McDonald v. Smith*, 472 U.S. 479, 484 (1985) (holding that "filing a complaint in court is a form of petitioning activity" that the First Amendment protects).

2.      The Executive Order, moreover, "constitutes a sufficiently adverse action" against NTEU "to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The Executive Order plainly punishes NTEU for its legal challenges to this Administration's actions by cancelling, as relevant here, twelve of NTEU's collective-bargaining relationships, including NTEU's largest and oldest one at the IRS. Facts ¶ 34. The Order eliminates NTEU's ability to serve as the exclusive bargaining representative for about two-thirds of its membership, and it cuts off more than half of NTEU's dues revenue. *Id.* ¶¶ 115, 119.

Particularly given the President's mandate to agency heads to recommend even broader exclusions from the Statute (*see* Exec. Order No. 14,251 § 7), the Executive Order "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Connelly v. Cty. of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023) (quoting *Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007)). It is reasonable to believe that NTEU's protected activity might lead to

19

more of its agencies being excluded from the Statute. *See* Exec. Order No. 14,251 § 7.

    **3.**    The "adverse action" here—the exclusion of the NTEU-represented agencies from the Statute through a national-security exemption that could not conceivably apply to them—"would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019). The IRS, for example, does not plausibly have a "primary function" of national security or intelligence work (*see* 5 U.S.C. § 7103(b)(1)); but the IRS is NTEU's largest bargaining unit, so the Executive Order excludes it from the Statute.

    The Executive Order retaliates against NTEU for its litigation against this Administration, which "strikes at the heart of the First Amendment." *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009). This Court found "clear evidence [that] the White House Fact Sheet reflects retaliatory motive towards certain unions" like NTEU. *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *27. The White House Fact Sheet on the Executive Order proclaims the Order's retaliatory motive. To justify the Executive Order, the Fact Sheet states that "[c]ertain Federal unions have declared war on President Trump's agenda." Facts ¶ 14. It further states that the Civil Service Reform Act, of which the Statute is one part, "enables hostile Federal unions to obstruct agency management." *Id.*

    "[T]hese statements in the Fact Sheet appear to be in direct response to the number of lawsuits and grievances NTEU has filed against the Trump Administration in the last several months." *NTEU*, 2025 U.S. Dist. LEXIS 80268, at

*28. Before this lawsuit, NTEU filed four other federal district court lawsuits challenging the Trump Administration's execution of high-priority policy objectives. That included legal challenges to the Executive Order reviving the Schedule F Executive Order from the President's first term, the Administration's attacks on the CFPB, and the Administration's efforts to get rid of a substantial portion of the federal workforce. Facts ¶¶ 103–06. NTEU also filed dozens of grievances in response to the Trump Administration's actions against federal workers. *Id.* ¶ 107. This protected activity spurred the Executive Order's exclusions of NTEU-represented agencies from the Statute.

And a preemptive lawsuit that the Department of Justice filed against NTEU on the morning after the Executive Order issued shows the aggressiveness with which the Executive Branch is targeting NTEU. The Administration sued an NTEU chapter in the Eastern District of Kentucky seeking a declaratory judgment that the Department of Treasury may rely on the Executive Order to terminate the IRS's collective-bargaining agreement with NTEU. *See generally* Compl., *Dep't of Treasury v. NTEU Ch. 73*, No. 25-cv-49 (E.D. Ky. Mar. 28, 2025).

The lawsuit against NTEU shows a government on the attack. The Administration sued NTEU to solidify loss of its largest bargaining unit as promptly as possible. In other words, the Administration went on offense and picked the target that would hurt NTEU the most. There is no other plausible explanation for the lawsuit's scope; it makes no mention of the other eleven NTEU collective-bargaining agreements that the Executive Order affects.

21

The language of the government's complaint leaves no doubt that retaliatory animus is the driver: It mimics the Fact Sheet's language, referring to NTEU as a "hostile union" and alleges that NTEU plans to use its collective-bargaining agreement to "prevent changes to agency operations" and "interfere with the President's ability to oversee the Executive Branch." *Id.* ¶¶ 30, 54. The government's complaint also specifically calls out NTEU's National President. It provides a link to a letter that NTEU's National President wrote to the IRS, which the government characterizes as "confirm[ing] the union 'vehemently opposes' any reductions in force and plans to use [a] contract provision to resist this administration policy." *Id.* ¶ 54.[4]

The Administration's lawsuit in Kentucky is on all fours with the Fact Sheet's indication that hostile unions like NTEU will be hurt, while unions that collaborate with the President will not be. *See id.* ¶¶ 14–15. The Executive Order itself backs up those statements with whom it keeps within the Statute's coverage and whom it excludes. *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *29–30 (describing the Order's gerrymandering). This retaliation against NTEU for its litigation plainly violates the First Amendment. *See Wilmer Cutler Picking Hale & Dorr v. Exec. Off. of the President*, No. 25-917, 2025 U.S. Dist. LEXIS 100078, at *47 (D.D.C. May 27, 2025) ("The Order shouts through a bullhorn: If you take on causes disfavored by President Trump, you will be punished!").

---

[4] On May 20, the lawsuit was dismissed for lack of standing. *Dep't of Treasury v. NTEU Ch. 73*, No. 25-cv-49, 2025 U.S. Dist. LEXIS 95533 (E.D. Ky. May 20, 2025). The government has not indicated if it will appeal that ruling.

22

### III.    NTEU Will Continue to Suffer Harm Absent Injunctive Relief.

#### A.  The Executive Order Is Harming NTEU's Bargaining Power.

The injunctive relief that NTEU requests is needed because the Executive Order is causing NTEU to suffer a loss of bargaining power and influence in agency workplaces. The Executive Order substantially reduces the number of employees that NTEU represents. At the end of 2024, NTEU represented approximately 158,144 employees in its various agencies. Facts ¶ 115. The Executive Order takes away about 104,278 of those employees. *Id.* The Executive Order thus cuts the number of NTEU-represented employees by over 65%. *Id.*[5] As the OPM Guidance confirms, the agency employers of these employees "are no longer subject to the collective-bargaining requirements of [chapter 71]" and NTEU has "los[t] [its] status" as their exclusive representative. *Id.* ¶ 9.

The Executive Order has thus led to agencies disregarding a dozen of its collective-bargaining agreements. *Id.* ¶¶ 130–204. After the Executive Order issued, excluded agencies stopped bargaining with NTEU on changes to conditions of employment—including the impending reductions-in-force—and stopped participating in the grievance-arbitration process. *Id.* NTEU members in these agencies have cancelled their membership explicitly because of the Executive Order. *Id.* ¶ 121 ("President Trump demolished the union several weeks ago . . . Please see the attached form, SF-1188 to end my participation in NTEU.").

---

[5] Federal-sector unions are required to represent all employees in their bargaining units, not just the employees who voluntarily choose to join a union and pay dues. 5 U.S.C. § 7114(a). Accordingly, NTEU represents almost 160,000 employees of whom about 91,000 are dues-paying members. The Executive Order slashes both.

Defendants previously raised the false premise that agencies are honoring their collective-bargaining agreements with NTEU. *See* Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. at 6, Dkt. 26. Defendants' representation to this Court was based on an April 8 "Frequently Asked Questions" document that OPM issued, which offers a suggestion that "[a]gencies should not terminate any collective bargaining agreements[.]" *Id.* These FAQs were hurriedly issued to aid the government in litigation after NTEU filed suit and filed its motion for preliminary relief. Despite the FAQs' suggestion, agencies have utterly rejected their collective-bargaining obligations with NTEU. Before and after those FAQs issued, agencies refused to meet with NTEU, to bargain with NTEU, or to honor contractual obligations (for example, the withholding of dues payments via payroll deduction for members). *See* Facts ¶¶ 130–204.

While this Court's preliminary injunction led to agency compliance with some contractual obligations for a brief period, agencies' noncompliance resumed after the D.C. Circuit's May 16 stay of that emergency relief. *Id.* ¶ 124. Since the stay issued, every exempted agency or subdivision with a collective-bargaining agreement with NTEU has either stopped processing dues payments via payroll deduction or notified NTEU that it will imminently stop those payments, in violation of its respective agreement. *Id.* (noting that nine agency defendants have stopped processing dues payments and that dues payments will cease for two other

agencies).[6] And agencies have again stopped complying with their other contractual obligations—for example, refusing to bargain with NTEU, refusing to process grievances, and even evicting local union leaders from their union offices at agency workplaces. *Id.* ¶¶ 130–204.

Recent communications from the IRS and FDA are emblematic of the current state of affairs across NTEU-represented agencies now excluded from the Statute. As the IRS explained to NTEU and to an arbitrator on May 20:

> Our office has been instructed to refrain from participating in any activities related to collective bargaining, including having any substantive contact with the union. Substantive contact is basically anything more than notifying the union that we are not to have contact.

*Id.* ¶ 138. FDA sent a similar notification to NTEU on June 3:

> FDA is not recognizing labor relations with (NTEU/AFGE) in adherence to the presidential Executive Order . . . FDA will cease to recognize all labor organizations and will not participate in any labor related activities . . .

*Id.* ¶ 153.

The narrow injunctive relief that NTEU has requested is thus necessary to stop the ongoing implementation of the unlawful Executive Order.

---

[6] The twelfth and final agency defendant representing NTEU workers, DOJ, has simply refused to discuss processing employee requests for dues deductions from their paychecks since NTEU organized its workers earlier this year. Facts ¶¶ 202–203. NTEU and DOJ do not yet have a collective-bargaining agreement (Facts ¶ 201), but Section 7115(a) requires DOJ to process dues payments that its employees wish to make via payroll deductions.

**B.    The Executive Order Is Causing NTEU Ongoing Financial Harm.**

Injunctive relief is also appropriate considering the ongoing financial harm that the unlawful Executive Order is causing to NTEU. "Dues payments of union members are the economic lifeblood of a labor organization . . ." *Local Union No. 5741, United Mine Workers v. NLRB*, 865 F.2d 733, 738 (6th Cir. 1989) (cleaned up). The Executive Order eliminates 58,692 of NTEU's dues-paying members.  Facts ¶ 123. The vast majority of NTEU members—approximately 94%—pay their dues through payroll deductions. *Id.* ¶ 122.

NTEU lost over $2 million before this Court's preliminary injunction because the agency defendants stopped processing dues payments to NTEU through payroll deductions, as 5 U.S.C. § 7115(a) and their collective-bargaining agreements require. *Id.* ¶ 125. And by the time the agency defendants complied with the preliminary injunction, NTEU's losses exceeded $3 million. *Id.* Since the D.C. Circuit's stay of the preliminary injunction, the agency defendants have once again stopped processing dues via payroll deduction. *Id.* ¶ 124. If those losses continue, NTEU will lose over half of its annual revenue. *See NTEU*, 2025 U.S. Dist. LEXIS 80268, at *55.

While the government has previously argued that NTEU could ask members in agencies that it no longer represents for financial support, it cannot contest that the Executive Order takes away the apparatus that Congress created in 5 U.S.C. § 7115(a) and on which NTEU relies for virtually all its dues payments. *See NTEU*, 2025 U.S. Dist. LEXIS 80268, at *53–54. Nor can the government contest that the

Executive Order takes away the basic reason that NTEU members pay dues at all: to support their exclusive representative, which is entitled to collectively bargain on their behalf and with which their employers must engage. *See id.*; *cf. Perkins Coie LLP v. U.S. Dep't of Justice*, No. 25-716, 2025 U.S. Dist. LEXIS 84475, at *38 n.20 (D.D.C. May 2, 2025) (noting that executive order took away the reason clients hired firm: *i.e.*, it "hamper[ed] the effectiveness of [the firm's] representation of clients").

### C.    The Executive Order Is Exacting First Amendment Retaliation.

The exclusion of NTEU's agencies reflects First Amendment retaliation (see supra at 18–22), which injunctive relief would remedy. Additionally, if the government is not stopped from its retaliatory use of the Statute's national-security exemption, additional national-security exemptions targeting NTEU's agencies are substantially likely to come. *See* Exec. Order No. 14,251 § 7 (mandating that the head of each agency still within the Statute's coverage submit a report to the President "identify[ing] any agency subdivisions" that should be excluded from the Statute through Section 7103(b)(1)).

### <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff requests that this Court grant its motion for summary judgment and order the relief described in its proposed order.

27

Respectfully submitted,

*/s/  Julie M. Wilson*
JULIE M. WILSON
General Counsel
D.C. Bar 482946

*/s/  Paras N. Shah*
PARAS N. SHAH
Deputy General Counsel
D.C. Bar 983881

*/s/  Allison C. Giles*
ALLISON C. GILES
Assistant Counsel
D.C. Bar 439705

*/s/  Jessica Horne*
JESSICA HORNE
Assistant Counsel
D.C. Bar 1029732

*/s/  Kathryn W. Bailey*
KATHRYN W. BAILEY
Assistant Counsel
D.C. Bar 1643256

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C. 20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
jessica.horne@nteu.org
kathryn.bailey@nteu.org

June 9, 2025                    Counsel for Plaintiff NTEU

28