**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, | ) ) ) ) | |
| *Plaintiff*; | ) ) | Case No. 1:25-cv-935-PLF |
| v. | ) ) | Judge Paul L. Friedman |
| DONALD J. TRUMP, *et al.*, | ) ) | |
| *Defendants*. | ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND............................................................................................................. 2

I.   The FSLMRS Framework and Related Executive Orders .................................. 2

II.  The Statutory Channeling Requirement ............................................................. 5

III. Procedural History.............................................................................................. 6

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT................................................................................................................. 7

I.   The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Claims................... 8

    A.   The FSLMRS Precludes District Court Jurisdiction Over Plaintiff's Claims. ............... 8

    B.   Plaintiff Has Not Identified a Cause of Action or an Applicable Waiver of Sovereign
    Immunity............................................................................................. 12

II.  The Executive Order Is a Lawful Exercise of the President's Authority and Is Not
Subject to Judicial Review. ................................................................................ 14

    A.   The FSLMRS and Binding D.C. Circuit Precedent Do Not Allow Judicial Review of
    the Executive Order. ............................................................................ 14

    B.   The Agencies Meet the FSLMRS Statutory Criteria. .................................. 16

        1.   Each relevant Defendant agency or subdivision thereof has as a primary
        function national security or investigative work. .................................. 16

        2.   The FSLMRS cannot be applied here consistent with national security
        requirements and considerations. ...................................................... 23

III. Plaintiff's *Ultra Vires* Claims Fail as a Matter of Law ...................................... 25

    A.   The President's Determination Is Consistent with the Statute......................... 27

    B.   The President's Actions Are Entitled to a Presumption of Regularity. .............. 31

IV.  Plaintiff's First Amendment Retaliation Claim Fails as a Matter of Law.............. 33

V.   Plaintiff Cannot Satisfy the Elements Necessary to Obtain a Permanent Injunction........... 35

CONCLUSION ............................................................................................................. 38

## TABLE OF AUTHORITIES

**Cases**

*AFGE v. Trump,*
   929 F.3d 748 (D.C. Cir. 2019) ........................................................................ *passim*

*AFGE, AFL-CIO v. Reagan,*
   870 F.2d 723 (D.C. Cir. 1989) ........................................................................ *passim*

*AFSA v. Trump,*
   No. 25-5184, slip op. (D.C. Cir. June 20, 2025) ............................................. *passim*

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................................ 7

*Aref v. Holder,*
   774 F. Supp. 2d 147 (D.D.C. 2011) ..................................................................... 33

*Aref v. Lynch,*
   833 F.3d 242 (D.C. Cir. 2016) ............................................................................. 33

*Army Corps of Eng'rs,*
   53 F.L.R.A. 79 (1997) ......................................................................................... 24

*Axon Enter., Inc. v. Fed. Trade Comm'n,*
   598 U.S. 175 (2023) .................................................................................. 9, 10, 11

*Bd. of Governors, FRS v. MCorp Fin., Inc.,*
   502 U. S. 32 (1991) ...................................................................................... 13, 26

*Black Lives Matter D.C. v. Trump,*
   544 F. Supp. 3d 15 (D.D.C. 2021) ................................................................ 33, 34

*Bouarfa v. Mayorkas,*
   604 U.S. 6 (2024) ................................................................................................ 14

*Building & Construction Trades Dep't, AFL-CIO v. Allbaugh,*
   295 F.3d 28 (D.C. Cir. 2002) ................................................................................ 3

*Bureau of Alcohol, Tobacco & Firearms v. FLRA,*
   464 U.S. 89 (1983) ......................................................................................... 3, 11

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) .............................................................................................. 7

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.,*
   333 U.S. 103 (1948) ............................................................................................ 23

*Citizens for Resp. & Ethics in Wash. v. FEC,*
    971 F.3d 340 (D.C. Cir. 2020) ................................................................ 28

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ................................................................................ 31

*City of Ketchican v. Cape Fox Corp.,*
    85 F.3d 1381 (9th Cir. 1996) ................................................................. 27

*Cole v. Young,*
    351 U.S. 536 (1956) ........................................................................... 28, 29

*Davis v. Pension Benefit Guar. Corp.,*
    571 F.3d 1288 (D.C. Cir. 2009) ............................................................. 36

*DCH Regional Med. Ctr. v. Azar,*
    925 F.3d 503 (D.C. Cir. 2019) ............................................................... 26

*Dep't of Def. v. FLRA,*
    685 F.2d 641 (D.C. Cir. 1982) ............................................................... 15

*Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181,*
    4 F.L.R.A. 644 (1980) .......................................................... 17, 19, 20, 29

*Dep't of Homeland Sec. v. NTEU,*
    68 F.L.R.A. 13 (2014) ............................................................................ 17

*Dep't of the Navy v. Egan,*
    484 U.S. 518 (1988) ............................................................................... 16

*Doe v. District of Columbia,*
    796 F.3d 96 (D.C. Cir. 2015) ................................................................. 33

*eBay, Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ............................................................................... 36

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) ................................................................................... 10

*FDA v. Wages & White Lion Invs., L.L.C.,*
    604 U.S. ___, 145 S. Ct. 898 (2025) ...................................................... 31

*FDIC v. Meyer,*
    510 U. S. 471 (1994) .............................................................................. 12

*Fed. Express Corp. v. Dep't of Com.,*
    39 F.4th 756 (D.C. Cir. 2022) ............................................................... 26

*Fed. Law Enf't Officers Ass'n v. Ahuja,*

62 F.4th 551 (D.C. Cir. 2023) ........................................................................................ 10

*Gill v. Whitford*,
   585 U.S. 48 (2018) ........................................................................................................ 37

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) ...................................................................................................... 37

*Heckler v. Ringer*,
   466 U.S. 602 (1984) ...................................................................................................... 10

*Henson v. Santander Consumer USA Inc.*,
   582 U.S. 79 (2017) ................................................................................................. 30, 31

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) .......................................................................................................... 16

*Jackson v. Bush*,
   448 F. Supp. 2d 198 (D.D.C. 2006) .............................................................................. 12

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) ................................................................................................. 31, 32

*Lewis v. Casey*,
   518 U.S. 343 (1996) ...................................................................................................... 38

*Lewis v. Clarke*,
   581 U.S. 155 (2017) ...................................................................................................... 12

*Local 1498, AFGE v. AFGE, AFL/CIO*,
   522 F.2d 486 (3d Cir. 1975) ........................................................................................... 3

*Manhattan-Bronx Postal Union v. Gronouski*,
   350 F.2d 451 (D.C. Cir. 1965) ....................................................................................... 3

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................................................................................ 7

*Merck Sharp & Dohme Corp. v. Albrecht*,
   587 U.S. 299 (2019) ...................................................................................................... 31

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ...................................................................................................... 36

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977) ...................................................................................................... 33

*Myers v. United States*,
   272 U.S. 52 (1926) .......................................................................................................... 3

*Nat'l Treasury Emps. Union v. Reagan,*
    1981 WL 150530 (D.D.C. Sept. 3, 1981) ................................................................... 15

*Nat'l Treasury Emps. Union v. Trump,*
    No. 25-5157, slip op. (D.C. Cir. May 16, 2025) ......................................................... 6

*Nieves v. Barlett,*
    587 U.S. 391 (2019) .................................................................................................. 34

*Niz-Chavez v. Garland,*
    593 U.S. 155 (2021) .............................................................................................. 16, 28

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................................................. 36

*North American Butterfly Ass'n v. Wolf,*
    977 F.3d 1244 (D.C. Cir. 2020) ................................................................................ 26

*Nuclear Regul. Comm'n v. Texas,*
    605 U.S. ___, slip op. (2025) ........................................................................ 13, 26, 27

*Nyunt v. Chairman, Broadcasting Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) .................................................................................. 26

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979) .................................................................................................. 30

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) .................................................................................................. 10

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ........................................................................................... *passim*

*United States EPA,*
    70 F.L.R.A. 279 (2017) ............................................................................................. 22

*United States v. Armstrong,*
    517 U.S. 456 (1996) .................................................................................................. 31

*United States v. Chemical Found.,*
    272 U.S. 1 (1926) ...................................................................................................... 31

*United States v. Deuman,*
    568 F. App'x 414 (6th Cir. 2014) ............................................................................. 16

*United States v. Miller,*
    No. 23-824, 604 U.S. __, slip op. (2025) ................................................................. 12

*United States v. W.T. Grant Co.,*

345 U.S. 629 (1953) ........................................................................................... 36

*United States v. Woods*,
571 U.S. 31 (2013) ............................................................................................ 29

*U.S. Dep't of Treasury Internal Revenue Serv.*,
62 F.L.R.A. 298 (2007) ..................................................................................... 29

*Webster v. Doe*,
486 U.S. 592 (1988) ........................................................................................... 15

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ........................................................................................... 37

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................................................................... 14

*Zukerman v. United States Postal Serv.*,
64 F.4th 1354 (D.C. Cir. 2023) ......................................................................... 36

**Statutes**

5 U.S.C. § 7101 .................................................................................................... 3

5 U.S.C. § 7103 ........................................................................................... *passim*

5 U.S.C. § 7104 .................................................................................................... 5

5 U.S.C. § 7105 .................................................................................................... 5

5 U.S.C. § 7106 .................................................................................................. 24

5 U.S.C. § 7116 ............................................................................................... 5, 11

5 U.S.C. § 7118 .................................................................................................... 5

5 U.S.C. § 7121 .................................................................................................. 11

5 U.S.C. § 7123 .................................................................................................. 10

12 U.S.C. § 5511 ........................................................................................... 17, 28

15 U.S.C. § 634b ........................................................................................... 17, 28

22 U.S.C. § 2251 ........................................................................................... 17, 28

28 U.S.C. § 509A(b) .......................................................................................... 22

28 U.S.C. § 1331 ................................................................................................ 13

42 U.S.C. § 247d-4 ................................................................................................ 20

42 U.S.C. § 247d ................................................................................................... 20

42 U.S.C. § 300hh-10 ........................................................................................... 20

42 U.S.C. § 7111 .............................................................................................. 18, 23

47 U.S.C. § 151 ..................................................................................................... 23

Pub. L. No. 95-454, 92 Stat. 111 (1978) ................................................................ 3

Pub. L. No. 111-353, 124 Stat. 3885 (2011) ........................................................ 21

**The Constitution**

U.S. Const., art. II, § 1, cl. 1 .................................................................................. 3

**Legislative Materials**

124 Cong. Rec. H9633 (daily ed. Sept. 13, 1978) .............................................. 4, 15

**Rules**

Fed. R. Civ. P. 56(a) .............................................................................................. 7

**Regulations**

5 C.F.R. § 2423.30 .................................................................................................. 5

5 C.F.R. § 2423.40 .................................................................................................. 5

5 C.F.R. § 2423.41 .................................................................................................. 5

Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979) ........................ 4, 18

Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008) ........................... 4, 30

*Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024) ................................ 23

*New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units*, 89 Fed. Reg. 39,798 (May 9, 2024) ........................................................................ 22

Exec. Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 20, 2025) ............................... 19

Exec. Order No. 14,251 (Mar. 27, 2025) ............................................................... 19

## <u>INDEX OF EXHIBITS</u>

Ex. 1    *American Foreign Service Association v. Trump*, No. 25-5184 (D.C. Cir. June 20, 2025) (slip op.)

Ex. 2    Defendants' Local Rule 7(h)(1) Statement

Ex. 3    Declaration of Matthew E. Hirt, Senior Attorney for the Labor and Employment Law Office, Justice Management Division, Human Resources Staff, U.S. Department of Justice (June 23, 2025)

Ex. 4    Declaration of Christian V. Ballance, Executive Director of the National Labor and Employee Relations Office, U.S. Department of Health and Human Services (June 23, 2025)

Ex. 5    Declaration of Michael Molina, Principal Deputy Assistant Administrator for Mission Support, U.S. Environmental Protection Agency (June 23, 2025)

Ex. 6    Declaration of Reesha Trznadel, Acting Chief Human Capital Officer, U.S. Department of Energy (June 23, 2025)

Ex. 7    Declaration of Mark Stephens, Managing Director, U.S. Federal Communications Commission, (June 23, 2025)

Ex. 8    Declaration of Trevor Norris, Deputy Assistant Secretary for Human Resources, U.S. Department of the Treasury (June 23, 2025)

Ex. 9    Declaration of Stephanie M. Holmes, Acting Chief Human Capital Officer, U.S. Department of the Interior (June 23, 2025)

## INTRODUCTION

The Federal Service Labor-Management Relations Statute (FSLMRS or statute), which governs bargaining with federal-sector labor unions, authorizes the President to exempt from its coverage "*any* agency or subdivision thereof" if the President makes the determinations that "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and that the provisions of the statute "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1) (emphasis added).  Since 1979, when President Carter exempted more than forty-five agencies or subdivisions pursuant to that authority, every President (other than President Biden) has issued one or more executive orders exempting additional agencies and subdivisions from the statute's coverage in response to the Nation's changing needs.

On March 27, 2025, President Trump issued such an order.  In Executive Order 14,251, *Exclusions from Federal Labor Management Relations Programs*, the President made the determinations specified in the FSLMRS, thereby excluding the identified agencies and agency subdivisions from its coverage.  Among the agencies covered by Executive Order 14,251 are the Defendants or certain subdivisions thereof.  The national security and/or investigative function of these agencies and subdivisions is clear and primary, and the provisions of the FSLMRS are inconsistent with national security considerations and requirements.

Through this action, Plaintiff seeks declaratory and injunctive relief against Defendants, asserting that Section 2 of the Executive Order is: *ultra vires* in violation of 5 U.S.C. § 7103(b)(1) (Count 1); *ultra vires* in violation of 5 U.S.C. Chapter 71 (Count 2); and retaliation in violation of Plaintiff's First Amendment rights (Count 3).  Plaintiff is not entitled to this or any relief.

As a threshold matter, this Court lacks subject matter jurisdiction because Plaintiff's claims should have been channeled through the Federal Labor Relations Authority (FLRA) to a court of

appeals, and because Plaintiff fails to identify an applicable waiver of sovereign immunity. Defendants are entitled to summary judgment on either one of those bases alone.

To the extent the Court reaches the merits of Plaintiff's claims, the claims still fail. *See Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184 (D.C. Cir. June 20, 2025) ("*AFSA v. Trump*"). Established D.C. Circuit precedent precludes this Court from substantively reviewing the President's determinations, which are a lawful exercise of his authority pursuant to the FSLMRS and are supported in any event. Indeed, the D.C. Circuit Court recently granted a stay of a preliminary injunction pending appeal and offered a merits analysis rejecting claims nearly identical to the ones here. *See AFSA v. Trump*, No. 25-5184, slip op. at 2–5 (D.C. Cir. June 20, 2025), attached as Exhibit 1. There, the D.C. Circuit reasoned that because the President is not an agency, "it is unclear whether *ultra vires* review"—"which is a suit in equity, not a statutory cause of action"—"is available at all." *Id.* at 3. And even if it were available, "the [FSLMRS] statute commits the relevant decision to the President's discretion," such that an inquiry more searching than a "single sentence that d[oes] not inspect the President's rationale," "would be 'inconsistent with the broad statutory test and deference traditionally accorded the President in this [national security] sphere.'" *Id.* at 4–5 (citation omitted). This case merits the same conclusions. Finally, Plaintiff has failed to prove that the issuance of the Executive Order was retaliatory in violation of the First Amendment because the President would have taken the challenged action absent the alleged retaliatory motive. For these reasons, the Court should grant Defendants' motion for summary judgment.

## BACKGROUND

### I. The FSLMRS Framework and Related Executive Orders

Article II of the Constitution provides that "[t]he executive Power shall be vested in a

President of the United States of America."[1]    U.S. Const., art. II, § 1, cl. 1.    Before Congress enacted the FSLMRS in 1978, the President routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees[]" by Executive Order.    *See, e.g.*, *Local 1498, AFGE v. AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975).    "This was a project of the Executive, and not of the Congress."    *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 452 (D.C. Cir. 1965).

Against this backdrop, Congress in 1978 passed the FSLMRS, 5 U.S.C. § 7101 *et seq.*    The statute, enacted as Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 111, provides a "comprehensive . . . scheme governing labor relations between federal agencies and their employees," *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 91 (1983), and, among other protections, establishes the right of certain federal employees to form or join a labor union.    But the FSLMRS exempts certain agencies and matters from its coverage.    5 U.S.C. § 7103(a)(3) (excluding from coverage the Federal Bureau of Investigation, the Central Intelligence Agency, and the Tennessee Valley Authority, among others).    The FSLMRS also empowers the President to make additional exemptions from its requirements, including by exempting entire agencies or specific subcomponents.    The statute provides:

> The President may issue an order excluding *any* agency or subdivision thereof from coverage under this chapter [the FSLMRS] if the President determines that—
>
> > (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
> >
> > (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

---

[1] This power "necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government," *Building & Construction Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)), and includes the authority to make "improvement[s] in the efficiency of federal employment," *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965).

3

5 U.S.C. § 7103(b)(1) (emphasis added).  *See* Defendants' Local Rule 7(h)(1) Statement, Exhibit 2, at ¶ 2.  Congress considered other versions of this provision, including one that would have vested the FLRA with the power to determine whether a specific agency falls within the national security exemption.  However, the final version of § 7103(b) "[gave] to the President the power to exclude agencies and agency subdivisions from coverage for national security reasons," "in his or her sole discretion."[2]  124 Cong. Rec. H9633 (daily ed. Sept. 13, 1978) (statement of Rep. Udall).

Pursuant to this authority, President Carter issued an executive order in 1979 excluding from FSLMRS coverage more than forty-five agencies or agency subdivisions—including the General Services Administration's Information Security Oversight Office, and several components of the Department of Treasury—precluding their employees from collective bargaining.  Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979).  Every President since then, with the sole exception of President Biden, has authorized such exemptions in response to changing circumstances and the evolving investigative and national security responsibilities of federal agencies.  *See, e.g.*, Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008).

Following that long tradition, on March 27, 2025, President Trump issued another such Executive Order.  Ex. 2 at ¶ 1.  In Section 2 of the order, the President determined that certain agencies and subdivisions—including Defendants and/or their components—have as a primary function intelligence, counterintelligence, investigative, or national security work, and that the FSLMRS cannot be applied to those agencies and subdivisions in a manner consistent with national security requirements and considerations.  *Id*. at ¶ 3–5.

---

[2] This final version of § 7103(b)(1) substituted for an earlier draft provision that would have required an agency seeking an exclusion to apply to the FLRA, which would review and investigate the matter, and then issue a decision either granting or denying the exclusion.  Congress instead vested the exclusion authority in the President.  124 Cong. Rec. H9633 (daily ed. Sept. 13, 1978) (statement of Rep. Udall).

## II.    The Statutory Channeling Requirement

In the FSLMRS, Congress established a dedicated mechanism for resolving disputes regarding alleged unfair labor practices (ULP) for failing to bargain in good faith or comply with the provisions of the FSLMRS.[3]  An employee or a union alleging that an agency has "refuse[d] to consult or negotiate in good faith with a labor organization as required by [the FSLMRS]," or that an agency has "otherwise fail[ed] or refuse[d] to comply with any provision of [the FSLMRS]," 5 U.S.C. § 7116(a)(5) and (a)(8), may file a charge of an ULP with the Federal Labor Relations Authority (FLRA).  *See* 5 U.S.C. § 7118(a)(1).  The FLRA's General Counsel "shall investigate the charge and may issue and cause to be served upon the agency . . . a complaint."[4] *Id.*; *see also id.* § 7104(f).  An Administrative Law Judge (ALJ) conducts a hearing on the complaint and determines whether the challenged party committed an ULP.  *See id.* §§ 7105(e)(2), 7118(a)(6); 5 C.F.R. § 2423.30.  Any exceptions to the ALJ's decision must be filed with the Authority.[5]  5 C.F.R. § 2423.40; *see also* 5 U.S.C. § 7105(f).  The Authority may issue a final agency decision on the ULP complaint and order appropriate relief.[6]  *See* 5 C.F.R. § 2423.41; 5 U.S.C. §§ 7105(f)–(g), 7118.  The Authority's final orders are, with few exceptions not relevant here, subject to specified judicial review "in the United States court of appeals in the circuit in which the [aggrieved] person resides or transacts business or in the United States Court of Appeals

---

[3] The statute also provides exclusive mechanisms for an employee or union to file a grievance in accordance with a negotiated grievance procedure outlined in a CBA. *See* 5 U.S.C. §§ 7103(a)(9), 7121.

[4] "In any case in which the General Counsel does not issue a complaint because the charge fails to state an unfair labor practice, the General Counsel shall provide the person making the charge a written statement of the reasons for not issuing a complaint." 5 U.S.C. § 7118(a)(1).

[5] The Authority is a quasi-judicial body comprised of three full-time members whom the President appoints for fixed five-year terms. The Authority adjudicates ULP disputes, among other statutory duties. *See* 5 U.S.C. § 7104; FLRA.gov, *The Authority: About Us*, https://perma.cc/X4X9-GZVY.

[6] If no exceptions to the ALJ's decision are timely filed, then the ALJ's decision becomes the final decision and order of the Authority. 5 C.F.R. § 2423.41(a).

for the District of Columbia." *Id.* § 7123(a).

## III.    Procedural History

Plaintiff the National Treasury Employees Union filed this lawsuit on March 31, 2025. Compl., ECF No. 1.  The Complaint includes three causes of action.  Count 1 asserts that "[t]he President's Executive Order [14,251], Section 2 is unlawful and *ultra vires* because it conflicts with 5 U.S.C. § 7103(b)(1)."  Compl. ¶¶ 78–82.  Count 2 asserts that "[t]he President's Executive Order, Section 2 is unlawful and *ultra vires* because it conflicts with 5 U.S.C. Chapter 71."  *Id.* ¶¶ 83–89.  And Count 3 asserts that "[t]he President's Executive Order, Section 2, is unlawful because it reflects retaliation in violation of NTEU's First Amendment rights."  *Id.* ¶¶ 90–95.  Plaintiff seeks declaratory relief and an injunction enjoining all Defendants other than President Trump from implementing (a) Section 2 of the Executive Order and (b) a March 27, 2025 memorandum issued by the Office of Personnel Management, entitled *Guidance on Executive Order Exclusions from Federal Labor-Management Programs* (OPM Memorandum), *available at* https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf.

This Court entered a preliminary injunction against Defendants on April 25, 2025, with a written opinion issued on April 28, 2025.  ECF No. 32, 33, 34.  On May 16, 2025, the D.C. Circuit stayed the injunction pending appeal finding that, in addition to Plaintiff's failure to establish irreparable harm, the Court's injunction "inflicts irreparable harm on the President by impeding his national security-prerogatives, which were explicitly recognized by Congress [in Section 7103(b)(1)]."  *See Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, slip. op. at 2–3 (D.C. Cir. May 16, 2025).  It is in the public interest to preserve "the President's autonomy" under the statute, and "to hold otherwise would give to the courts what the Constitution gave to Congress and the President."  *Id.* at 4 (internal quotation omitted).

On May 20, 2025, the Court issued a Minute Order directing the parties to meet and confer and to "provide proposed next steps for this litigation" and "provide a briefing schedule for any expected motions." Pursuant to that Order, on May 22, 2025, the parties submitted a proposed briefing schedule for cross-motions for summary judgment, *see* Joint Status Report, ECF No. 40; the Court entered the parties' proposed schedule by Minute Order on May 22, 2025. On June 9, 2025, Plaintiff filed its motion for summary judgment, ECF No. 43. Defendants now oppose that motion and file this cross-motion for summary judgment.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Once the moving party establishes the absence of a genuine dispute of a material fact, the burden shifts to the nonmoving party to produce "specific" facts showing a "genuine issue" for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

## ARGUMENT

This Court lacks subject matter jurisdiction over Plaintiff's claims for two related reasons: first, to the extent Plaintiff relies on chapter 71 of Title 5, those claims should be channeled through the FLRA review scheme; second, Plaintiff has failed to raise any claim for which the United States has waived sovereign immunity. Because the Court lacks jurisdiction, it should not reach the merits of Plaintiff's claims, which, in any event, would fail because the President made the

determinations pursuant to section 7103(b)(1) of the FSLMRS. Under established circuit precedent, this Court lacks authority to look behind and review the President's determinations under section 7103(b)(1). *See AFGE, AFL-CIO v. Reagan*, 870 F.2d 723 (D.C. Cir. 1989). Thus, this Court's review should be limited to whether the President made the required discretionary determinations. But in any event, the President's determinations are supported as the record before the Court attests, and Plaintiff's unsubstantiated speculation about the President's motivations neither give rise to cognizable *ultra vires* claims—which rely on an implied equitable action—nor a First Amendment retaliation claim. Rather, the presumption of regularity requires this Court to reject Plaintiff's invitation to second guess the President, who clearly would have issued the Executive Order absent the alleged retaliatory motive. Accordingly, because each of Plaintiff's claims fail as a matter of law, Plaintiff is not entitled to the extraordinary relief of an injunction, and the Defendant agencies are entitled to summary judgment in their favor.

I.      **The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Claims.**

        A.      **The FSLMRS Precludes District Court Jurisdiction Over Plaintiff's Claims.**

        This Court lacks jurisdiction to review Plaintiff's claims. By Plaintiff's account, Executive Order 14,251 is invalid, meaning the agencies and subdivisions identified in the Executive Order remain subject to the FSLMRS, and the CBAs with Defendant agencies are valid and binding. Under that theory, Plaintiff's claims must be channeled to the administrative process provided in the FSLMRS, and the D.C. Circuit's decision in *AFGE v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019), compels dismissal of this case on jurisdictional grounds.

        In *AFGE v. Trump*, numerous federal unions, including Plaintiff, asserted broad constitutional and statutory challenges to Executive Orders issued by President Trump during his first term. The orders would have enacted substantial changes to the way federal unions operated. The D.C. Circuit reversed the district court's decision on jurisdictional grounds, holding that the

comprehensive administrative-judicial review scheme set forth by the FSLMRS channeled jurisdiction away from federal district courts. 929 F.3d at 753, 762. The D.C. Circuit emphasized that most federal labor disputes must be heard through the FLRA review scheme, with any judicial review occurring in the relevant federal court of appeals. *Id.* at 754–61.

This case requires the same jurisdictional outcome. Similar to those plaintiffs' broad challenge to the Executive Orders at issue in *AFGE v. Trump*, Plaintiff here alleges that Executive Order 14,251 and the OPM Memorandum will result in financial harm and loss of bargaining power. Specifically, Plaintiff claims that Defendants repudiated the relevant CBAs, refused to recognize and bargain with the relevant unions, and ceased withholding dues. Mem. of P.&A. in Supp. of Pl. NTEU's Mot. for Summ. J. 24–27, ECF No. 43-1 ("Pl. Mot."). These claims turn on Plaintiff's argument that its members are covered by the FSLMRS's statutory requirements. They therefore fall within the statute's exclusive review scheme and may not be heard in federal district court. *AFGE v. Trump*, 929 F.3d at 756. Notably, Plaintiff's motion is silent on these jurisdictional issues.

The Supreme Court's decision in *Axon Enterprises* does not change the calculus. *See Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023). As the Court explained in *Axon Enterprises*, "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.* at 185. The D.C. Circuit in *AFGE v. Trump* held that the FSLMRS is such a scheme. And Plaintiff's claims are not like the "wholly collateral" challenge the *Axon* plaintiff brought to the Federal Trade Commission's structure. Rather, the crux of Plaintiff's claim is that Defendant agencies are violating the FSLMRS by implementing the President's Executive Order—precisely the sort of claims that the D.C. Circuit found to be precluded in *AFGE v. Trump*.

The *Thunder Basin* factors that the Court applied in *Axon*—the existence of meaningful

9

relief without district court review, whether a claim is "wholly collateral" to the statute's review scheme, and the relevance of agency expertise—establish that the FSLMRS precludes district court jurisdiction over Plaintiff's claims. *See Axon*, 598 U.S. at 186 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994)). First, a finding of preclusion in this case does not foreclose meaningful judicial review of Plaintiff's claims. Plaintiff can bring its claims before the FLRA, and any arguments that the FLRA cannot resolve will be addressed by the circuit courts on appeal through the administrative-judicial review process Congress crafted in the FSLMRS. *See* 5 U.S.C. § 7123(a); *AFGE v. Trump*, 929 F.3d at 759. For that reason, Plaintiff's invocation of constitutional claims does not excuse it from the requirement that it first seek relief before the FLRA. *Id.* The Supreme Court has previously held that whether a claim is precluded under the Civil Service Reform Act does not "turn on the constitutional nature . . . but rather on the type of the employee and the challenged employment action." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012). So too here. Plaintiff cannot escape the FSLMRS's preclusive review scheme by framing its breach of contract arguments in constitutional terms. In short, Plaintiff can still receive meaningful judicial review of its claims by bringing them before the FLRA in the first instance, followed by an appeal in the circuit courts.

Second, Plaintiff's claims are within the statutory scheme and not collateral to it. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 615 (1984)). As the Supreme Court explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions[.]" *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices" and "business merger" that constituted the subject matter of the agency

actions. *See id.* at 193–94. Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* No such separation exists here. Plaintiff challenges Defendant agencies' refusal to abide by provisions of their CBAs, including a provision requiring them to deduct union dues from paychecks. These issues fall well within the FSLMRS's broad definition of "grievance," which the CBAs provide the exclusive procedures for resolving.[7] 5 U.S.C. §§ 7103(a)(9), 7121(a)(1). Plaintiff also broadly complains that by following the Executive Order Defendant agencies will not comply with FSLMRS requirements. This is an ULP charge, which the FLRA General Counsel prosecutes. 5 U.S.C. §§ 7116(a)(8), 7118. These are the kinds of issues central to the FLRA's work and are in no way collateral to the statutory review provisions. *See AFGE v. Trump*, 929 F.3d at 760 ("The unions' challenge in this case is of the type that is regularly adjudicated through the FSLMRS's scheme: disputes over whether the Statute has been violated.").

For similar reasons, Plaintiff's claims are clearly within the expertise of the FLRA—the third *Thunder Basin* factor. The FLRA is the federal authority on matters of federal labor relations. *E.g.*, *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 (1983) ("[T]he FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act.") (citation omitted). In concluding that the unions had to first bring their constitutional claims before the FLRA and MSPB in *AFGE*

---

[7] The FSLMRS defines a "grievance" as "any complaint (A) by any employee concerning any matter relating to the employment of the employee; (B) by any labor organization concerning any matter relating to the employment of any employee; or (C) by any employee, labor organization, or agency concerning (i) the effect or interpretation, or a claim of breach, of a collective bargaining agreement; or (ii) any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment[.]" 5 U.S.C. § 7103(a)(9). Pursuant to 5 U.S.C. § 7121(a)(1), "any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability," and except for narrow circumstances provided for in the statute, "[these] procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage."

*v. Trump*, the D.C. Circuit noted that those agencies, despite having less expertise on constitutional issues, may be able to "offer an interpretation of the [statutes] in the course of the proceeding that might alleviate or shed light on the constitutional concerns." *AFGE*, 929 F.3d at 761 (internal quotations omitted). Indeed, the FLRA may well offer an interpretation of the statute or Executive Order 14,251 that obviates the need to address some of Plaintiff's broader constitutional arguments. For the foregoing reasons, Plaintiff's claims must be channeled to the FLRA, the Court lacks jurisdiction over Plaintiff's claims, and Defendants are entitled to summary judgment as a matter of law.

### B.    Plaintiff Has Not Identified a Cause of Action or an Applicable Waiver of Sovereign Immunity

"'[S]overeign immunity is jurisdictional in nature'" and "deprives courts of the power to hear suits against the United States absent Congress's express consent." *United States v. Miller*, No. 23-824, 604 U.S. __, slip op. at 7 (2025) (quoting *FDIC v. Meyer*, 510 U. S. 471, 475 (1994)). This action raises claims against individual defendants in their "official capacity" in addition to the President. Compl. ¶¶ 6–17. A suit against U.S. government officials acting in their official capacity is the same as a suit against the United States.[8] *Lewis v. Clarke*, 581 U.S. 155, 161 (2017) (lawsuits brought against employees in their official capacity are really against the entity and are subject to sovereign immunity). Congress has waived the sovereign immunity of the United States in certain instances—not present here. In the absence of an applicable waiver of sovereign immunity, this Court lacks jurisdiction to hear this case, and Defendants are entitled to summary judgment as a matter of law. *See, e.g.*, *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign

---

[8] When the President is acting in his official capacity, he is acting on behalf of the United States and is protected by the same immunity of the United States. *See Jackson v. Bush*, 448 F.Supp.2d 198, 201 (D.D.C. 2006) (in suit for money damages against President Bush, the court held that sovereign immunity required dismissal of the suit).

immunity is jurisdictional in nature.").

Plaintiff invokes only 28 U.S.C. § 1331, federal question jurisdiction, as to the Defendant officials (or their agencies). As addressed above, however, the proper forum for Plaintiff's claims is the FLRA. And Plaintiff's circumvention of that scheme by pleading an equitable *ultra vires* claim regarding the President's actions does not confer jurisdiction on this Court. First, Plaintiff asserts only that the Executive Order—not any action taken by the Defendant agencies—was *ultra vires*. *See* Counts 1 & 2, Compl. ¶¶ 27–30; *see also AFSA*, slip op. at 3 (Because "the President is not an agency . . . it is unclear whether *ultra vires* review is available at all."). Second, the Supreme Court has confirmed that *ultra vires* review is not available when the challenged action was taken pursuant to delegated powers and not contrary to any specific statutory prohibition. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. ___, slip op. at 15 (2025). Moreover, such review "is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review[.]" *Id.* (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U. S. 32, 43 (1991)). Here, the President issued the Executive Order pursuant to his delegated powers; there is no prohibition against its issuance; and there is a separate statutory scheme that provides review, the FLRA. Accordingly, no jurisdiction lies in this Court.

Finally, because the Complaint asserts three causes of action—all directed at the President, not Defendant agencies or their officials—judgment cannot be entered against Defendant agencies alternatively on that basis. Compl. ¶¶ 78–95; *see AFSA*, slip op. at 3 ("The President's national-security findings [in Executive Order 14,251] are not agency actions subject to arbitrary-or-capricious review, and we decline to treat them as such.").

II.    **The Executive Order Is a Lawful Exercise of the President's Authority and Is Not Subject to Judicial Review.**

    A.    **The FSLMRS and Binding D.C. Circuit Precedent Do Not Allow Judicial Review of the Executive Order.**

The D.C. Circuit has repeatedly recognized that § 7103(b)(1) entrusts the relevant determinations to the President alone, without interference from courts or other actors. *See, e.g.*, *AFGE v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989). Executive Order 14,251 represents the President's exercise of his authority under the FSLMRS to exclude certain agencies or subdivisions from the provisions of the statute. The statute provides that the President "may issue" such an order if he makes the requisite determinations. This is a "quintessential grant of discretion" *Bouarfa v. Mayorkas*, 604 U.S. 6, 13 (2024) ("As [the Supreme] Court has repeatedly observed, the word 'may' clearly connotes discretion." (cleaned up)). "Moreover, here, Congress has in no way prescribed how that discretion must be exercised." *Id.* In the FSLMRS, Congress vested the President—and the President alone—with the authority to exclude agencies or subdivisions from the statute's coverage; thus the President's determinations are not subject to judicial review. *See id.; cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum[.]"). The Executive Order makes plain that the President determined that each specified agency or subdivision has a relevant primary function and that Chapter 71's provisions could not be applied to that agency or subdivision in a manner consistent with national security requirements and considerations. The Court's inquiry should end there.

Courts in this Circuit have repeatedly recognized that the President's determinations under the statute are unreviewable. The D.C. Circuit observed that "Section 7103(b)(1) makes clear that the President may exclude an agency from the Act's coverage whenever he 'determines' that the conditions statutorily specified exist," *AFGE v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989), and

cautioned that others must not "arrogate . . . the President's power in this regard." *Dep't of Def. v. FLRA*, 685 F.2d 641, 650 (D.C. Cir. 1982). Section 7103(b)(1) "is for the President alone to invoke." *Id.*; *see also Nat'l Treasury Emps. Union v. Reagan*, 1981 WL 150530, at *2 (D.D.C. Sept. 3, 1981) (holding that a § 7103(b)(1) exclusion by President Carter was "not reviewable" because "Congress intended the chief executive to act 'in his or her sole discretion'" when making § 7103(b)(1) determinations) (quoting 124 Cong. Rec. H.9633 (daily ed. Sept. 13, 1978)). Indeed, the President need not even "insert written findings in an exempting order[]" under § 7103(b)(1). *AFGE*, 870 F.2d at 727. If the President's order can be sustained without *any* findings, the statute surely does not permit second-guessing or flyspecking of findings actually made.

Mostly recently, the D.C. Circuit Court in *AFSA v. Trump*, held that "a more 'searching inquiry' than this would be 'inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere.'" *AFSA v. Trump*, slip. op. at 5 (quoting *Trump v. Hawaii*, 585 U.S. 667, 686 (2018)). Contrary to Plaintiff's argument, the Fact Sheet and OPM memorandum do not open the door to such judicial second-guessing. *See* Section III.B. *infra*. Any other conclusion would be flatly inconsistent with the deference regularly due to the President's national security-related determinations. *See, e.g.*, *Hawaii*, 585 U.S. at 686 (dismissing as "inconsistent with the broad statutory text and the deference traditionally accorded the President in th[e national security] sphere" an argument "for a searching inquiry into . . . the President's justifications" for a finding about national interests); *Webster v. Doe*, 486 U.S. 592, 600 (1988) (concluding that a statute authorizing the CIA Director to terminate an employee when the Director "shall deem such termination necessary or advisable in the interests of the United States" forecloses "any meaningful judicial standard of review").

The President's determination under the statute's second prong—whether the provisions of Chapter 71 "cannot be applied . . . in a manner consistent with national security requirements

and considerations," 5 U.S.C. § 7103(b)(1)(B)—is especially ill-suited to judicial second-guessing. When the President adopts "a preventive measure . . . in the context of . . . national security," he is "not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010). Determining the "national security requirements and considerations" of the Nation is not a task for which this Court or any other is well-equipped. *See id.* at 34 ("the lack of competence on the part of the courts is marked" (citation omitted)); *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) (refusing to review denial of security clearance because "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment . . . [n]or can such a body determine what constitutes an acceptable margin of error in assessing the potential risk"). Rather, the President is entitled to reach a national security-based finding before the national security is jeopardized. As with the exemption's first prong, this Court is ill suited to second guess that determination.

## B. The Agencies Meet the FSLMRS Statutory Criteria.

### 1. Each relevant Defendant agency or subdivision thereof has as a primary function national security or investigative work.

In any event, the President's determinations withstand scrutiny. Each Defendant agency or subdivision "has as a primary function intelligence, counterintelligence, investigative, or national security work[.]" 5 U.S.C. § 7103(b)(1)(A).[9]

---

[9] The statute only requires that the agencies have investigative or national security work as *a* primary function, not *the* primary function. 5 U.S.C. § 7103(b)(1). *See Niz-Chavez v. Garland*, 593 U.S. 155, 162–63 (2021) ("[I]ndefinite articles (like 'a' or 'an') precede *countable* nouns . . . By contrast, *noncountable* nouns [] 'almost never take indefinite articles.'") (emphasis in original); *see United States v. Deuman*, 568 F. App'x 414, 421 (6th Cir. 2014) ("That definition uses the indefinite article 'an' as opposed to the definite article 'the.' By its terms, then, the rule applies to *any* witness . . .") (emphasis in original). And Congress has recognized that an agency can have several primary functions. *See, e.g.*, 12 U.S.C. § 5511(c) (assigning an agency six "primary functions"); 15 U.S.C. § 634b (assigning an office 12 "primary functions"); 22 U.S.C. § 2551

The FLRA has "appl[ied] a standard dictionary definition of 'investigate' as meaning 'to search into so as to learn the facts; inquire into systematically'" to determine whether work is "investigative." *Dep't of Homeland Sec. v. NTEU*, 68 F.L.R.A. 13, 23 (2014) (quoting Webster's New World Dictionary of American English 710 (Victoria Neufeldt *et al.* eds., 3d college ed. 1988)). As for "national security work," that phrase has long and consistently been interpreted in the federal labor relations context to refer to work "directly related to protection and preservation of the military, economic, and productive strength of the United States[.]" *Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181*, 4 F.L.R.A. 644, 655–56 (1980).

Defendant agencies and/or their relevant subdivisions perform such work, as detailed in the declarations submitted with this motion.[10]  The Court should give greater weight to these agency declarations given their familiarity with their daily functions, as opposed to the general descriptions provided by Plaintiff.  As demonstrated by the agencies' declarations:

**Department of the Treasury (Treasury).**  NTEU's principal complaint is with the exclusion of Treasury, but Treasury's national security role is clear, primary, and longstanding. Treasury's "'mission is to maintain a strong economy and create economic and job opportunities by promoting the conditions that enable economic growth and stability at home and abroad, strengthen national security by combating threats and protecting the integrity of the financial system, and manage the U.S. Government's finances and resources effectively.'"  Decl. of Trevor Norris ¶ 3 (quoting U.S. Dep't of the Treasury, *About: Role of the Treasury*, https://perma.cc/9U5T-RCXR), attached as Exhibit 8 ("Norris Decl.").  "Put simply, Treasury

---

(assigning the Secretary of State four "primary functions" in the area of arms control alone).

[10] The Office of Personnel Management was named as a Defendant in this matter based on its role in guiding federal agencies' compliance and implementation of the Executive Order. Compl. ¶ 5. Although certain segments of OPM were exempted from FSLMRS coverage pursuant to the Executive Order, OPM's employees are not represented by Plaintiff, and Plaintiff's motion did not dispute OPM's national security purpose. *See* Pl. Mot. at 13–16.

exists to promote the economic and productive strength of the United States—a core national security mission." *Id.*

Treasury also has investigative work as a primary function, for example through its components the Internal Revenue Service ("IRS"), the Financial Crimes Enforcement Network ("FinCEN"), and the Office of Foreign Assets Control ("OFAC"). Norris Decl. ¶ 4. IRS has a primary investigative function, as one of its principal duties is auditing tax filings. In fact, the IRS Criminal Investigations Division, which includes IRS special agents who investigate tax and related crimes, like money laundering, has been excluded since 1979. *Id.*; *see also* Exec. Order No. 12,171, § 1–2, 44 Fed. Reg. 66,565 (Nov. 20, 1979). FinCEN's mission is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence. FinCEN analyzes financial transactions data for law enforcement purposes. *Id.* OFAC investigates and enforces potential violations of U.S. economic and trade sanctions. This includes investigating transactions involving targeted foreign countries, regimes, and individuals and entities engaging in harmful activity, such as terrorists, international narcotics traffickers, weapons of mass destruction proliferators, and other malign actors, in response to threats to the national security, foreign policy, or economy of the United States. *Id.*

**Department of Energy.** Energy's "primary role is setting national energy policy, with obvious national security objectives and implications. The same Congress that enacted the FSLMRS acknowledged Energy's national security objectives, closely tied to its role in regulating domestic energy production, when it created the Department of Energy. *See* 42 U.S.C. § 7111(2) ("[O]ur increasing dependence on foreign energy supplies present a serious threat to the national security of the United States and to the health, safety and welfare of its citizens.")." Decl. of Reesha Trznadel ¶ 3, attached as Exhibit 6 ("Trznadel Decl."). Energy "'ensure[s] the security of

the U.S. nuclear weapons stockpile,'" "'manages the Strategic Petroleum Reserve, invests in protection against cyber and physical attacks on U.S. energy infrastructure,'" and "'provides training tools and procedures for emergency response and preparedness.'"  Trznadel Decl. ¶ 3 (quoting U.S. Dep't of Energy, *Energy Security*, https://www.energy.gov/topics/energy-security) (brackets in original).  On the first day of his second term, President Trump recognized that "[e]nergy security is an increasingly crucial theater of global competition"; "hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets"; and "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation."  Exec. Order No. 14,156, § 1, 90 Fed. Reg. 8,433, 8,433 (Jan. 20, 2025).

**Bureau of Land Management (BLM).**  "Domestic energy production is a critical national security priority, and [BLM] oversees energy production on America's hundreds of millions of acres of public lands as one of its principal responsibilities."  Decl. of Stephanie M. Holmes ¶ 4, attached as Exhibit 9 ("Holmes Decl.").  A primary function of the Department of the Interior, specifically BLM, is to protect the nation's natural energy and mineral resources from internal subversion and foreign aggression by helping the nation become more energy independent and ensure safe energy production and mineral extraction and development from external and internal threats.  Holmes Decl. ¶ 5.  BLM thus directly manages the Nation's "economic[] and productive strength."  *Oak Ridge*, 4 F.L.R.A. at 655–56.  BLM's "public lands management also plays a substantial role in funding the Federal Government's operations through mineral development, the Nation's second-largest revenue source after tax revenue."  Holmes Decl. ¶ 4.; *see* U.S. Dep't of Interior, Bureau of Land Management, *About the BLM Oil and Gas Program*, https://perma.cc/CG9U-F4RU.

19

**Department of Health and Human Services (HHS) Subdivisions.** The relevant HHS subdivisions play major roles in, and have as primary functions, the "protection and preservation of the military, economic, and productive strength of the United States," *Oak Ridge*, 4 F.L.R.A. at 655–56, "given their critical roles in anticipating, identifying, and responding to biological, chemical, radiological, and pandemic threats—threats which, if left unaddressed, could cripple national infrastructure, devastate economic activity, and imperil civilian and military readiness." Decl. of Christina V. Ballance ¶ 4, attached as Exhibit 4 ("Ballance Decl."). The Office of the Secretary plays key roles in achieving that objective, including by holding the power to declare an emergency in the event of a pandemic or bioterrorist attack, and broad powers stemming from such a declaration, 42 U.S.C. § 247d(a). The Centers for Disease Control and Prevention (CDC) likewise "has an essential role in defending against and combatting public health threats domestically and abroad," including the threat of "bioterrorism." 42 U.S.C. § 247d-4(a)(1). And the Administration for Strategic Preparedness and Response similarly "leads the nation's medical and public health preparedness for, response to, and recovery from disasters and public health emergencies." ASPR, *ASPR: Administration for Strategic Preparedness and Response*, https://aspr.hhs.gov/Pages/Home.aspx; *see* 42 U.S.C. § 300hh-10(f)(1) ("[T]he Assistant Secretary for Preparedness and Response shall implement strategic initiatives or activities to address threats, including pandemic influenza and which may include a chemical, biological, radiological, or nuclear agent … that pose a significant level of risk to public health and national security.").

The Food and Drug Administration (FDA) is best known for investigating the efficacy of drugs and medical treatments like vaccines. These "investigative and regulatory functions extend beyond public health to encompass national economic and security interests[,]" Ballance Decl. ¶ 4(c)—for example, the FDA's rapid approval of the COVID-19 vaccine facilitated the reopening of the American economy. Likewise, a secure food supply is critical to national security, as

20

Congress recognized in 2011 by passing the Food Safety Modernization Act to enhance the FDA's authority to prevent and respond to foodborne threats, including terrorist threats. *See* Pub. L. No. 111-353, 124 Stat. 3885. And, preparedness for chemical, biological, radiological, and nuclear threats is a key part of FDA's mission, as it collaborates with other agencies to approve and stockpile treatments for national security threats such as anthrax, smallpox, and the like. *See* Press Release, *HHS Strengthens Country's Preparedness for Health Emergencies, Announces Administration for Strategic Preparedness and Response (ASPR)* (July 22, 2022), https://www.hhs.gov/about/news/2022/07/22/hhs-strengthens-countrys-preparedness-health-emergencies-announces-administration-for-strategic-preparedness-response.html. And the FDA's authority to issue Emergency Use Authorization for critical treatments, such as the COVID-19 vaccine, represents an important part of its mission and a crucial tool for maintaining the country's military, economic, and productive strength.

Finally, the Office of Refugee Resettlement has as its mission to aid refugees and other immigrants. Immigration and the government's policy toward foreign nationals within the country are core national security issues and emphatically within the President's national security prerogatives. *See, e.g.*, *Hawaii*, 585 U.S. at 704.

**Department of Justice (DOJ).** DOJ performs investigative, intelligence, and national security work as primary functions. DOJ's investigative work is carried out, for example, by prosecutors in U.S. Attorney's Offices, the Drug Enforcement Administration, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, and Firearm as well as its other litigating components. *See* U.S. Dep't of Just., *Organization, Mission and Functions Manual*, https://perma.cc/SV2K-5LRJ. The Bureau of Prisons conducts internal investigations into inmate activities, including identifying and monitoring terrorist inmates' communications. *See* U.S. Dep't of Just. Off. of the Inspector General, *DOJ OIG Releases Report on the BOP's Monitoring of*

*Inmate Communications to Prevent Radicalization* (Mar. 25, 2020), https://perma.cc/R4Y7-U2AE. DOJ's national security and intelligence missions are carried out principally (but not exclusively) by its National Security Division, which "consist[s] of the elements of the Department of Justice . . . engaged primarily in support of the intelligence and intelligence-related activities of the United States Government." 28 U.S.C. § 509A(b). Similarly, "DOJ litigating divisions prosecute terrorist and other foreign threats against U.S. citizens, while other DOJ components investigate and prevent hostile actions." Decl. of Matthew E. Hirt ¶ 4, attached as Exhibit 3 ("Hirt Decl.") This is why DOJ components like the National Security Division, U.S. Attorney's Offices, and the Criminal Division have long been exempted under 5 U.S.C. § 7103(b)(1).

**Environmental Protection Agency (EPA).** EPA has a "primary mission with respect to national security to prevent, limit, mitigate, or contain chemical, oil, radiological, biological and/or natural or man-made disasters and provide environmental monitoring, assessment, and reporting in support of overall domestic incident management[.]" Decl. of Michael Molina ¶ 3(a), attached as Exhibit 5 ("Molina Decl."). As the FLRA has recognized, EPA's mission of environmental regulation, investigation, and enforcement is a national security mission. "Any sabotage or interference with the availability of safe drinking water or breathing air may impact the economic and productive strength of the country as well as the general health and safety of U.S. citizens." *United States EPA*, 70 F.L.R.A. 279, 283 (2017). EPA also has taken on a role in energy policy through its regulation of greenhouse gas emissions under the Clean Air Act. *See, e.g.*, *New Source Performance Standards for Greenhouse Gas Emissions From New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units*, 89 Fed. Reg. 39,798 (May 9, 2024). EPA policies like its mandate to produce electric vehicles have serious national security implications, including by making America dependent on its adversaries for critical minerals necessary to produce electric vehicle batteries. *See Multi-Pollutant Emissions Standards for Model Years 2027 and Later Light-*

*Duty and Medium-Duty Vehicles*, 89 Fed. Reg. 27,842 (Apr. 18, 2024). Congress has long recognized that policies that reduce our reliance on foreign nations for critical resources implicate national security. *See* 42 U.S.C. § 7111.

**Federal Communications Commission (FCC).** Congress created the FCC "for the purpose of the national defense[.]" 47 U.S.C. § 151. "The FCC secures the Nation by regulating and protecting its communications networks—crucial infrastructure for national defense and America's economic productivity. The primacy of national security in the agency's mission and operations is reflected, for example, in its Council on National Security, which 'leverage[s] the full range of the Commission's regulatory, investigatory, and enforcement authorities to protect America and counter foreign adversaries, particularly the threats posed by the People's Republic of China (PRC) and Chinese Communist Party (CCP).'" Decl. of Mark Stephens ¶ 3 (quoting FCC, *FCC Council on National Security*, https://www.fcc.gov/fcc-council-national-security), attached as Exhibit 7 ("Stephens Decl.").

In sum, these record facts bear out the President's determination that each Defendant agency "has as a primary function intelligence, counterintelligence, investigative, or national security work[.]" 5 U.S.C. § 7103(b)(1)(A).

### 2. The FSLMRS cannot be applied here consistent with national security requirements and considerations.

The President also properly determined that the provisions of Chapter 71 cannot be applied to Defendant agencies "consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). Such a determination requires "delicate, complex" assessments. *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948). Here, the President determined that the exempted agencies' missions require rapid responses to changed working conditions and unencumbered mobility of their employees—things incompatible with Plaintiff's

CBAs with Defendants.

Specifically, under the FSLMRS, agencies must postpone changes that have more than a *de minimis* effect on working conditions until the agencies have provided the union with notice and an opportunity to bargain. The process includes completing any subsequent negotiations, mediation, and impasse proceedings, when needed. 5 U.S.C. §§ 7106(b), 7119. The FLRA routinely pauses agency attempts to implement changes before this midterm bargaining process has concluded. *See, e.g.*, *Army Corps of Eng'rs,* 53 F.L.R.A. 79, 81 (1997). This process often imposes significant delays before changes can take effect. Holmes Decl. ¶ 9. For example, "[p]rior to making any changes to conditions of employment, BLM is required to provide 14–15 days advanced notice to the union (depending on the agreement). The union is then allowed another 14–15 days to present proposals to the agency prior to the parties bargaining over the impact and implementation of the proposed change. If the parties are unable to reach agreement, the parties may seek the services of the Federal Mediation and Conciliation Services ("FMCS") and/or the Federal Service Impasse Panel ("FSIP")." *Id.* ¶ 8(a). The President appropriately determined that requiring lengthy delays before agencies with important national security roles can adjust their operations is incompatible with national security considerations.

Employee performance is also critical in agencies with important national security roles. Many provisions in federal agencies' CBAs make it more difficult to remove employees who perform poorly. For example, "Bargaining Unit Employees receiv[e] more time to demonstrate performance than non-Bargaining Unit Employees which has resulted in inconsistent application of the requirements to demonstrate performance." Trznadel Decl. ¶ 7(c). At times, the agency "must provide a minimum of 60 days and as many as 120 days for a performance improvement period (PIP. Shorter PIPs are not permitted for bargaining unit (BU) members, but they are now limited to 30 days for non-bargaining unit employees[.]" Norris Decl. ¶ 7(a). Even after that

process, CBAs allow unions to grieve dismissals of poor performers to binding arbitration, with arbitrators overturning approximately three-fifths of arbitrated removals. *See* James Sherk, America First Policy Inst., *Union Arbitrators Overturn Most Federal Employee Dismissals* 5 (2022). The result: OPM recently found that a plurality of federal employees reported that poor performers in their work units typically "remain in the work unit and continue to underperform," including at Plaintiff agencies. *See* OPM, *2023 Office of Personnel Management Federal Employees Viewpoint Survey: Report by Agency* 49–60, https://perma.cc/4PFM-XYVM. The Merit Systems Protection Board has concluded that only a quarter of Federal supervisors are confident they could remove a subordinate who was underperforming in a critical job element. *See*, U.S. Merit Sys. Protection Bd. Off. of Policy & Evaluation, *Remedying Unacceptable Employee Performance in the Federal Civil Service* (June 18, 2019), https://perma.cc/F257-N9JE. The President properly determined that the CBAs, as a clear impediment to separating underperforming employees, are inconsistent with national security considerations.

The CBAs further require Defendant agencies to divert resources from their primary work functions towards union related activities. For example, Defendant agencies must allow union officials time to work on union business, such as negotiating agreements, processing of grievances, presenting cases in arbitration, and representing employees at meetings with management, completely unrelated to the work the employees were hired to perform. *See* Trznadel Decl. ¶ 7(a).

Although the Court should not substantively evaluate the President's determination, the record facts nonetheless bear out his determination that the FSLMRS and CBAs cannot be applied to Defendant agencies consistent with national security requirements and considerations.

III.    **Plaintiff's *Ultra Vires* Claims Fail as a Matter of Law**

As an initial matter, "[u]ltra vires review is unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for

judicial review[.]'" *NRC*, slip. op. at 15 (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U. S. 32, 43 (1991). Because the FSLMRS provides for administrative review of Plaintiff's claims before the FLRA, Plaintiff's *ultra vires* claim must fail. *See* Section I.A. *supra*.

Moreover, the bar for asserting an *ultra vires* claim is high: Plaintiff must meet a heightened standard "confined to 'extreme'" errors—not present here. *See Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 763–64 (D.C. Cir. 2022); *see also DCH Reg. Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (noting "extremely limited scope" and "extraordinarily narrow" nature of *ultra vires* claims). Such a claim "applies only when an agency has taken actions entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *NRC*, slip. op. at 15 (internal quotation omitted) (emphasis in original). It requires a violation of a "specific prohibition in the statute that is clear and mandatory," a violation that was "obviously beyond the terms of the statute," or action that was "far outside the scope of the task that Congress gave it," *North American Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citations omitted). The Supreme Court recently reaffirmed that an *ultra vires* claim is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC*, slip. op. at 15 (quoting *Nyunt v. Chairman, Broadcasting Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

Plaintiff's *ultra vires* claims are no exception. Those claims merely assert that the President exceeded the statutory authority granted to him by § 7103(b)(1).[11] As the D.C. Circuit recently held in another case challenging Executive Order 14,251 and involving claims nearly identical to this one, to succeed on an *ultra vires* claim, "a plaintiff must show more than a 'routine

---

[11] Plaintiff presents no argument to support its assertion of an *ultra vires* claim against the President, notwithstanding that the President is not an agency, and it remains unclear whether an *ultra vires* claim may lie against action taken by the President. *See e.g., AFSA*, slip. op. at 3 (internal quotations omitted) ("Another hurdle is that the President is not an agency. So it is unclear whether *ultra vires* review is available at all. Again, an *ultra vires* action is a suit in equity . . . and courts generally lack authority to enjoin the President.").

error in statutory interpretation or challenged findings of fact." *AFSA*, slip. op. at 3.  Plaintiff relies

on a strained reading of the statute to support the assertion that the President violated a "clear and

mandatory" prohibition within the statute, and points to the Fact Sheet and OPM Memorandum as

evidence of improper motive to support Plaintiff's otherwise insufficient claims.  However, such

an attempt to "dress up a typical statutory-authority argument as an ultra vires claim" is a "fairly

common maneuver when a litigant tries to squeeze its arguments into the [*ultra vires*] box—and

is in large part why those claims rarely succeed." *NRC*, slip. op. at 15.  The claims do not succeed

here because the FSLMRS "commits the relevant decision to the President's discretion."  *AFSA*,

slip. op. at 3.  Section 7103(b)(1) "delegates broad authority to the President to exclude parts of

the [civil service from 5 U.S.C. Chapter 71] . . . in the interest of national security." *See id.*  "Such

determinations are consistent with the President's role as commander-in-chief."  *Id.*  Because the

President's determination was not prohibited by statute, and the Fact Sheet and OPM

Memorandum are insufficient to overcome the presumption of regularity, Plaintiff's *ultra vires*

claims fail as a matter of law.

### A.    The President's Determination Is Consistent with the Statute.

As shown above, the Executive Order is consistent with the FSLMRS.  Plaintiff's attempts

to narrowly characterize the President's authority under § 7103(b)(1) are unpersuasive.  First,

Plaintiff relies on cherry-picked dictionary definitions and inapposite Ninth Circuit caselaw to

narrowly define "primary" as one function.[12]  Pl. Mot. at 11.  But the statute permits Defendant

agencies to have multiple functions as long as *a* primary function is investigative or national

security work.  5 U.S.C. § 7103(b)(1); *see Niz-Chavez v. Garland*, 593 U.S. 155, 162–63 (2021)

---

[12] Plaintiff cites *City of Ketchican v. Cape Fox Corp.*, 85 F.3d 1381, 1383–94 (9th Cir. 1996), for
the proposition that "primary" connotes a singular leading function.  However, this case was
defining a "primary place of business," and its reasoning plainly does not apply outside of that
context.

("[I]ndefinite articles (like 'a' or 'an') precede *countable* nouns . . .  By contrast, *noncountable* nouns [] 'almost never take indefinite articles.'") (emphasis in original); *see Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 354 (D.C. Cir. 2020) ("[T]he indefinite article[] 'a' [is] used when 'referring to something not specifically identified . . . but instead treated as one of a class: one, some, *any*") (emphasis added).  And Congress has recognized that an agency can have several primary functions.  *See, e.g.*, 12 U.S.C. § 5511(c) (assigning an agency six "primary functions"); 15 U.S.C. § 634b (assigning an office 12 "primary functions"); 22 U.S.C. § 2251 (assigning the Secretary of State four primary functions in the area of arms control alone).

Plaintiff next contends that the President's discretion is cabined by the Supreme Court's definition of "national security" in *Cole v. Young*, 351 U.S. 536 (1956).  Pl. Mot. at 11–12.  Not so.  In *Cole*, the Supreme Court interpreted the undefined term "national security" in the context of a statute that gave "heads of certain departments and agencies of the Government summary suspension and unreviewable dismissal powers over their civilian employees, when deemed necessary 'in the interest of the national security of the United States.'"  *Cole*, 351 U.S. at 544.  The statute specifically applied to eleven agencies.[13]  *Id*.  at 544.  In determining whether an agency head acted according to the statute, the Court concluded that the term "national security" in that specific statute was used in a "definite and limited sense"—namely, to refer to "those activities which are directly concerned with the Nation's safety, as distinguished from the general welfare."  *Id*. at 543–44.  The *Cole* Court did not purport to announce a generally applicable definition of "national security" across the United States Code; it construed particular statutory language based on its surrounding statutory context, specifically the eleven agencies expressly

---

[13] The statute also allowed the President to extend its coverage to any other departments or agencies the President deemed "necessary in the best interests of national security."  *Cole*, 351 U.S. at 542. Notably, the President extended the statute to all departments and agencies, which the Court assumed was validly extended for purposes of this decision.  *Id.*

included in the act. Plaintiff does not cite any decision applying the *Cole* Court's definition outside of the specific statutory context at issue there. Here, Congress's authorization to the President is broad—it encompasses "any agency or subdivision," 5 U.S.C. § 7103(b), not a defined set. As such, it would defy reason to apply the context-specific *Cole* definition here. And in any event, the Executive Order is consistent with the *Cole* definition, because the designated agencies perform work that is "directly concerned with the Nation's safety." 351 U.S. at 543.

Moreover, the earlier-discussed FSLMRS context provides the better definition for § 7103's purposes. From its inception, and drawing on a then-contemporaneous definition in the *Federal Personnel Manual*, the FLRA interpreted the term "national security" in this statutory scheme to encompass matters relating to the "economic[] and productive strength" of the country. *See Oak Ridge*, 4 F.L.R.A. at 655–56. The FLRA has since consistently applied this definition, and Defendant agencies' functions clearly fall within it. *See* Section II.B.1. *supra*; *Oak Ridge*, 4 F.L.R.A. at 655–56; *see also U.S. Dep't of Treasury Internal Revenue Serv.*, 62 F.L.R.A. 298, 303–05 (2007) (finding that the work of IRS security personnel "directly affects national security").

Plaintiff's contention that the President exceeded his authority by exempting entire cabinet-level departments is also belied by the statute. Section 7103 expressly permits the President to exclude *"any agency* or subdivision thereof" from the FSLMRS's coverage. 5 U.S.C. § 7103(b)(1) (emphasis added). In fact, Congress exempted entire agencies in the statute itself, 5 U.S.C. § 7103(a)(3), and the plain text makes clear that the President has the discretion to exempt an entire "agency" or only a "subdivision" of that agency. *See United States v. Woods*, 571 U.S. 31, 45–46 (2013) ("[T]he operative terms are connected by the conjunction 'or' . . . [which in] its ordinary use is almost always disjunctive, that is, the words it connects are to 'be given separate meanings.'") (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)). And the statute

extends the President's authority to "any" agency or subdivision that he determines warrants exempting. The very same statutory section also defines "agency" under the FSLMRS to mean "an Executive agency." 5 U.S.C. § 7103(a)(3). An "Executive agency," in turn, is defined in Title 5 as "an Executive department, a Government corporation, and an independent establishment." *Id.* § 105. The FSLMRS therefore empowers the President to exclude "any" "Executive department," "Government corporation," or "independent establishment" from the coverage of the FSLMRS. Moreover, Plaintiff fails to recognize that large portions of multiple cabinet-level departments were previously exempted, including several of Defendant agencies here. *See, e.g.*, Exec. Order No. 13,480, *Exclusions From the Federal Labor-Management Relations Program*, 73 Fed. Reg. 73,991 (Dec. 4, 2008) (excluding from the FSLMRS large portions of the Department of Energy, the Department of Justice, and the Department of the Treasury, among others); *see*, Hirt Decl. ¶ 3 (citing several Executive Orders and describing the increased exclusion of the Department of Justice over time). The President is authorized to extend his predecessors' exemptions to include the entire department based on changing national security considerations. Plaintiff's atextual reading cannot be squared with Congress's expressed intent or the historical practice of past Presidents.

Lacking support in the text of § 7103(b)(1), Plaintiff argues that the scope of the Executive Order violates the statutory structure and purpose. Pl. Mot. at 17–18. However, Plaintiff improperly prioritizes Congress's stated finding that "labor organizations and collective bargaining in the civil service are in the public interest" while ignoring that the FSLMRS contemplates that collective bargaining should yield to priorities like national security. This Court would be "quite mistaken to assume," as Plaintiff does, "that 'whatever' might appear to 'further the statute's primary objective must be the law.'" *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (alteration omitted). "[N]o statute . . . 'pursues its stated purpose at all costs,'"

*id.* (alterations omitted), which is why Congress allowed for exemptions from the FSLMRS. It is Defendants' reading of that statute, not Plaintiff's, that best respects that purpose.

For these reasons, Plaintiff cannot establish the clear violation necessary for an *ultra vires* claim.

### B.    The President's Actions Are Entitled to a Presumption of Regularity.

Executive actions that are within the lawful authority of the Executive are entitled to a presumption of regularity. Courts therefore "presume that [public officers] have properly discharged their official duties" absent "clear evidence to the contrary."[14] *AFGE v. Reagan*, 870 F.2d at 727 (quoting *United States v. Chemical Found.*, 272 U.S. 1, 14–15 (1926)). That presumption is overcome only upon a "strong showing of bad faith or improper behavior." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. ___, 145 S. Ct. 898, 923 (2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). Plaintiff has not made that showing here.

As courts have held time and again, the Court's review of a presidential decision is limited to "whether the Executive gave a 'facially legitimate and bona fide' reason for its action." *Hawaii*, 585 U.S. at 703 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972)). Plaintiff's claim of bad faith rests on cherry-picked statements from the White House Press Office's "Fact Sheet" and the OPM Memorandum. Pl. Mot. at 12–13; *see also* The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/W93G-Z889 ("Fact Sheet"). Putting aside whether either document is binding on the President, or can be truly said to reflect his motives, the

---

[14] The term "clear evidence" in this context does not refer to a formal evidentiary standard, *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 315 (2019), but rather refers to evidence that is direct, specific, and sufficient to rebut the presumption of regularity, *see, e.g.*, *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *United States v. Chemical Found.*, 272 U.S. 1, 14–15 (1926).

isolated statements identified by Plaintiff do not carry the same meaning as the documents as a whole. To the contrary, as the Fact Sheet explains at length, the President signed Executive Order 14,251 in service of two of his top policy priorities: protecting Americans from threats to our national security and improving the efficiency and efficacy of the federal workforce. *Id.* To the extent that the Court considers the Fact Sheet, it should credit these "facially legitimate and bona fide" reasons for the President's actions. *See Hawaii*, 585 U.S. at 703; *Mandel*, 408 U.S. at 770 ("[W]hen the Executive exercises [statutorily delegated authority] . . . on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests" of the plaintiff).

Plaintiff's attempt to characterize the "Fact Sheet" as evidence that "the President was indifferent to the purposes and requirements of the statute, or acted deliberately in contravention of them," misunderstands § 7103(b)(1), which, by its very existence, is a recognition by Congress that union activity under the statute can impede agency operations. Both the Fact Sheet and the OPM Memorandum confirm that the Executive Order is consistent with § 7103(b)(1). Those documents explain that unions have used the FSLMRS's collective-bargaining and grievance provisions to interfere with agencies' ability to remove employees for poor performance or misconduct; change working conditions to meet national-security demands; eliminate waste, bloat, and insularity; and optimize agency efficiency through restructuring. *See* Fact Sheet; OPM Memorandum. The President reasonably determined that such impediments to the effective and efficient operation of the government are inconsistent with the national-security obligations of the agencies specified in the Executive Order—agencies such as the Departments of Justice, Energy, and Treasury. Plaintiff has not overcome the presumption of regularity here. *See AFGE v. Reagan*, 870 F.2d at 727.

**IV.    Plaintiff's First Amendment Retaliation Claim Fails as a Matter of Law.**

Plaintiff's cherry-picked evidence is also insufficient to establish that the Executive Order was retaliation because the President would have issued the Executive Order absent Plaintiff's continued litigation against the Administration.  To prevail on a claim of First Amendment retaliation, a plaintiff must prove that: "(1) [it] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link exists between the exercise of a constitutional right and the adverse action taken against [it]."  *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 46 (D.D.C. 2021) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)).  To establish a "causal link [ ] a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendant's retaliatory action."  *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) (quoting *Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.D.C. 2011)).  When the Federal Government can show that it would have taken the challenged action absent the asserted First Amendment activity, a retaliation claim must fail.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  Plaintiff has not established either that the Executive Order would deter a similarly situated person of ordinary firmness in Plaintiff's position or that Plaintiff's protected conduct was the but for cause of the President's action.

Plaintiff suggests that Section 7 of the Executive Order, which directs agency heads to submit a report to the President that identifies any additional subdivisions that are not (but could be) exempted, constitutes evidence that the Executive Order would deter a similarly situated individual of ordinary firmness.  Pl. Mot. at 23.  Plaintiff ignores, however, that Section 7 directs those recommendations to be made "[w]ithin 30 days of the date of this order," and that nearly two months later, no new exclusions have been made.  Thus Section 7 is hardly the deterrent Plaintiff suggests, and Plaintiff's continued pressing of litigation against the Administration together cast

doubt on the second element of a First Amendment retaliation claim.

More fundamentally, however, Plaintiff has not demonstrated that any of its First Amendment activities were the but-for cause of the President's Executive Order. *See Nieves v. Barlett*, 587 U.S. 391, 399 (2019).  As explained earlier, the President's exemption decision was plainly consistent with his statutory authority and adopted for facially legitimate national security reasons.  Plaintiff speculates, however, that the Fact Sheet regarding the Executive Order and *Department of the Treasury v. NTEU Chapter 73*, No. 25-119 (E.D. Ky.)[15]—both of which note that certain federal-sector unions have taken actions hostile to the President's policy objectives— evidence the President's retaliatory motive.  But neither passes muster.  As both the Fact Sheet and the Government's complaint in *Department of the Treasury v. NTEU Chapter 73* explain at length, the President signed Executive Order 14,251 in service of two of his top policy priorities: protecting Americans from threats to our national security and improving the efficiency and efficacy of the federal workforce.

Plaintiff moreover ignores that the Fact Sheet discusses, at great length, permissible, facially neutral justifications motivations for the Administration's action.  For example, the Fact Sheet begins by identifying the myriad ways the Executive Order will help protect the national security, including through the "National Defense," "Border Security," "Foreign Relations," "Energy Security," "Pandemic Preparedness, Prevention, and Response," "Cybersecurity," "Economic Defense," and "Public Safety."  *See* Fact Sheet at 1–2.  If the Fact Sheet is evidence of anything, it is that the President was also motivated by a determination that the excluded agencies

---

[15] Plaintiff's additional assertion that the Kentucky litigation "shows a government on the attack" is false. Pl. Mot. at 25–26. Plaintiffs in the Kentucky action sought only narrow relief with respect to IRS employees represented by NTEU Chapter 73, not "a declaratory judgment that the Department of Treasury may rely on the Executive Order to terminate the IRS's collective-bargaining agreement with NTEU." *Id.* at 25.  Such a tailored action is hardly evidence of retaliatory animus.

had national security or investigative work as a primary function, and that the CBAs could not be applied consistent with that work. Additionally, Plaintiff's focus on the Fact Sheet's reference to union efforts to impede the President's agenda fails to acknowledge that the statute expressly permits just that sort of assessment of union conduct. Section 7103(b)(1)(B), by design, is a recognition by Congress that union activity—in any manner encompassed by the collective bargaining rights afforded under the statute—can impede agency operations and that, when such activity impacts national security considerations, the President can act to restrict it by exempting agencies or subdivisions that have national security work as a primary function from the Act's coverage.

Because Plaintiff has not offered any evidence that a person of ordinary firmness would be deterred by the President's action and has failed to establish a causal link between its litigation activity and the issuance of the Executive Order, Plaintiff's claim must fail as a matter of law.

## V.    Plaintiff Cannot Satisfy the Elements Necessary to Obtain a Permanent Injunction.

Plaintiff seeks a broad injunction as to all Defendants other than President Trump. Compl. at 31, Request for Relief ¶¶ C, D. The requested injunction is not limited to Defendant agencies' bargaining units with Plaintiff but would enjoin the Defendant agencies "from implementing Section 2 of the Executive Order" altogether. *Id.* ¶ C. Yet Plaintiff has not demonstrated entitlement to an injunction, let alone a universal injunction. Because any injury Plaintiff faces is not irreparable and can be remedied through the statute's channeling process; Plaintiff does not have standing to seek a nationwide injunction; and, as the D.C. Circuit recognized, an injunction would injure the President, this Court should not grant Plaintiff's request for permanent injunction.

A party seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). As the Supreme Court explained in *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953), because the purpose of a permanent injunction is to prevent future violations, "the moving party must satisfy the court that relief is needed[, and] that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the cases alive."

Here, while Plaintiff suggests it has suffered an irreparable injury caused by Defendant agencies, Plaintiff's claims solely focus on the President's actions, not Defendant agencies. *See* Compl. ¶¶ 78–95. Thus, the first factor is not established on this record. And to the extent Plaintiff has been injured by Defendant agencies, the FLRA process is available. Given that Plaintiff cannot establish the first two factors necessary to obtain a permanent injunction, "it is clear [it] cannot make the corresponding strong showings [on the remaining factors] required to tip the balance in its favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009).

A permanent injunction also is not appropriate because the balance of the equities and the public interest weigh in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"); *see Zukerman v. United States Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (declining to find abuse of discretion where district court concluded that combined balance of equities and public interest factors weighed against issuing injunctive relief). It is vital that agencies with a primary purpose of national security are responsive and accountable to the American people. As the D.C. Circuit Court recognized, the clear congressional purpose of § 7103(b)(1) is to allow the President to guarantee the effective operation of agencies relevant to national security without the constraints of collective bargaining. *See Nat'l Treasury Emps. Union v. Trump*, No. 25-5157 (D.C. Cir. May

36

16, 2025) (holding that "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest.  To hold otherwise would give to the courts what the Constitution gave to Congress and the President").  To that end, the public has an interest in ensuring that agencies with a primary intelligence, counterintelligence, investigative, or national security function operate effectively and without delay to protect the American people.  A permanent injunction would displace and frustrate the President's decision about how best to address issues of national security, matters on which the courts typically defer to the President's judgment.  The President has long been charged with directing the Executive Branch workforce, and he has determined that agencies with a primary national security focus are hamstrung by restrictive terms of CBAs that frustrate his ability to safeguard the interests of the American people.  The democratically-elected President's determination regarding the public interest in that sphere is entitled to deference.

Finally, if the Court were to enjoin the Defendant agencies from enforcing Section 2 of the Executive Order or the OPM Memorandum, *see* Compl. at 32, Request for Relief ¶¶ C, D, that relief should be limited to the parties here in accordance with constitutional and equitable principles.  Article III of the Constitution limits a federal court's power to grant relief to remedy "the inadequacy that produced [the plaintiff's] injury."  *Gill v. Whitford*, 585 U.S. 48, 66 (2018).  And a court's equitable authority is generally limited to relief "traditionally accorded by courts of equity" in 1789.  *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999).  Historically, "American courts of equity did not provide relief beyond the parties to the case."  *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)).  While Congress "may intervene and guide or control the exercise of the courts' discretion," courts should "not lightly assume that Congress has intended to depart from established [equity] principles."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).  Nor does Plaintiff have standing to

obtain relief for anyone other than itself and its members. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (holding that the scope of a district court's remediation is bound by the scope of the injury demonstrated by the plaintiff). Thus, any relief—whether declaratory or injunctive—should be limited to only Plaintiff and its members to the extent they have proven injury, in accordance with these principles.

## CONCLUSION

For these reasons, the Court should grant Defendants' cross motion for summary judgment and deny Plaintiff's motion for summary judgment.


Dated: June 23, 2025

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
EMILY M. HALL
TYLER BECKER
Counsel to the Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

ALEXANDER K. HAAS
Director
Civil Division, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Branch Director
Civil Division, Federal Programs Branch

   */s/ Lydia J. Jines*
LYDIA JINES (MD Bar No. 2205230001)
JEREMY MAURITZEN
SYED AHMAD
Trial Attorneys
LISA ZEIDNER MARCUS
Senior Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L St., NW, Twelfth Floor
Washington, DC 20530

Tel: (202) 353-5652
Fax: (202) 616-8470
Email: Lydia.Jines@usdoj.gov

*Counsel for Defendants*