# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION,<br><br>    *Plaintiff*;<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>    *Defendants*. | Case No. 1:25-cv-935-PLF<br><br>Judge Paul L. Friedman |

## **DECLARATION OF REESHA TRZNADEL**

I, Reesha Trznadel, declare, pursuant to 28 U.S.C. § 1746, as follows:

    1.    I have served in the Department of Energy ("DOE" or the "Department") for more than eighteen years, in various positions. I am the Acting Chief Human Capital Officer, a position I have held since February 27, 2025. Previously I served as the Deputy General Counsel for Business Transactions. Before that I served as the Chief Counsel of the Department's Golden Field Office. The Office of the Chief Human Capital Officer ("OCHCO") is responsible for agency employment and staffing, compensation, benefits, executive resources, succession planning, labor and employee relations, workforce development, performance management, and other human capital functions. OCHCO also provides for the full range of human resource services to support Departmental Offices. Based on personal knowledge and information provided to me in the course of my official duties, I provide this declaration in support of the Defendants' opposition to Plaintiff's motion for summary judgment and Defendants' cross-motion for summary judgment in the above-captioned case.

2.	Section 2 of Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order"), excludes DOE, except for the Federal Energy Regulatory Commission, from coverage under chapter 71 of title 5, United States Code. Exec. Order No. 14,251 § 2, 90 Fed. Reg. 14553, 14554 (Apr. 3, 2025).

3.	DOE's primary role is setting national energy policy, with obvious national security objectives and implications. The same Congress that enacted the Federal Service Labor-Management Relations Statute, when it created the Department, acknowledged DOE's national security objectives, closely tied to its role in regulating domestic energy production. *See* 42 U.S.C. § 7111(2) ("[O]ur increasing dependence on foreign energy supplies present a serious threat to the national security of the United States and to the health, safety and welfare of its citizens."). DOE "ensure[s] the security of the U.S. nuclear weapons stockpile," "manages the Strategic Petroleum Reserve, invests in protection against cyber and physical attacks on U.S. energy infrastructure," and "provides training tools and procedures for emergency response and preparedness." U.S. Dep't of Energy, Energy Security, https://www.energy.gov/topics/energy-security.

4.	On the first day of his second term, the President recognized that "[e]nergy security is an increasingly crucial theater of global competition"; "hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets"; and "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." Exec. Order No. 14,156, § 1, 90 Fed. Reg. 8433, 8433 (Jan. 20, 2025). Other Presidents have also acknowledged the Department of Energy's role in national security. *See* Exec. Order No. 14,017, 86 Fed. Reg. 11849 (March 1, 2021) (recognizing the Department's role in securing supply chains to "ensure economic prosperity and national

security"); Exec. Order No. 13,603, 77 Fed. Reg. 16651 (Mar. 22, 2012) (recognizing the Department's role in promoting the national defense using authority delegated under the Defense Production Act of 1950).

5. The FSLMRS is inconsistent with the national security work performed by DOE and the Department's responsibilities in intelligence and counterintelligence. For example, the Department's Cyber Security, Energy Security, and Emergency Response office protects critical energy infrastructure from cyberthreats targeting our energy systems, from physical threats, and natural hazards while managing the nation's Strategic Petroleum Reserve. The Office of Intelligence and Counterintelligence mitigates threats to the nation's energy security by providing insights on foreign nuclear capabilities and activities as well as counterintelligence and cyber threat intelligence support. Given the important national security concerns encompassed in the Department's mission, the Department must have the ability to act with swiftness and agility to address emerging threats and issues. However, many provisions in DOE's collective bargaining agreement (CBA) with NTEU hamstring the Agency's ability to conduct official business, manage the DOE workforce, and quickly address emergency situations that impact national security, including threats to the nation's nuclear stockpile. These CBAs and the requirements imposed by the FSLMRS impede DOE's ability to carry out its national security mission and to protect the American public.

6. DOE and National Treasury Employees Union (NTEU) have a CBA (available at https://www.energy.gov/sites/default/files/2023-03/2021%20DOE%20Headquarters%20and%20the%20National%20Treasury%20Employees%20Union%20CBA.pdf), which took effect on January 12, 2022.

7. The CBA includes numerous articles that materially restrict the power of DOE to govern and set policies for its own workforce:

   a. Article 7, Official Union Time, allows DOE employees to use regular duty time to conduct union business, including allowing certain union officials to engage in union business on a full-time basis. This prevents management from directing employees to use their paid work hours to further the mission of the agency.

   b. Article 11, Grievances, creates a procedure under which Bargaining Unit Employees may file grievances contesting certain management decisions. If the matter is not resolved in the grievance process, NTEU may invoke arbitration on the matter under Article 12. This process can become onerous to management, requiring time and resources to respond to grievances and participate in arbitration rather than focusing on mission priorities. Further, the grievance and arbitration articles allow NTEU and third-party arbitrators to alter, constrain, and second-guess leadership decisions about how to manage employees in the pursuit of the Agency's mission-related goals.

   c. Article 17, Performance Management Program, states "Generally, DOE will provide no less than forty-five (45) calendar days to demonstrate performance improvement [or longer]." Historically, this has resulted in Bargaining Unit Employees receiving more time to demonstrate performance than non-Bargaining Unit Employees which has resulted in inconsistent application of the requirements to demonstrate performance. This section also requires that DOE provide notice to the union and bargain changes to its Performance Management Program which impairs management rights, limits the ability to make changes as needed to properly

manage DOE's workforce, is time consuming, and delays the implementation of DOE's priorities.

d. Article 19, Merit Promotion, requires that DOE use particular announcement procedures for certain promotion opportunities, which directly impacts the agency's ability to promote a qualified candidate without entering into a competitive process. This process delays management's ability to timely manage its workforce to the optimal level.

e. Article 22, Reduction in Force, requires that DOE give NTEU advance notice of a reduction in force and the opportunity to bargain "in accordance with the procedures contained in Article 13: Midcontract Negotiations." Requiring advance notice and the opportunity to bargain in accordance with Midcontract Negotiations procedures limits management rights, impedes the ability to make changes as needed to properly manage DOE's workforce, is time consuming, and delays the implementation of DOE's priorities.

f. Article 32, Health and Safety, requires that DOE give NTEU notice and the opportunity to bargain the impact and implementation of any changes to DOE regulations, standards, and directives which may affect the health and/or safety of NTEU Bargaining Unit Employees. Requiring notice and the opportunity to bargain the impact and implementation of these changes restricts management rights, limits the ability to make changes as needed to properly manage DOE's workforce, is time consuming, and delays the implementation of DOE's priorities.

g. Article 38, Drug Testing, requires that DOE give Bargaining Unit Employees additional rights and protections that are not available to non-Bargaining Unit

   Employees including being informed of the "right to Union representation at every stage of the drug testing procedure" and duty time to research and consult with an NTEU steward (or other appropriate source) regarding any notice concerning the Substance Abuse Testing Plan. These requirements are overly burdensome and needlessly involve the union in a process that is a quintessential management function.

8. As a general matter, the CBA interferes with DOE's ability to execute and implement the President's initiatives related to national security. For example, DOE cannot implement government-wide rules and regulations from the President that conflict with the CBAs (without renegotiation and agreement with the unions). Applying the NTEU CBA to DOE is likewise inconsistent with national security requirements and considerations.

  a. For instance, in Article 32, Health and Safety, DOE management is required to provide NTEU with swift notice followed by a briefing of any credible threats to the workforce, such as a bomb threat or active shooter. Such a burdensome requirement infringes on management's ability to act promptly to address and mitigate security threats to its personnel. Moreover, timely notification and a briefing of real threats could divulge sensitive and potentially classified information, which could violate federal laws pertaining to maintenance of sensitive information. The workforce is also exposed to unnecessary risk by publicizing sensitive information to NTEU officials, none of whom is responsible for the physical protection of DOE employees.

  b. Similarly, in Article 38, Drug Testing, NTEU is entitled to represent employees during the drug testing process and permits employees to grieve DOE direction to

        submit a testing specimen entirely. Employees who occupy testing-designated positions are usually responsible for crucial intelligence and nuclear security roles. Such overreaching union interference into DOE's drug testing program jeopardizes the fitness of the workforce and also poses severe security risks to the American public by allowing employees to evade established testing protocol.

    c. Furthermore, the NTEU CBA requires management to notify and bargain, as appropriate, reorganizations and realignments before announcing them to the impacted employees. This early access to information allows the union to engage the impacted employee(s) before management, thus undermining the relationship between management and the employee. In addition, this CBA requirement also ends up driving the timing of the various communications. In order to meet the CBA requirements, management must ensure actions are taken in proper sequence and often within strict timeframes, which creates an unnecessary burden on management.

    d. The Executive Order removes these obstacles.

9.     Plaintiff asserts that DOE has stopped withholding and remitting NTEU dues as of the pay period ending on May 31, 2025. That is not correct. DOE has continued to process dues deductions unless an individual employee requests to stop via a submitted SF-1188 form. The agency has received new dues forms (SF-1187) but is not currently processing them due to the Executive Order.

I declare under penalty of perjury that the foregoing is true and correct. Executed on the <u>23rd</u> of June, 2025.

_____
REESHA TRZNADEL
ACTING CHIEF HUMAN CAPITAL OFFICER
US DEPARTMENT OF ENERGY