# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION,<br><br>*Plaintiff*;<br><br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Case No. 1:25-cv-935-PLF<br><br>Judge Paul L. Friedman |

## DECLARATION OF TREVOR NORRIS

I, Trevor Norris, declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am Deputy Assistant Secretary ("DAS") for Human Resources ("HR") for the United States Department of the Treasury, headquartered in Washington, D.C. I have served in this position since September 2017, and at the Department of the Treasury since 2016. As DAS for HR, I oversee all human capital programs for the Department of the Treasury and its bureaus (collectively, "Treasury"). Based on personal knowledge and information provided to me in the course of my official duties, I provide this declaration in support of Defendants' opposition to Plaintiff's motion for summary judgment and Defendants' cross-motion for summary judgment in the above-captioned case.

2. Section 2 of Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* (the "Executive Order") excludes Treasury, except for Bureau of Engraving and Printing ("BEP"), from coverage under chapter 71 of title 5, United States Code. Exec. Order No. 14,251 § 2, 90 Fed. Reg. 14553, 14553 (Apr. 3, 2025).

3. Treasury's national security role is clear, primary, and longstanding. Treasury's

"mission is to maintain a strong economy and create economic and job opportunities by promoting the conditions that enable economic growth and stability at home and abroad, strengthen national security by combating threats and protecting the integrity of the financial system, and manage the U.S. Government's finances and resources effectively." U.S. Dep't of the Treasury, *Role of the Treasury*, https://home.treasury.gov/about/general-information/ role-of-the-treasury. Put simply, Treasury exists to promote the economic and productive strength of the United States.

4.  Treasury also has investigative work as a primary function, for example through its components the Internal Revenue Service ("IRS"), the Financial Crimes Enforcement Network ("FinCEN"), and the Office of Foreign Assets Control ("OFAC"). IRS has a primary investigative function, as a principal duty is auditing tax filings. In fact, the IRS Criminal Investigations Division, which includes IRS special agents who investigate tax and related crimes, like money laundering, have been excluded since 1979. *See* Exec. Order No. 12,171, 44 Fed. Reg. 66,565, at § 1–2 (Nov. 20, 1979); *see* also IRS, *How criminal investigations are initiated*, https://www.irs.gov/compliance/criminal-investigation/how-criminal-investigations-are-initiated. FinCEN's mission is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence. FinCEN analyzes financial transactions data for law enforcement purposes. *See* FinCEN, *What We Do*, https://www.fincen.gov/about/what-we-do. OFAC investigates and enforces potential violations of U.S. economic and trade sanctions. This includes investigating transactions involving targeted foreign countries, regimes, and individuals and entities engaging in harmful activity, such as terrorists, international narcotics traffickers, weapons of mass destruction proliferators, and other malign actors, in response to threats to the national security, foreign policy, or economy of

the United States. *See* OFAC, *OFAC Consolidated Frequently Asked Questions*, https://ofac.treasury.gov/faqs/all-faqs. OFAC also investigates failures to comply with license requirements and other sanctions violations. *See id.*

5. The National Treasury Employees Union ("NTEU") is a federal labor union representing employees of Treasury or its subcomponents. The following six Treasury bureaus (i.e., subdivisions) have collective bargaining agreements ("CBAs") with NTEU or its affiliates: Departmental Offices ("DO"); Bureau of the Fiscal Service ("BFS"); Internal Revenue Service; Internal Revenue Service, Office of Chief Counsel ("IRS-CC"); Office of the Comptroller of the Currency ("OCC"); and Alcohol and Tobacco Tax and Trade Bureau ("TTB").[1]

    a. DO's CBA was agreed to on June 15, 2009.

    b. BFS' CBA was executed on August 1, 2019.

    c. IRS' 2022 National Agreement was executed on August 26, 2021, and implemented on October 1, 2021. Additionally, an Addendum was executed on February 23, 2024 and implemented on October 1, 2024.

    d. IRS-CC's current CBA went into effect on January 12, 2025.

    e. OCC's current CBA was executed on February 22, 2024.

    f. TTB's current CBA was executed on November 10, 2022.

6. The overwhelming majority of DO's workforce is excluded from bargaining unit coverage, primarily under 5 USC § 7112(b)(6) (employees engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security). The application of this provision is on a position-by-position basis and is subject to FLRA review upon

---

[1] Another Treasury subdivision—BEP—has a CBA with NTEU or its affiliates but is not covered by the Executive Order as noted above in paragraph 2.

3

NTEU challenge – requiring DO to be vigilant and expend resources making and defending these determinations. When management exercises its right to make changes in its personnel policy and procedures, the statutory and contractual requirement to complete bargaining prior to implementation requires management to choose to either (1) delay implementation for the entire workforce based on the need to negotiate with the representative of the 10% of DO employees who are not excluded; or (2) operating under two policies while negotiations are being completed (interfering with management's interest in unifying the workforce).

7. As a general matter, the CBAs interfere with Treasury's ability to execute and implement the President's initiatives related to national security.

a. For example, regarding OCC under Article 31 of the parties' CBA, the OCC must provide a minimum of 60 days and as many as 120 days for a performance improvement period (PIP). Shorter PIPs are not permitted for bargaining unit (BU) members, but they are now limited to 30 days for non-bargaining unit employees pursuant to Executive Order 14171 and OPM guidance to return to the policies of the first Trump administration related to unacceptable performance. This restriction impedes the agency's ability to address performance deficiencies promptly and efficiently for all employees. Under Article 8 of the parties' CBA, any performance feedback provided to a rating official that will be considered when evaluating an employee's performance must be shared with the employee, normally within 15 workdays. Additionally, during interim reviews, managers are required to compare current performance to the prior year and notify employees if they have identified a change in performance that would result in a reduction in the employee's summary or element rating. When these restrictions are invoked by NTEU, they impede the agency's ability to accurately rate employee performance. Under

Article 38 of the parties' CBA, the OCC must provide NTEU with at least 90 days advance notice of a reduction in force, unless circumstances leave the OCC with "no choice" but to give less notice. This restriction potentially impedes the agency's ability to promptly initiate a reduction in force.

      b.      Regarding BFS, Article 26 of the parties' CBA, Space Moves, and a supplemental Memorandum of Understanding, provide that NTEU will have pre-decisional input (PDI) in space moves and commits BFS to establishing both a Bureau-wide workgroup and a local workgroup for each move. The local space workgroup is required to be established at least ninety (90) days prior to any anticipated space changes/relocations involving fifteen (15) or more employees. Once convened, the workgroups meet on a bi-weekly basis, until the relocation has been completed. This process is burdensome to BFS as it delays such moves to provide the required pre-decisional input of the union and workgroups in advance of official negotiations on the subject. Once official negotiations begin for a space move, the Union usually requests an official briefing and then have fifteen (15) to respond with official proposals.

      c.      NTEU has argued that Article 36, "Telework Program," prevents BFS from making Bureau-wide changes to telework frequency or the telework program. NTEU interpreted the language to limit BFS to only making changes on an individual employee basis. This created extensive delays in negotiating the Bureau's return to office posture for bargaining unit employees and created inconsistencies with application of the policy between bargaining unit and non-bargaining unit employees throughout the process.

      d.      Similarly, regarding TTB, in Article 22, Hours of Work, Section 3 provides, in general, that "All employees are eligible to work a flexible or compressed schedule . . .

5

." and Section 4(G) provides for the use of "a flip of a coin" to resolve scheduling conflicts between employees of equal tenure.  Section 7(E) requires bargaining as a condition precedent to terminate flexible and compressed work schedules, even if such work schedules are having an adverse impact on TTB's ability to provide service to the public. Article 29, Space and Office Moves, Sections 1, 2, 3, and 4 provide NTEU with the right to bargain and be involved in any decisions to move, co-locate, open new offices, expand, or contract any offices.  Article 46, Telework, Section 1 states that it is the Bureau's policy to provide employees telework and maximize the amount of work that can be done through telework.  Section 12 subjects any denial of a request for telework or termination or suspension of telework to negotiated grievance procedures.  The foregoing provisions materially restrict the power of TTB to govern and set policies for its own workforce.

8. Treasury needs the latitude to swiftly implement changes to its policies to fit its changing needs, particularly considering its national security purpose and the Administration's priorities.  The Executive Order removes these obstacles.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 23, 2025.

John T. Norris  
Digitally signed by John T. Norris  
Date: 2025.06.23 14:25:03 -04'00'

J. TREVOR NORRIS