## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C. 20001,

                        Plaintiff,

            v.

DONALD J. TRUMP,
President of the United States
1600 Pennsylvania Avenue N.W.
Washington, D.C. 20500, *et al.*,

                        Defendants.

Case No. 1:25-cv-00935 (PLF)

## PLAINTIFF NTEU'S OPPOSITION TO DEFENDANTS'
## CROSS-MOTION FOR SUMMARY JUDGMENT AND
## REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... ii

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 3

I.  The Executive Order's Sweeping and Politically Motivated Exemptions, Individually and Collectively, Are Ultra Vires (Counts 1 and 2) ..................... 3

    A.  NTEU's Ultra Vires Claims Are Judicially Reviewable, as the Government Previously Conceded, and the Government's Own Statements Rebut the Presumption of Regularity. ........................................................................... 3

    B.  The Executive Order's Sweeping Exclusions Are Ultra Vires. .................... 6

        1.  There Is Clear Evidence that the President's National Security Exemptions Were Based on Considerations Outside of the Statutory Criteria ................................................................................................... 9

        2.  The Excluded Agencies and Subdivisions Do Not Plausibly Have a Primary Function of National Security Work. ...................................... 12

        3.  The Government Raises No Credible Argument that Collective Bargaining at the Excluded Agencies and Subdivisions Cannot Continue in a Manner Consistent with National Security Considerations. ...................................................................................... 22

        4.  The Executive Order's Exemptions, Collectively, Are Ultra Vires. ..... 23

II.  The Executive Order Is First Amendment Retaliation, as the White House Fact Sheet Effectively Concedes (Count 3). ................................................... 25

III.  Because the Executive Order Cuts Off Access to the Statute's Administrative Channels, the Government's Channeling Argument Fails. ............................. 32

IV.  The Government's Sovereign Immunity Arguments Repackage Its Channeling Arguments and Arguments Against Ultra Vires Review, All of Which Fail. ...................................................................................................... 37

V.  NTEU's Request for Relief Is Narrowly Tailored to the Government's Implementation of the Unlawful Executive Order. ....................................... 39

CONCLUSION ....................................................................................................... 42

# TABLE OF AUTHORITIES

## Cases

*AFGE v. Trump*, 2025 U.S. Dist. LEXIS 120042 (N.D. Cal. June 24, 2025)..... passim

*AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) ........................................................ 34

*AFGE, Local 446 v. Nicholson*, 475 F.3d 341 (D.C. Cir. 2007). .......................... 33, 34

*AFGE Local 987*, 66 F.L.R.A. 589 (2012).................................................................. 33

*AFGE, Local 3966*, 57 F.L.R.A. 750 (2002)............................................................... 33

*AFSA v. Trump*, No. 25-5184, 2025 U.S. App. LEXIS 15297 (D.C. Cir. June 20, 2025) .......................................................................................................................... 8

*Am. Forest Res. Council v. United Sates*, 77 F.4th 787 (D.C. Cir. 2023) .............. 3, 38

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) ....................................................... 25, 27

*Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89 (1983) ...................... 24

*Chamber of Com. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ................................. passim

*City of Ketchikan v. Cape Fox Corp.*, 85 F.3d 1381 (9th Cir. 1996) .................... 12, 13

*Clark v. Library of Congress,* 750 F.2d 89 (D.C. Cir. 1984) ....................................... 31

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821) ....................................................... 4

*Cole v. Young*, 351 U.S. 536 (1956) ............................................................................. 14

*Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). ............. 4

*Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803 (9th Cir. 2017)........................... 4

*Dep't of Energy, Oak Ridge Operations*, 4 F.L.R.A. 644 (1980)................................. 15

*Dep't of Treasury v. NTEU Ch. 73*, No. 25-cv-49, 2025 U.S. Dist. LEXIS 95533 (E.D. Ky. May 20, 2025).............................................................................. 29, 34, 35

*DHS, ICE*, 70 F.L.R.A. 628 (2018) ............................................................................. 11

*Doe v. Mattis*, 889 F.3d 745 (D.C. Cir. 2018) ............................................................ 39

*FTC v. Whole Foods Mkt., Inc.*, 502 F. Supp. 2d 1 (D.D.C. 2007) ............................. 14

*Holder v. Humanitarian Law Project,* 561 U.S. 1 (2010) ...................................... 3, 31

iii

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) ........................................................ 23

*Jarecki v. G. D. Searle & Co.*, 367 U.S. 303 (1961) .................................................... 20

*Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015) ........................................................ 36, 37

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .............. 41

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................ 23

*Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018) ................................................. 26

*Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 U.S. Dist. LEXIS 151291
(D.D.C. Aug. 23, 2024) ...................................................................................... 27, 28

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) ................... 31

*Mt. States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002). ...................... 3, 6, 7

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960 (D.C. Cir. 2022).
........................................................................................................................ 6, 7, 8

*Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) ............................................... 27

*New Mexico v. Musk*, No. 25-cv-429, 2025 U.S. Dist. LEXIS 100076 (D.D.C. May 27,
2025) ....................................................................................................................... 6

*NRC v. Texas*, Nos. 23-1300 & 23-1312, 2025 U.S. LEXIS 2378 (2025) ................. 8, 9

*NTEU v. Chertoff*, 452 F.3d 839 (D.C. Cir. 2006) ..................................................... 11

*NTEU v. Trump*, No. 25-0935, 2025 U.S. Dist. LEXIS 80268 (D.D.C. Apr. 28, 2025)
.................................................................................................................... passim

*Trump v. CASA, Inc.*, __ S. Ct. __, 2025 U.S. LEXIS 2501 (Jun. 27, 2025) .............. 42

*Turgeon v. FLRA,* 677 F.2d 937 (D.C. Cir. 1982) ...................................................... 33

*Twin Rivers Paper Co. v. SEC*, 934 F.3d 607 (D.C. Cir. 2019) .................................. 16

*United States v. Robel*, 389 U.S. 258 (1967) .............................................................. 31

*Univ. of D.C. Faculty Ass'n v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*,
163 F.3d 616 (D.C. Cir. 1998). ................................................................................ 7

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. 25-cv-
917, 2025 U.S. Dist. LEXIS 100078 (D.D.C. May 27, 2025) ............................ 27, 28

**Statutes**

5 U.S.C. § 702 .................................................................................................. 38

5 U.S.C. § 7101(a). ............................................................................. 20, 23, 24, 41

5 U.S.C. § 7103(b)(1) ................................................................................... passim

5 U.S.C. § 7106 ................................................................................................ 11

5 U.S.C. § 7115(a). ........................................................................................... 37

5 U.S.C. § 7121(a)(1) ........................................................................................ 10

**Rules**

Fed. R. Civ. P. 56(c) ........................................................................................... 2

Local Rule 7(h)(l) ................................................................................................ 2

**Other Authorities**

124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. Clay) .............. 24

Executive Order No. 14,251, *Exclusions from Federal Labor-Management Relations Programs*, 90 Fed. Reg. 14553 (Mar. 27, 2025) ................................................ 12, 24

*Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/26AL-73TZ ......................................................................... 11, 21

*Investigate*, Merriam Webster, https://www.merriam-webster.com/dictionary/investigative (last visited July 1, 2025) ........................... 19

# INTRODUCTION

The government portrays Plaintiff National Treasury Employees Union (NTEU) as seeking judicial review of legitimate and nuanced national security exemptions from the Federal Service Labor-Management Relations Statute (the Statute). These exemptions, the government argues, are just like the ones that Presidents since Jimmy Carter have made. But that is not remotely the case—and the Executive Order and accompanying White House Fact Sheet show it.

The President's sweeping use of the Statute's national security exemption to strip the collective-bargaining rights of most of the federal employees who had them, including about two-thirds of NTEU's workers, was not based on a national security calculus. The Fact Sheet makes clear that the President will treat unions who seek "constructive partnerships" with him differently than those who "obstruct[]" his agenda. As this Court observed, the President has "issued an Executive Order which targets" "those that have sued him, those that have filed grievances, those that have complained against him."[1] This nakedly retaliatory use of the Statute's exemption opens the door to judicial review and ultimately to rulings against the government.

The same legal analysis that led the Court to conclude that NTEU's claims are likely to succeed on the merits should lead to a conclusion that summary judgment is merited here. The government cannot rebut that sound analysis or walk back its earlier concessions that the President's national security exemptions

---

[1] Transcript of Motion for Preliminary Injunction Hearing (Apr. 23, 2025) (Tr. of PI Hr'g) at 35 ("I mean, how else can you read what he's done?").

are judicially reviewable, at least in certain circumstances. And the government does not allege that there are any material facts in dispute.[2]

There is no limiting principle to the government's position in this case. In its view, the President could exempt *every* agency from the Statute using the national security exemption. Those exemptions, the government believes, would be unreviewable because it is within the President's discretion to render the Statute a nullity through its narrow exemption. It is irrelevant, according to the government, if the President uses that exemption explicitly and strictly to retaliate against perceived political enemies.

This Court should reject the government's position, perform the judicial branch's function of ensuring that the political branches stay within the bounds of their legal authority, and conclude that the President's unprecedented use of the national security exemption to punish unions for mounting legal challenges to his actions is unlawful.

---

[2] The parties agree that there is no material fact in dispute. Yet the government objects to nearly every fact that NTEU asserts, including objections to direct quotes and citations to the Executive Order, OPM Guidance, and Fact Sheet at issue. *See, e.g.*, Table: Defendants' Responses to Plaintiff's Statement of Material Facts Not in Dispute (Table), Nos. 2, 3, 5, 7–15. The government's objections fail to comport with Local Rule 7(h)(l) and Fed. R. Civ. P. 56(c). Its two hundred-plus objections merely (1) refer the Court to certain documents or laws in their entirety (*see, e.g.*, Table Nos. 15–21, 23–29), or (2) otherwise identify no specific evidence of record demonstrating a real conflict as to facts (*see, e.g.*, Table Nos. 43–46 (government vaguely objecting to the use of direct quotes from a record of its own website by providing links to the same website), 126 (asserting "lack [of] sufficient knowledge to form a belief"), 174, 177, 181, 186, 192 (government supporting its factual objections solely with citations to its own previous factual objections)).

## ARGUMENT

I. **The Executive Order's Sweeping and Politically Motivated Exemptions, Individually and Collectively, Are Ultra Vires (Counts 1 and 2).**

   A. **NTEU's Ultra Vires Claims Are Judicially Reviewable, as the Government Previously Conceded, and the Government's Own Statements Rebut the Presumption of Regularity.**

1. The government's arguments that this Court may not assess whether the President's extraordinary use of the national security exemption exceeds his statutory authority fall flat. *See* Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment (June 23, 2025) (Gov't Opp.) at 14–16. "The Congress can and often does cabin the discretion it grants the President, and it remains the responsibility of the judiciary to ensure that the President acts within those limits." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023). In other words, "the responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts by Congress." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (quoting *Stark v. Wickard*, 321 U.S. 288, 310 (1944)).

Even where a statute grants "very broad discretion" to the President, "Courts remain obligated to determine whether [those] statutory restrictions have been violated." *Mt. States Legal Found. v. Bush*, 306 F.3d 1132, 1136–37 (D.C. Cir. 2002). That is true even in the context of national security. *See Holder v. Humanitarian Law Project,* 561 U.S. 1, 34 (2010) ("Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role."); *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 827 (9th Cir.

2017) ("When confronting a statutory question touching on . . . national security . . . a court does not adequately discharge its duty by pointing to the broad authority of the President and Congress and vacating the field without considered analysis.").

Otherwise, Congress's statutory restrictions would be outside the boundaries of enforcement and thus meaningless. That would be incompatible with the federal courts' "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). *Accord Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (Marshall, C.J.).

    **2.**    Here, Circuit precedent establishes—and the government does not contest—that this Court may review national security exemptions that are "plainly beyond the bounds" of the Statute; reflect a "gross violation of the [S]tatute"; or present a "constitutional" question. *See* Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction (Apr. 11, 2025) (Govt PI Opp.) at 18 & n.7 (citing cases); Tr. of PI Hr'g at 27 (government concession that under the D.C. Circuit's decision in "*AFGE versus Reagan* . . . the exception identified [allowing for judicial review of national security exemptions] includes constitutional cases and gross violations of the statute"). Those are precisely the types of claims that NTEU presents here.

Consistent with this Circuit precedent, this Court previously held that, in this unique circumstance, the White House's own words and actions defeated the presumption of regularity and allowed for judicial review of NTEU's ultra vires claims. *See NTEU v. Trump*, No. 25-0935, 2025 U.S. Dist. LEXIS 80268, at *18–33 (D.D.C. Apr. 28, 2025). This Court found "clear evidence that 'the President was

indifferent to the purposes and requirements of the [Statute], or acted deliberately in contravention of them.'" *Id.* at *23 (quoting *AFGE v. Reagan*, 870 F.2d 723, 728 (D.C. Cir. 1989)).

The President's message through the Executive Order and its accompanying Fact Sheet is straightforward: The Statute's national security exemption is being used to punish unions that challenge the President's policy initiatives and to make federal employees easier to fire. *Id.* at *31. The exemptions are not a reflection of national security considerations; instead, according to the White House, they turn on whether the President considers a union to be a "constructive partner[]" or to be engaging in "mass obstruction" against his agenda. *See id.* at *30.

This Court thus found "clear evidence" that the President's sweeping use of that narrow national security exemption was "retaliatory" and aimed to "punish unions for the 'war' they have 'declared [] on President Trump's agenda'"; served to facilitate "unrelated policy objectives" like making federal employees easier to fire; and "bear no relation to the [statutory] criteria" for the national security exemption. *Id.* at *28, *30, *33. The evidence likewise clearly showed that the President's exemptions were based on "a disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly, rather than a determination that such rights cannot be applied in a 'manner consistent with national security requirements and considerations.'" *Id.* at *26 (quoting 5 U.S.C. § 7103(b)(1)(B)).

A failure to exercise judicial review over national security exemptions that the President *admits* are not national security driven would render Congress's limitations in Section 7103(b)(1) meaningless. And it would pave the way for the destruction of the Statute in its entirety. If congressional intent matters at all, the government's arguments against judicial review must fail.

### B. The Executive Order's Sweeping Exclusions Are Ultra Vires.

The bar for asserting an ultra vires claim is not so insurmountable as the government makes it out to be. *See* Gov't Opp. at 13; *see also New Mexico v. Musk*, No. 25-cv-429, 2025 U.S. Dist. LEXIS 100076, at *55 (D.D.C. May 27, 2025) (noting that ultra vires review "is not as rigid as Defendants suggest"). The ultra vires standard "subsumes review" of various kinds of executive actions exceeding statutory authority. *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022). The Executive Order challenged here is ultra vires under the standards set forth in the most on-point precedent.

The D.C. Circuit's leading case on determining whether an executive order is ultra vires is *Chamber of Commerce v. Reich*, 74 F.3d at 1326–39. There, the Court held that an executive order that the president had broad discretion to issue under the Procurement Act was ultra vires because it conflicted with a separate statute, the National Labor Relations Act (NLRA). *Id.* at 1324. The D.C. Circuit later confirmed that a president also acts ultra vires if he exceeds the bounds of the very statute authorizing him to act. *Mt. States Legal Found.*, 306 F.3d at 1136. "Courts remain obligated to determine whether statutory restrictions have been violated,"

the court reasoned, whether those restrictions come from the authorizing statute or an independent one. *Id.*

Contrary to the government's characterization of the ultra vires standard, the court in *Reich* found it "untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that . . . contravene direct statutory prohibitions." 74 F.3d at 1332. Far from defying a direct statutory prohibition, the executive order in *Reich* conflicted with an *implicit* right in the NLRA and a judicially created doctrine of preemption from regulating such rights. *Id.* at 1332–39.

*Reich* is not a one-off in finding ultra vires action without a direct or extreme violation. For example, the D.C. Circuit held that a Control Board given wide-ranging powers over the District of Columbia's budget and operations acted ultra vires when it ordered a reduction-in-force at the University of the District of Columbia that disregarded provisions of the collective-bargaining agreement with the faculty. *Univ. of D.C. Faculty Ass'n v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 163 F.3d 616, 619–22 (D.C. Cir. 1998). The Court rejected the argument that the Control Board "ha[d] the authority to do anything that [was] not expressly prohibited" by statute. *Id.* at 621.

The D.C. Circuit rejected an overly narrow interpretation of the ultra vires standard more recently in *Postal Supervisors*, 26 F.4th at 971. The Court held that language in the Postal Act beginning with "[i]t shall be the policy of the Postal Service," despite affording broad discretion to the agency, "place[d] clear limits" on

that discretion and formed the basis for an ultra vires claim. *Id.* at 970–71. The Court clarified that the standard for ultra vires action allows for enforcement of "discernible" limits on executive discretion, as opposed to "vague" or "ambiguous" ones. *Id.* at 972.

The criteria in Section 7103(b)(1) cabin the President's authority to exclude agencies from the Statute with precisely the kind of "discernible standards" that the D.C. Circuit has found enforceable through ultra vires review. *Postal Supervisors*, 26 F.4th at 972. And as NTEU has shown, the Executive Order's sweeping exclusions far exceed those standards, naming agencies with barely a nexus to, let alone a "primary function" of, national security. *See* Memorandum in Support of Plaintiff NTEU's Motion for Summary Judgment (June 9, 2025) (NTEU Mot.) at 12–18. Even if ultra vires review captures only extreme or obvious violations, the Executive Order here fits the bill.

The government ignores *Reich* and other applicable precedent and instead relies mostly on *AFSA v. Trump*, No. 25-5184, 2025 U.S. App. LEXIS 15297 (D.C. Cir. June 20, 2025) (per curiam), and *NRC v. Texas*, Nos. 23-1300 & 23-1312, 2025 U.S. LEXIS 2378 (2025). But *Reich* and other published D.C. Circuit opinions on the merits should carry more weight than *AFSA*, an unsigned, per curiam opinion by a motions panel that itself did not distinguish or even address *Reich*. *NRC*, moreover, involves very different circumstances and has no application here. In *NRC*, the Supreme Court rejected attempts to assert an ultra vires claim as a means of appealing an NRC licensing decision directly to a court of appeals by

entities who were not even parties to the licensing proceeding. *NRC*, 2025 U.S. LEXIS 2378, at *20–22. NTEU did not attempt to raise its claims in a court of appeals in the first instance—that admittedly would be a true "Hail Mary pass." *See NRC*, 2025 U.S. LEXIS 2378, at *22. Rather, NTEU followed the established blueprint in *Reich* in challenging in this Court an extraordinary and sweeping executive order as ultra vires.

      1.     **There Is Clear Evidence that the President's National Security Exemptions Were Based on Considerations Outside of the Statutory Criteria.**

The government does not meaningfully contest that the President did not base the Executive Order's exemptions on Section 7103(b)(1)'s narrow criteria for national security exemptions. Nor could it. The White House has confessed that the President's exemptions were aimed, instead, at punishing unions that have challenged his agenda and making federal employees easier to fire. *See* NTEU Mot. at 8–9 (quoting this Court's detailed factual findings regarding the same). For that reason alone, those exemptions are ultra vires.

      a.     Far from challenging that the President failed to stay within the bounds of Congress's narrow criteria for national security exemptions, the government doubles down on the President's general policy objections to the existence of federal-sector unions. *See* Gov't Opp. at 23–25 (making generalized arguments about collective bargaining and the ability of unions to challenge removals through grievances). Those incorrect policy arguments against Congress's decision to codify collective bargaining in the federal sector cannot justify the President's national security exemptions of the agencies at issue here. Instead, they

show that the President has exceeded his narrow statutory authority to exclude agencies or agency components based on the narrow criteria that Congress established in Section 7103(b)(1).

The government cannot refute what the Fact Sheet and OPM Guidance show: that the President's national security exemptions were "in furtherance of unrelated policy goals rather than based on the statutory criteria." *NTEU*, 2025 U.S. Dist. LEXIS 80268, *30–31 (noting that "substantial evidence in the record" supports this conclusion). Under the guise of national security, the government mimics the President's policy concerns about federal-sector unions, parroting his view that unions make it harder to fire federal employees (Gov't Opp. at 24–25) and that Congress's statutory bargaining process and the statutorily required grievance-arbitration process (*see* 5 U.S.C. § 7121(a)(1)) hinder agency operations (Gov't Opp. at 25).[3] This is not an appropriate Section 7103(b)(1) analysis—*i.e.*, one tailored to Congress's narrow statutory criteria. It instead takes issue with Congress's decision to codify collective bargaining in the federal sector.

The government is wrong, in any event, that unions "impose[] significant delays" when agencies attempt to implement changes to conditions of employment, in a way that hinders government operations. Gov't Opp. at 24. The D.C. Circuit

---

[3] There is no limit to the government's argument that "[t]he President properly determined that the CBAs, as a clear impediment to separating underperforming employees, are inconsistent with national security considerations." Gov't Opp. at 25. If this rationale is sufficient for an Executive Order eliminating collective-bargaining rights for the bulk of unionized federal workers, nothing would prevent it from being used to eliminate those rights for the rest of the federal workforce down the road.

has underscored that "the scope of bargaining under [the Statute] is extraordinarily narrow." *NTEU v. Chertoff*, 452 F.3d 839, 860 (D.C. Cir. 2006). "[T]he restricted scope of bargaining under [the Statute] gives federal agencies great 'flexibility' in collective bargaining." *Id.* at 861. The Statute, moreover, grants agencies wide latitude to act promptly in exigent situations and often allows bargaining to occur *after* an agency implements a change to working conditions.[4]

**b.**       Critically, the Executive Order and the accompanying White House Fact Sheet show that hurting unions was not just a bonus of the President's national security determinations: It was a driving factor in the analysis of which agencies or agency components to exclude from the Statute. The White House Fact Sheet distinguishes between "[c]ertain Federal unions [that] have declared war on President Trump's agenda" and "unions who work with him." Plaintiff's Statement of Material Facts Not in Dispute (Facts) ¶ 15 (quoting *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/26AL-73TZ (Fact Sheet)).

Those in the first category, like NTEU, were severely hurt through the Executive Order's exclusions. But the Administration protected unions with "constructive partnerships" with the President. *See id.* The Executive Order, at

---

[4] *See* 5 U.S.C. § 7106 (granting agencies the right "to take whatever actions may be necessary to carry out the agency mission during emergencies"); *DHS, ICE*, 70 F.L.R.A. 628, 630 (2018) (finding that agencies may bargain after implementing changes to conditions of employment if changes made pursuant to a law or government-wide regulation).

Section 2, provides that "agency police officers, security guards, and firefighters" will not be exempted from the Statute—that is, unless they work for the Bureau of Prisons (*see id.* ¶ 5), which is represented by a large federal-sector union that the President has likewise targeted. *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *29–30. No "searching inquiry into [] the President's justifications" is needed here. Gov't Opp. at 15.

### 2. The Excluded Agencies and Subdivisions Do Not Plausibly Have a Primary Function of National Security Work.

As this Court previously concluded, "the President applied an overly broad interpretation of the term 'primary function' or wrote the term out of the statute entirely" and likewise "applied an overly broad interpretation of 'national security' when invoking Section 7103(b)(1), thereby making the President's Executive Order ultra vires." *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *39, *45.

**a. Primary Function**. The government fails to meaningfully contest that, in the absence of a definition of "a primary function" in the Statute, the dictionary meaning of those words should govern. *See* NTEU Mot. at 11 (citing *Delligatti v. United States*, 145 S. Ct. 797, 810 (2025)). With respect to "primary," even with the modifier "a," this Court should interpret this term as "first in order of time" or "of first rank, importance, or value." *Id.* (citing Merriam Webster definition of "primary").

That is precisely how the Ninth Circuit has interpreted the phrase "a primary," as it appears in a different statute. *City of Ketchikan v. Cape Fox Corp.*, 85 F.3d 1381, 1383–84 (9th Cir. 1996). While the government complains that *City of*

*Ketchikan* involves a different statutory context (Gov't Opp. at 27 n.12), it cannot dispute that Court's dictionary-based rationale, which applies equally here: "To read the statute otherwise would change the meaning of 'primary' to merely 'significant.'" *See* 85 F.3d at 1383–84.

And even if this Court prefers not to restrict the government to a single "primary function" here, the government cannot "read[] 'primary' entirely out of the text" and simply point to "any function that an agency at issue performs." *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *39; *see* Gov't Opp. at 16–17 n.9, 27–28 (arguing that agencies have several "primary" functions); *see also id.* at 17–23 (making arguments related to several "primary" functions for the relevant agencies).

The government's own publications show the primary functions of the excluded agencies and subdivisions; NTEU relies on those agency websites, and so does the government. *See* NTEU Mot. at 13–16; Gov't Opp. at 17–23. The government's suggestion that NTEU's primary-function analysis is based on less persuasive evidence (*see* Gov't Opp. at 17) should thus fail. And the agencies' official statements on their public websites about their functions (which are generally drawn from their statutory missions) should be given more weight than the declarations by individual agency employees—one human resources staffer apiece for the Departments of Treasury, Interior, Health and Human Services, Justice, and Energy, for example—that the government also relies on. *See* Gov't Opp., Exs. 3–9. The post-hoc, litigation-driven declaration of a single agency employee should have little persuasive value when compared to the agency's earlier public statements. *Cf.*

13

*FTC v. Whole Foods Mkt., Inc.*, 502 F. Supp. 2d 1, 4 n.4 (D.D.C. 2007) (citing *United States v. Gypsum Co.*, 333 U.S. 364, 396 (1948)), *rev'd and remanded on other grounds*, 533 F.3d 869 (D.C. Cir. 2008).

      **b.**    **National Security Work.** The government fails to mount any real defense to the Court's use of the Supreme Court's definition of "national security" in *Cole v. Young*, 351 U.S. 536, 544 (1956), in the absence of a definition of "national security" or "national security work" in the Statute. *Compare* Gov't Opp. at 29 ("the Executive Order is consistent with the *Cole* definition"), *with NTEU*, 2025 U.S. Dist. LEXIS 80268, at *41–45 (explaining at length why *Cole*'s definition of "national security" and its reasoning applies here) *and* NTEU Mot. at 11–12 (same).

      In *Cole*, the Supreme Court held that the statutory context—federal-worker protections—called for a "narrow meaning" of "national security" that included "only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare." 351 U.S. at 544. Including the latter category (which the government urged), the Court cautioned, would result in "an exception to the general personnel laws" being "utilized effectively to supersede those laws." *Id.* at 547.

      That type of risk, this Court explained, is present here too:

> President Trump . . . has applied a startlingly broad application of "national security," which—directly contrary to the Supreme Court's definition in *Cole v. Young*—encompasses "those activities of Government . . . which contribute to the strength of the Nation only through their impact on the general welfare." *Cole v. Young*, 351 U.S. at 544. This interpretation of "national security" therefore is inconsistent with the statute and "risks allowing the exception to swallow the rule,

> thereby undermining the purpose of the statute itself." *Nat'l Fed'n of Fed. Emps. v. McDonald*, 128 F. Supp. 3d 159, 172 (D.D.C. 2015). "[I]f Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the 'national security,' the result would be that the [FSLMRS], though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws." *Cole v. Young*, 351 U.S. at 548.

*NTEU*, 2025 U.S. Dist. LEXIS 80268, at *44–45.

This Court should reaffirm *Cole*'s application here. Regardless, the administrative decision that the government relies on for its interpretation of "national security work," *Dep't of Energy, Oak Ridge Operations*, 4 F.L.R.A. 644, 655–56 (1980) (*see* Gov't Opp. at 29), is "significantly less supportive of the government's position than it may think." *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *40. There, the Federal Labor Relations Authority "cautioned against applying an overly broad interpretation of 'national security'" and "ma[de] clear that the Supreme Court's decision in *Cole v. Young*, 351 U.S. 536 (1956), provided guidance on the interpretation of 'national security' in Section 7103(b)(1)." *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *41.

c.    **Treasury Subdivisions.** As a final threshold matter, the government does not contest NTEU's argument that because the Executive Order exempts various subdivisions of Treasury, as opposed to the agency in its entirety, those subdivisions must likewise be the focus of the statutory analysis. *See* NTEU Mot. at 10–11 n.2. Yet the government fails to raise any arguments that five of the Treasury subdivisions at issue have a primary function of national security work: the IRS Office of Chief Counsel, BFS, OCC, TTB, and Treasury's departmental offices. *See, e.g.,* Gov't Opp. at 17–23 (addressing other exempted agencies and

15

subdivisions). The government has therefore waived its opportunity to provide a statutory defense for the President's exemption of those subdivisions. *See Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 615 (D.C. Cir. 2019) (explaining "that arguments generally are forfeited if raised for the first time in reply").

The Executive Order does not exempt the entirety of Treasury because it leaves the Bureau of Engraving and Printing within the Statute's coverage. Exec. Order No. 14,251 § 2. Before the D.C. Circuit, the government acknowledged that, as the plain text of the Executive Order shows, the President excluded "subdivisions" of Treasury only—and not the whole agency. *See* Emergency Motion for an Immediate Administrative Stay and Stay Pending Appeal at 5, *NTEU v. Trump, et al.*, No. 25-5157 (D.C. Cir. Apr. 30, 2025) (Gov't Stay Mot.) (The designated agencies include, *inter alia*, [four entire agencies] and *subdivisions of the Departments of Treasury*[.]") (emphasis added). The government thus cannot rely on the broad mission of the Department as a whole to justify those subdivisions' exclusion. *See* Gov't Opp. at 17–18. The plain text of Section 7103(b)(1) requires that the statutory criteria be applied to each "subdivision" when the President elects to exempt only a "subdivision," as he did in this instance.

The government assessed the functions of each exempted "subdivision" of the Department of Health and Human Services, for example, instead of relying on the agency's mission as a whole. *See* Gov't Opp. at 20–21. And it addressed the functions of one of Treasury's excluded subdivisions, the IRS. *See* Gov't Opp. at 18.

16

But the government failed to address the other five Treasury subdivisions at issue and has thus conceded its exemption argument for each of them.

      **d.**      Where the government does raise arguments concerning an excluded agency or subdivision, it offers no plausible arguments that "the agency or subdivision has as a primary function . . . national security work." 5 U.S.C. § 7103(b)(1). And, as discussed above, the government's reliance on a declaration of a single human resources staffer to show the "primary function" of a particular agency should not be credited over better evidence, such as the agency's official statements regarding its functions on its public website.

      In earlier proceedings before this Court, showcasing its overbroad interpretation of "national security work," the government argued that the IRS's collection of taxes for the Civil War merited its exemption from the Statute over 150 years later. *See* Gov't PI Opp. at 21. Notably, the government now fails to make *any* argument at all that the IRS itself does national security work. *See* Gov't Opp. at 18. It instead relies on Treasury's broad mission—and the missions of two specific Treasury subdivisions not at issue here—for that argument. Gov't Opp. at 17–18. That is the wrong focus for an exclusion of an agency subdivision like the IRS (as explained above). And the government's only IRS-specific argument, which is that IRS's tax-auditing functions are "investigative" work, fails for the reasons discussed on pp. 19–22 below.

      For the other excluded agencies and subdivisions that the government addresses:

> The government's approach is essentially pointing to a specific function that a particular agency or subdivision performs, and then arguing that the instance of "national security work" means the entire agency's or its subdivision's "primary function" is "national security work." But even if an agency performs *some work* that implicates national security, that does not mean that the entire agency has "a primary function" of "national security work."

*NTEU*, 2025 U.S. Dist. LEXIS 80268, at *38–39 (addressing virtually the same arguments that the government makes here for Treasury, IRS, DOE, FDA, and BLM).

The government argues, for example, that because a few DOJ components, such as its National Security Division, "have long been exempted under 5 U.S.C. § 7103(b)(1)," that is enough to justify the President's exclusion of the entire agency. Gov't Opp. at 22. For BLM, which serves primarily to sustain public lands (NTEU Mot. at 15–16), the government seizes upon its oversight of mineral development and energy production on those lands, which it ties to national security. Gov't Opp. at 19. The government struggles to find any nexus to (let alone primary function of) national security work for EPA, straining with references to electric car production and the nation's interest in clean water and air. *Id.* at 22–23. And the government's arguments regarding the relevant HHS subdivisions, FCC, and DOE (see Gov't Opp. 19–21, 23) fare no better for the same reason that the Court noted in its earlier decision. *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *38–39.

e.       In perhaps an implicit acceptance that its arguments that the exempted agencies and subdivisions here have a "primary function" of "national security work" are implausible, the government has been pivoting away from that

argument and relying on another term in Section 7103(b)(1): "investigative." *See* Gov't Opp. at 18, 20–22 (arguing that the IRS, EPA, DOJ, and FDA have a primary function of investigative work, as that term is used in Section 7103(b)(1)). As this Court has explained, that effort fails.

*First*, Section 7103(b)(1)'s national security-focused context is vital to interpreting "investigative," and it shows that the government is interpreting the term far too expansively. That incorrect interpretation dooms its arguments related to the IRS, EPA, DOJ, and FDA.

Section 7103(b)(1)'s first criterion speaks to whether an agency or subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work." Read within the context of the statutory provision, "investigative" does not mean any form of investigation, as the government argues. *See* Gov't Opp. at 17. "Investigative" is sandwiched between "intelligence, counterintelligence" and "national security" in Section 7103(b)(1). That is vital to the statutory construction because intelligence and counterintelligence work plainly relate to our national security—but the same is not true of all "investigative" work, if that term is given its usual definition. So, giving "investigative" its ordinary definition ("to observe or study," according to Merriam-Webster), would not make sense here. *Investigate*, Merriam Webster, https://www.merriam-webster.com/dictionary/investigative (last visited July 1, 2025).

Bolstering that conclusion is Section 7103(b)(1)'s second criterion, which informs the interpretation of the initial, "primary function" criterion. Section

7103(b)(1)'s second criterion is limited to the compatibility of coverage under the Statute with "national security requirements or considerations." Section 7103(b)(1)'s narrow, national security focus thus confirms that "'investigative' work likely should be interpreted as having a national security valence in light of Section 7103(b)(1) as a whole." *See NTEU*, 2025 U.S. Dist. LEXIS 80268, at *36 n.4.[5]

The larger statutory context likewise lends itself to a narrow, national security-focused interpretation of "investigative." There is no dispute that Congress intended for the Statute to promote collective bargaining. *See* 5 U.S.C. § 7101(a). Nor is there any dispute that Congress intended to take control over federal-sector labor relations away from the President through its codification. Tr. of PI Hr'g at 49–50 ("[P]laintiff's counsel mentioned that Congress enacted the [S]tatute in order to take away power from the President. That certainly is true."). This broader statutory context confirms that "investigative" should be interpreted narrowly. Otherwise, every agency that does any type of fact-finding or analysis would fall into this category. Such an overbroad interpretation would defeat the Statute's purpose.

---

[5] This Court's analysis mirrors the Supreme Court's application of the basic rule of statutory construction that "a word is known by the company it keeps." *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961) (narrowly interpreting "discovery," given the statutory context). This rule is "often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Id.* ("The application of the maxim here leads to the conclusion that 'discovery' in § 456 means only the discovery of mineral resources.").

***Second***, the President's exemptions explicitly rely on a conclusion that the exempted agencies and subdivisions are doing "national security work." And so do the government's arguments to this Court defending those exemptions.

The government must defend the President's stated basis for his national security exemptions; it cannot simply change it. The White House Fact Sheet on the Executive Order, issued the same night as the Order, is the most authoritative document on the basis for the President's exemptions. That document makes plain that the President's exemptions are based on a conclusion that the excluded agencies have a primary function of "national security work" as opposed to "investigative" work. The very first sentence of the Fact Sheet explains that the President's exemptions "end collective bargaining" at the specified "agencies with national security missions." Fact Sheet. These agencies, the White House underscores, have "national security responsibilities" and are "vital to national security." *Id.* These exemptions, according to the Fact Sheet, "protect our national security." *Id.*

These references to national security missions and responsibilities clearly articulate the President's "national security work" basis for his exemptions. The Fact Sheet does not contain a single reference to "investigative" work. So the government's obligation here is to defend the President's basis and not to create its own. That takes its "investigative" work rationale for the various exempted agencies off the map.

And even if the government could pivot to a new rationale for purposes of this litigation, its arguments related to judicial review and on the merits depend on the conclusion that the exempted agencies are doing "national security work." *See NTEU*, 2025 U.S. Dist. LEXIS 80268, at *36 n.4 (noting the government's arguments that the Court "lacks authority to review the President's national security determination" and that the exempted agencies have "national security mission[s]"); *see also* Gov't Opp. at 16 (discussing the "lack of competence on the part of the courts" on national security matters and characterizing the President's exemptions as "national security-based finding[s]"). "The government's success therefore depends on the validity of its interpretation of work implicating 'national security.'" *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *36 n.4.

> **3.    The Government Raises No Credible Argument that Collective Bargaining at the Excluded Agencies and Subdivisions Cannot Continue in a Manner Consistent with National Security Considerations.**

The government fails to provide any real analysis of Section 7103(b)(1)'s second criterion: that the Statute cannot be applied to the agency "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). It says nothing at all in response to the fact that the agencies that the Executive Order targets have fallen within the Statute's coverage, in many cases, for several decades. *See* NTEU Mot. at 13–16. It does not matter to the government that Presidents did not pull these agencies—or *any* entire Cabinet-level agency—out of the Statute's coverage during any military conflict since the Statute was enacted, not even after the September 11, 2001, attacks that fundamentally

altered our country's national security regime. Nor does it matter to the government that this President did not exempt any of these agencies or subdivisions in his first term, even though the agencies' primary functions remain the same. The government thus ignores that "the longstanding practice of the government . . . can inform a court's determination of what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (cleaned up).

Instead of engaging with Section 7103(b)(1)'s second criterion, the government complains about the very existence of collective bargaining in the federal sector, arguing that it improperly impedes federal agencies. *See* Gov't Opp. at 23–25. But the government's "disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly," is an insufficient analysis of Congress's statutory criterion. *See NTEU*, 2025 U.S. Dist. LEXIS 80268, at *26; *see also In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he President may not decline to follow a statutory mandate . . . simply because of policy objections."). And Congress itself provides the direct rebuttal to the government's policy objections with its finding that unions "contribute[] to the effective conduct of public business." 5 U.S.C. § 7101(a)(1)(B).

### 4. The Executive Order's Exemptions, Collectively, Are Ultra Vires.

The government has no real response to this Court's preliminary conclusion that the Executive Order's sweeping exclusions, collectively, exceed the President's authority and are ultra vires. *Compare* Gov't Opp. at 30–31 (offering only that NTEU "improperly prioritizes Congress's stated finding that 'labor organizations

and collective bargaining in the civil service are in the public interest'"), with *NTEU*, 2025 U.S. Dist. LEXIS 80268, at \*25–27, \*33–45 (concluding that claim is likely to succeed) and NTEU Mot. at 16–18 (arguing exemptions collectively are ultra vires).

The Executive Order's attempt to largely nullify the Statute through its narrow national security exemption conflicts with Congress's intent in enacting the Statute. Congress passed the Statute to codify federal labor relations and to safeguard it from the whims of any President; to promote collective bargaining; and to strengthen federal labor unions. *See* 5 U.S.C. § 7101(a); *see also Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 107 (1983); NTEU Mot. at 16–18. Particularly critical here is that Congress intended to create a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. Clay).

The President's use of the Statute's narrow national security exemption to undo the bulk of the Statute's coverage is plainly at odds with Congress's explicit intent. The Executive Order's far-reaching use of the Statute's narrow national security exemption is unprecedented. The Executive Order exempts nearly one-half of all Cabinet-level agencies from the Statute. *See* Exec. Order No. 14,251 § 2.[6] It

---

[6] This is highly relevant context for the unprecedented breadth of the Executive Order. NTEU is not arguing, though, that the President may not exempt an entire agency from the Statute (if the statutory criteria were satisfied), as the government suggests. *See* Gov't Opp. at 29–30.

24

excludes some two-thirds of the federal workforce and three-fourths of workers who are currently represented by unions from the Statute. Facts ¶ 4. That includes about two-thirds of all NTEU-represented workers across the government. Facts ¶ 115.

The Executive Order's exemptions collectively reflect "disagreement with Congress's decision to extend collective bargaining rights to the federal workforce broadly," instead of an analysis of Section 7103(b)(1)'s criteria. *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *26. They are ultra vires for this reason alone.

## II. The Executive Order Is First Amendment Retaliation, as the White House Fact Sheet Effectively Concedes (Count 3).

The Executive Order is not only ultra vires, but it is also textbook retaliation against NTEU for its litigation against the Administration. The Executive Order is therefore unlawful under the First Amendment.

For its First Amendment retaliation claim, NTEU has shown (1) that it "engaged in conduct protected under the First Amendment"; (2) that the government "took some retaliatory action sufficient to deter a person of ordinary firmness in [NTEU's] position from speaking again"; and (3) "a causal link between the exercise of a constitutional right and the adverse action taken." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quoting *Banks v. York*, 515 F. Supp. 2d 89, 111 (D.D.C. 2007)).

The government does not contest that NTEU has engaged in protected activity or that the Executive Order punished the union. Instead, the government argues that: (1) the Executive Order is lawful, "consistent with [the President's]

25

statutory authority," and thus cannot be retaliatory (Gov't Opp. at 34); (2) NTEU has not been deterred from speaking out against the Administration (Gov't Opp. at 33); and (3) the Executive Order was based on the President's "policy priorities" and not a retaliatory motive (Gov't Opp. at 34). Each argument fails.

*First*, the Executive Order is unlawful, as discussed in the preceding section. And no presumption of regularity is owed to the President's national security determinations here, given the Administration's explicit statements about the improper reasons for the Executive Order's exclusions. *See* Section I.A, *supra*. Moreover, even if the Executive Order did not exceed the President's statutory authority, NTEU would still prevail on its First Amendment claim. The Supreme Court has held that even if there is a lawful basis for a defendant's conduct, that conduct can still be improper First Amendment retaliation. In *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018), the Court held that the plaintiff could still pursue his claim that his arrest was improper First Amendment retaliation even though there was probable cause for the arrest. *Id.* at 97–101*; see also AFGE v. Trump*, 2025 U.S. Dist. LEXIS 120042 at *40–41. (N.D. Cal. June 24, 2025) (enjoining this Executive Order and finding that even an otherwise lawful Order may constitute unlawful First Amendment retaliation).

*Second*, Defendants are wrong that, because NTEU has stated that it will continue to engage in protected activity, no actionable First Amendment retaliation occurred when the Executive Order cut off over half of NTEU's revenue and over two-thirds of the workers that it represents. NTEU does not need to be conclusively

bullied into stopping its First Amendment activity to show that the government "took some retaliatory action sufficient to deter a person of ordinary firmness in [NTEU's] position from speaking again." *Aref*, 833 F.3d at 258. For example, a court in this Circuit held that a media company's persistence in publishing stories related to the social media platform X after defendant's allegedly retaliatory criminal investigation of the company "does not mean Plaintiffs' expression has not been sufficiently chilled." *Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 U.S. Dist. LEXIS 151291, at *34 (D.D.C. Aug. 23, 2024). Similarly, another court in this Circuit held that a law firm that proceeded with litigation against the Administration while other law firms capitulated showed that defendant's "retaliatory action" was more than "sufficient to deter a person of ordinary firmness . . . from speaking again." *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. 25-cv-917, 2025 U.S. Dist. LEXIS 100078, at *47 (D.D.C. May 27, 2025).

Here, the deterrent effect of the President's retaliatory action is particularly obvious given the "power that [he] wields." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024). "[T]he greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." *Id.* at 191–92. The coercive effect wielded by the President of the United States is at its apex here.[7]

---

[7] The government argues that Section 7 of the Executive Order, which directs agencies to recommend additional exclusions from the Statute to the President, could not have a deterrent effect because the deadline for those recommendations

If the government's circular argument is accepted, no First Amendment claim could ever succeed because (according to the government's logic), the mere fact that a plaintiff has brought a First Amendment lawsuit would "prove" that they were not deterred from engaging in protected activity. Imposing that type of requirement not only would deter First Amendment activity, but it also is flatly irreconcilable with many successful First Amendment retaliation suits. *See, e.g.*, *WilmerHale*, 2025 U.S. Dist. LEXIS 100078, at *43 (enjoining Administration action against law firm on First Amendment grounds).

**Third**, Defendants cannot credibly argue that the heavily gerrymandered Executive Order is not based on the retaliatory motive that the Administration's own issuances describe—and that the Administration's lawsuit against NTEU mimics—and is instead based on general policy views regarding national security and "the efficiency and efficacy of the federal workforce." Gov't Opp. at 32.

The White House's "public statements are direct evidence of retaliatory intent." *Media Matters*, 2024 U.S. Dist. LEXIS 151291 at *41 (finding causation prong of First Amendment retaliation claim satisfied where public official publicly called for investigation of plaintiff media company). The White House Fact Sheet acknowledges that the Executive Order is the result of "[c]ertain Federal unions []

---

has passed and "no new exclusions have been made." *See* Gov't Opp. at 33. That argument ignores what Section 7 directs: *recommendations*. The government does not argue that agency heads disregarded the President's direction and failed to recommend additional exclusions. It is unsurprising that the President has not yet pulled the trigger on those recommendations, given the fluidity of the litigation surrounding this Executive Order.

declar[ing] war on President Trump's agenda." Facts ¶ 15. The government has likewise conceded to this Court that the fact "that federal unions have declared war on President Trump's agenda . . . [is] actually part of the President's reasoning" for the Executive Order's exemptions. Tr. of PI Hr'g at 38.

It is uncontested that NTEU is one of the federal unions to which the Fact Sheet refers. NTEU has filed lawsuits challenging several of this Administration's high-profile policy objectives, from its mass firings of employees to its attempt to dismantle the Consumer Financial Protection Bureau. *See* NTEU Mot. at 20–21; *see also NTEU*, 2025 U.S. Dist. LEXIS 80268, at *28 ("[T]hese statements in the Fact Sheet appear to be in direct response to the number of lawsuits and grievances NTEU has filed against the Trump Administration in the last several months.").

Coupled with the White House Fact Sheet's language about unions, the government's targeting of NTEU through its aggressive and unusual lawsuit in the Eastern District of Kentucky further shows the causal connection. *See generally* Compl., *Dep't of Treasury v. NTEU Ch. 73*, No. 25-cv-49 (E.D. Ky. Mar. 28, 2025).[8] That preemptive lawsuit was filed against a local NTEU chapter only hours after the Executive Order issued. It mimics the Fact Sheet's language, referring to NTEU as a "hostile union." *Id*. ¶ 30. And it was filed in an atypical forum, given that it

---

[8] On May 20, the lawsuit was dismissed for lack of standing. *Dep't of Treasury v. NTEU Ch. 73*, No. 25-cv-49, 2025 U.S. Dist. LEXIS 95533 (E.D. Ky. May 20, 2025). The government has not indicated if it will appeal that ruling.

centered on a national-level collective-bargaining agreement between two parties headquartered in Washington, D.C.

The complaint sought to void NTEU's collective-bargaining agreement with the IRS, which is NTEU's largest bargaining unit (*see* Facts ¶ 34). The government, in other words, picked the target that would hurt NTEU the most. The government offers no explanation—much less a plausible, non-retaliatory explanation—for why it targeted NTEU's largest bargaining unit or why it filed such an unusual preemptive suit in such an unusual forum.

The Kentucky lawsuit thus confirms that the Executive Order seeks to punish NTEU. And its filing is consistent with the White House Fact Sheet on the Executive Order, which makes clear that unions like NTEU that are "hostile" to the President will be hurt, while those unions "who work with him" will not. *See* Facts ¶¶ 14–15. The Executive Order further demonstrates this with the Administration's affirmative statement that it will not exempt "agency police officers, security guards, or firefighters" from the Statute—unless they work for the Bureau of Prisons, which is represented by another federal-sector union that the President has likewise targeted. *See* Section 1.B.1.b, *supra*.

These same facts also defeat the government's argument that NTEU cannot prevail unless the union's constitutionally protected activity is the "but for" cause of the defendant's retaliatory action. Gov't Opp. at 34. As a threshold matter, the government wrongly states that it is NTEU that must "establish[]" that "Plaintiff's protected conduct was the but for cause of the President's action." *See* Gov't Opp. at

33. It is the government's burden on the but-for test. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (defendant school board must show "that it would have reached the same decision as to respondent . . . even in the absence of the protected conduct"); *Clark v. Library of Congress*, 750 F.2d 89, 101 (D.C. Cir. 1984) (defendant-employer has the burden of showing that the plaintiff's protected conduct was not the "but for" cause of the employer's adverse hiring decision).

And the government cannot carry its burden on the but-for test. As explained above, its own Fact Sheet, its preemptive lawsuit against NTEU in Kentucky, and the Executive Order's blatant gerrymandering of which agencies to include and which to exclude preclude the government from showing that the Executive Order would not have issued but for the improper motivation.

The government's claimed national security concerns do not change this analysis. The Supreme Court has held that "concerns of national security and foreign relations do not warrant abdication of the judicial role. We do not defer to the Government's reading of the First Amendment[.]" *Holder,* 561 U.S. at 34; *see also United States v. Robel*, 389 U.S. 258, 264 (1967) ("Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart," and "the most cherished of those ideals have found expression in the First Amendment."); *AFGE*, 2025 U.S. Dist. LEXIS 120042, at *38 (enjoining the same Executive Order challenged here on First Amendment grounds notwithstanding the deference owed to the executive branch on national security matters).

In sum, the Executive Order is unlawful retaliation against NTEU's protected First Amendment activity and should be enjoined on that basis alone.

### III. Because the Executive Order Cuts Off Access to the Statute's Administrative Channels, the Government's Channeling Argument Fails.

The government argues that the district court lacked subject-matter jurisdiction over NTEU's claims because they must be brought through the Statute's administrative channels. Govt' Opp. at 8–12. That argument fails for several reasons. The most obvious is that the Executive Order has taken away the administrative channels that the government argues must be used.

**A.** This Court correctly concluded that, consistent with this Court's precedent, NTEU's claims could not be channeled because the Executive Order takes that channel away. "The administrative review scheme . . . is not available . . . for the simple reason that those agencies and subdivisions have been excluded from the [Statute's] coverage by the very Executive Order at issue here." *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *13. Another federal district court evaluating this Executive Order has reached the same conclusion, explicitly agreeing with this Court's earlier channeling analysis. *AFGE*, 2025 U.S. Dist. LEXIS 120042, at *28–32.

Defendant Office of Personnel Management (OPM) has conceded that a "union no longer has standing to file [an unfair labor practice] charge" against an excluded agency or agency subdivision because that agency or agency subdivision "is no longer subject to provisions of the [Statute]." Facts ¶ 20. Similarly, OPM has conceded that an arbitration hearing under a negotiated grievance-arbitration

32

process against an excluded agency or agency subdivision cannot go forward because "the union is no longer the exclusive representative and there is no jurisdiction before the arbitrator." *Id.* ¶ 24.

The Federal Labor Relations Authority (the Authority) has held that it lacks jurisdiction in just these circumstances. *See AFGE Local 987*, 66 F.L.R.A. 589, 598 (2012) (dismissing claim against Air Force Office of Special Investigations for lack of jurisdiction because it was exempted from the Statute); *AFGE, Local 3966*, 57 F.L.R.A. 750 (2002) ("[S]ince [an] Executive Order exempts United States Attorneys' Offices from coverage of the Statute, the Authority lacks jurisdiction to decide the cases."). A charge against an excluded agency would thus be dismissed for lack of jurisdiction—and that dismissal would not be subject to judicial review. *Turgeon v. FLRA*, 677 F.2d 937, 938–39 (D.C. Cir. 1982) (holding that a dismissal of an unfair labor practice charge is not appealable to a federal court of appeals).

This Circuit's precedent shows that federal district-court jurisdiction exists for claims over which the Authority lacks jurisdiction. In *AFGE, Local 446 v. Nicholson*, the D.C. Circuit unanimously held that the district court had jurisdiction because the challenged action was "expressly outside the FLRA's purview" and the union was "presumptively entitled to judicial review of its claim." 475 F.3d 341, 348 (D.C. Cir. 2007). The same is true here, where the Executive Order takes the agency

defendants "outside the FLRA's purview" (*id.*), as the government conceded in its litigation against NTEU in the Eastern District of Kentucky over the Order.[9]

Because NTEU has no administrative options left as to the excluded agencies, *AFGE v. Trump* is inapposite. 929 F.3d 748, 754 (D.C. Cir. 2019); *see NTEU*, 2025 U.S. Dist. LEXIS 80268, at *15–16 (discussing decision). In *AFGE v. Trump*, the unions had "several 'administrative options'" available to them for challenging the executive orders at issue. *See* 929 F.3d at 757. Here, the Executive Order categorically removed any union claims relating to the agencies at issue from the administrative scheme.

**B.**     This Court should not embrace the government's position that a federal district court has jurisdiction to declare the Executive Order *lawful*, as it asked the Eastern District of Kentucky to do, but that a federal district court lacks jurisdiction to determine that the Executive Order is *unlawful*, as it argues to this Court.[10] Those views are irreconcilable. *See AFGE*, 2025 U.S. Dist. LEXIS 120042, at *31 (noting, in that case, that the government has likewise "taken an inconsistent position with respect to jurisdiction" after suing "over a dozen unions in the Western District of Texas" for a declaratory judgment that the Executive Order is lawful).

---

[9] Motion for Summary Judgment at 20, *Dep't of Treasury v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky. Apr. 18, 2025).

[10] Complaint, *Dep't of Treasury v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky. Mar. 28, 2025).

The government has tried to explain its inconsistent positions by arguing to the Eastern District of Kentucky that the Department of Treasury "is not subject to Chapter 71 after the President's Executive Order" and therefore has no channel through which to proceed for its claim.[11] But the same is true here: because the agency defendants are "not subject to Chapter 71 after the President's Executive Order," they are outside the Statute's administrative processes. So those agencies cannot institute an Authority proceeding against NTEU, and NTEU cannot initiate an Authority proceeding against them.

To try to distinguish its position in Kentucky, the government has argued that NTEU's theory that the Executive Order is unlawful has jurisdictional implications. Gov't Stay Mot. at 12 ("Plaintiff's own theory dictates that the FLRA was the exclusive venue for this suit."). But a federal district court's jurisdiction does not depend on what side of an issue the plaintiff takes, as another district court evaluating this Executive Order has explained. *See AFGE*, 2025 U.S. Dist. LEXIS 120042, at *31 ("The question of the Court's jurisdiction is not answered by the plaintiffs' or defendants' beliefs about the merits of the case."). NTEU fully grasps that the Executive Order cut off access to the Statute for nearly a dozen of its agencies; a legal claim that the Executive Order is unlawful does not restore the administrative channels that the Executive Order has cut off.

---

[11] Motion for Summary Judgment at 20, *Dep't of Treasury v. NTEU Ch. 73*, No. 2:25-cv-49 (E.D. Ky. Apr. 18, 2025).

**C.**     Additionally, this Circuit's precedent instructs that where a party would suffer "independent harm caused by the delay" associated with channeling, "full relief" cannot not be obtained through the administrative scheme and district court jurisdiction is thus merited. *Jarkesy v. SEC*, 803 F.3d 9, 27–28 (D.C. Cir. 2015). That would apply here, given the threat to NTEU's existence.

The Executive Order strips the collective-bargaining rights of "65.9% of all NTEU-represented employees, or approximately 104,278 employees." *NTEU*, 2025 U.S. Dist. LEXIS 80268 at *47. Even if NTEU had a path through the administrative process to federal court review of its claims—which it does not, as explained above—NTEU would suffer harm during the process of channeling those claims against each excluded agency or agency subdivision that could not be remedied after the fact.

NTEU's bargaining power and influence would be impaired in a way that could not be remediated. Agencies will continue to ignore NTEU—to refuse to bargain or engage with it—all while federal workers are under unprecedented attack. *See* Facts ¶¶ 130–204. That includes the impending large-scale reductions-in-force. *Id.* at ¶¶ 12, 132. The one-dozen NTEU-represented agencies that that Executive Order targets will continue not to discuss those reductions-in-force with NTEU or honor the reduction-in-force procedures in their collective-bargaining agreements. *Id.* NTEU will not get these chances to advocate for and to protect its workers back: "there is a substantial possibility that only a small fraction of its once

large union w[ill] remain upon prevailing in this litigation." *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *48.

Agencies exempted through the Executive Order will also continue to refuse to process dues payments to federal-sector unions via the payroll-deduction process that Congress created in 5 U.S.C. § 7115(a). Since agencies rushed to begin implementing the Executive Order, NTEU has been losing over one million dollars per pay period. Facts ¶ 126. That is over half of its revenue. Facts ¶ 119. As this Court understood, those losses urgently threaten NTEU's very existence. *NTEU*, 2025 U.S. Dist. LEXIS 80268, at *52. If NTEU fails to survive in its current form in the near term, later federal court review would not remedy that harm. Federal district court review is merited for that reason alone. *Jarkesy*, 803 F.3d at 27–28.

## IV. The Government's Sovereign Immunity Arguments Repackage Its Channeling Arguments and Arguments Against Ultra Vires Review, All of Which Fail.

The government argues that sovereign immunity bars NTEU's claims for the first time in its summary judgment papers, after failing to raise the argument in its preliminary injunction papers, at the preliminary injunction hearing, in its motion for a stay in the D.C. Circuit, or in its response to NTEU's petition for rehearing of the stay *en banc*. When the government made the same argument in *Reich*, the court called it "breathtakingly broad," and the government did "not seriously press" it at oral argument. *Reich*, 74 F.3d at 1329. The argument is similarly not to be taken seriously here. The law is clear that sovereign immunity poses no bar to NTEU's claims that the Executive Order is ultra vires.

The D.C. Circuit has long held that "a claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision." *Am. Forest Council*, 77 F.4th at 796 (citing *Reich*, 74 F.3d at 1326–28). "The APA's waiver of sovereign immunity applies to any suit [for declaratory or injunctive relief against a federal agency or officer] whether under the APA or not." *Reich*, 74 F.3d at 1328; *see also* 5 U.S.C. § 702 (waiving sovereign immunity against any suit for "relief other than money damages and stating a claim that an agency or officer or thereof acted or failed to act . . . under color of legal authority"). And more fundamentally, "if the officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit" because ultra vires actions "are considered individual and not sovereign actions." *Reich*, 74 F.3d at 1329 (quoting *Larson v. Domestic & For. Com. Corp.*, 337 U.S. 682, 689 (1949)). In other words, "there is no sovereign immunity to waive--it never attached in the first place." *Reich*, 74 F.3d at 1329.

Despite these settled principles, the government repackages its channeling arguments and arguments against ultra vires review as implicating sovereign immunity. These arguments all fail. For example, the government argues that "the proper forum for Plaintiff's claims is the FLRA." Gov't Opp. at 13. As demonstrated in Section III above, however, the challenged Executive Order cuts off access to the FLRA's review scheme. The government also contends that "*ultra vires* review is not available when the challenged action was taken pursuant to delegated powers and not contrary to any specific statutory prohibition." Gov't Opp. at 13. But as

discussed in Section I above, the Court is empowered to determine whether the President exceeded the limits that Congress placed on his delegated powers, as the President has done here.

## V. NTEU's Request for Relief Is Narrowly Tailored to the Government's Implementation of the Unlawful Executive Order.

Contrary to the government's arguments, NTEU's proposed injunctive relief is consistent with binding authority, serves the public interest, and is narrowly tailored to its claims. Because the Court's consideration of permanent injunctive relief necessarily requires NTEU's "actual success on the merits," NTEU easily satisfies the first of the four requirements for a permanent injunction, along with the remaining factors. *See Doe v. Mattis*, 889 F.3d 745, 751 (D.C. Cir. 2018) (cleaned up) (explaining that factors for a permanent injunction are the same as for a preliminary one, except that the requesting party must show actual success on the merits). The government's arguments to the contrary must fail.

NTEU has properly requested that the Court enjoin the Defendant agencies from implementing the Executive Order. It is "well established that 'review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Reich*, 74 F.3d at 1328 (quoting Justice Scalia's concurrence in *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992)). That is exactly what NTEU has done here. The government thus misses the point in arguing that NTEU has not satisfied the first injunction factor because its "claims solely focus on the President's actions, not Defendant agencies." *See* Gov't Opp. at 36. And as explained above, the government's assertion that "the

39

FLRA process is available" to challenge the Defendant agencies' actions is wrong. *Compare* Gov't Opp. at 36 *with* Section III, *supra*.

Defendants also suggest injunctive relief is not warranted unless there is "some cognizable danger of recurrent violation[.]" Gov't Opp. at 36. This argument ignores the voluminous, unrebutted evidence in the record demonstrating Defendant agencies' continued noncompliance with their statutory and contractual obligations. *See* Facts ¶¶ 130–204; Plaintiff's Supplemental Statement of Material Facts Not in Genuine Dispute ¶¶ 2–15, 20; Section III.C, *supra*; Kaspar Supp. Decl., Ex. 6 (HHS email stating that, because of the Executive Order, the Statute "no longer applies to the components of the Department of Health and Human Services within the Office of the Secretary" and noting that "management will discontinue communications with NTEU in its capacity as a labor representative").[12]

_____

[12] A divided motions panel found that NTEU is not suffering any harm because "the Government directed agencies to refrain from terminating collective bargaining agreements . . . until after the litigation concludes." *See* Order at 2, *NTEU v. Trump*, No. 25-5157 (D.C. Cir. May 16, 2025) (Stay Panel Order) (citing April 8, 2025 Frequently Asked Questions (FAQs)). That finding was wrong and unsupported by the record. *See* NTEU Mot. at 24–25; Facts ¶¶ 130–204. But even that panel noted that NTEU could proceed "if a specific agency or subagency deviates from that self-imposed rule" and does not comply with its CBA. *See* Stay Panel Order at 2 n.3. And this Court noted the same. Memorandum Opinion and Order at 7 (May 20, 2025). NTEU has submitted undisputed evidence that agencies are not adhering to the FAQs' suggestion about following CBAs. See Facts ¶¶ 130–204. The government does not claim (much less submit declaratory support for) anything to the contrary. Indeed, the government is now affirmatively arguing to a different federal court that agencies, including Treasury, HHS, and DOJ, are complying with the Executive Order, so much so that it would cost them time and manpower if they had to unwind that compliance and re-engage with unions. *See* Defendants' Emergency Motion to Stay the Preliminary Injunction Pending Appeal at 6, *AFGE, v. Trump*, No. 3:25-cv-03070 (N.D. Cal. July 1, 2025).

The government further misses the point in arguing that a permanent injunction is not in the public interest and would not properly balance the equities in this case. *See* Gov't Opp. at 36–37. In enacting the Statute, Congress determined that federal-sector collective-bargaining rights "safeguard[] the public interest." 5 U.S.C. § 7101(a). On the flip side, the government's implementation and enforcement of an illegal executive order cannot serve the public interest. As the D.C. Circuit has recognized, "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up).

At bottom, the government's "public interest" argument is merely a repackaged merits argument. *See* Gov't Opp. at 36–37. While the government invokes the balance-of-the-equities and public-interest injunction factors, the substance of the argument goes to the merits of NTEU's claims, not the appropriate remedy in this case. *See id.* at 37 (arguing that the "President's determination regarding the public interest in [the national security] sphere is entitled to deference"). The Court should ignore the government's attempt to take a second bite of the merits apple as part of its argument on the proper remedy.

Finally, there is no dispute that "relief should be limited to the parties here." Gov't Opp. at 37. NTEU's proposal asks for a declaratory judgment that Section 2 of the Executive Order, along with OPM's March 27 Guidance, is "unlawful as applied

41

to the Defendants *who are heads of NTEU-represented agencies.*" *See* [Proposed] Order Regarding Plaintiff NTEU's Motion for Summary Judgment at 1 (emphasis added). The Proposed Order further requests that the Defendants in this case, other than President Trump, be "enjoined from implementing" Section 2 of the Executive Order and OPM's March 27 Guidance. *Id.* at 2. To avoid any ambiguity, NTEU is submitting a revised proposed order that makes clear that any relief would be limited to NTEU. NTEU's requested relief is thus in accord with the government's position (*see* Gov't Opp. at 37–38) and the Supreme Court's decision in *Trump v. CASA, Inc.*, __ S. Ct. __, 2025 U.S. LEXIS 2501 (Jun. 27, 2025).

## CONCLUSION

For the foregoing reasons and those stated in its motion and memorandum in support, Plaintiff NTEU requests that this Court grant its motion for summary judgment, deny the government's cross-motion for summary judgment, and issue the relief set out in NTEU's revised proposed order.

Respectfully submitted,

*/s/  Julie M. Wilson*
JULIE M. WILSON
General Counsel
D.C. Bar 482946

*/s/  Paras N. Shah*
PARAS N. SHAH
Deputy General Counsel
D.C. Bar 983881

*/s/  Allison C. Giles*
ALLISON C. GILES
Assistant Counsel
D.C. Bar 439705

*/s/  Jessica Horne*
JESSICA HORNE
Assistant Counsel
D.C. Bar 1029732

*/s/  Kathryn W. Bailey*
KATHRYN W. BAILEY
Assistant Counsel
D.C. Bar 1643256

*/s/  Lindsay Dunn*
LINDSAY DUNN (pro hac vice)
Assistant Counsel
N.Y. Bar 4574224

NATIONAL TREASURY EMPLOYEES UNION
800 K Street N.W., Suite 1000
Washington, D.C. 20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
jessica.horne@nteu.org
kathryn.bailey@nteu.org
lindsay.dunn@nteu.org

July 7, 2025                    Counsel for Plaintiff NTEU