**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL TREASURY EMPLOYEES UNION, )<br><br>*Plaintiff*; )<br><br>v. )<br><br>DONALD J. TRUMP, *et al.*, )<br><br>*Defendants*. ) | Case No. 1:25-cv-935-PLF<br><br>Judge Paul L. Friedman |

**DEFENDANTS' REPLY IN SUPPORT OF
<u>DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................... 1

ARGUMENT ........................................................................................................... 1

I.  Plaintiff Has Not Established This Court's Subject Matter Jurisdiction. ............... 1

    A.  The FSLMRS Precludes District Court Jurisdiction Here. ........................ 1

    B.  Plaintiff Has Not Identified a Cause of Action or an Applicable Waiver of Sovereign Immunity. ........................................................................................ 5

II.  The Executive Order Is Lawful and Not Subject to Judicial Review. ................... 6

    A.  The FSLMRS and Binding Circuit Precedent Preclude District Court Review. ............ 7

    B.  The President's Determinations are Valid. ............................................. 8

III.  Plaintiff's *Ultra Vires* Claims Fail as a Matter of Law. .............................. 13

IV.  Plaintiff's First Amendment Retaliation Claim Fails. ................................. 18

V.  Plaintiff Does Not Satisfy the Elements Necessary for a Permanent Injunction. ........ 24

CONCLUSION ....................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*AFGE, AFL-CIO, Local 446 v. Nicholson*,
    475 F.3d 341 (D.C. Cir. 2007) ................................................................ 3

*AFGE v. Air Force*,
    716 F.3d 633 (D.C. Cir. 2013) ................................................................ 2

*AFGE v. Loy*,
    367 F.3d 932 (D.C. Cir. 2004) ................................................................ 3

*AFGE v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019) ............................................................. 1, 2

*AFSA v. Trump*,
    No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ............................ 14, 25

*Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*,
    870 F.2d 723 (D.C. Cir. 1989) ....................................................... 1, 7, 8, 19

*Am. Sch. of Magnetic Healing v. McAnnulty*,
    187 U.S. 94 (1902) ............................................................................ 6

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .......................................................................... 8

*Aref v. Holder*,
    774 F. Supp. 2d 147 (D.D.C. 2011) ........................................................ 19

*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016) .............................................................. 18

*Auster v. Ghana Airways Ltd.*,
    514 F.3d 44 (D.C. Cir. 2008) ................................................................ 5

*Axon Enters., Inc. v. Fed. Trade Comm'n*,
    598 U.S. 175 (2023) .......................................................................... 4

*Bd. of Governors, FRS v. MCorp Fin., Inc.*,
    502 U. S. 32 (1991) .......................................................................... 13

*Black Lives Matter D.C. v. Trump*,
    544 F. Supp. 3d 15 (D.D.C. 2021) .............................................. 18, 21, 24

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ..................................................... 5, 6, 16, 24

*Citizens for Resp. & Ethics in Wash. v. FEC*,
  971 F.3d 340 (D.C. Cir. 2020) ............................................................. 15

*City of Ketchikan v. Cape Fox Corp.*,
  85 F.3d 1381 (9th Cir. 1996) ............................................................. 15

*Cole v. Young*,
  351 U.S. 536 (1956) ............................................................. 17

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ............................................................. 5

*Dakota Cent. Tel. Co. v. South Dakota*,
  250 U.S. 163 (1919) ............................................................. 16

*Dalton v. Specter*,
  511 U.S. 462 (1994) ............................................................. 16

*Dep't of Def. v. FLRA*,
  685 F.2d 641 (D.C. Cir. 1982) ............................................................. 7

*Dep't of Energy, Oak Ridge*,
  4 F.L.R.A. 644 (1980) ............................................................. 17, 18

*Doe v. District of Columbia*,
  796 F.3d 96 (D.C. Cir. 2015) ............................................................. 18

*Fed. Express Corp. v. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) ............................................................. 14

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ............................................................. 5, 24

*Franklin-Mason v. Mabus*,
  742 F.3d 1051 (D.C. Cir. 2014) ............................................................. 5

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ............................................................. 11

*Houston Cnty. Coll. Sys. v. Wilson*,
  595 U.S. 468 (2022) ............................................................. 19

*Jenkins v. Howard Univ.*,
  123 F.4th 1343 (D.C. Cir. 2024) ............................................................. 5

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ............................................................. 23

*League of United Latin Am. Citizens v. Exec. Off. of the President*,

___ F. Supp. 3d ___, 2025 WL 1187730 (D.D.C. Apr. 24, 2025)................................................. 5

*Leedom v. Kyne*,
   358 U.S. 184 (1958)................................................................................................... 6, 13

*Media Matters for America v. Bailey*,
   No. 24-cv-147, 2024 WL 3924573 (D.D.C. Aug. 23, 2024)......................................... 20

*Mountain States Legal Foundation v. Bush*,
   306 F.3d 1132 (D.C. Cir. 2002).................................................................................. 16

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977)..................................................................................................... 19

*N. Am. Butterfly Ass'n v. Wolf*,
   977 F.3d 1244 (D.C. Cir. 2020)............................................................................. 14, 16

*Nat'l Ass'n of Postal Supervisors v. USPS*,
   26 F.4th 960 (D.C. Cir. 2022)..................................................................................... 14

*Nat'l Rifle Ass'n v. Vullo*,
   602 U.S. 175 (2024)..................................................................................................... 19

*Nieves v. Bartlett*,
   587 U.S. 391 (2019)..................................................................................................... 22

*Niz-Chavez v. Garland*,
   593 U.S. 155 (2021)..................................................................................................... 15

*NTEU v. Reagan*,
   No. 80-606, 1981 WL 150530 (D.D.C. Sept. 3, 1981)................................................ 12

*NTEU v. Trump*,
   No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ....................................... 25

*Nuclear Regul. Comm'n v. Texas*,
   605 U.S. ___ , 145 S. Ct. 1762 (2025).................................................. 6, 13, 14, 16

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009)..................................................................................... 14

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017)....................................................................................... 5

*Reichle v. Howards*,
   566 U.S. 658 (2012)..................................................................................................... 22

*Sierra Club v. Wheeler*,
   956 F.3d 612 (2020)....................................................................................................... 6

*Steadman v. Governor, U.S. Soldiers' & Airmen's Home,*
  918 F.2d 963 (D.C. Cir. 1990) ................................................................................ 3

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) ............................................................................................... 2

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ............................................................................... 12, 19, 23

*Turgeon v. FLRA,*
  677 F.2d 937 (D.C. Cir. 1982) ............................................................................... 2

*U.S. Dep't of Homeland Sec., U.S. Immigr. & Customs Enf't,*
  67 F.L.R.A. 501 (2014) ......................................................................................... 22

*U.S. Dep't of Treasury IRS,*
  62 F.L.R.A. 298 (2007) ......................................................................................... 18

*Univ. of D.C. Faculty Ass'n v. D.C. Fin. Resp. & Mgmt. Assistance Auth.,*
  163 F.3d 616 (D.C. Cir. 1998) ....................................................................... 16, 17

*Univ. of Texas v. Camenisch,*
  451 U.S. 390 (1981) ............................................................................................. 11

*Webster v. Doe,*
  486 U.S. 592 (1988) ............................................................................................. 19

*Williams v. Johnson,*
  701 F. Supp. 2d 1 (D.D.C. 2010) ................................................................... 19, 22

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ............................................................................................... 7

**Statutes**

5 U.S.C. § 7101 ........................................................................................................ 13

5 U.S.C. § 7103 ................................................................................................. *passim*

5 U.S.C. § 7116 ..................................................................................................... 3, 4

5 U.S.C. § 7123 ..................................................................................................... 2, 3

12 U.S.C. § 5511 ..................................................................................................... 15

15 U.S.C. § 634b ..................................................................................................... 15

22 U.S.C. § 2551 ..................................................................................................... 15

38 U.S.C. § 7422 .................................................................................................................. 3

Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) ....................................................... 2

**Rules**

Fed. R. Civ. P. 12 ................................................................................................................ 5

**Executive Order**

Exec. Order No. 14,251, § 2(b), 90 Fed. Reg. 14553 (Apr. 3, 2025) ......................... 10, 11, 20, 23

## INDEX OF EXHIBITS

### *Submitted with Defendants' Opening Brief*

Ex. 1     ECF No. 44-2     *American Foreign Service Association v. Trump*, No. 25-5184 (D.C. Cir. June 20, 2025) (slip op.)

Ex. 2     ECF No. 44-3     Defendants' Local Rule 7(h)(1) Statement

Ex. 3     ECF No. 44-4     Declaration of Matthew E. Hirt, Senior Attorney for the Labor and Employment Law Office, Justice Management Division Human Resources Staff, U.S. Department of Justice (June 23, 2025)

Ex. 4     ECF No. 44-5     Declaration of Christina V. Ballance, Executive Director of the National Labor and Employee Relations Office, U.S. Department of Health and Human Services (June 23, 2025)

Ex. 5     ECF No. 44-6     Declaration of Michael Molina, Principal Deputy Assistant Administrator for Mission Support, U.S. Environmental Protection Agency (June 23, 2025)

Ex. 6     ECF No. 44-7     Declaration of Reesha Trznadel, Acting Chief Human Capital Officer, U.S. Department of Energy (June 23, 2025)

Ex. 7     ECF No. 44-8     Declaration of Mark Stephens, Managing Director, U.S. Federal Communications Commission, (June 23, 2025)

Ex. 8     ECF No. 44-9     Declaration of Trevor Norris, Deputy Assistant Secretary for Human Resources, U.S. Department of the Treasury (June 23, 2025)

Ex. 9     ECF No. 44-10     Declaration of Stephanie M. Holmes, Acting Chief Human Capital Officer, U.S. Department of the Interior (June 23, 2025)

### *Submitted with Defendants' Reply Brief*

Ex. 10     Transcript of Oral Argument at 46:19 in *Dep't of Treasury v. NTEU, Chapter 73*, No. 25-49 (April 25, 2025 E.D. Ky)

Ex. 11     Defendants' Responses to Plaintiff's Supplemental Statement of Material Facts Not in Dispute

**INTRODUCTION**

This Court lacks subject matter jurisdiction over Plaintiff's claims for two related reasons: first, to the extent Plaintiff relies on chapter 71 of Title 5, those claims should be channeled through the Federal Service Labor-Management Relations Statute (FSLMRS) review scheme; second, Plaintiff has failed to raise any claim for which the United States has waived sovereign immunity. Because the Court lacks jurisdiction, it should not reach the merits of Plaintiff's claims, which, in any event, would fail because under established circuit precedent, this Court lacks authority to look behind and review those determinations. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723 (D.C. Cir. 1989) ("*AFGE*"). Thus, this Court's review should be limited to whether the President made the required discretionary determinations. But in any event, the President's determinations are supported as the record before the Court attests, and Plaintiff's unsubstantiated speculation about the President's motivations gives rise to neither cognizable *ultra vires* claims—which rely on an implied equitable action—nor a First Amendment retaliation claim. Rather, the presumption of regularity requires this Court to reject Plaintiff's invitation to second guess the President, who clearly would have issued the Executive Order absent the alleged retaliatory motive. Accordingly, because each of Plaintiff's claims fail as a matter of law, Plaintiff is not entitled to the extraordinary relief of an injunction, and Defendants are entitled to summary judgment in their favor.

**ARGUMENT**

**I.    Plaintiff Has Not Established This Court's Subject Matter Jurisdiction.**

**A.  The FSLMRS Precludes District Court Jurisdiction Here.**

This Court lacks jurisdiction over Plaintiff's claims. The FSLMRS review scheme is "exclusive with respect to claims within its scope," including "constitutional claims." *AFGE v. Trump*, 929 F.3d 748, 755–59 (D.C. Cir. 2019). Despite Plaintiff's argument that "the Executive

Order [took] that channel away," Pl.'s Opp'n to Defs.' Cross-Mot. for Summ. J. 32, ECF No. 48 ("Pl. Opp."), the Federal Labor Relations Authority (FLRA) remains the appropriate forum for these claims, and any decision to dismiss or deny such claims can be reviewed by a circuit court on appeal.  Plaintiff's arguments to the contrary fail.

First, Plaintiff cites a "Frequently Asked Questions" (FAQs) document that the Chief Human Capital Officers Council (CHCOC) released to federal agency chief human capital officers on April 8, 2025.[1]  Plaintiff argues that through the document, Defendant Office of Personnel Management (OPM) "conceded that [proceedings before the FLRA] cannot go forward because 'the union is no longer the exclusive representative and there is no jurisdiction.'"  Pl. Opp. 32–33.  However, that out-of-context CHCOC statement cannot unilaterally alter this Court's jurisdiction or override the preclusive statutory review scheme Congress established.  *See id.* at 24; *see also Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*"); *AFGE v. Air Force*, 716 F.3d 633, 638 (D.C. Cir. 2013); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994).

Second, any decision by the FLRA dismissing Plaintiff's claims for lack of jurisdiction is a "final order" of the FLRA subject to judicial review in the courts of appeals.  5 U.S.C. § 7123(a). Plaintiff relies on *Turgeon*, where the D.C. Circuit found that it lacked jurisdiction to review a decision by the FLRA's General Counsel not to issue an unfair-labor-practice complaint because "there is 'no final order of the [FLRA].'"  *Turgeon v. FLRA*, 677 F.2d 937, 939 (D.C. Cir. 1982).

---

[1] The CHCOC was established by the Chief Human Capital Officers Act of 2002, which was enacted as part of the Homeland Security Act of 2002.  Pub. L. No. 107-296, 116 Stat. 2135, 2287–300 (Nov. 25, 2002).  The CHCOC is the principal interagency forum on such matters as modernization of human resources systems, improved quality of human resources information, and legislation affecting human resources operations and organizations.  CHCOC Charter 1, *available at* https://perma.cc/89H9-BK9V.  The OPM Director serves as the Chairperson of the CHCOC.  *Id.* at 3.

While the FLRA General Counsel's decision not to issue a complaint is not a reviewable final order, Plaintiff has not even attempted to raise its claims with the FLRA (despite maintaining that the relevant agencies remain covered by the FSLMRS). It certainly has not established that if it did raise its claims with the agency, they would not ultimately be resolved with a final order of the FLRA—which would be a judicially reviewable final order. 5 U.S.C. § 7123(a).

Plaintiff's reliance on *AFGE, AFL-CIO, Local 446 v. Nicholson* fares no better. Pl. Opp. 33. *Nicholson* involved a Department of Veterans Affairs-specific statute, 38 U.S.C. § 7422(d), that specifically prohibited review of certain VA decisions "'by any other agency,'" including the FLRA. 475 F.3d 341, 347–48 (D.C. Cir. 2007) (quotation omitted). The court therefore found that the general rule that "'district courts do not have concurrent jurisdiction over matters within the [FLRA's] exclusive purview'" did not apply, since Congress expressly placed challenges under 38 U.S.C. § 7422(d) "outside the FLRA's purview." *Id.* (quoting *AFGE v. Loy*, 367 F.3d 932, 935 (D.C. Cir. 2004)). Here, nothing in § 7103(b)(1) exempts challenges to the President's determinations under that provision from the general channeling scheme.

Third, contrary to Plaintiff's arguments, Pl. Opp. 34–35, Defendants have not taken inconsistent positions in litigation. Plaintiff unconvincingly argues that a lawsuit filed by the Department of the Treasury somehow undermines the channeling arguments in this case. *Id.* However, the two cases raise distinct legal claims. Here, Plaintiff alleges injuries stemming from steps Defendant agencies took to implement the Executive Order, such as refusing to consult or negotiate in good faith with Plaintiff as the exclusive bargaining representative. Because those asserted injuries are precisely the type that may be filed as unfair labor practice claims, they are subject to the FLRA's exclusive review scheme. 5 U.S.C. § 7116(a) (listing actions that would constitute an unfair labor practice (ULP) on behalf of an agency); *see Steadman v. Governor, U.S. Soldiers' & Airmen's Home*, 918 F.2d 963, 966–67 (D.C. Cir. 1990) (holding that "the FLRA

enjoys exclusive jurisdiction" over ULP claims, even when a plaintiff seeks to assert a related, non-ULP claim). And Plaintiff's theory of the case is that Executive Order 14,251 *did not* validly exempt the Defendant agencies from the FSLMRS—so that review scheme, along with the other rights and obligations that the FSLMRS imposes—would still apply. In contrast, the Department of the Treasury did not allege any unfair labor practices in *Department of the Treasury v. NTEU*. *See* Tr. of Oral Argument, No. 25-49 (E.D. Ky. Apr. 25, 2025), *see* 5 U.S.C. § 7116(b) (listing actions that would constitute an unfair labor practice on behalf of a union). They proceeded on the theory that the Executive Order *did* exempt Treasury from the FSLMRS (including its review scheme). So in that case, the Department's claim was outside the purview of the FLRA.

Finally, Plaintiff does not allege an "independent harm" that stems from the FLRA administrative review scheme itself, such that district court jurisdiction would be appropriate. *See* Pl. Opp. 36; *see Axon Enters., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 192 (2023). In *Axon*, the plaintiff claimed that being forced to participate in the review scheme *was* the constitutional harm; on that basis, the Supreme Court permitted district court review of the challenge *to the review scheme*. 598 U.S. at 191 ("The claim . . . is about subjection to an illegitimate proceeding, led by an illegitimate decisionmaker."). The Court specified that the "'expense and disruption' of 'protracted adjudicatory proceedings'" does not justify immediate review; what matters is the nature of the claims and accompanying harms. *Id.* at 192. Plaintiff's potential loss of bargaining power or monetary loss are not "here-and-now injur[ies]" from "subjection to an unconstitutionally structured administrative process," like the injuries asserted in *Axon*—rather, they have nothing to do with the FLRA review scheme and can be remedied upon a favorable ruling. *Id.* This Court therefore lacks jurisdiction over Plaintiff's claims.

### B. Plaintiff Has Not Identified a Cause of Action or an Applicable Waiver of Sovereign Immunity.

"[T]he party asserting federal jurisdiction . . . has the burden of establishing it." *Jenkins v. Howard Univ.*, 123 F.4th 1343, 1347 (D.C. Cir. 2024) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006)); *see Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 603 (D.C. Cir. 2017) ("Before delving into the merits, we pause to assure ourselves of our jurisdiction, as is our duty."). For a plaintiff "bring[ing] a claim against the United States," carrying that jurisdictional burden requires "identify[ing] an unequivocal waiver of sovereign immunity." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014); *see Perry Cap.*, 864 F.3d at 619. Plaintiff's proffered reasons for failing to identify a waiver of immunity are unavailing.

First, Plaintiff notes the issue of a waiver of sovereign immunity is being raised for the first time at the summary judgment stage. Subject matter jurisdiction, however, is an indispensable condition precedent for any court action. "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *Auster v. Ghana Airways Ltd.*, 514 F.3d 44, 48 (D.C. Cir. 2008) ("When a court lacks subject matter jurisdiction, it must dismiss the case and not grant summary judgment."). Defendants, by raising it in their motion for summary judgment, therefore have not waived this jurisdictional defect.

Second, Plaintiff relies on *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996), to assert that the APA's waiver of sovereign immunity applies to suits against federal agencies whether or not they raise APA claims. But Plaintiff's claims do not challenge agency action; they challenge action by the President. And "because 'the President is not an agency within the meaning of' the APA, his issuance of an executive order is not a final agency action." *League of United Latin Am. Citizens v. Exec. Off. of the President*, ___ F. Supp. 3d ___, 2025 WL 1187730, at *16 (D.D.C. Apr. 24, 2025) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).

*Reich* did not deny that premise. It instead found that the APA's waiver of sovereign immunity applied where an Executive Order "was subsequently implemented by the Secretary's regulations" and "the regulations appear[ed] relevant." 74 F.3d at 1329. Here, Plaintiff asserts a facial challenge to Executive Order 14,251, with no attendant implementing regulations, so *Reich*'s limited holding should not apply. And in any event, the D.C. Circuit has confirmed that the APA's waiver "does not support jurisdiction here because [the APA] contains a carve-out that prevents a plaintiff from using its general sovereign immunity waiver to evade limitations contained in other statutes[.]" *Sierra Club v. Wheeler*, 956 F.3d 612, 619 (2020). Because Plaintiff's claims are subject to channeling under the FSLMRS, the APA's waiver of sovereign immunity is unavailable. This does not "repackage" channeling, Pl. Opp. 38, but confirms that the APA does not apply because of the FSLMRS.

Third, Plaintiff asserts that "sovereign immunity poses no bar to NTEU's claims that the Executive Order is ultra vires," Pl. Opp. 37, relying on the rationale of *Reich*. But the Supreme Court just last month issued an opinion that explained the extremely narrow scope of ultra vires review. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. ___ , 145 S. Ct. 1762 (2025) ("*NRC*"). It confirmed that ultra vires review is unavailable where a statutory review scheme exists, and explained that cases on which *Reich* relied heavily (*Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) and *Leedom v. Kyne*, 358 U.S. 184 (1958)) should not be expanded beyond their facts. *Id.* at 1775–76. For that reason, *Reich*'s vitality on this question is at minimum in serious doubt. The D.C. Circuit, in granting a stay in the parallel *AFSA* litigation, questioned "whether *ultra vires* review is available at all" against the President. *AFSA v. Trump*, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025).

## II.    The Executive Order Is Lawful and Not Subject to Judicial Review.

As Defendants have explained, this Court should not look behind the Executive Order and

independently assess whether the President's determinations were consistent with the Court's assessment of national security. Rather, because the President made the determinations required by statute in the Executive Order, it was a lawful exercise of his statutory authority. But in any event, the President's determinations are supported by the record.

### A.  The FSLMRS and Binding Circuit Precedent Preclude District Court Review.

The FSLMRS vests in the President alone the discretion to determine whether an "agency has as a primary function intelligence, counterintelligence, investigative, or national security work" and whether applying the statute to a given agency is "consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum[.]"). On-point, binding D.C. Circuit precedent makes clear that the President may exclude an agency from the Act's coverage "whenever he 'determines' that the conditions statutorily specified exist," *AFGE v. Reagan*, 870 F.2d at 727, and others must not "arrogate" the President's "power in this regard." *Dep't of Def. v. FLRA*, 685 F.2d 641, 650 (D.C. Cir. 1982). Therefore, this Court's inquiry should go no further than determining whether the President issued Executive Order 14,251 and stated in the Order that he made the requisite determinations, which Plaintiff concedes the President did. Pl.'s Resp. to Defs.' Statement of Material Facts 3, ECF No. 48-1 ("Pl.'s Resp.").

Plaintiff contends that because courts *generally* exercise judicial review of whether the President has acted within the limits Congress has set for his authority, this Court should engage in its own review of whether the Defendant agencies meet the requirements of the statute. *See* Pl. Opp. 3–4. But that general proposition does not override the D.C. Circuit's express direction in *AFGE v. Reagan* that judicial review under § 7103(b)(1) is extremely cabined. *AFGE v. Reagan*, 870 F.2d at 727. And it ignores the D.C. Circuit's recent holding as to this very Executive Order

that the parallel foreign-service statute "commits the relevant decision to the President's discretion," such that review—if it exists at all—"must be exceedingly deferential." *AFSA, at *3*. Indeed, the D.C. Circuit—assuming without deciding that any review could be appropriate— explained that as in the near-identical foreign-service statute, when "a statutory delegation invokes the President's discretion in exercising core Article II responsibilities, there is little for a court to review." *Id.*

Faced with the same evidence Plaintiff relies on here (the White House Press Office's "Fact Sheet," for example), the D.C. Circuit declined to disturb the presumption of regularity that presidential action is due. *Id.* at 5. This Court should follow the D.C. Circuit's well-reasoned approach in that case and substantially cabin its review. Accordingly, the only material fact at issue here is whether the President made the required determinations, which Plaintiff concedes he did. *See* Pl.'s Resp. 1, 3. (stating that "Plaintiff does not dispute" that: (1) "the President of the United States issued Executive Order 14,251"; (2) "Executive Order 14,251 states that the President determined that '[t]he agencies and agency subdivisions . . . are hereby determined to have as a primary function intelligence, counter intelligence, investigative, or national security work'"; and (3) "Executive Order 14,251 states that the President 'determined that Chapter 71 of title 5, United States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations.'"). Defendants are entitled to summary judgment on this basis alone.

**B.  The President's Determinations are Valid.**

In any event, the President's determinations are clearly supported by the record, and Plaintiff fails to submit evidence creating a genuine dispute of a *material* fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (holding that summary judgment should be granted if the record evidence shows that there is no genuine issue as to any material fact, which requires

more than the mere existence of some alleged factual dispute). Defendants established in their Cross Motion that each exempted agency or component has a primary national security or investigative function, and that the FSLMRS cannot be applied to such agencies consistent with national security requirements. Mem. of P.&A. in Supp. of Defs.' Cross-Mot. for Summ. J. 16–25, ECF No. 44-1 ("Defs. Mot."); Decl. of Matthew E. Hirt, ECF No. 44-4 ("Hirt Decl."); Decl. of Christina V. Ballance, ECF No. 44-5 ("Ballance Decl."); Decl. of Michael Molina, ECF No. 44-6 ("Molina Decl."); Decl. of Reesha Trznadel, ECF No. 44-7 ("Trznadel Decl."); Decl. of Mark Stephens, ECF No. 44-8 ("Stephens Decl."); Decl. of Trevor Norris, ECF No. 44-9 ("Norris Decl."); Decl. of Stephanie M. Holmes, ECF No. 44-10 ("Holmes Decl."). Plaintiff fails to offer record evidence to genuinely dispute any of the agencies' demonstrated functions or the FSLMRS's burdens on national security. Pl. Opp. 18. Plaintiff unconvincingly argues that Defendants' evidence should not be trusted or that Defendants rely on a misreading of the statutory terms. Such arguments fail in controverting a motion for summary judgment.

Defendants' evidence satisfies their evidentiary burden and should be accorded more weight than Plaintiff's. Defendants submitted declarations from high-level agency officials explaining the functions of their respective agencies. *See generally* Hirt Decl. ¶¶ 1, 4–5; Ballance Decl. ¶¶ 1, 4, 6–7; Molina Decl. ¶¶ 1, 3–4; Trznadel Decl. ¶¶ 1, 3–4; Stephens Decl. ¶¶ 1, 3; Norris Decl. ¶¶ 1, 3–4; Holmes Decl. ¶¶ 1–2, 4–5. Contrary to Plaintiff's assertions, these are not "human resources staffer[s]," but rather executives who oversee the human resources management and labor relations of entire federal agencies. *Compare* Pl. Opp. 13 *with e.g.*, Ballance Decl. ¶ 1 (declaration from the Executive Director of the National Labor and Employee Relations Office of the Department of Health and Human Services); Trznadel Decl. ¶ 1 (declaration from the Acting Chief Human Capital Officer of the Department of Energy); Stephens Decl. ¶ 1 (declaration from the Managing Director of the Federal Communications Commission). Moreover, although both

parties rely on agency websites and publicly available information to establish the agencies' functions, Pl. Opp. 34, Plaintiff relies on cherry-picked, out-of-context descriptions to counter the Government's showing.  These statements alone are insufficient to create a genuine dispute of a material fact.  Indeed, the different functions cited by each party are indicative of the multi-faceted roles of Defendant agencies, only one of which the President needed to rely on for the statutory exemption, which requires investigative or national security work as only "*a*" primary function. Congress entrusted the President, and not this Court, with the authority to weigh those various functions and determine which are primary.  5 U.S.C. § 7103(b)(1) ("The President may issue an order excluding any agency or subdivision thereof . . . if [he makes the requisite determinations."); *see also* Section II(A) *supra*.

Plaintiff's arguments as to specific agencies fare no better.  Plaintiff asserts that Defendants "do not contest NTEU's argument that" various subdivisions of the Treasury, rather than the Department as whole, should be the focus of the statutory analysis.  Pl. Opp. 15.  Plaintiff again misconstrues Defendants' position.  The exclusion of one component (the Bureau of Engraving) from the President's determination that was otherwise made at the Departmental level does not turn the President's determination with respect to the Department of Treasury into multiple individual determinations regarding each individual component within the agency.  This Court's analysis should track the determinations the President made in the Executive Order.  Because the President determined that "[t]he Department of Treasury, except the Bureau of Engraving and Printing" met the statutory criteria, that actual determination, not Plaintiff's hypotheticals, should be the focus of this Court's analysis.  *See* Exec. Order No. 14,251, § 2(b), 90 Fed. Reg. 14553 (Apr. 3, 2025).  For similar reasons, Plaintiff's summary dismissal of Defendants' stated national security functions is insufficient to create a genuine dispute of material fact.  *Compare* Pl. Opp. 18 *with* Hirt Decl. ¶¶ 4–5; Ballance Decl. ¶¶ 4, 6–7; Molina Decl. ¶¶ 3–4; Trznadel Decl. ¶¶ 3–4;

Stephens Decl. ¶ 3; Norris Decl. ¶¶ 3–4; Holmes Decl. ¶¶ 4–5.  Rather than disputing any of the stated functions of Defendant agencies, Plaintiff asserts that those functions are not primary enough, or that the Court already ruled on such issues.  Plaintiff is unable to contend with Defendants' asserted functions because they are, in fact, primary, and the President, not Plaintiff or this Court, is in the best position to make that determination.  *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 35 (2010) ("The Government, when seeking to prevent imminent harms in the context of . . . national security, is not required to conclusively link all the pieces in the puzzle before [the court] grant[s] weight to its empirical conclusions.").  Plaintiff cannot rely on this Court's prior findings on its preliminary injunction motion to create a genuine factual dispute, as the Court now has significantly more evidence before it, and the summary judgment standard is distinct from the preliminary injunction standard.  *See Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits . . . and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding . . . on the merits.") (citations omitted).

Recognizing that Plaintiff cannot reasonably dispute Defendants' functions, Plaintiff makes an improper inference from the omission from the White House Press Office's Fact Sheet— which Plaintiff contends is the "most authoritative document" on the President's determination— of references to "investigative work."  Pl. Opp. 21.  According to Plaintiff, this Court should conclude that the President must not have based his determinations on such functions and any reliance on such work in these proceedings is a post-hoc rationalization.  *Id.*  Plaintiff's specious argument ignores that the Executive Order itself is the most authoritative document and it expressly states that the exempted agencies had as a primary function "intelligence, counterintelligence, investigative, or national security work."  Exec. Order No. 14,251, § 1(a).

11

Moreover, the statute's second prong requires the President to determine whether "the provisions of this chapter [can] be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1)(B). Any determination pursuant to the statute therefore necessarily involves national security concerns—so it is natural that the Fact Sheet might reference national security implications and not investigative functions.

Finally, Plaintiff reiterates its prior arguments that the President's determination must be unsupported because the statute has been applied to certain agencies for "several decades" and prior Presidents did not exempt those agencies. Pl. Opp. 22–23. Defendants submitted declarations from every Defendant agency establishing the various burdens presently imposed by the FSLMRS and the related impediments to national security today. Hirt Decl. ¶ 8; Ballance Decl. ¶ 8; Molina Decl. ¶¶ 6–7; Trznadel Decl. ¶¶ 7–8; Stephens Decl. ¶¶ 6–7; Norris Decl. ¶¶ 7–8; Holmes Decl. ¶¶ 8–9. The fact that a certain agency was not previously excluded from the statute cannot possibly be enough to create a genuine dispute; otherwise, a President might be required to create a factual record akin to an administrative record for any future exemptions. Congress has never imposed such a requirement on presidential decision-making, and neither should the courts. Rather, Congress, unlike Plaintiff, recognized through Section 7103 that the Nation's national security needs are ever evolving, and the President needs the discretion and flexibility to manage the federal workforce to respond to such changes appropriately. *See AFSA,* at *3 ("a more 'searching inquiry' . . . would be 'inconsistent with [§ 4103(b)(1)'s] broad statutory text and the deference traditionally accorded the President in this sphere") (quoting *Trump v. Hawaii,* 585 U.S. 667, 686 (2018); *see also NTEU v. Reagan,* No. 80-606, 1981 WL 150530, at *2 (D.D.C. Sept. 3, 1981) (holding that a § 7103(b)(1) exclusion by President Carter was "not reviewable" because "Congress intended the chief executive to act 'in his or her sole discretion'" when making § 7103(b)(1) determinations). Although Congress found that "unions 'contribute to

the effective conduct of public business,'" 5 U.S.C. § 7101(a)(1)(B), Congress also recognized that collective bargaining could impede national security and gave the President the discretion to respond as he sees fit, *id.* § 7103(b)(1). For these reasons, the Court should uphold the President's determinations under § 7103(b)(1) and enter judgment in favor of Defendants.

## III.  Plaintiff's *Ultra Vires* Claims Fail as a Matter of Law.

Plaintiff's ultra vires claims fail for several reasons. As an initial matter, "[u]ltra vires review is also unavailable if . . . a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review[.]'" *NRC*, 145 S. Ct. at 1776 (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U. S. 32, 43 (1991)). The FSLMRS provides for administrative review of Plaintiff's claims before the FLRA, *see* Section I(A) *supra*, so Plaintiff does not have an available nonstatutory avenue in this Court. Thus, Plaintiff's ultra vires claims must fail as a matter of law entitling Defendant agencies to judgment in their favor.

Plaintiff in any event cannot meet the heightened standard necessary to prove ultra vires claims. The bar for asserting an ultra vires claim is high: such a claim is "strictly limited [to the] 'painstakingly delineated procedural boundaries of *Kyne*,'" and is only available "when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute."[2] *NRC*, 145 S. Ct. at 1775–76 (emphasis in original) (citations omitted). It requires a violation of a "specific prohibition in the statute that is clear and mandatory," a violation that was

---

[2] In *Leedom v. Kyne* the Supreme Court determined that a district court had jurisdiction over an *ultra vires* claim against the National Labor Relations Board (NLRB) when the NLRB violated a specific prohibition in the statute and the effected employees could not otherwise seek review of such violation. 358 U.S. 184, 188–89 (1958). The Court focused on the fact that the NLRB violated a "specific prohibition" in the statute that was "clear and mandatory." *Id.* In that instance, the NLRB, without approval of the professional employees, certified a bargaining unit that included professional and non-professional employees despite the statute's specific prohibition that "the Board shall not decide that any unit is appropriate for such [bargaining] purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit." *Id.*

"obviously beyond the terms of the statute," or action that was "far outside the scope of the task that Congress gave it," *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citations omitted).  The Supreme Court recently reaffirmed that an ultra vires claim is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC*, 145 S. Ct. at 1776 (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).

Plaintiff's ultra vires claims are no exception.  Those claims merely assert that the President exceeded the statutory authority granted to him by § 7103(b)(1)—not that the President violated a "specific prohibition in the statute that is clear and mandatory." *E.g.*, *N. Am. Butterfly Ass'n*, 977 F.3d at 1263.[3]  As the D.C. Circuit recently held in another case challenging Executive Order 14,251 and involving claims nearly identical to this one, to succeed on an ultra vires claim, "a plaintiff must show more than a 'routine error in statutory interpretation or challenged findings of fact.'" *AFSA,* at *2 (quoting *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022)).

Here, Plaintiff seeks to water-down the ultra vires standard.  Instead of attempting to show a "specific prohibition in the statute that is clear and mandatory," *North American Butterfly Ass'n*, 977 F.3d at 1263, that the President allegedly violated, Plaintiff argues that the statute must merely include a "'discernible' limits on executive discretion." Pl. Opp. 8.  Yet, the decision in *National Ass'n of Postal Supervisors*—from which Plaintiff's quotes the word "discernible"—did not purport to change the "clear and mandatory" standard.  *See Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 971 (D.C. Cir. 2022) (citation omitted) ("[A] challenged action must

---

[3] Plaintiff presents no argument to support its assertion of an ultra vires claim against the President, notwithstanding that the President is not an agency, and it remains unclear whether an ultra vires claim may lie against action taken by the President.  *See e.g., AFSA*, at *2 (internal quotations omitted) ("Another hurdle is that the President is not an agency.  So it is unclear whether *ultra vires* review is available at all.  Again, an *ultra vires* action is a suit in equity . . . and courts generally lack authority to enjoin the President[.]").

'contravene[ ] a clear and specific statutory mandate' to be susceptible to *ultra vires* review.").

Further, Plaintiff relies on a strained reading of the statute to support its assertion that the President's determinations here were ultra vires. Plaintiff asserts that 5 U.S.C. § 7103(b)(1) should be read to permit only one "primary" function, and that any other reading would change the meaning of "'primary' to merely 'significant,'" Pl. Opp. 12–13 (citing *City of Ketchikan v. Cape Fox Corp.*, 85 F.3d 1381, 1383–84 (9th Cir. 1996)). Plaintiff's reliance on inapposite cases to support its narrow interpretation of the President's § 7103(b)(1) authority is misplaced. For example, that the court in *City of Ketchikan* concluded that "a business may have only one 'primary place,'" 85 F.3d at 1384, has no bearing on whether the agencies exempted by the President, which Plaintiff concedes have multiple functions, have as *a* primary function investigative or national security work. 5 U.S.C. § 7103(b)(1); *see Niz-Chavez v. Garland*, 593 U.S. 155, 162–63 (2021) ("[I]ndefinite articles (like 'a' or 'an') precede *countable* nouns . . . By contrast, *noncountable* nouns [] 'almost never take indefinite articles.'") (emphasis in original); *see Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 354 (D.C. Cir. 2020) ("[T]he indefinite article[] 'a' [is] used when 'referring to something not specifically identified . . . but [instead] treated as one of a class: one, some, *any*") (emphasis added). Congress has recognized that an agency can have several primary functions. *See, e.g.*, 12 U.S.C. § 5511(c) (assigning an agency six "primary functions"); 15 U.S.C. § 634b (assigning an office 12 "primary functions"); 22 U.S.C. § 2551 (assigning the Secretary of State four primary functions in the area of arms control alone). Plaintiff also points to the Fact Sheet and OPM Memorandum as evidence of improper motive to support Plaintiff's otherwise insufficient claims. Pl. Opp. 9–10. The Fact Sheet and OPM Memorandum do not assist Plaintiff's ultra vires claim because Plaintiff points to no "clear and mandatory prohibition" within the statute to which the Fact Sheet and OPM Memorandum allegedly conflict. *See N. Am. Butterfly Ass'n*, 977 F.3d at 1263. In the end, Plaintiff attempts to "dress up a typical

15

statutory-authority argument as an ultra vires claim," which is a "fairly common maneuver when a litigant tries to squeeze its arguments into the [ultra vires] box—and is in large part why those claims rarely succeed." *NRC*, 145 S. Ct. at 1776. Plaintiff attempts to rely on the D.C. Circuit's opinions in *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) (holding that the NLRA preempted Department of Labor regulations) and *Mountain States Legal Foundation v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002) (finding that plaintiffs failed to allege sufficient facts to support their *ultra vires* claim and dismissing plaintiffs' complaint), to the contrary. *See* Pl. Opp. 6–7. But the reasoning in these cases is unavailing. This case is much closer to *Dalton v. Specter*, 511 U.S. 462 (1994) than *Reich* or *Mountain States Legal Foundation.* Indeed, as the D.C. Circuit noted in *Reich* and the Supreme Court declared in *Dalton*, "longstanding authority holds that [judicial review of an alleged presidential violation of a statute] is not available when the statute in question commits the decision to the discretion of the President." *Reich*, 74 F.3d at 1326 (quoting *Dalton*, 511 U.S. at 474). The *Dalton* Court went on to explain that "where a claim 'concerns not a want of [Presidential] power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power.'" *Dalton*, 511 U.S. at 474 (quoting *Dakota Cent. Tel. Co. v. South Dakota*, 250 U.S. 163, 184 (1919)). Such a claim is presented here. Congress, in enacting the FSLMRS, delegated significant authority to the President to exclude agencies upon making the required statutory findings. Plaintiff's ultra vires claims plainly challenge the President's use of that well-established power and therefore are beyond the reach of this Court's review.

Plaintiff's reliance on *University of D.C. Faculty Ass'n* is also unavailing. Pl. Opp. 7 (citing *Univ. of D.C. Faculty Ass'n v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 163 F.3d 616, 619–22 (D.C. Cir. 1998)). That case did not involve Presidential actions but rather the actions of a "Control Board" that oversaw financial management of the District of Columbia. Further, that

case did not involve a question regarding implantation of delegated authority.  Rather, the Control Board in that case had taken an action that was wholly outside of the "parameters set forth in its enabling Act and subsequent legislation."  *Univ. of D.C. Fac. Ass'n*, 163 F.3d at 621.  Because "[n]othing" in the statute "gave the Control Board the authority to repudiate [a] CBA" the court held "the order was without legal effect."  *Id.* at 623.  Here, Plaintiff does not and cannot argue that the President's determinations were wholly outside the parameters of the FSLMRS.  The FSLMRS plainly authorizes the President to "issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President" makes certain determinations, which is exactly what he did.  5 U.S.C. § 7103(b)(1).

Plaintiff also contends that *Cole v. Young* provides a better interpretation of national security work than the FLRA's administrative decision interpreting the phrase in the context here—§ 7103(b)(1).  Pl. Opp. 14–15.  That suggestion is baseless.  The *Cole* Court did not purport to announce a generally applicable definition of "national security" across the United States Code; it construed particular statutory language based on its surrounding statutory context, specifically the eleven agencies expressly included in the act.  Congress's authorization to the President in the FSLMRS is broad—it encompasses "any agency or subdivision," 5 U.S.C. § 7103(b), not a defined set.  As such, it would defy reason to apply the context-specific *Cole* definition here.  And in any event, the Executive Order is consistent with the *Cole* definition, because the designated agencies perform work that is "directly concerned with the Nation's safety."  351 U.S. 536, 543 (1956).

The FSLMRS context should inform the Court's decision.  The FLRA has long interpreted the term "national security" in this statutory scheme at issue here to encompass matters relating to the "economic[] and productive strength" of the country.  *See Dep't of Energy, Oak Ridge*, 4 F.L.R.A. 644, 655–56 (1980).  Plaintiff makes much of the fact that, in *Oak Ridge*, the FLRA looked to *Cole v. Young* for guidance on the interpretation of national security but then ignores

that the FLRA has since consistently applied the *Oak Ridge* definition to its consideration of § 7103(b)(1), and Defendant agencies' functions clearly fall within it. *See id.* at 655–56; *see also U.S. Dep't of Treasury IRS*, 62 F.L.R.A. 298, 303–05 (2007) (finding that the work of IRS security personnel "directly affects national security").

The claims fail here because the FSLMRS "commits the relevant decision to the President's discretion." *AFSA*, at *3. Section 7103(b)(1) "delegates broad authority to the President to exclude parts of the [civil service from 5 U.S.C. Chapter 71] . . . in the interest of national security." *Id.* "Such determinations are consistent with the President's role as commander-in-chief." *Id.* Because the President's determination was not prohibited by statute, and the Fact Sheet and OPM Memorandum are insufficient to establish a violation of the statute, Plaintiff's ultra vires claims fail as a matter of law.

For these reasons, Plaintiff is not entitled to judgment in its favor on its ultra vires claims, and instead Defendants' cross-motion for summary judgment on those claims should be granted.

## IV.    Plaintiff's First Amendment Retaliation Claim Fails.

Plaintiff's First Amendment retaliation claim fails for several reasons. First, Plaintiff has not established the necessary causal connection for its First Amendment retaliation claim. To prevail on such a claim, Plaintiff must prove that: "(1) [it] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link exists between the exercise of a constitutional right and the adverse action taken against [it]." *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 46 (D.D.C. 2021) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)). To establish a "causal link [ ] a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendant's retaliatory action." *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) (quoting *Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.D.C.

2011)).  "Only once the plaintiff meets this burden of showing at least some causal nexus between [its] speech and the alleged retaliatory conduct does the burden shift to the defendant to show why it would have taken the same action even in the absence of any protected activity." *Williams v. Johnson*, 701 F. Supp. 2d 1, 18 (D.D.C. 2010) (citation omitted).  When the Federal Government can show, as here, that it would have taken the challenged action absent the asserted First Amendment activity, a retaliation claim must fail.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see Houston Cnty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022); *see Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 203 (2024) (Jackson, J., concurring) ("Requiring that causal connection to a retaliatory motive is important, because '[s]ome official actions adverse to . . . a speaker might well be unexceptionable if taken on other grounds.'").

As an initial matter, Plaintiff asks this Court to ignore Congress's clear message: that "the President may exclude an agency . . . whenever he 'determines' that the conditions statutorily specified exist." *Reagan*, 870 F.2d at 727 (quoting 5 U.S.C. § 7130(b)(1)).  Section 7103(b)(1) "fairly exudes deference" to the President "and appears . . . to foreclose the application of any meaningful judicial standards of review" regarding the President's conclusion that national-security considerations support exclusions." *Webster v. Doe*, 486 U.S. 592, 600 (1988).  While that latitude afforded the President may not preclude limited judicial review of constitutional claims, *see id.* at 603–04, any such review must reflect the deference afforded the President in national security matters and the presumption he properly discharged his duties.  *See Reagan*, 870 F.2d at 727.  Although courts "do not defer to the [g]overnment's reading of the First Amendment," where litigants assert that the President acted from improper motives in making a determination "involving sensitive and weighty interests of national security," judicial deference is at its zenith— even when the First Amendment is involved, *Hawaii*, 585 U.S. at 708 (quotations omitted).  The Court need only look to the text of the Executive Order to determine whether the President made

the required determinations.  The President did.  *See* Exec. Order No. 14,251, § 1–2.  Accordingly, the inquiry stops there, and the Court should defer to the President's facially legitimate exercise of authority to make the necessary national security determinations.

Plaintiff has not established the requisite causal connection between constitutionally protected activity and the Executive Order in any event.  Plaintiff's primary support for their retaliation claim comes from a White House Press Office Fact Sheet issued the same night as the Executive Order.  *See* Pl. Opp. 28–29.  Statements issued by the White House Press Office are not statements from the President.  Unlike Presidential Memoranda, which are attributed to and signed by the President, Fact Sheets are not direct statements of the President but rather provide information about his policies and actions.  *Compare* The White House, *Strengthening the Suitability and Fitness of the Federal Workforce* (Mar. 20, 2025), https://perma.cc/4YTF-HB6S (signed by President Trump) *with* The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/W93G-Z889 ("Fact Sheet") (unattributed).  And as such, Plaintiff's reliance on *Media Matters for America v. Bailey* is inappropriate.  No. 24-cv-147, 2024 WL 3924573, at *14 (D.D.C. Aug. 23, 2024) (statements found to be relevant by the Court were made by defendant himself and not a spokesperson or press office).  Moreover, Plaintiff does not meaningfully respond to the White House Press Office Fact Sheet's enumeration of permissible bases for the President's determination that certain excluded agencies have as a primary function national security work or Congress's express contemplation that the FSLMRS could not be applied to all agencies consistent with national security.  For example, the Fact Sheet begins by identifying the myriad ways the Executive Order will help protect the national security, including through the "National Defense," "Border Security," "Foreign Relations," "Energy Security," "Pandemic Preparedness, Prevention, and Response," "Cybersecurity," "Economic

Defense," and "Public Safety." *See* Fact Sheet. The Fact Sheet further explains how union activity has impaired agency functioning in a manner that could undermine national security. Not only are such determinations constitutionally permissible, they are the very determinations § 7103(b)(1) entrusts the President to make. Contrary to Plaintiff's assertion that the Fact Sheet constitutes retaliatory animus, the Fact Sheet illustrates ways that union activity can "obstruct agency management" and undermine national-security functions, like requiring Immigration and Customs Enforcement to bargain over cybersecurity measures. *Id.* Far from supporting Plaintiff's invitation to ascribe unconstitutional motives to the President, the Fact Sheet demonstrates the propriety of the President's actions.

Plaintiff also baldly asserts that the Department of the Treasury's litigation strategy in *Department of the Treasury v. NTEU Ch. 73*, No. 25-49 (E.D. Ky.), constitutes evidence of First Amendment retaliation in this case. *See* Pl. Opp. 29–31. Plaintiff fails to identify any basis on which to attribute retaliatory animus to the President from the Department's litigation strategy in a suit filed *after* the Executive Order was issued. Plaintiff moreover mischaracterizes the breadth of the relief sought by the Department in the Eastern District of Kentucky as seeking "to void NTEU's collective-bargaining agreement with the IRS, which is NTEU's largest bargaining unit." *Id.* at 35. Plaintiff's argument is disingenuous at best. As noted during the April 25, 2025 argument in that case, the Department was "seeking a very limited scope of [declaratory] relief in the case against a small number of employees if they choose to exercise it." Tr. of Oral Argument at 46:19, *Dep't of Treasury v. NTEU, Ch. 73*, No. 25-49 (E.D. Ky. Apr. 25, 2025). And contrary to Plaintiff's criticisms of the allegedly "atypical forum," Pl. Opp. 34, in which the Department's "very limited" suit was filed, the Eastern District of Kentucky was the proper venue to sue NTEU Chapter 73. Plaintiff is doing here what it accuses the President of doing—attacking the government for exercising its statutory rights and exercising its right to seek redress in the courts.

Thus, that litigation is hardly evidence of the necessary causation element for Plaintiff's First Amendment retaliation claim.

Finally, Plaintiff's suggestion that the tailoring of the Executive Order to include some but not all subdivisions of an agency is evidence of retaliation lacks merit. Pl. Opp. 33. Indeed, this argument flies in the face of Plaintiff's other arguments here. *See, e.g., id.* at 8. Plaintiff complains that the Executive Order is too tailored and must reflect retaliatory animus but simultaneously suggests that the Executive Order is too broad and must be an *ultra vires* exercise of Presidential power. Plaintiff cannot have it both ways.

Regardless of whether Plaintiff can meet its burden to show causation, it is clear that the President would have taken the same action even without the alleged animus. As the Fact Sheet explained, union activities have impaired agency functioning in a manner that could undermine national security. *See* Fact Sheet (explaining that the FSLMRS can "enable hostile Federal union to obstruct agency management" by impeding agencies from removing employees for poor performance or misconduct and from taking other operational measures including, for example, "modify[ing] cybersecurity policies."). The fact sheet called out certain union activity not as retaliation but to explain how such activity hampers agencies' ability to pursue their national security functions. *See U.S. Dep't of Homeland Sec., U.S. Immigr. & Customs Enf't*, 67 F.L.R.A. 501 (2014). That the President may have considered Plaintiff's union activity in reaching the national-security determinations does not render those determinations unlawful, as even protected speech may be a "wholly legitimate consideration" for determining whether the FSLMRS's requirements can be appropriately applied. *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019) (quotation marks omitted); *see Reichle v. Howards*, 566 U.S. 658, 668 (2012).

Importantly, where it is alleged that animus drove a presidential determination in the national-security context, court review of that determination is limited to "whether the Executive

gave a 'facially legitimate and bona fide' reason for its action." *Hawaii*, 585 U.S. at 703 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972)). Plaintiff's claim of bad faith rests on cherry-picked statements from the White House Press Office's "Fact Sheet" and the OPM Memorandum. Pl. Opp. 12–13. Putting aside whether either document is binding on the President, or can be truly said to reflect his motives, the isolated statements identified by Plaintiff do not carry the same meaning as the documents read as a whole. As the Fact Sheet explains at length, the President signed Executive Order 14,251 in service of two of his top policy priorities: protecting Americans from threats to our national security and improving the efficiency and efficacy of the federal workforce. *See* Fact Sheet. To the extent that the Court considers the Fact Sheet, it should credit these "facially legitimate and bona fide" reasons for the President's actions. *See Hawaii*, 585 U.S. at 703; *Mandel*, 408 U.S. at 770 ("[W]hen the Executive exercises [statutorily delegated authority] . . . on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests" of the plaintiff). Ultimately, Plaintiff's retaliation claim fails as a matter of law because Plaintiff cannot make the required showing that its constitutionally protected conduct was the but-for cause of the President's decision to issue Executive Order 14,251, the President would have taken the same action regardless of Plaintiff's conduct, and there was a legitimate reason for the President's actions even if this Court finds one of his motivations was impermissible. Because the President is entitled to a presumption of regularity here, the only material fact at issue here is whether the President made the required determinations, which Plaintiff concedes he did in its statement of material facts. Pl.'s Resp. 3; *see* Exec. Order No. 14,251, § 1 (making the determinations required by the FSLMRS). Accordingly, the Court should enter judgment in the Government's favor on Plaintiff's retaliation claim.

## V.    Plaintiff Does Not Satisfy the Elements Necessary for a Permanent Injunction.

Plaintiff effectively concedes that its originally requested relief was beyond the authority of this Court because it was not limited to Plaintiff.  Pl. Opp. 41 (conceding that "relief should be limited to the parties here").  Although Plaintiff's revised request is now so limited, *see* ECF No. 48-3 (revised proposed order), Plaintiff has not demonstrated entitlement to that injunction.

First, Plaintiff fails to show that it has suffered an injury caused by Defendant agencies in connection with Plaintiff's claims.  *See* Defs. Mot. 35–36.  As Defendants demonstrated in their opening brief, Plaintiff's claims solely focus on the President's actions, not Defendant agencies'.  Defs. Mot. 36 (citing Compl. ¶¶ 78–95).  Plaintiff's complaint contains three counts, each of which is solely directed at the President.  Compl. at 27 ("Count 1: The President's Executive Order, Section 2 is unlawful and ultra vires because it conflicts with 5 U.S.C. § 71l03(b)(1)."); *id.* at 28 ("Count 2: The President's Executive Order, Section 2 is unlawful and ultra vires because it conflicts with 5 U.S.C. Chapter 71."); *id.* at 30 ("Count 3: The President's Executive Order, Section 2 is unlawful because it reflects retaliation in violation of NTEU's First Amendment rights.").  Plaintiff responds by arguing that it is "well established that 'review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'"  Pl. Opp. 39 (quoting *Reich*, 74 F.3d at 1328; *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring)).  Yet Plaintiff fails to address the disconnect in their Complaint.  It has not brought claims against "the officers who attempt to enforce the President's directive," *cf. Reich*, 74 F.3d at 1328, they have only brought claims against the President.  And they are unable to get relief against the President.  *See Franklin*, 505 U.S. at 828 (Scalia, J., concurring) ("[W]e cannot direct the President to take a specified executive act[.]").

Moreover, the harms that Plaintiff asserts are not irreparable.  Plaintiff argues that Defendants are violating the collective bargaining agreements (CBAs), *see* Pl. Opp. at 40 n.12, but

any violations could be remedied by the processes available to Plaintiff through the FLRA. Nor do the financial injuries asserted by Plaintiff qualify as irreparable injuries. *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) ("[N]othing prevents Union members covered by the Executive Order from voluntarily paying the dues they owe; that is, after all, how most other voluntary membership organizations collect dues.").

The equitable factors also favor the Government. A permanent injunction would inflict irreparable harm on the public and the President by interfering with the national-security determinations entrusted to the President by Congress, *see* Hirt Decl. ¶¶ 4–6, 8; Ballance Decl. ¶¶ 4–8; Molina Decl. ¶¶ 3–7; Trznadel Decl. ¶¶ 3–8; Stephens Decl. ¶¶ 3–7; Norris Decl. ¶¶ 3–8; Holmes Decl. ¶¶ 4–9, and the balance of the equities favors the Government. *See AFSA*, 2025 WL 1742853, at *3. "The competing interests—union representation versus national security—were already weighed by Congress" when it passed the FSLMRS, including § 7103(b). *See id.* Finally, "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest." *Id.* (quoting *NTEU*, 2025 WL 1441563, at *3).

## CONCLUSION

For these reasons and those explained in Defendants' Opposition and Cross-Motion for Summary Judgment, the Court should grant Defendants' cross motion for summary judgment, deny Plaintiff's motion for summary judgment, and enter judgment in favor of Defendants.

Dated: July 17, 2025                    BRETT A. SHUMATE
                                        Assistant Attorney General

                                        YAAKOV M. ROTH
                                        Principal Deputy Assistant Attorney General
                                        EMILY M. HALL
                                        TYLER BECKER
                                        Counsel to the Assistant Attorney General
                                        Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

ALEXANDER K. HAAS
Director
Civil Division, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Branch Director
Civil Division, Federal Programs Branch

 */s/ Lydia J. Jines*
LYDIA JINES (MD Bar No. 2205230001)
JEREMY MAURITZEN
SYED N. AHMAD
Trial Attorneys
LISA ZEIDNER MARCUS
Senior Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L St., NW, Twelfth Floor
Washington, DC 20530
Tel: (202) 353-5652
Fax: (202) 616-8470
Email: Lydia.Jines@usdoj.gov

*Counsel for Defendants*